The Honorable Judge John C. Coughenour

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

STATE OF WASHINGTON; STATE OF
ARIZONA; STATE OF ILLINOIS; and
STATE OF OREGON,

                Plaintiffs,

  v.

DONALD TRUMP, in his official capacity
as President of the United States; U.S.
DEPARTMENT OF HOMELAND
SECURITY; BENJAMINE HUFFMAN, in
his official capacity as Acting Secretary of
Homeland Security; U.S. SOCIAL
SECURITY ADMINISTRATION;
MICHELLE KING, in her official capacity
as Acting Commissioner of the Social
Security Administration; U.S.
DEPARTMENT OF STATE; MARCO
RUBIO, in his official capacity as Secretary
of State; U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
DOROTHY FINK, in her official capacity
as Acting Secretary of Health and Human
Services; U.S. DEPARTMENT OF
JUSTICE; JAMES MCHENRY, in his
official capacity as Acting Attorney
General; U.S. DEPARTMENT OF
AGRICULTURE; GARY WASHINGTON,
in his official capacity as Acting Secretary
of Agriculture; and the UNITED STATES
OF AMERICA,

                Defendants.

NO. 2:25-cv-00127

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER

NOTE ON MOTION CALENDAR:
JANUARY 21, 2025

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................. 1

II.   BACKGROUND................................................................................................... 2

    A.   President Trump Issues the Citizenship Stripping Order on Day One of His
        Presidency................................................................................................... 2

    B.   The Citizenship Stripping Order Will Immediately Disrupt Plaintiff States'
        Programs and Upset the Lives of Hundreds of Thousands of Children ................... 4

III.  ARGUMENT ...................................................................................................... 6

    A.   The States Have Standing to Bring This Action Based on Their Pecuniary and
        Proprietary Interests..................................................................................... 6

    B.   The Plaintiff States' Claims Are Likely to Succeed on the Merits Because
        Birthright Citizenship Is a Cornerstone of American Constitutional and
        Statutory Law That Is Beyond Serious Dispute................................................. 8

        1.   Birthright Citizenship Is Enshrined in the Constitution and Federal
            Statute............................................................................................. 9

    C.   The Citizenship Stripping Order Will Immediately and Irreparably Harm the
        Plaintiff States............................................................................................ 15

    D.   The Equities and Public Interest Weigh Strongly in the Plaintiff States' Favor ..... 20

IV.   CONCLUSION .................................................................................................... 24

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

i

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Aptheker v. Sec'y of State,*
  378 U.S. 500 (1964) ............................................................................................................ 21

*Betschart v. Oregon,*
  103 F.4th 607 (9th Cir. 2024) ........................................................................................... 20

*Biden v. Nebraska,*
  --- U.S. ----, 143 S. Ct. 2355 (2023) .................................................................................. 6

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ............................................................................................ 15

*Chin v. United States,*
  43 App. D.C. 38 (D.C. App. Ct. 1915) ............................................................................ 14

*City & Cnty. of San Francisco v. U.S. Citizen & Immigr. Servs.,*
  408 F. Supp. 3d 1057 (N.D. Cal. 2019) ........................................................................... 15

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) ........................................................................................................... 6

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ........................................................................................................... 9

*Dred Scott v. Sanford,*
  60 U.S. 393 (1857) .............................................................................................. 1, 10, 20

*Elk v. Wilkins,*
  112 U.S. 94 (1884) ........................................................................................................... 10

*Fedorenko v. United States,*
  449 U.S. 490 (1981) ........................................................................................................... 4

*Gee v. United States,*
  49 F. 146 (9th Cir. 1892) .................................................................................................. 13

*Idaho v. Coeur d'Alene Tribe,*
  794 F.3d 1039 (9th Cir. 2015); ........................................................................................ 15

*INS v. Rios-Pineda,*
  471 U.S. 444 (1985) ......................................................................................................... 13

*Juarez v. Asher,*
  556 F. Supp. 3d 1181 (W.D. Wash. 2021) ........................................................................ 6

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

ii

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016)...................................................................... 20

*Louie v. United States*,
   238 F.75 (3d Cir. 1916) ............................................................................ 14

*Morrison v. California*,
   291 U.S. 82 (1934) .................................................................................... 13

*Moy Suey v. United States*,
   147 F. 697 (7th Cir. 1906) ........................................................................ 14

*Perkins v. Elg*,
   307 U.S. 325 (1939) .................................................................................. 13

*Plyler v. Doe*,
   457 U.S. 202 (1982) ............................................................................ 10, 12

*Regan v. King*,
   49 F. Supp. 222 (N.D. Cal. 1942) ............................................................ 13

*Sagana v. Tenorio*,
   384 F.3d 731 (9th Cir. 2004) .................................................................... 10

*Santa Clara v. Trump*,
   250 F. Supp. 3d 497 (N.D. Cal. 2017) ..................................................... 19

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) ...................................................................... 6

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) .................................................................... 15

*Trop v. Dulles*,
   356 U.S. 86 (1958) .................................................................................... 21

*United States v. Texas*,
   599 U.S. 670 (2023) .................................................................................... 6

*United States v. Wong Kim Ark*,
   169 U.S. 649 (1898) ............................................................................ 12, 13

*Washington v. Trump*,
   C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017) ................. 19

*Washington v. U.S. Food & Drug Admin.*,
   668 F. Supp. 3d 1125 (E.D. Wash. 2023) ................................................ 15

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................................ 6

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

iii

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

*Wolford v. Lopez*,
   116 F.4th 959 (9th Cir. 2024). ........................................................................ 20

## **Statutes**

8 U.S.C. § 1611(a) ............................................................................................... 16

8 U.S.C. § 1611(c)(1)(B) ..................................................................................... 16

22 U.S.C. § 211(a) ............................................................................................... 14

42 U.S.C. § 1396b(v) ........................................................................................... 16

42 U.S.C. § 1395dd(b) ......................................................................................... 17

42 U.S.C. § 1397bb ............................................................................................. 16

## **Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ................................................................................. 9

U.S. Const. amend. XXII ...................................................................................... 20

U.S. Const. amend. XXVI .................................................................................... 20

U.S. Const. art 1, §§ 2-3 ...................................................................................... 20

U.S. Const. art. 2, § 1 .......................................................................................... 20

## **Rules**

Fed. R. Civ. P. 65(b)(1) ......................................................................................... 6

## **Regulations**

42 C.F.R. § 435.406 ............................................................................................. 16

## **Other Authorities**

Amanda Frost,
   *Paradoxical Citizenship*,
   65 Wm. & Mary L. Rev. 1177 (2024) ............................................................. 11

Christopher L. Eisgruber,
   *Birthright Citizenship and the Constitution*,
   72 N.Y.U. L. Rev. 54 (1997) .......................................................................... 11

Gabriel J. Chin & Paul Finkelman,
   *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal
   Immigration Regulation*,
   54 U.C. Davis L. Rev. 2215 (2021) ................................................................ 11

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

iv

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Garrett Epps,
*The Citizenship Clause: A "Legislative History,"*
60 Am. Univ. L. Rev. 331 (2010) ........................................................................ 11

James C. Ho,
*Defining "American:" Birthright Citizenship and the Original Understanding of the
14th Amendment* in *Made in America, Myths & Facts About Birthright Citizenship,*
Imm. Pol'y Ctr., Sept. 2009 ................................................................................ 11

*Legislation Denying Citizenship at Birth to Certain Children Born in the United States,*
19 Op. O.L.C. 340, 1995 WL 1767990 (1995) .................................................... 14

Michael H. LeRoy,
*The Labor Origins of Birthright Citizenship,*
37 Hofstra Lab. & Emp. L.J. 39 (2019) .............................................................. 10

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

v

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

# I.    INTRODUCTION

The Citizenship Clause of the Fourteenth Amendment emerged out of one of our Nation's darkest chapters and embodies one of its most solemn promises. It was passed and ratified following the Civil War to overturn the Supreme Court's infamous holding in *Dred Scott v. Sanford*, 60 U.S. 393 (1857), which denied citizenship to an entire class of persons—descendants of enslaved people. The Citizenship Clause repudiated *Dred Scott* and reaffirmed the longstanding common law principle of *jus soli*: All individuals born in the United States and subject to its jurisdiction are citizens. Its operation is automatic and its scope broad. It provides our Nation a bright-line and nearly universal rule under which citizenship cannot be conditioned on one's race, ethnicity, alienage, or the immigration status of one's parents. And since its adoption, the Supreme Court, Congress, and the Executive Branch have continuously and unanimously affirmed both its breadth and its foundational principle that birth in the United States confers citizenship, with all its benefits and privileges.

President Trump and the federal government now seek to impose a modern version of *Dred Scott*. But nothing in the Constitution grants the President, federal agencies, or anyone else authority to impose conditions on the grant of citizenship to individuals born in the United States. The President's Executive Order of January 20, 2025—the Citizenship Stripping Order— declares that children born to parents who are undocumented or who have lawful, but temporary, status lack citizenship and directs federal agencies to deprive those individuals of their rights. It is flatly contrary to the Fourteenth Amendment's text and history, century-old Supreme Court precedent, longstanding Executive Branch interpretation, and the Immigration and Nationality Act. The Plaintiff States are therefore exceedingly likely to succeed on the merits of their claims.

Absent immediate relief, the Citizenship Stripping Order will work substantial and irreparable harm to the Plaintiff States and their residents: More than 150,000 newborn children who are born each year in the United States will be denied citizenship under the Citizenship Stripping Order because their parents are undocumented; more than 1,100 such children are born

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

in the Plaintiff States each month. These numbers represent only a conservative baseline—because the Order also denies citizenship to children born to parents who have lawful, temporary status, its reach will be even broader. As a result of the Citizen Stripping Order, the Plaintiff States will suffer direct losses of federal funds that are conditioned on their residents' citizenship and will incur immediate, substantial, and unbudgeted expenditures to implement the massive changes required to state programs and systems, none of which the Plaintiff States can recoup through this case or otherwise.

The Plaintiff States will also suffer irreparable harm because thousands of children will be born within their borders but denied full participation and opportunity in American society. Absent a temporary restraining order, children born in the Plaintiff States will soon be rendered undocumented, subject to removal or detention, and many stateless. They will be denied their right to travel freely and re-enter the United States. They will lose their ability to obtain a Social Security number (SSN) and work lawfully as they grow up. They will be denied their right to vote, serve on juries, and run for certain offices. And they will be placed into positions of instability and insecurity as part of a new, Presidentially-created underclass in the United States.

A temporary restraining order is imperative to protect the Plaintiff States and their public agencies, public programs, public fiscs, and state residents against the egregiously illegal actions of the President and federal government. The Court should enjoin the Citizenship Stripping Order immediately.[1]

## II.     BACKGROUND

### A.     President Trump Issues the Citizenship Stripping Order on Day One of His Presidency

On January 20, 2025, President Trump issued an Executive Order entitled "Protecting the Meaning and Value of American Citizenship." Compl. for Decl. & Inj. Relief ("Compl.") ¶ 2; Declaration of Lane Polozola, Ex. 1. This action follows years of President Trump's threats

---

[1] Pursuant to Federal Rule of Civil Procedure 65(b) and Local Civil Rule 65(b), Plaintiffs' counsel has provided notice of this motion to Defendants' counsel. *See* Declaration of Lane Polozola ¶ 4.

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    and promises to attempt to end birthright citizenship as a political tool to deter immigration to

2    the United States. In his most recent campaign, he pledged to end birthright citizenship to

3    "eliminate a major incentive for illegal immigration, discourage future waves of illegal

4    immigration to exploit this misapplication of citizenship, and encourage illegal aliens in the U.S.

5    to return home." Compl. ¶ 46; Polozola Decl., Ex. 2. After the 2024 election, President-Elect

6    Trump again promised to overhaul the Fourteenth Amendment and issue an executive order

7    "directing federal agencies to require a child to have at least one parent be either a U.S. citizen

8    or legal permanent resident to automatically become a U.S. citizen." Compl. ¶ 47; Polozola

9    Decl., Ex. 3.

10            The Citizenship Stripping Order is the promised Executive Order. It declares that U.S.

11   citizenship "does not automatically extend to persons born in the United States" if (1) the

12   individual's mother is "unlawfully present in the United States and the father was not a citizen

13   or lawful permanent resident at the time of said person's birth"; or (2) the "person's mother's

14   presence in the United States at the time of said person's birth was lawful but temporary . . . and

15   the father was not a United States citizen or lawful permanent resident at the time of said person's

16   birth." Polozola Decl., Ex. 1. The Order states that, effective in 30 days, it is the "policy of the

17   United States" that no department or agency of the federal government shall issue documents

18   recognizing such persons as U.S. citizens, nor accept documents issued by State governments

19   recognizing such persons as U.S. citizens. *Id.* The Order directs the Secretary of State, the

20   Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security

21   to "take all appropriate measures to ensure that the regulations and policies of their respective

22   departments and agencies are consistent with this order[.]" *Id.* Finally, the Order directs that "the

23   heads of all executive departments and agencies shall issue public guidance within 30 days of

24   the date of this order regarding this order's implementation with respect to their operations and

25   activities." *Id.*

26

**B.**    **The Citizenship Stripping Order Will Immediately Disrupt Plaintiff States' Programs and Upset the Lives of Hundreds of Thousands of Children**

Citizenship confers the "right to full and equal status in our national community, a right conferring benefits of inestimable value upon those who possess it." *Fedorenko v. United States*, 449 U.S. 490, 522 (1981) (Blackmun, J., concurring). At the highest level, "citizenship confers legal, political, and social membership in the United States, thus creating paths to mobility." Declaration of Caitlin Patler ¶ 9. It guarantees the opportunity to participate and belong in society—to live free from fear of deportation, vote, serve on a jury, and travel. Compl. ¶¶ 55-63; *see* Declaration of Matt Adams ¶¶ 7, 9; Declaration of David Baluarte ¶¶ 12-15. It further provides the opportunity to achieve economic, health, and educational potential through the right to work legally and eligibility for social supports, such as federally-backed healthcare benefits, cash and food assistance during vulnerable times or emergencies, and eligibility for federal student financial aid. Compl. ¶¶ 64-65, 71-90; Patler Decl. ¶¶ 10-13, 16-17; Declaration of Tom Wong ¶¶ 11-14; Declaration of Sarah Peterson Decl. ¶¶ 5, 8-10.

By purporting to revoke birthright citizenship, the Citizenship Stripping Order seeks to immediately deny these rights and benefits to more than 150,000 children born each year in the United States, condemning most to a life without authorized immigration status and some to statelessness. Compl. ¶ 3; Declaration of Shelley Lapkoff ¶ 10; Baluarte Decl. ¶¶ 9-10; Adams Decl. ¶ 5-10 ("the vast majority of persons subject to the Order will remain without any path to lawful immigration status . . . forced to remain undocumented"). Instead of the right to full participation and belonging in their home country—the United States—these children will be forced to live "in the shadow," under the constant risk of deportation and unable to obtain work authorization as they grow up, interrupting their "ability to count on the promise of the future." Patler Decl. ¶¶ 20-21; *see also* Compl. ¶¶ 56, 64-65; Adams Decl. ¶¶ 5, 9-10, 12; Baluarte Decl. ¶¶ 12-15. The consequences will be severe and long-lasting: Undocumented students are less likely to complete high school or enroll in higher education and will earn less at almost every

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1   stage of the lifetimes than their citizen counterparts. Compl. ¶ 64; Patler Decl. ¶¶ 10-12; Wong

2   Decl. ¶¶ 11-12, 14. They will be more likely than their citizen peers to experience disease,

3   depression, anxiety, and social isolation. Compl. ¶ 64; Patler Decl. ¶¶ 18-19, 22. And they will

4   be ineligible for food and cash assistance, critical benefits to prevent childhood poverty and

5   ensure access to nutrition. Compl. ¶¶ 71-90; Peterson Decl. ¶¶ 8-9; Patler Decl. ¶¶ 17-18. Stated

6   differently, "denying birthright citizenship to children born in the U.S. to undocumented parents

7   will create a permanent underclass of people who are excluded from U.S. citizenship and are

8   thus not able to realize their full potential." Wong Decl. ¶ 10. "Birthright citizenship is a

9   cornerstone of the U.S. identity as a nation of immigrants, promoting social cohesion,

10  opportunity, and mobility. Ending birthright citizenship would erode those principles and divide

11  our national community, creating and reinforcing vast inequality for generations to come." Patler

12  Decl. ¶ 27.

13      The Citizenship Stripping Order will also directly injure the Plaintiff States by reducing

14  their federal funding or reimbursements through programs that the States administer, such as

15  Medicaid, the Children's Health Insurance Program (CHIP), Title IV-E foster care and adoption

16  assistance programs, and programs to facilitate streamlined issuance of SSNs to eligible babies—

17  among others. Compl. ¶¶ 72-92; *see also* Declaration of Charissa Fotinos ¶¶ 21-28; Declaration

18  of Jenny Heddin ¶¶ 11-21; Declaration of Katherine Hutchinson ¶¶ 9-13; Declaration of Jeffery

19  Tegen ¶¶ 8-17, 21-26; Declaration of Krystal Colburn ¶¶ 12-15; Declaration of Nadine J.

20  O'Leary ¶¶ 19-22; Declaration of Jennifer Woodward ¶ 13. And in addition to direct and

21  substantial financial losses, the Plaintiff States will also be required—on no notice and at

22  enormous burden and expense—to immediately begin modifying their funding and operational

23  structures and administration of programs to account for this change. Compl. ¶¶ 93-101; Fotinos

24  Decl. ¶¶ 14-19, 21-28; Heddin Decl. ¶¶ 18-21; Hutchinson Decl. ¶¶ 14-18; Tegen Decl. ¶¶ 18-

25  20; O'Leary Decl. ¶¶ 7-13, 23; Woodward Decl. ¶¶ 14-18.

26

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### III.    ARGUMENT

A temporary restraining order is warranted where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65(b)(1); *Juarez v. Asher*, 556 F. Supp. 3d 1181, 1187 (W.D. Wash. 2021); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). All factors strongly favor the Plaintiff States here, and this Court should enter a TRO to prevent the cascade of irreparable and immediate harm that will follow if the Order is allowed to stand.

### A.    The States Have Standing to Bring This Action Based on Their Pecuniary and Proprietary Interests

As a threshold matter, the Plaintiff States may seek redress for the direct and immediate harms the Citizenship Stripping Order will impose on the States and their residents. The Plaintiff States provide health, social, and administrative services to their residents and will, as a result of the Order, lose substantial federal funds they currently receive and face immediate unbudgeted expenditures to rework programs' operations. As the Supreme Court has explained, "[m]onetary costs are of course an injury[,]" *United States v. Texas*, 599 U.S. 670, 676 (2023), and such losses are "sufficiently concrete and imminent injury to satisfy Article III." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019). Indeed, where the federal government's action causes a reduction in the number of individuals a state entity serves—and therefore a loss of revenue earned—the loss is unquestionably sufficient for standing. *Biden v. Nebraska*, --- U.S. ----, 143 S. Ct. 2355, 2365-66 (2023) (holding Missouri had standing to challenge federal action cancelling student loans because state entity serviced loans under contract with the federal government, and the state alleged the challenged action would cost it millions in fees "it otherwise would have earned under its contract").

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

The Plaintiff States here will suffer precisely these same kinds of immediate financial losses because of the Citizenship Stripping Order and thus have standing to bring this case. Thousands of babies born each year will be subject to the Citizenship Stripping Order: at a minimum there will be approximately 4,000 in Washington, 5,200 in Illinois, 3,400 in Arizona, and 1,500 in Oregon. Compl. ¶ 3; Lapkoff Decl. ¶¶ 11-15. These estimates of the numbers of babies born to two undocumented parents are even fewer than the Order will reach. Compl. ¶¶ 3, 92; Lapkoff Decl. ¶ 16. These children, if denied citizenship, will no longer be eligible for federally-funded medical benefits and social services provided through programs that the Plaintiff States administer pursuant to federal law, including Medicaid, CHIP, and foster care and adoption assistance programs. Compl. ¶¶ 94-100; Fotinos Decl. ¶¶ 21-28; Heddin Decl. ¶¶ 6, 11-13; Tegen Decl. ¶¶ 8-17, 23-25. The result is that the Citizenship Stripping Order will directly injure the state agencies that will lose reimbursement dollars for services provided through established federal programs. Compl. ¶¶ 75-82, 86-89, 91-92. With respect to healthcare coverage and foster care services, the Plaintiff States will be forced to bear the increased costs of providing essential and mandatory benefits solely with state funds and resources. Compl. ¶¶ 72-82; *see* Fotinos Decl. ¶¶ 21-28 (Washington's Health Care Authority estimating likely loss of nearly $7 million per year if approximately 4,000 children become ineligible for Medicaid or CHIP coverage); Heddin Decl. ¶¶ 11-19 (detailing how each loss of an eligible child will negatively impact Washington's foster care reimbursements under Title IV-E); Tegen Decl. ¶¶ 23-25 (Arizona Health Care Cost Containment System (AHCCCS) estimating expected reduction in federal revenue to the state for medical care for children of $321,844,600 over the first 18 years of life for those subject to the Order).

The States will also lose reimbursements under the Social Security Administration's longstanding Enumeration at Birth program. Compl. ¶¶ 91-92; Hutchinson Decl. ¶¶ 9-13 (detailing expected loss of $16,000 per year in federal reimbursements to Washington's Department of Health due to decrease in the number of newborns assigned SSNs at birth);

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

7

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Colburn Decl. ¶¶ 12-15 (revocation of birthright citizenship to children born in Arizona will result in reduced EAB funding to the state); O'Leary Decl. ¶¶ 19-22 (estimating loss of EAB funds to Illinois due to the Order of $21,788 to $38,129); Woodward Decl. ¶¶ 12-13 (estimating loss of funds to Oregon due to the Order of likely more than $7,230 a year). And the States will immediately suffer significant operational disruptions and administrative burdens within state agencies and state-run-healthcare facilities as they try to navigate the chaos and uncertainty the Citizenship Order creates. Compl. ¶¶ 93-101; *see* Declaration of Brian Reed ¶ 7 (detailing disruptions to "services UW Medicine provides to newborns in the neonatal intensive care unit (NICU)"); Fotinos Decl. ¶¶ 25-28 (detailing HCA's need to develop extensive training and guidance in response to a denial of birthright citizenship to children born in the United States, which it estimates will require 7-8 FTEs and take two to three years to complete); Hutchinson Decl. ¶¶ 14-18 (detailing Washington DOH's likely need to devote "substantial operational time, manpower resources, and technological resources" to change Washington's vital records system in response to the Order); Heddin Decl. ¶¶ 20-21 (explaining that Washington's DCYF will need to amend and update processes related to Title IV-E eligibility determination, training, and divert staff resources from existing projects); Tegen Decl. ¶¶ 18-20 (estimates it would cost $2.3-4.4 million and require 12 months to update Arizona's three systems to determine eligibility for healthcare coverage); O'Leary Decl. ¶¶ 13, 23 (state-run healthcare facilities would incur new administrative costs to implement new systems registration of newborns). These harms and more are detailed below, and there is no doubt that they confer standing upon the Plaintiff States to challenge the Citizenship Stripping Order. *See infra* § III.C.

**B.    The Plaintiff States' Claims Are Likely to Succeed on the Merits Because Birthright Citizenship Is a Cornerstone of American Constitutional and Statutory Law That Is Beyond Serious Dispute**

The Plaintiff States will succeed on the merits because the Citizenship Stripping Order unlawfully attempts to rob individuals born in the United States of their constitutionally conferred citizenship. A wall of Supreme Court, Ninth Circuit, and Executive Branch authority

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    all make clear that children born in the United States in the coming weeks are citizens—just like

2    all children born in the United States for more than 150 years.

3        **1.**    **Birthright Citizenship Is Enshrined in the Constitution and Federal Statute**

4        The Citizenship Stripping Order is unlawful because its limited view of birthright

5    citizenship is contrary to the Fourteenth Amendment's text and history, century-old Supreme

6    Court precedent, and longstanding Executive Branch interpretation, as well as the Immigration

7    and Nationality Act (INA). Section 1 of the Fourteenth Amendment to the Constitution states:

8    "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are

9    citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1.

10    This provision is known as the Citizenship Clause, and it contains no exceptions for children

11    born to non-citizens or undocumented immigrants. Likewise, the INA faithfully tracks the

12    Citizenship Clause's language, stating: "The following shall be nationals and citizens of the

13    United States at birth:[] a person born in the United States, and subject to the jurisdiction

14    thereof[.]" 8 U.S.C. § 1401(a). Any violations of the Citizenship Clause likewise violate the INA

15    because Congress adopted identical language.

16        The meaning of the Fourteenth Amendment begins with the text. As the Supreme Court

17    has explained, "[t]he Constitution was written to be understood by the voters; its words and

18    phrases were used in their normal and ordinary as distinguished from technical meaning."

19    *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008). And the text is expressly broad: "*All*

20    persons born or naturalized in the United States, and subject to the jurisdiction thereof, are

21    citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1

22    (emphasis added). The Citizenship Clause contains no exceptions based on the citizenship,

23    immigration status, or country of origin. Rather, the Citizenship Clause's only requirements are

24    that an individual be born "in the United States" and "subject to the jurisdiction thereof."

25        The only individuals excluded are those who are *not* in fact subject to the jurisdiction of

26    the United States at birth—the children of diplomats covered by diplomatic immunity and

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

children born to foreign armies at war against the United States while on United States soil.[2] Not excepted are children born in the United States, even if their parents are undocumented. They must comply with U.S. law; so too must their parents. Undocumented immigrants pay taxes, must register for the Selective Service, and must otherwise follow—and are protected by—the law just like anyone else within the United States' territorial sweep. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 211 (1982) ("That a person's initial entry into a State, or into the United States, was unlawful . . . cannot negate the simple fact of his presence within the State's territorial perimeter. Given such presence, he is subject to the full range of obligations imposed by the State's civil and criminal laws."); *Sagana v. Tenorio*, 384 F.3d 731, 740 (9th Cir. 2004) ("Aliens who are in the jurisdiction of the United States under any status, even as illegal entrants or under a legal fiction, are entitled to the protections of the Fourteenth Amendment.").

The history of the Citizenship Clause confirms this longstanding, recognized meaning of its plain language. Birthright citizenship stems from English common law's principle of *jus soli*—citizenship determined by birthplace. *See* Michael H. LeRoy, *The Labor Origins of Birthright Citizenship*, 37 Hofstra Lab. & Emp. L.J. 39, 66–67 (2019). The American colonies accepted and relied on that common law principle until *Dred Scott* denied citizenship to descendants of enslaved individuals in 1857. *See id.* at 74; *Dred Scott*, 60 U.S. at 417-18. In response to *Dred Scott* and the Civil War, Congress and the States adopted the Fourteenth Amendment to once again make clear that birthright citizenship is enshrined in the United States with only narrow exceptions for the limited group of individuals who are truly not subject to United States law. *See Elk v. Wilkins*, 112 U.S. 94, 101 (1884) ("The main object of the opening sentence of the fourteenth amendment was to settle the question . . . and to put it beyond doubt

---

[2] The Plaintiff States note that despite the original understanding for purposes of the Fourteenth Amendment that children born to tribal members are not subject to the United States' jurisdiction at birth, it is well established under a federal statute passed in 1924 that such children *are* granted U.S. citizenship at birth. *See* 8 U.S.C. § 1401(b).

PLAINTIFF STATES' MOTION FOR TEMPORARY RESTRAINING ORDER CASE NO. 2:25-CV-00127

10

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

that all persons . . . born or naturalized in the United States, and owing no allegiance to any alien power, should be citizens of the United States and of the state in which they reside.").

The Fourteenth Amendment's ratification history makes clear that the Citizenship Clause's universal nature was known—and indeed was the motivation for its passage. *See, e.g.*, Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215, 2227 (2021) ("Congress had indeed identified a category of people who were not allowed to be here, and who could be deported under federal law if found in the United States. Nevertheless, through the Fourteenth Amendment, Congress made the children of illegally imported slaves and free blacks U.S. citizens if born in the United States."); Christopher L. Eisgruber, *Birthright Citizenship and the Constitution*, 72 N.Y.U. L. Rev. 54, 65 (1997) ("[T]he children of illegal aliens are certainly 'subject to the jurisdiction of the United States' in the sense that they have no immunity from American law."); James C. Ho, *Defining "American:" Birthright Citizenship and the Original Understanding of the 14th Amendment* in *Made in America, Myths & Facts About Birthright Citizenship*, Imm. Pol'y Ctr., Sept. 2009, at 12 ("[N]othing in text or history suggests that the drafters intended to draw distinctions between different categories of aliens. To the contrary, text and history confirm that the Citizenship Clause reaches all persons who are subject to U.S. jurisdiction and laws, regardless of race or alienage."). All involved in passage of the Citizenship Clause understood its breadth and bright-line nature. *See, e.g.*, Amanda Frost, *Paradoxical Citizenship*, 65 Wm. & Mary L. Rev. 1177, 1187 (2024) ("[T]he 39th Congress initially toyed with a birthright citizenship provision that would maintain a race-based citizenship standard, granting citizenship at birth only to Blacks and Whites, but then chose instead to adopt universal birthright citizenship."); Garrett Epps, *The Citizenship Clause: A "Legislative History,"* 60 Am. Univ. L. Rev. 331, 352–59 (2010) (detailing congressional debate); *see also Plyler*, 457 U.S. at 214 ("Although the congressional debate concerning § 1 of the Fourteenth Amendment was

1    limited, that debate clearly confirms the understanding that the phrase 'within its jurisdiction'

2    was intended in a broad sense.").

3        This understanding of the Citizenship Clause is cemented by controlling U.S. Supreme

4    Court precedent which, more than 125 years ago, confirmed that the Fourteenth Amendment

5    guarantees citizenship to the children of immigrants born in the United States. *United States v.*

6    *Wong Kim Ark*, 169 U.S. 649, 654 (1898). As the Supreme Court explained: "*Every citizen or*

7    *subject of another country*, while domiciled here, is within the allegiance and the protection, and

8    consequently subject to the jurisdiction, of the United States." *Id.* at 693 (emphasis added).

9    Consequently, the Court held that a child born in San Francisco to Chinese citizens was an

10   American citizen by birthright. *Id.* at 704. In reaching this conclusion, the Court reasoned that

11   the Fourteenth Amendment "affirms the ancient and fundamental rule of citizenship by birth

12   within the territory, in the allegiance and under the protection of the country, including all

13   children here *born of resident aliens*." *Id.* at 693 (emphasis added). The Court noted that only

14   three groups are excluded by the Citizenship Clause because they were not subject to U.S.

15   jurisdiction: children of Indian tribes, as well as "children born of alien enemies in hostile

16   occupation, and children of diplomatic representatives of a foreign state—both of which . . . from

17   the time of the first settlement of the English colonies in America, had been recognized

18   exceptions to the fundamental rule of citizenship by birth within the country." *Id.* at 682. And in

19   language that remains apt to today's dispute, the Court explained that the Citizenship Clause "is

20   throughout affirmative and declaratory, intended to allay doubts and to settle controversies which

21   had arisen, and not to impose any new restrictions upon citizenship." *Id.* at 688.

22       In addition to *Wong Kim Ark*, the Supreme Court has separately made clear that

23   undocumented immigrants are "subject to the jurisdiction" of the United States. In *Plyler v. Doe*,

24   457 U.S. 202 (1982), the Court interpreted the Fourteenth Amendment's Equal Protection

25   Clause—the sentence immediately following the Citizenship Clause—and explained that the

26   term "within its jurisdiction" makes plain that "the Fourteenth Amendment extends to anyone,

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

12

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

citizen or stranger, who *is* subject to the laws of a State, and reaches into every corner of a State's territory." *Id.* at 215. As the Court explained, "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." *Id.* at 211 n.10. The Court further confirmed that the phrases "within its jurisdiction" and "subject to the jurisdiction thereof" in the first and second sentences of the Fourteenth Amendment have the same meaning. *Id.*

These are merely the most notable examples of the judiciary's steadfast protection of the Fourteenth Amendment's birthright citizenship guarantee. The Supreme Court, the Ninth Circuit, and other courts have repeatedly confirmed that individuals born in this country are citizens subject to its jurisdiction regardless of their parents' status or country of origin. *See*, *e.g.*, *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (recognizing that child of two undocumented immigrants "was a citizen of this country" by virtue of being "born in the United States"); *Perkins v. Elg*, 307 U.S. 325, 328 (1939) ("[A] child born here of alien parentage becomes a citizen of the United States"); *Morrison v. California*, 291 U.S. 82 (1934) (recognizing a child born here is a U.S. citizen even when racial bars would have rendered them ineligible to be naturalized if they had been born abroad). During World War II, the Ninth Circuit affirmed a district court's rejection of an attempt to strike from voter rolls 2,600 people of Japanese descent who were born in the United States. *Regan v. King*, 49 F. Supp. 222, 223 (N.D. Cal. 1942), *aff'd*, 134 F.2d 413 (9th Cir. 1943), *cert denied*, 319 U.S. 753 (1943) (internal citations omitted). As the district court explained, it was "unnecessary to discuss the arguments of counsel" that challenged those individuals' citizenship because it was "settled" that a child born "within the United States" is a U.S. citizen. *Id.* And even before *Wong Kim Ark*, the Ninth Circuit had confirmed the same. *Gee v. United States*, 49 F. 146, 148 (9th Cir. 1892) (Chinese exclusion

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

13

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    laws "are inapplicable to a person born in this country, and subject to the jurisdiction of its

2    government, even though his parents were not citizens, nor entitled to become citizens").[3]

3         The Executive Branch, too, has long endorsed this understanding of the Citizenship

4    Clause. When the U.S. Department of Justice's Office of Legal Counsel (OLC) was asked in

5    1995 to assess the constitutionality of a bill that would deny citizenship to children unless a

6    parent was a citizen or a permanent resident alien, OLC reasoned that "[t]his legislation is

7    unquestionably unconstitutional." *Legislation Denying Citizenship at Birth to Certain Children*

8    *Born in the United States*, 19 Op. O.L.C. 340, 1995 WL 1767990 at *2 (1995) ("My office

9    grapples with many difficult and close issues of constitutional law. The lawfulness of this bill is

10   not among them."). As recognized by OLC, "Congress and the States adopted the Fourteenth

11   Amendment in order to place the right to citizenship based on birth within the jurisdiction of the

12   United States *beyond question*." *Id.* at *1. By enshrining the right in the Constitution, "the text

13   and legislative history of the citizenship clause as well as consistent judicial interpretation make

14   clear that the amendment's purpose was to remove the right of citizenship by birth from

15   transitory political pressures." *Id.* at *5.

16        Executive agencies have accordingly accepted this foundational understanding and built

17   daily government functions around the Citizenship Clause's plain meaning. For example, the

18   U.S. Department of State is granted the authority under federal law to issue U.S. passports.

19   22 U.S.C. § 211(a). As explained in the State Department's Foreign Affairs Manual, "[a]ll

20   children born in and subject, at the time of birth, to the jurisdiction of the United States acquire

21   U.S. citizenship at birth even if their parents were in the United States illegally at the time of

22   birth." Compl. ¶ 40; Polozola Decl., Ex. 4. The State Department's Application for a U.S.

23

24       [3] *See also Louie v. United States*, 238 F.75, 76 (3d Cir. 1916) (concluding it was "conclusively established
     that a child born in the United States of Chinese parents domiciled in the United States, becomes, at the time of his
     birth, a citizen of the United States"); *Chin v. United States*, 43 App. D.C. 38, 42 (D.C. App. Ct. 1915) ("If it be
25   true that Chin Wah was born of Chinese parents domiciled in California, and not employed in any diplomatic or
     official capacity, he became at his birth a citizen of the United States"); *Moy Suey v. United States*, 147 F. 697, 698
26   (7th Cir. 1906) ("Nativity gives citizenship, and is a right under the Constitution. It is a right that congress would
     be without constitutional power to curtail or give away.").

14

Passport confirms that for "Applicants Born in the United States" a U.S. birth certificate alone is sufficient to prove one's citizenship. Compl. ¶ 40; Polozola Decl., Ex. 5. And USCIS, likewise, confirms in public guidance that "[i]f you were born in the United States, you do not need to apply to USCIS for any evidence of citizenship. Your birth certificate issued where you were born is proof of your citizenship." Compl. ¶ 40; Polozola Decl., Ex. 6.

In short, with the stroke of a pen, the Citizenship Stripping Order seeks to overrule 150 years of consensus among government officials from all three branches of government as to the Citizenship Clause's established meaning. But the Constitution does not confer upon the President the authority to condition or deny birthright citizenship to children born on American soil. The Citizenship Stripping Order is unlawful, and the Plaintiffs are overwhelmingly likely to succeed on the merits of their claims.

## C. The Citizenship Stripping Order Will Immediately and Irreparably Harm the Plaintiff States

The Citizenship Stripping Order will immediately and irreparably harm the Plaintiff States by forcibly shifting unrecoverable financial costs and substantial administrative and operational burdens onto the Plaintiff States and their agencies. This is more than sufficient to enjoin the Citizenship Stripping Order, as the harm analysis "focuses on irreparability, irrespective of the magnitude of the injury." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (cleaned up). Economic harm that is not recoverable, such as that caused by unlawful executive action, satisfies the irreparable harm standard. *Id.*; *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015); *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015); *Washington v. U.S. Food & Drug Admin.*, 668 F. Supp. 3d 1125, 1137-38 (E.D. Wash. 2023). This includes losses to reimbursements received through programs like Medicaid and "burdens on ongoing operations." *City & Cnty. of San Francisco v. U.S. Citizen & Immigr. Servs.*, 408 F. Supp. 3d 1057, 1122 (N.D. Cal. 2019) (holding State's allegations that they are "likely to suffer from

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

15

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    the loss of Medicaid reimbursements" and face "burdens on ongoing operations" sufficient to

2    demonstrate irreparable harm), *aff'd in relevant part* 981 F.3d 742 (9th Cir. 2020).

3        Under the new regime the Citizenship Stripping Order attempts to create, the Plaintiff

4    States' will suffer irreparable and immediate harm to their public health care programs. Medicaid

5    and CHIP, created by federal law, support the States' provision of low-cost health insurance to

6    individuals whose family incomes fall below eligibility thresholds and who are U.S. citizens or

7    "qualified aliens." 42 C.F.R. § 435.406; 42 U.S.C. § 1397bb; 8 U.S.C. § 1611(a), (c)(1)(B). The

8    programs are administered by States but funded in part by the federal government. *See* Fotinos

9    Decl. ¶¶ 4-5, 9-14.

10        Under federal law, agencies like the Washington State's Health Care Authority (HCA)

11    must provide Medicaid and CHIP coverage to citizens and qualified noncitizens whose

12    citizenship or qualifying immigration status is verified and who are otherwise eligible. Fotinos

13    Decl. ¶ 17. However, federal law prohibits federal reimbursement for costs incurred on behalf

14    of "an alien who is not lawfully admitted for permanent residence or otherwise permanently

15    residing in the United States under color of law," except for certain emergency services. 42

16    U.S.C. § 1396b(v); *see* Fotinos Decl. ¶ 10. To provide legally mandated care and to ensure that

17    children within their jurisdiction have access to comprehensive health insurance, certain states

18    like Washington offer state-funded health insurance to undocumented children who otherwise

19    are eligible for Medicaid or CHIP. Fotinos Decl. ¶¶ 4-5, 10-18. Such coverage provides access

20    to preventative care and vaccines and reduces the need for the use of more burdensome

21    emergency medical services, thereby supporting the public health of the entire community. *See*

22    Fotinos Decl. ¶ 24.

23        Washington's Medicaid and CHIP programs are well established and rely on federal

24    funding to operate—including federal reimbursements of between 50 and 65 percent of

25    expenditures for coverage provided to eligible children. Fotinos Decl. ¶¶ 24, 26. Based on HCA

26    data from 2022, HCA administered coverage for more than 4,000 children born to mothers who

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

16

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

would have been eligible for Medicaid but for their citizenship or immigration status. Fotinos Decl. ¶ 27. If those children were not citizens at birth, they would be ineligible for Medicaid or CHIP and the cost of their care would shift to Washington's state-funded CHP health coverage for children. Fotinos Decl. ¶¶ 26-27. The Citizenship Stripping Order will impact at least that many newborn children in Washington each year, Lapkoff Decl. ¶ 11, meaning it will result in a direct increase in costs of approximately $6.9 million per year to the State due to a loss of federal funds for the coverage. *Id.* And to be clear, Washington will suffer financial losses for services that it must provide. State providers like UW Medicine's Harborview hospital are required by federal law to provide emergency care. Fotinos Decl. ¶ 26; *see* 42 U.S.C. § 1395dd(b); 42 C.F.R. § 440.255(c). For children who would be eligible for CHIP but for their status, the State will necessarily lose the 65 percent federal reimbursement for emergency care that is provided—solely because the child, now as a non-citizen, will not be eligible for CHIP. Fotinos Decl. ¶ 26. Other Plaintiff States will similarly lose federal Medicaid and CHIP funding for babies stripped of citizenship. *See* Tegen Decl. ¶¶ 23-25 (estimating that removal of birthright citizenship would reduce federal revenue to Arizona for medical care provided to children in the amount of $321,844,600 over the first 18 years of life for those subject to the Order).

The Citizenship Stripping Order will likewise cause the States to lose federal reimbursements for services provided in operating their foster care systems. For example, Washington State's Department of Children, Youth, and Families (DCYF), like other state's child welfare agencies, receives Title IV-E funding for the administration of its foster care program, including for determining eligibility for foster care, management of placements, recruitment of adoptive homes, and other functions that are critical to the success of Washington's foster care program. Heddin Decl. ¶¶ 4-10. The U.S. Department of Health and Human Services provides federal reimbursements to States when they serve foster children who are eligible for Title IV-E reimbursements. *See* 42 U.S.C. § 670. State reliance on Title IV-E is substantial: In federal financial year 2024, Washington received $219 million in Title IV-E

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

17

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  reimbursements. Heddin Decl. ¶ 17. Because of the Citizenship Stripping Order, children born

2  to undocumented parents are no longer eligible under Title IV-E's requirement that a child be a

3  citizen or a qualifying non-citizen; the States will thus bear the full cost of serving children in

4  the foster care system, when they would previously have received federal reimbursements.

5  Heddin Decl. ¶¶ 11-18.

6          In addition to the loss of federal funding that support those programs, the Plaintiff States

7  will face an immediate reduction in payments from the Social Security Administration (SSA)

8  for administration of the Enumeration at Birth program. Hutchinson Decl. ¶ 13; Colburn Decl.

9  ¶¶ 12-15; O'Leary Decl. ¶¶ 19-22; Woodward Decl. ¶¶ 12-13. Pursuant to agreements with SSA,

10  Plaintiff States' vital statistics agencies, like Washington's Department of Health, collect

11  newborn birth data, format it, and transmit it to the SSA to facilitate the assignment of SSNs to

12  newborn babies born in Washington. Hutchinson Decl. ¶¶ 7-13. This is how almost all SSNs are

13  assigned in the United States today. Hutchinson Decl. ¶ 10. In exchange, the SSA pays the State

14  $4.19 for each SSN assigned through this process, for a total of nearly $440,000 per year.

15  Hutchinson Decl. ¶ 12; *see also* O'Leary Decl.  ¶ 19 (Illinois receives $4.19 per SSN, for a total

16  of just under $500,000 in FYI 2025). Woodward Decl. ¶ 12 (Oregon receives $4.82 per SSN, for

17  a total of $158,381 in 2023). The loss of revenue to this program under the Citizenship Stripping

18  Order is direct and will begin occurring imminently as a result of the Order's direction to the

19  SSA to stop issuing SSNs to children whose citizenship the federal government no longer

20  recognizes.

21          Finally, Plaintiff States' agencies will suffer additional immediate harms due to the

22  sudden and substantial new administrative and operational burdens created by the Order—in

23  particular relating to their systems for verifying residents' eligibility for federally-funded

24  programs such as Medicaid, CHIP, and Title IV-E. States are required under federal law to verify

25  the eligibility of the residents they serve through programs like Medicaid and CHIP. *See* Fotinos

26  Decl. ¶¶ 21-28. Likewise, States must confirm citizenship or a qualifying immigration status of

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127                                  18                    ATTORNEY GENERAL OF WASHINGTON
                                                                                      Civil Rights Division
                                                                                  800 Fifth Avenue, Suite 2000
                                                                                      Seattle, WA  98104
                                                                                        (206) 464-7744

children in foster care in order to receive federal reimbursements under Title IV-E. Heddin Decl. ¶ 20. State agencies that previously relied on a child's place of birth, birth certificate, or SSN to automatically determine eligibility for federal programs will now be required, with no notice or resources, to create new systems to affirmatively determine the immigration status of each child born to ascertain whether they are entitled to federal funding or benefits, as well as update policies, training, and guidance to operationalize these new systems. *See, e.g.*, Heddin Decl. ¶¶ 20-21; Fotinos Decl. ¶¶ 20, 27-28; Tegen Decl. ¶¶ 18-20. State healthcare agencies' required use of automated verification procedures will likely be negatively impacted, requiring agencies like Washington's HCA to dedicate significantly more resources to manual review and confirmation of citizenship or other qualifying immigration status—a burdensome process for the individual seeking coverage and for HCA staff. Fotinos Decl. ¶¶ 19, 21. The Citizenship Stripping Order upends the Plaintiff States' systems, and agencies now face substantial uncertainty and operational burdens as they determine how they must remake systems to make eligibility and verification determinations. *See* Fotinos Decl. ¶¶ 19, 21, 25, 28; Heddin Decl. ¶¶ 20-21; Tegen Decl. ¶¶ 18-20; O'Leary Decl. ¶¶ 13, 23.

Ultimately, the States will be forced to bear the costs of reforming their systems for administration of several programs due to the Citizenship Stripping Order. They will lose millions of dollars in federal reimbursements and be forced to expend significant State resources addressing the "chaotic" change in citizenship status that is being and will be required under the Citizenship Stripping Order. Hutchinson Decl. ¶ 16. These types of financial, operational, and administrative burdens, which cannot be avoided, are precisely the types of irreparable harm that warrant an injunction. *See, e.g.*, *Washington v. Trump*, C17-0141JLR, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3, 2017) (concluding states suffered irreparable harm from "injury to the States' operations"); *Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (finding irreparable harm where executive action "interfere[d] with the Counties' ability to operate [and] to provide key services"); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8

PLAINTIFF STATES' MOTION FOR TEMPORARY RESTRAINING ORDER CASE NO. 2:25-CV-00127

19

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  (D.C. Cir. 2016) ("An organization is harmed if the actions taken by [the defendant] have

2  'perceptibly impaired' the [organization's] programs.") (cleaned up).

3  **D.      The Equities and Public Interest Weigh Strongly in the Plaintiff States' Favor**

4          The final two elements—equities and public interest—merge when the government is a

5  party. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024). The balance of equities and public

6  interest could not tip more sharply in favor of the Plaintiff States here: With the Citizenship

7  Stripping Order, the President attempts to return our Nation to a reprehensible chapter of

8  American history when *Dred Scott* excluded Black Americans from citizenship—a view of

9  citizenship soundly rejected by the people and their representatives in the Fourteenth

10 Amendment. *See* 19 Op. O.L.C. 340, 1995 WL 1767990 at *6 ("From our experience with *Dred*

11 *Scott*, we had learned that our country should never again trust to judges or politicians the power

12 to deprive from a class born on our soil the right of citizenship."). This Court should not allow a

13 return to a regime where Americans born on United States soil are excluded from our citizenry

14 at the whims of politicians. This grave deprivation of constitutional rights belies any public

15 interest in the order because "public interest concerns are implicated when a constitutional right

16 has been violated, . . . all citizens have a stake in upholding the Constitution." *Betschart v.*

17 *Oregon*, 103 F.4th 607, 625 (9th Cir. 2024) (cleaned up).

18         The Citizenship Stripping Order deprives children born in the Plaintiff States of a

19 foundational right enabling full participation in our democracy. Citizens may exercise their

20 fundamental right to vote in federal, state, or local elections. U.S. Const. amend. XXVI;

21 Compl. ¶ 57 (citing state constitutions). They may serve on federal and state juries. 28 U.S.C.

22 § 1865(b)(1); Compl. ¶ 58 (citing state statutes). They may become the President, Vice President,

23 or a member of Congress, and hold states offices in the Plaintiff States. U.S. Const. art. 2, § 1;

24 U.S. Const. amend. XXII; U.S. Const. art 1, §§ 2-3; Compl. ¶ 61 (citing state laws). Children

25 subject to the Citizenship Stripping Order will be denied each of these rights and benefits they

26 would have had if they were born earlier.

In addition to denying the rights of citizenship, the vast majority of those subject to the Order will be condemned to the additional harm of living with undocumented legal status. Most of the babies denied citizenship will be left with no legal immigration status and no prospects for legalization, absent change in U.S. immigration laws. Adams Decl. ¶¶ 5-10; Baluarte Decl. ¶ 13. Children left without legal status will lose protection from deportation and be placed at risk of family separation or being forcibly sent to a country they have never stepped foot in. Baluarte Decl. ¶ 13; Adams Decl. ¶¶ 9-10. "[C]hildren stripped of citizenship by the Order and left undocumented will be at immediate risk of removal from the United States." Adams Decl. at ¶ 9. Others will likely become stateless, left in limbo as a citizen of no nation, unrecognized by the United States and with nowhere else to go. Baluarte Decl. ¶¶ 6-15. Statelessness, as the Supreme Court put it, would assign these children "a fate of ever-increasing fear and distress." *Trop v. Dulles*, 356 U.S. 86, 102 (1958).

The harms of living in the United States without legal status are profound. One such harm is the deprivation of one's fundamental right to travel: "Travel abroad, like travel within the country . . . may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values." *Aptheker v. Sec'y of State*, 378 U.S. 500, 505 (1964) (quoting *Kent v. Dulles*, 357 U.S. 116, 127 (1958)). The Order deprives those subject to it of the right to travel by denying eligibility to obtain a passport, 22 C.F.R. § 51.1, 51.2, bars them from re-entry to the United States, Adams Decl. ¶¶ 7, 11, and makes them ineligible for REAL ID Act-compliant identification needed for certain domestic travel. 6 C.F.R. § 37.11(g); 6 C.F.R. § 37.5.

Depriving children born and residing in the Plaintiff States of citizenship will further harm their economic, educational, and mental health outcomes, depriving States of the human capital and economic contribution that results from the full social and economic integration of youth into society. *See* Wong Decl. ¶ 10-14; Patler Decl. ¶¶ 9-12, 17-19, 22; Baluarte Decl. ¶¶ 13-15. Without legal status, individuals have worse educational outcomes: One study found that

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

21

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

undocumented immigrant youth had more than double the probability of high school non-completion, relative to U.S. citizens. Patler Decl. ¶ 10. There are multiple causes of the disparity in education outcomes for undocumented students, including that undocumented students are ineligible for federal student financial aid, a critical support for access to higher education. 34 C.F.R. § 668.33(a); *see also* Patler Decl. ¶ 13 (in addition to lack of access to financial aid, institutional characteristics, knowledge of future barriers, and feelings of despair and hopelessness affect educational trajectories).

In addition, the impacts on earning potential and mobility of undocumented status are stark. Children left without lawful status due to the Order will not be eligible for employment authorization. *See* 8 C.F.R. § 274a.12 (only certain non-citizens with particular immigration statuses are or can be authorized to work); Adams ¶ 12; Baluarte Decl. ¶ 14. While citizens and undocumented immigrants are both employed at similar rates, U.S. citizens earn significantly more annual total income when compared to likely undocumented immigrants. Wong Decl. ¶¶ 13-14; *see also* Patler Decl. ¶ 10 n.1.

"[I]mmigrant legal status is also a fundamental determinant of health." Patler Decl. ¶ 17. Children growing up undocumented experience "profound" health harms "particularly with regard to mental health and emotional wellbeing." *Id.* ¶ 19. Barriers to health care, isolation and stigma, exclusion from normal rites of passage in American life, and fear of deportation contribute to undocumented children experiencing anxiety, chronic sadness, depression, and hopelessness. *Id.* ¶¶ 17-21; *see also* Adams Decl. ¶ 10 ("the fear of detention and deportation is profoundly detrimental to their wellbeing and the ability to fully integrate into their communities"). These conditions also lead to poorer physical health: undocumented individuals are more likely to experience hypertension and disease, including breast cancer. *Id.* ¶ 18, 22. Furthermore, denial of critical benefits of cash and food assistance to children who would have been eligible but for the Order deprives children of access to sufficient and healthy food and to shelter, warm clothing, and safety. Peterson Decl. ¶¶ 7-9. This will have a negative impact on

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

22

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

children's health, risk increasing rates of child hunger, and create barriers to becoming self-sufficient. *Id.* ¶ 8. Furthermore, expected disenrollment from public benefits out of fear by eligible immigrants will exacerbate the harm to public health. *Id.* ¶¶ 13-14; Declaration of Magaly Solis Chavez ¶ 10. The chilling effect has already begun: NWIRP has received calls from immigrant parents asking "whether their children will now lose their citizenship and whether they should pull their children out of the school, or whether they should withdraw from WIC or cutoff food stamps for their children." Adams Decl. ¶ 14.

In addition to these tangible harms to individuals, the Citizenship Stripping Order will harm communities and civic life in the States. "The Executive Order creates barriers for immigrants' abilities to get the assistance they need to meet their basic needs, stabilize their lives, and fulfill their full potential to contribute to diverse and thriving communities in Washington state." Peterson Decl. ¶ 7. Threats to citizenship status trigger fear and causes young people to "distance themselves from their family, culture, and language" and experience a "lack of belonging." Solis Chavez Decl. ¶ 12. That is because the loss of citizenship is a loss of legal, political, and social membership in the United States, contributing to a loss of belonging and impeding engagement in civil life and democracy. *See* Patler Decl. ¶¶ 9, 19-21 ("legal status is a central determinant of immigrants' integration and mobility"); Solis Chavez Decl. ¶¶ 4, 12 ("Without lawful status, [young people] . . . cannot experience full belonging in U.S. culture and communities."); Baluarte Decl. ¶¶ 13-15. "[D]enying citizenship to children born to undocumented parent(s) would be catastrophically harmful for children's development, wellbeing, and mobility. These harms would extend beyond the millions of impacted children themselves, impacting schools, neighborhoods, communities and, indeed, our nation as a whole." Patler Decl. ¶ 27. The Citizenship Stripping Order will create a permanent underclass of people excluded from American society, impeding community integration, self-sufficiency, and a thriving democracy. *See* Baluarte Decl. ¶ 15; Wong Decl. ¶ 8; Patler Decl. ¶¶ 9, 27; Peterson Decl. ¶¶ 7, 10; Solis Chavez Decl. ¶¶ 7-12.

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

23

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    In sum, the federal government has no legitimate public interest in enforcing the

2    unconstitutional Order. An executive order's "facially unconstitutional directives and its

3    coercive effects weigh heavily against leaving it in place." *Santa Clara*, 250 F. Supp. at 539;

4    *League of Women Voters of U.S.*, 838 F.3d at 12 ("There is generally no public interest in the

5    perpetuation of unlawful agency action."). The only justification offered for the Citizenship

6    Stripping Order is that it may deter unlawful immigration, a hypothetical rationale and political

7    motivation that can never overcome an unlawful deprivation of constitutional rights. *Plyler*, 457

8    U.S. at 210 (holding that the constitution protects undocumented immigrants "from invidious

9    discrimination by the Federal Government"). Indeed, the entire point of the Citizenship Clause

10   was to *remove* the weaponization of citizenship status as a policy tool. *Elk*, 112 U.S. at 101; 19

11   Op. O.L.C. 340, 1995 WL 1767990 at *5. The government has lawful means to control and

12   effect immigration policy without violating the Fourteenth Amendment. This Order is not one

13   of them, and it should be enjoined before it ever takes effect.

## IV.    CONCLUSION

15   Plaintiff States respectfully request that this Court immediately enter a temporary

16   restraining order enjoining the Citizenship Stripping Order in its entirety until such time as the

17   Court can further consider the merits

18   DATED this 21st day of January 2025.

19
                                    NICHOLAS W. BROWN
20                                  Attorney General

21                                  *s/ Lane M. Polozola*
                                    COLLEEN M. MELODY, WSBA #42275
22                                  Civil Rights Division Chief
                                    LANE POLOZOLA, WSBA #50138
23                                  DANIEL J. JEON, WSBA #58087
                                    ALYSON DIMMITT GNAM, WSBA #48143
24                                  Assistant Attorneys General
                                    Wing Luke Civil Rights Division
25                                  Office of the Washington State Attorney General
                                    800 Fifth Avenue, Suite 2000
26                                  Seattle, WA 98104-3188
                                    (206) 464-7744

1    colleen.melody@atg.wa.gov
     lane.polozola@atg.wa.gov
2    daniel.jeon@atg.wa.gov
     alyson.dimmittgnam@atg.wa.gov
3
     *Attorneys for Plaintiff State of Washington*
4
     I certify that this memorandum contains 8,397
5    words, in compliance with the Local Civil Rules.

6    KRIS MAYES
     *Attorney General of Arizona*
7
     *s/ Joshua Bendor*
8    Joshua D. Bendor (AZ No. 031908)*
     Luci D. Davis (AZ No. 035347)*
9    Gabriela Monico Nunez (AZ No. 039652)*
     Office of the Arizona Attorney General
10   Firm State Bar No. 14000
     2005 N. Central Ave.
11   Phoenix, AZ 85004
     (602) 542-3333
12   Joshua.Bendor@azag.gov
     Luci.Davis@azag.gov
13   Gabriela.MonicoNunez@azag.gov
     ACL@azag.gov
14
     **Pro hac vice motions forthcoming*
15   *Attorneys for Plaintiff State of Arizona*

16   KWAME RAOUL
     *Attorney General, State of Illinois*
17
     *s/ Rebekah Newman*
18   REBEKAH NEWMAN, ARDC #6327372*
     Assistant Attorney General
19   Special Litigation Bureau
     Office of the Illinois Attorney General
20   115 South LaSalle St., Floor 35
     Chicago, IL 60603
21   Tel. (773) 590-6961
     rebekah.newman@ilag.gov
22
     **Pro hac vice motion forthcoming*
23   *Attorneys for Plaintiff State of Illinois*

24   DAN RAYFIELD
     *Attorney General, State of Oregon*
25
     */s/ Carla A. Scott*
26   CARLA A. SCTOTT, WSBA #39947

Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Carla.A.Scott@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

PLAINTIFF STATES' MOTION FOR
TEMPORARY RESTRAINING ORDER
CASE NO. 2:25-CV-00127

26

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744