1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF ILLINOIS; and STATE OF OREGON, | NO. 2:25-cv-00127 |
| Plaintiffs, | DECLARATION OF DAVID C. BALUARTE |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; BENJAMINE HUFFMAN, in his official capacity as Acting Secretary of Homeland Security; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity as Acting Commissioner of the Social Security Administration; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY FINK, in her official capacity as Acting Secretary of Health and Human Services; U.S. DEPARTMENT OF JUSTICE; JAMES MCHENRY, in his official capacity as Acting Attorney General; U.S. DEPARTMENT OF AGRICULTURE; GARY WASHINGTON, in his official capacity as Acting Secretary of Agriculture; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

DECLARATION OF
DAVID C. BALUARTE
CASE NO. 2:25-cv-00127

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

I, David C. Baluarte, declare as follows:

1.    I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.    I am a Professor of Law and the Senior Associate Dean for Academic Affairs at CUNY School of Law in New York. My professional and scholarly focus is and has long been on immigration, refugee, and statelessness protection, and international human rights issues.

3.    Prior to joining CUNY School of Law in 2024, I held numerous academic positions at Washington and Lee University School of Law in Lexington, Virginia, from 2013 to 2023. As a Clinical Professor of Law, I founded the Immigrant Rights Clinic and designed a clinical curriculum in which students represented immigrants in federal removal proceedings and state court custody matters. In addition to the Immigrant Rights Clinic, I taught classes on Immigration Law, Transnational Law, Refugee Protection and Human Rights, and Civil Litigation. Prior to my time at Washington and Lee University School of Law, I also was a Practitioner-in-Residence in the International Human Rights Law Clinic at American University Washington College of Law, where I co-taught a year-long clinic seminar and supervised students in their representation of individuals and communities in international human rights litigation and advocacy, as well as their representation of asylum seekers. I also taught a class on Asylum and Refugee Law in that position. In this role, I also conducted multiple funded projects, including a project to establish a pilot clinic for stateless persons in the United States (funded through the United Nations High Commissioner for Refugees) and a cross-clinical partnership focused on protecting and promoting nationality rights in the Bahamas.

4.    I have researched and published extensively on issues related to immigration, refugee, and statelessness in particular. For example, in 2017, I published an article in the Yale Human Rights and Development Law Journal on issues related to statelessness, entitled *The Risk of Statelessness: Reasserting a Rule for the Protection of the Right to Nationality*, 19 Yale Hum. Rts. & Dev. L.J. 47 (2017). Before that, in 2015, I published an article in the Georgetown

DECLARATION OF
DAVID C. BALUARTE
CASE NO. 2:25-cv-00127

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Immigration Law Journal entitled *Life after Limbo: Stateless Persons in the United States and the Role of International Protection in Achieving a Legal Solution*, 29 Geo. Imm. L.J. 351 (2015). In addition to those law review articles (and numerous others), I have also published multiple short journal articles and reports on issues related to statelessness and other immigration, refugee, and human rights issues. For example, in 2020, I published an article in the Brown Journal of World Affairs entitled *Protecting Stateless Refugees in the United States*. In 2012, I authored a report entitled *Citizens of Nowhere*, which was co-published by the United Nations High Commissioner for Refugees (UNHCR) and the Open Society Justice Initiative. That report was the first comprehensive review of U.S. jurisprudence relating to statelessness.

5.     As a scholar focused on statelessness issues, I have also served as an expert consultant in numerous roundtable matters, advised on a variety of legal issues related to statelessness, and engaged with civil society on these issues. I have also delivered numerous speaking engagements on statelessness issues in multiple academic and civil society convenings. I was a founding Steering Committee Member of the American Network on Nationality and Statelessness and am currently an Advisory Council Member with the Institute on Statelessness and Inclusion.

6.     The term "stateless" refers to individuals and populations who are "not considered as a national by any State under the operations of its law." That definition comes from the 1954 Convention Relating to the Status of Stateless Persons and has acquired customary international law status. In essence, stateless individuals are citizens or nationals of no country. They include individuals who are not recognized as a national under the laws of any country or certain individuals outside the county of their presumptive nationality who are denied the protection, assistance, or recognition by that country. An expert meeting on statelessness issues in 2010 offered a useful and recognized functional definition of statelessness, stating that an individual is stateless "if all states to which he or she has a factual link fail to consider the person as a national." Polly J. Price, *Stateless in the United States: Current Reality and a Future*

DECLARATION OF
DAVID C. BALUARTE
CASE NO. 2:25-cv-00127

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    *Prediction*, 46 Vanderbilt J. Transnat'l L. 443, 451 (2021) (discussing the 2010 Expert Meeting

2    on the Concept of Stateless Persons at Prato, Italy). The State Department's Bureau of

3    Population, Refugees, and Migration likewise recognizes this understanding of what it means to

4    be stateless, explaining that "[a] stateless person is someone who, under national laws, does not

5    enjoy citizenship – the legal bond between a government and an individual – in any country."[1]

6    As I have written previously, "to be stateless is to have no nationality, which the U.S. Supreme

7    Court has called 'a fate of ever increasing fear and distress' that is 'deplored by the international

8    community of democracies.'" *Life after Limbo: Stateless Persons in the United States and the*

9    *Role of International Protection in Achieving a Legal Solution*, 29 Geo. Imm. L.J. 351, 352

10   (2015).

11         7.        Worldwide, the United Nations Commissioner for Refugees has found that there

12   are at least 4.4 million stateless people and recognizes that the actual number is believed to be

13   substantially higher due to the fact that many countries do not report statelessness data. In the

14   United States, the Center for Migration Studies, which is recognized as having conducted the

15   most rigorous analysis to date on the issue, estimates that as of 2020, there were approximately

16   218,000 U.S. residents, spread across all 50 states, that are potentially stateless or at risk of

17   becoming stateless.[2] Numerous causes are recognized as driving statelessness in the United

18   States and elsewhere, including gaps in nationality laws (including laws restricting acquisition

19   of citizenship, laws restricting the right of women to pass on their nationality to their children,

20   and laws relating to children born out of wedlock and during transit), discrimination against

21   minorities, lack of birth registration and birth certificates, birth to stateless parents, political

22   changes and transfers of territory, and other administrative oversights and procedural problems

23   (such as destruction of official records).

24

25

26
        [1] Available at: https://www.state.gov/other-policy-issues/statelessness/.
        [2] Available at: https://cmsny.org/wp-content/uploads/2020/01/StatelessnessReportFinal.pdf

DECLARATION OF                            4                ATTORNEY GENERAL OF WASHINGTON
DAVID C. BALUARTE                                                 Civil Rights Division
CASE NO. 2:25-cv-00127                                        800 Fifth Avenue, Suite 2000
                                                                  Seattle, WA 98104
                                                                    (206) 464-7744

8.      While there are likely more than 200,000 individuals in the United States who are potentially stateless or at risk of being stateless today, that number is generally limited to one generation. The reason is that under the existing rule of birthright citizenship in the U.S., children born in the United States are citizens regardless of their parents' citizenship, status, or country of origin. In other words, the United States currently has a relatively minor statelessness problem when compared with other countries around the world, in large part because of the longstanding and brightline rule of birthright citizenship. If the established rule of birthright citizenship in the United States were to change to exclude children born to undocumented mothers or parents, however, the number of stateless children would increase dramatically.

9.      This likely outcome of modifications to the Fourteenth Amendment's birthright citizenship rule in the United States has been discussed at length in the academic literature on statelessness issues. One key article that details the mechanisms by which the number stateless individuals would increase if there were a change to the United States' established rule of birthright citizenship is Professor Polly Price's *Stateless in the United States: Current Reality and a Future Prediction*, 46 Vanderbilt J. Transnat'l L. 443 (2021). As Professor Price explains, "[s]tatelessness, already present in the United States, would be increased by these restrictions [on birthright citizenship]" for two reasons: "(1) statelessness already exists in the Western Hemisphere, from which many, if not most, unauthorized migrants come to the United States, and (2) new restrictions will extend statelessness to second or subsequent generations, as well as create statelessness for some children even when the parent has a recognized nationality." *Id.* at 446. In terms of the number of individuals who might be rendered stateless under a change to the U.S. birthright citizenship rules, one study estimated that a prospective denial of birthright citizenship to children born to unauthorized immigrants would create in the United States a population of up to 13.5 million native-born, but stateless, children by 2050. *See* Margaret Stock,

DECLARATION OF
DAVID C. BALUARTE
CASE NO. 2:25-cv-00127

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

*The Cost to Americans and America of Ending Birthright Citizenship*, National Foundation for American Policy (March 2012).[3]

10.     In my view, there are three ways that the number of stateless individuals in the United States would multiply at an exponential rate should the established birthright citizenship rule be limited. The first is that there are already individuals who are stateless in the United States today. If those individuals have children who are not U.S. citizens and do not automatically acquire another nationality through their parents' country of origin, those children too will become stateless. This is essentially the creation of a second generation of stateless individuals. Second, the number of stateless individuals would be increased because some parents, due to the laws of their country of origin, may be nationals of that country but are prohibited from transmitting citizenship to their children born abroad (i.e., in the United States). This is essentially the creation of a new generation of stateless individuals in the United States. And third, there are individuals who are nationals of other countries that nonetheless reside here in the United States. Under a reasonable interpretation of their country of origin's nationality laws, they may be able to pass that citizenship to their children, but despite a credible claim, their country of origin may refuse to recognize a claim to citizenship for numerous reasons (such as record keeping issues, political issues or disagreements with the United States, or discrimination against certain racial, ethnic, or religious groups of which the individual is a member).

11.     The impacts are not purely hypothetical. As I have explained in prior work, whatever the exact size of the stateless population, birthright citizenship limits the size of the population put into the legal limbo that is being statelessness in the United States. Indeed, the Fourteenth Amendment's birthright citizenship rule has provided a guarantee that statelessness cannot be reproduced in the United States. One example is Kuwaiti Bidoons (a group that lacks a nationality in their homeland), who fled the first Gulf War to the United States and can count on U.S. citizenship for their children who are born here. Those children would otherwise be

---

[3] Available at: https://nfap.com/pdf/NFAPPolicyBrief.BirthrightCitizenship.March2012.pdf.

DECLARATION OF
DAVID C. BALUARTE
CASE NO. 2:25-cv-00127

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

stateless. As noted above, due to country-specific nationality laws, nationals of some countries cannot transmit their own nationality to children who are born abroad. But if those children are born in the United States, they automatically gain American citizenship. The Bahamas presents another example of this phenomenon in the Western hemisphere: Bahamian women are not permitted to pass their nationality to children born abroad. And in Haiti and some other Western hemisphere countries, crumbling birth-registration systems make it difficult to substantiate nationality claims for children who are born abroad. Other noted profiles of individuals who are stateless or likely stateless in the United States have been recognized in the literature, including in the 2020 CMS Report, which provides an extensive description of such groups in the United States. Taking these cases into consideration, the potential problem of statelessness in the United States would be substantially larger if the current birthright citizenship rule is changed or limited.

12.     The harm of individuals becoming stateless is significant to the individual and to the United States as a whole. For an individual, U.S. immigration law does not explicitly recognize statelessness, nor does it provide humanitarian protection to relieve stateless persons of their suffering. Stateless individuals are instead treated like other unauthorized migrants in the United States. This means that a limitation on birthright citizenship in the United States will have the effect of immediately increasing the population of undocumented individuals here, and in fact will create a permanent growing class of undocumented individuals. And because of their stateless status, these individuals do not have a home country to return to voluntarily or otherwise. They must simply remain in the United States with no citizenship or status at all.

13.     The personal harm is substantial to these individuals—many of whom will be children if birthright citizenship is denied to them. Some stateless individuals may be able to apply for and obtain protection from removal or a form of temporary relief, but neither those forms of relief nor a path to nationality or citizenship are guaranteed. If requests for those protections are not granted and the individual is put into removal proceedings and ordered removed, they may be subject to mandatory detention while immigration officials try to execute

DECLARATION OF
DAVID C. BALUARTE
CASE NO. 2:25-cv-00127

7

those efforts—which will fail because no other nation will recognize the stateless individual and accept them. And for individuals subsequently released or who have not entered removal proceedings, they are left in legal limbo. They have no nationality or legal status in the United States or elsewhere.

14.     Being stuck in this limbo comes with serious consequences. Stateless individuals face significant barriers to participating in the economy because, without a legal status, they cannot obtain authorization from the government to work legally. They also lack access to many social welfare or government services programs and cannot be involved in the political process. While they are here in the United States, they must navigate without consular assistance matters involving protection, travel documentation, and judicial proceedings. Instead, they must live with the permanent threat of detention or being put into removal proceedings, and they cannot return to a country of origin and pursue a life where political, economic, and social participation is possible.

15.     In essence, individuals who are stateless in the United States are part of a permanent underclass of people with no path to citizenship. They face increased insecurity and instability in their daily lives, restrictions on their ability to freely travel, detrimental employment and economic consequences as a result of their status that severely limit their upward mobility, and overall they must navigate their lives in American society without being fully part of society. This harm can be hard to quantify but cannot be understated—for individuals who are stateless there is simply no safe place to go. Limiting birthright citizenship in the United States will exponentially increase the number of individuals put into this situation and vastly expand the scope of those harms to those individuals, their families, and the United States at large.

DECLARATION OF
DAVID C. BALUARTE
CASE NO. 2:25-cv-00127

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    I declare under penalty of perjury under the laws of the State of Washington and the

2    United States of America that the foregoing is true and correct.

3    DATED and SIGNED this  20th  day of January 2025, at New York, NY.

4

5

6    _____
     David C. Baluarte

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF                                    9
DAVID C. BALUARTE
CASE NO. 2:25-cv-00127

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744