# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF ILLINOIS; and STATE OF OREGON,<br><br>    Plaintiffs,<br><br> v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; BENJAMINE HUFFMAN, in his official capacity as Acting Secretary of Homeland Security; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity as Acting Commissioner of the Social Security Administration; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY FINK, in her official capacity as Acting Secretary of Health and Human Services; U.S. DEPARTMENT OF JUSTICE; JAMES MCHENRY, in his official capacity as Acting Attorney General; U.S. DEPARTMENT OF AGRICULTURE; GARY WASHINGTON, in his official capacity as Acting Secretary of Agriculture; and the UNITED STATES OF AMERICA,<br><br>    Defendants. | NO. 2:25-cv-00127<br><br>DECLARATION OF<br>DR. CAITLIN PATLER |

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

I, Caitlin Patler, PhD, declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge. If called to testify as a witness, I could and would testify competently to the matters set forth below.

2. I am an Associate Professor of Public Policy at University of California (UC), Berkeley Goldman School of Public Policy. I am a faculty affiliate of the Berkeley Interdisciplinary Migration Initiative, the Berkeley Population Center, and the Institute for Research on Labor and Employment. Prior to joining the UC Berkeley faculty, I was an Associate Professor of Sociology at UC Davis, where I was a Chancellor's Fellow and helped establish the Global Migration Center. I received a Ph.D. in Sociology from the University of California Los Angeles (UCLA) in 2014. I have a Master of Arts and Bachelor of Arts degrees in Sociology, both from UCLA.

3. My research focuses on the origins and reproduction of inequality in the United States through an examination of immigration laws, legal statuses, and law enforcement institutions as drivers of socioeconomic and health disparities. I also study the spillover and intergenerational consequences of legal vulnerability and structural inequality for the health and wellbeing of older adults, young adults, youth, and children. I have written over 50 peer-reviewed journal articles and book chapters, commentaries, and research reports on these subjects.

4. I have received several internationally competitive awards. In 2021, I received the American Sociological Association (ASA) Section on Mental Health Best Publication Award. In 2019, I received the Pacific Sociological Association (PSA) Distinguished Contribution to Sociological Perspectives award. In 2018, I received the ASA Latina/o Sociology Section Distinguished Contribution to Research article award. My work has been supported with nationally and internationally competitive grants from the ASA, the National Academy of Education/Spencer Foundation, the National Science Foundation, the Russell Sage

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Foundation, and the Sociological Initiatives Foundation, among others. As a recognized expert on issues related to immigration law enforcement, in 2024, I presented summaries of research before the National Academies of Science, Engineering and Medicine Committee on Population.

5. My work has been presented to courts to aid in their consideration of issues concerning the rights of immigrants. In 2020, I authored a declaration to the United States District Court, Central District of California, analyzing the health profiles of certain individuals detained at Adelanto Detention Facility in 2013-14 who would have been classified as having "High-Risk conditions" by the Centers for Disease Control (CDC) for purposes of their vulnerability to COVID-19. *See* Reply Brief for Petition at Ex. 7, *Hernandez-Roman et al. v. Chad F. Wolf et al.*, No. 5:20-cv-00768-TJH-PVC (C.D. Cal., May 21, 2020). In 2019, I co-authored an amicus brief to the United States Supreme Court summarizing empirical research on the Deferred Action for Childhood Arrivals ("DACA") program. *See* Amici Curiae Brief of Empirical Scholars in Support of Respondents, *Dep't of Homeland Sec. et al. v. Regents of the Univ. of S. Cal., et al.*, Nos. 18-587, 18-589, 18-588 (U.S. Oct. 9, 2019). In 2018 and 2015, research I did as part of my analysis of the implementation of the injunction in *Rodriguez v. Robbins*, 804 F.3d 1060 (9th Cir. 2015), *rev'd in part*, *Jennings v. Rodriguez*, 138 S.Ct. 830 (2018), was judicially noticed by the Court. *See* Order, *Rodriguez v. Robbins*, No. 13-56706, ECF No. 133 at *4 (9th Cir. Oct. 28, 2015). My research has been cited in at least four federal courts of appeals and two federal district courts, as well as by the Department of Homeland Security in its response to public comments on the proposed Rule on Deferred Action for Childhood Arrivals (DACA) CIS No. 2691-21; DHS Docket No. USCIS-2021-0006, (Aug. 2022), as well as its Notice of Implementation of Keeping Families Together, CIS No. 2779-24; DHS Docket No. USCIS-2024-0010 (Aug. 2024). I have served as an expert on the economic and social impacts of US immigration detention in the California Senate Judiciary Committee.

6. I have attached a true and complete copy of my curriculum vitae as Exhibit A to this Declaration, which includes a list of all of my publications over the past fifteen years.

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

7. I have been retained by the State of Washington to provide a review of the research and academic literature on the impacts of denying birthright citizenship to certain children born in the United States, particularly with regard to education and health. In addition to my own research, I have reviewed a large body of peer-reviewed research on the socioeconomic and health disparities resulting from immigration law and legal statuses. I rely on my own research and this academic literature to inform my opinions.

8. I have attached as Exhibit B to this Declaration a complete list of all references cited herein.

9. My research and the academic literature show that citizenship confers legal, political, and social membership in the United States, thus creating paths to mobility. In contrast, undocumented immigrants are excluded from legal, political, and social membership, and thus face thwarted opportunities for mobility. In a comprehensive review of research on the integration of immigrants in the US, the National Academies of Sciences, Engineering, and Medicine concluded that immigrant legal status is a central determinant of immigrants' integration and mobility: "Given the significant potential to alter individuals' life chances, legal status has become a new axis of social stratification, similar to other social markers such as social class, gender, and race" (Waters, Pineau, and National Academies 2015:148), a "fundamental determinant of immigrant integration" (Hamilton, Patler, and Hale 2019:2). This is because the rights and benefits of citizenship structure access to opportunities, benefits, and resources not available to undocumented immigrants. These benefits include, e.g., federal loan support for higher education; access to the formal labor market; and access to health insurance and medical care, cash assistance, and other social services (Hamilton, Patler, et al. 2019; Perreira and Pedroza 2019). Undocumented immigration status also takes on negative social meaning through processes of politicization, stigmatization, and racialization (Asad and Clair 2018; Massey, Durand, and Pren 2016). In this way, citizenship advantage and undocumented disadvantage are

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

legally and socially produced, rather than stemming from innate or biological features of human beings.

10. My research and the academic literature has identified citizenship advantage and corresponding undocumented disadvantage in educational outcomes among undocumented immigrants who came to the US as children, with implications for their long-term mobility.[1] Undocumented immigrant children attend K-12 schools alongside US citizen children, and many do not realize they are undocumented, or the stakes of undocumented status, until they reach adulthood and become aware of the barriers they face to higher education and the formal labor market (Gonzales 2011, 2016). This realization, coupled with the corresponding fear of deportation and lack of support and information, can keep some undocumented immigrant children from completing high school (Jefferies 2014). One representative sample of Latina/o young adults (age 18-26), captured in the California Young Adult Study (CYAS), found that undocumented immigrant youth had more than double the probability of high school non-completion, relative to US citizens (16% and 7%, respectively), even after controlling for demographic and socioeconomic background and educational tracking (Patler 2018:16).

11. Undocumented educational disadvantage persists after high school: undocumented Latino youth in the CYAS had a predicted probability of 66% of enrolling in post-secondary education, compared to 82% among the US-born control group (Patler 2018:1096). Another study, using a large, nationally representative sample of US households

---

[1] A large and established body of research identifies educational, labor market, occupational, and other disadvantages among undocumented US adults and older adults. *See e.g.*, Hall, Greenman, and Farkas 2010 ("Our estimates reveal a gross 17 percent wage disparity between documented and undocumented Mexican immigrant men, and a 9 percent documented-undocumented wage disparity for Mexican immigrant women. When worker human capital and occupation are held constant, these wage gaps reduce to 8 and 4 percent, respectively. We also find large differences in returns to human capital with undocumented Mexican immigrants having the lowest wage returns to human capital and having very slow wage growth over time"); Hirokazu Yoshikawa et al., Unauthorized Status and Youth Development in the United States: Consensus Statement of the Society for Research on Adolescence, 27(1) J. Rsch. Adolesc. 4, 6 (2017) (workers with unauthorized status face worse work conditions, higher rates of working below minimum wage, and lower rates of wage growth); Flores Morales 2021 (arguing that there is a "continuity of exclusion via policies" that "magnify inequalities on the basis of immigration status and racialization in older age.")

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

captured in the Survey of Income and Program Participation (SIPP), compared undocumented and documented Mexican and Central Americans aged 18-24, concluding: "our results indicate that legal status matters: we find that the odds of college enrollment are about four times higher for documented immigrants than their undocumented peers" (Greenman and Hall 2013:1492).

12. Undocumented legal status also shapes the ability to persist and excel once enrolled in college, both at the community college and university levels. Analyzing CYAS data, one study found higher rates of discontinuous community college enrollment among undocumented students, relative to their non-immigrant peers (Terriquez 2014). While another study using administrative data from the CUNY system found that "undocumented students either perform as well as or outperform their legal-status peers, particularly compared to citizens," in community college and four-year college graduation rates and cumulative college GPA, this is likely due to selection into these experiences; that is, more disadvantaged undocumented immigrant students are likely to have been unable even to access these experiences (Hsin and Reed 2020). Furthermore, undocumented Latino immigrants in the CUNY system from 2002-2012 show evidence of achievement decline across their semesters of enrollment, relative to documented and naturalized citizen peers (Kreisberg and Hsin 2020).

13. There are numerous reasons for undocumented immigrants' difficulty persisting and excelling in higher education. Undocumented immigrants cannot access federally funded financial aid or work study. Terriquez found that: "the most common reason for withdrawing from community college was not being able to afford college," reported by 81% of undocumented students compared to 43% of their US citizen and lawful permanent resident (LPR) peers (Terriquez 2014:1313). Structural factors including financial barriers and institutional characteristics were also associated with reduced educational achievement among Latino undocumented immigrants in the CUNY system (Kreisberg and Hsin 2020). Qualitative research from children of working-class Latino immigrants in Los Angeles found that although undocumented and US citizen children attended schools together and had similar social

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

incorporation processes, "knowledge of future barriers to college attendance" led to "a decline in educational motivation" among some undocumented children (Abrego 2006). Another study, using qualitative interview data from 37 undocumented college students in Massachusetts and North Carolina found that "even when undocumented students gain access to higher education, barriers to legal status generate chronic feelings of despair and hopelessness that persist throughout their educational trajectories" (Bazo Vienrich and Torres Stone 2022:1). S*ee also* (Williams 2016) (finding feelings of exclusion among undocumented university students).

14. In contrast, undocumented students' educational outcomes improve when structural barriers are removed and supports are enacted, e.g., through in-state tuition policies that make college more affordable, through relief from removal and access to work authorization via the Deferred Action for Childhood Arrivals (DACA) program, or through access to citizenship via the Immigration Reform and Control Act (IRCA). One study using Current Population Survey data from 1999-2012 found that "the policy of granting in-state tuition to undocumented students does attain its intended goal and increases Mexican non-citizen college enrollment rates by 4 percentage points" without impacting rates for native-born students (Amuedo-Dorantes and Sparber 2014:21; see also Kaushal 2008). A longitudinal qualitative study of undocumented immigrant youth before and after the passage of California's in-state tuition policy provides context for the potential mechanisms for these changes: the policy not only provided a more affordable path to higher education, but also "immediately relieved stigma" and "provided a socially acceptable identity" (Abrego 2008:709).

15. The DACA program also led to increased rates of high school completion (Hamilton, Patler, and Savinar 2020), though there is more mixed evidence of DACA's impact on higher education, likely due to many DACA recipients feeling compelled to work while work authorization is valid, given the temporary nature of the program (Hamilton et al. 2020; Hsin and Ortega 2018; Pope 2016). The educational gains from DACA may also have varied by the age of the recipient, suggesting that "policy makers should ensure that opportunities to

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

7

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

permanently legalize status are available to immigrants as early as possible in the life course" (Hamilton, Patler, and Langer 2021:1).

16. Unlike temporary legalization programs, access to citizenship provides a much clearer path to higher education and socioeconomic mobility. The case of IRCA underscores the importance of citizenship: utilizing data from the 2000 decennial census and a rigorous causal identification strategy, Cortes shows that "immigrant youth who were granted legal status under IRCA are 13.9 percentage points more likely to enroll in college," signifying a "25% increase over the base college enrollment of 55%" (Cortes 2013:430, 432). The study concludes that "immigrant youth are more likely to enroll in college when legal barriers are removed and financial barriers lowered" (ibid). In summary, US citizenship creates structural opportunities and paths to educational mobility, while undocumented status imposes barriers to mobility.

17. My research and the academic literature shows that immigrant legal status is also a fundamental determinant of health, including mental and physical health (Bacong and Menjívar 2021; Castañeda et al. 2015). Federal laws governing immigration status and immigrants' rights, as well as state and local laws defining benefits based on citizenship, not only structure access to health care (e.g., through (in)eligibility for Medicaid or access to preventative care outside of community clinic settings), but also structure access to health-protective resources (e.g., through state and local policies that (dis)allow access to state-sponsored public benefits or increase or decrease immigration law enforcement, which can lead to delayed care) (Cabral and Cuevas 2020; Hamilton, Patler, et al. 2019; Perreira and Pedroza 2019; Wallace et al. 2019).

18. These structural disadvantages, combined with other disadvantages imposed by undocumented status (e.g., disadvantaged socioeconomic status that leads to poverty, housing/food insecurity, and neighborhood/school disadvantage; chronic exposure to deportation fear and/or discrimination based on racialized legal status, etc.) have severe consequences for health: "Undocumented individuals are more likely to report greater depression and social isolation, higher rates of hypertension with longer length of hospital stay, greater

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

anxiety and post-traumatic stress, and higher levels of acculturative stress compared to documented immigrants" (Cabral and Cuevas 2020:874). In addition, "undocumented immigrants present more advanced stage diseases, such as breast cancer and HIV infection…than their documented counterparts" at the initiation of treatment (Cabral and Cuevas 2020:874). Although some research finds undocumented immigrants have lower levels of physician-diagnosed health outcomes such as asthma or hypertension, "this may be a result of undocumented immigrants having limited access to healthcare," for the purposes of receiving diagnoses in the first place (Cabral and Cuevas 2020; see also Hamilton, Hale, and Savinar 2019). In summary, the cumulative effects of the adversities created by legal status increase risk of disease and poor mental and physical health.

19. The health harms of immigration policies determining immigrant legal status and rights are profound for undocumented children, particularly with regard to mental health and emotional wellbeing. As undocumented children grow up in the United States, they become increasingly aware of the implications of their legal status and living in "an in-between social position where one's social identity (as an immigrant or an American) is not recognized or reflected by society" (Hamilton, Patler, et al. 2019:6; see also Gonzales and Chavez 2012; Gonzales, Suárez-Orozco, and Dedios-Sanguineti 2013; Suárez-Orozco et al. 2011). Formal exclusion from mainstream rites of passage in adolescence and young adulthood (e.g., getting a driver's license or job, going to college) can cause many young undocumented immigrants to feel hopeless and isolated (Gonzales 2011). Emotional wellbeing is further harmed by negative public portrayals of undocumented immigrants: "children's identities, feelings of self-worth, friendships, and relationships with school-based adults are compromised as they become aware of the hostile and disparaging portrayal of unauthorized immigrants in the media, as well as of the common stigma associated with being undocumented" (Hamilton, Patler, et al. 2019:6; see also Abrego 2006; Gonzales et al. 2013; Patler 2014; Suárez-Orozco et al. 2011). Qualitative studies, based on interviews with undocumented youth, describe some of the emotional and

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1   physical manifestations of distress related to undocumented immigration status: "Many
2   participants spoke of their anxieties, of chronic sadness, of depression, of overeating or
3   undereating, of difficulties sleeping, and of a desire simply to never get out of bed. Participants
4   talked about exacerbation of chronic diseases like high blood pressure, chronic headaches,
5   toothaches, and bodily pain"(Gonzales et al. 2013:1187).

6       20.    Undocumented status also creates chronic deportation worry: "children growing
7   up in the shadow of undocumented status live with what is likely an immeasurable ever-present
8   stress of the threat of the deportation of a loved one or potentially themselves" (Suárez-Orozco
9   and Yoshikawa 2013:66; see also Abrego 2006; Gonzales 2011). This chronic stress is
10  exacerbated following the actual detention or deportation of a loved one can cause further harm
11  to wellbeing: In a qualitative study of children aged 11-18 who had experienced parental
12  detention, "Younger children were reported to cry inconsolably, wake with night terrors, and
13  cling to their remaining parents. Children of all ages reported loss of appetite or overeating, self-
14  isolation, trouble sleeping or being unable to get out of bed, headaches, stomach pain, and
15  dizziness" (Patler and Gonzalez 2020:896; see also Brabeck 2010; Patler et al. In press; Patler
16  and Gonzalez 2023).

17      21.    In these ways, undocumented immigration status interrupts children's ontological
18  security—the ability to count on the promise of the future, which is central to trust: "Lack of
19  ontological security is at the core of emotions [undocumented immigrant youth] must contend
20  with, from frustration, fear, shame, and depression to anxiety about their future" (Vaquera,
21  Aranda, and Sousa-Rodriguez 2017:298; see also Gonzales et al. 2013). Experts in child and
22  adolescent development conclude: "These compromised ecologies lead to far from optimal
23  developmental contexts for children of unauthorized parents" (Suárez-Orozco and Yoshikawa
24  2013:66).

25      22.    The legal, political, and social exclusion faced by undocumented children can
26  lead to poorer health. One study analyzed survey data from the 2005-2017 waves of the

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

10

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

California Health Interview Survey (CHIS) and found higher rates of poor self-reported health and among undocumented Latina/o immigrants who came to the US as children, compared to their naturalized citizen counterparts (Hamilton, Patler, and Savinar 2022). Another survey of middle- and high school aged Latino youth in North Carolina found higher rates of anxiety among undocumented adolescents, compared to documented peers (Potochnick and Perreira 2010).

23. In the most extreme cases, despair about blocked paths to mobility caused by legal status can lead to self-harm, suicidal ideation, or even suicide itself: "Eighteen-year-old Joaquin Luna Jr. came to the U.S. with his parents as a 6-month-old infant. Growing up in the small town of Mission, Texas, among his American-born peers, this church-attending, guitar-playing, strong student had hoped to become the first in his family to pursue college. Despairing that his undocumented status would block his ability to achieve his dreams to go to college, however, he took his life on November 25, 2011" (Gonzales et al. 2013:1175). Unfortunately, research suggests mental health issues are not likely to be addressed through access to healthcare alone: Interviews with undocumented immigrant college students, some of whom can access mental healthcare services through student health plans, showed that treatment was viewed by some as "futile because it could not address underlying immigration-related issues" (Cha, Enriquez, and Ro 2019:193).

24. State and federal policies and administrative programs that more directly address immigration status-related stressors may improve mental health, at least in the short-term. Qualitative research shows that in-state tuition policies gave immigrant youth in California an improved sense of wellbeing and renewed optimism about the future (Abrego 2008). Quantitative analyses of National Health Interview Survey (NHIS) support these conclusions, providing some evidence of improved self-related health and reduced psychological distress among noncitizen Mexican adults associated with in-state tuition policies, as well as increased

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

11

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

psychological distress associated with policies that ban in-state tuition access (Kaushal, Wang, and Huang 2018).

25. The Deferred Action for Childhood Arrivals (DACA) program addressed some of the formal and informal exclusion faced by young undocumented immigrants by providing relief from the immediate threat removal and granting work authorization. Multiple research studies find strong evidence of DACA's association with improvements to self-reported health and psychological distress (Patler, Hamilton, and Savinar 2021; Patler and Pirtle 2018; Venkataramani et al. 2017). Moreover, the health-promoting impacts of DACA were intergenerational: analyses of US birth records found that DACA-eligible Latina mothers gave birth to healthier infants, on average, compared to ineligible Latina immigrants (Hamilton, Langer, and Patler 2021). Another study, analyzing CHIS data found that following DACA's initiation, DACA-eligible Latina mothers reported improved health among their US citizen children who were, on average, under five years old (Patler et al. 2019). However, given DACA's temporary nature and the formal efforts to rescind it, improvements to health among DACA-eligible immigrants and their children may not have been sustained (Patler et al. 2019, 2021). Evidence from programs providing permanent access to citizenship (IRCA) is more promising: One study analyzed US birth records and found that in areas with higher concentration of IRCA applications, infants' average birth weights increased and the likelihood of low birthweight births was reduced by 5 to 15% (Timilsina 2023).

26. In summary, undocumented immigration status and the disadvantages it confers can lead to poorer physical and emotional health among undocumented immigrants. Unaddressed, these harms may be long-term and intergenerational (Torres and Young 2016).

27. Based on my own research and having reviewed the literature on the impacts of citizenship and immigration status' on education and health, my expert opinion is that denying citizenship to children born to undocumented parent(s) would be catastrophically harmful for children's development, wellbeing, and mobility. These harms would extend beyond the millions

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

12

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

of impacted children themselves, impacting schools, neighborhoods, communities and, indeed, our nation as a whole. Birthright citizenship is a cornerstone of the U.S. identity as a nation of immigrants, promoting social cohesion, opportunity, and mobility. Ending birthright citizenship would erode those principles and divide our national community, creating and reinforcing vast inequality for generations to come.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED and SIGNED this 20th day of January 2025, at Berkely, California.

Caitlin Patler, PhD

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

13

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744