1

The Honorable Judge John C. Coughenour

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9

10

STATE OF WASHINGTON; STATE OF
ARIZONA; STATE OF ILLINOIS; and
STATE OF OREGON,

11

Plaintiffs,

12

13

v.

14

DONALD TRUMP, in his official capacity
as President of the United States; U.S.
DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, in her official
capacity as Secretary of Homeland Security;
U.S. SOCIAL SECURITY
ADMINISTRATION; MICHELLE KING,
in her official capacity as Acting
Commissioner of the Social Security
Administration; U.S. DEPARTMENT OF
STATE; MARCO RUBIO, in his official
capacity as Secretary of State; U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; DOROTHY FINK,
in her official capacity as Acting Secretary
of Health and Human Services; U.S.
DEPARTMENT OF JUSTICE; JAMES
MCHENRY, in his official capacity as
Acting Attorney General; U.S.
DEPARTMENT OF AGRICULTURE;
GARY WASHINGTON, in his official
capacity as Acting Secretary of Agriculture;
and the UNITED STATES OF AMERICA,

15

16

17

18

19

20

21

22

23

24

25

Defendants.

26

NO. 2:25-cv-00127-JCC

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION

NOTE ON MOTION CALENDAR:
FEBRUARY 6, 2025

## **TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................... 1

II.   BACKGROUND ...................................................................................................... 3

    A.   President Trump Issues the Citizenship Stripping Order on Day One of His
        Presidency ....................................................................................................... 3

    B.   The Citizenship Stripping Order Will Immediately Disrupt Plaintiff States'
        Programs and Upset the Lives of Hundreds of Thousands of Families .................... 3

III.  ARGUMENT ........................................................................................................... 5

    A.   The Plaintiff States Have Standing to Challenge the Citizenship Stripping
        Order ............................................................................................................... 6

    B.   The Plaintiff States' Claims Are Likely to Succeed on the Merits Because
        Birthright Citizenship Is a Cornerstone of American Constitutional and
        Statutory Law That Is Beyond Serious Dispute .............................................. 9

        1.   Birthright Citizenship Is Enshrined in the Constitution ..................... 9

        2.   Birthright Citizenship Is Protected Under the INA .......................... 14

    C.   The Citizenship Stripping Order Will Immediately and Irreparably Harm the
        Plaintiff States .............................................................................................. 15

    D.   The Equities and Public Interest Weigh Strongly in the Plaintiff States' Favor ..... 19

    E.   A Nationwide Injunction Barring Implementation of the Citizenship Stripping
        Order Is Needed to Provide Complete Relief ................................................. 23

IV.   CONCLUSION ...................................................................................................... 24

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

i

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
    458 U.S. 592 (1982).................................................................................................... 6

*Aptheker v. Sec'y of State*,
    378 U.S. 500 (1964).................................................................................................... 20

*Ariz. Democratic Party v. Hobbs*,
    976 F.3d 1081 (9th Cir. 2020) .................................................................................. 19

*Betschart v. Oregon*,
    103 F.4th 607 (9th Cir. 2024) ................................................................................... 20

*Biden v. Nebraska*,
    --- U.S. ---, 143 S. Ct. 2355 (2023).................................................................... 7, 23

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020).................................................................................................... 14

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) .................................................................................... 15

*Chin v. United States*,
    43 App. D.C. 38 (D.C. App. Ct. 1915)..................................................................... 13

*City & Cnty. of San Francisco v. U.S. Citizen & Immigr. Servs.*,
    981 F.3d 742 (9th Cir. 2020) ................................................................................ 7, 19

*Davis v. Packard*,
    33 U.S. 312 (1834)...................................................................................................... 6

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)..................................................................................................... 6

*Diamond v. Charles*,
    476 U.S. 54 (1986)....................................................................................................... 6

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..................................................................................................... 9

*Doe #1 v. Trump*,
    957 F.3d 1050 (9th Cir. 2020) .................................................................................. 23

*Doe v. Trump*,
    288 F. Supp. 3d 1045 (W.D. Wash. 2017) ............................................................... 19

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

ii

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

*Dred Scott v. Sandford,*
   60 U.S. 393 (1857) .......................................................................................................... 1, 19

*Fedorenko v. United States,*
   449 U.S. 490 (1981) ............................................................................................................... 3

*Gee v. United States,*
   49 F. 146 (9th Cir. 1892) ..................................................................................................... 13

*George v. McDonough,*
   596 U.S. 740 (2022) ............................................................................................................ 15

*Idaho v. Coeur d'Alene Tribe,*
   794 F.3d 1039 (9th Cir. 2015) ............................................................................................ 16

*INS v. Rios-Pineda,*
   471 U.S. 444 (1985) ............................................................................................................ 12

*Ledbetter v. Baldwin,*
   479 U.S. 1309 (1986) .......................................................................................................... 16

*Moy Suey v. United States,*
   147 F. 697 (7th Cir. 1906) ................................................................................................... 13

*Perkins v. Elg,*
   307 U.S. 325 (1939) ............................................................................................................ 12

*Plyler v. Doe,*
   457 U.S. 202 (1982) ................................................................................................. 10, 11, 12

*Regan v. King,*
   49 F. Supp. 222 (N.D. Cal. 1942) ...................................................................................... 13

*Santa Clara v. Trump,*
   250 F. Supp. 3d 497 (N.D. Cal. 2017) ............................................................................... 22

*Schooner Exch. v. McFaddon,*
   11 U.S. 116 (1812) ................................................................................................................ 6

*Trop v. Dulles,*
   356 U.S. 86 (1958) .............................................................................................................. 20

*United States v. Texas,*
   599 U.S. 670 (2023) .............................................................................................................. 6

*United States v. Wong Kim Ark,*
   169 U.S. 649 (1898) ................................................................................................. 11, 12, 13

*Washington v. U.S. Food & Drug Admin.,*
   108 F.4th 1163 (9th Cir. 2024) ............................................................................................. 6

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

iii

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...................................................................................................... 5

*Wolford v. Lopez*,
  116 F.4th 959 (9th Cir. 2024). ................................................................................... 19

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ......................................................................................... 9

U.S. Const. amend. XXVI ............................................................................................ 20

U.S. Const. art. I, §§ 2-3 ............................................................................................. 20

U.S. Const. art. II, § 1 ................................................................................................. 20

**Statutes**

8 U.S.C. § 1401(a) ...................................................................................................... 14

8 U.S.C. § 1611(a) ...................................................................................................... 16

8 U.S.C. § 1611(c)(1)(B) ............................................................................................. 16

22 U.S.C. § 211(a) ...................................................................................................... 14

28 U.S.C. § 1865(b)(1) ............................................................................................... 20

42 U.S.C. §1395dd(b) ................................................................................................. 17

42 U.S.C. § 1396b(v) .................................................................................................. 16

**Regulations**

6 C.F.R. § 37.5 ........................................................................................................... 21

6 C.F.R. § 37.11(g) ..................................................................................................... 21

8 C.F.R. § 274a.12 ...................................................................................................... 21

22 C.F.R. § 51.2 .......................................................................................................... 21

34 C.F.R. § 668.33(a) .................................................................................................. 21

42 C.F.R. § 435.406 .................................................................................................... 16

42 C.F.R. § 440.255(c) ................................................................................................ 17

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

iv

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1

## **Other Authorities**

2

Gabriel J. Chin & Paul Finkelman,
   *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal*
3
   *Immigration Regulation*,
   54 U.C. Davis L. Rev. 2215 (2021) ....................................................................... 11
4

Garrett Epps,
5
   *The Citizenship Clause: A "Legislative History*,"
   60 Am. Univ. L. Rev. 331 (2010) ......................................................................... 11
6

*To Revise and Codify the Nationality Laws of United States into a Comprehensive*
7
   *Nationality Code: Hearings Before the Comm. on Immig. and Naturalization on H.R.*
   *6127 Superseded by H.R. 9980*, 76th Cong., 1st Sess. (1940)................................ 15
8

James C. Ho,
9
   *Birthright Citizenship, The Fourteenth Amendment, and State Authority*,
   42 U. Rich. L. Rev. 969 (2008) ............................................................................. 10
10

James C. Ho,
11
   *Defining "American" Birthright Citizenship and the Original Understanding of the*
   *14th Amendment*,
12
   9 Green Bag 367, 369 (2006) ................................................................................ 10

13
*Legislation Denying Citizenship at Birth to Certain Children Born in the United States*,
   19 Op. O.L.C. 340 (1995) ........................................................................ 13, 19, 23
14

15

16

17

18

19

20

21

22

23

24

25

26

# I.    INTRODUCTION

The Fourteenth Amendment's Citizenship Clause emerged out of one of our Nation's darkest chapters and embodies one of its most solemn promises. It was passed and ratified following the Civil War to overturn the Supreme Court's infamous holding in *Dred Scott v. Sandford*, 60 U.S. 393 (1857), which denied citizenship to an entire class of persons—descendants of enslaved people. The Citizenship Clause repudiated *Dred Scott* and reaffirmed the common law principle of *jus soli*, under which all individuals born in the United States and subject to its jurisdiction are citizens. Its operation is automatic and its scope broad. It provides our Nation a bright-line and nearly universal rule under which citizenship cannot be conditioned on one's race, ethnicity, alienage, or the immigration status of one's parents. And since its adoption, the Supreme Court, Congress, and the Executive Branch have continuously affirmed its foundational principle that birth in the United States confers citizenship, with all its benefits and privileges.

President Trump and the federal government now seek to impose a modern version of *Dred Scott*. But nothing in the Constitution grants the President, federal agencies, or anyone else authority to impose conditions on the grant of citizenship to individuals born in the United States. The President's Executive Order of January 20, 2025—the Citizenship Stripping Order—declares that children born to parents who are undocumented or who have lawful, but temporary, status lack citizenship and directs federal agencies to deprive those individuals of their rights. It is flatly contrary to the Fourteenth Amendment's text and history, century-old Supreme Court precedent, longstanding Executive Branch interpretation, and the Immigration and Nationality Act (INA). The Plaintiff States are therefore exceedingly likely to succeed on the merits of their claims.

Absent an injunction, the Citizenship Stripping Order will cause substantial and irreparable harm to the Plaintiff States and their residents. More than 150,000 newborn children who are born each year in the United States will be denied citizenship under the Citizenship

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Stripping Order because their parents are undocumented; more than 1,100 such children are born in the Plaintiff States each month. These numbers represent only a conservative baseline because the Order also attempts to deny citizenship to children born to parents with lawful, temporary status. If implemented, the Citizenship Stripping Order will cause the Plaintiff States to lose substantial federal funds that are conditioned on their residents' citizenship and to incur immediate, substantial, and unbudgeted expenditures to implement the massive changes required to state programs and systems, none of which the Plaintiff States can recoup through this case or otherwise.

The Plaintiff States will also suffer irreparable harm because thousands of children will be born within their borders but denied full participation and opportunity in American society and the Plaintiff States' communities. Children born in the Plaintiff States will be rendered undocumented, subject to removal or detention, and many left stateless. They will be denied their right to travel freely and re-enter the United States, including the Plaintiff States. They will lose their ability to obtain a Social Security number (SSN) and work lawfully in the Plaintiff States as they grow up. They will be denied their right to vote, serve on juries, and run for certain offices. And they will be placed into positions of instability and insecurity as part of a new, Presidentially-created underclass in the United States.

In issuing the Temporary Restraining Order currently in place, the Court rightfully recognized the blatant unlawfulness of the Citizenship Stripping Order and the grave harms it will cause. ECF No. 43. A preliminary injunction is imperative to protect the Plaintiff States and their public agencies, public programs, public fiscs, and state residents against the egregiously illegal actions of the President and federal government. The Court should preliminarily enjoin the implementation and enforcement of the Citizenship Stripping Order.

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

## II. BACKGROUND

### A. President Trump Issues the Citizenship Stripping Order on Day One of His Presidency

On January 20, 2025, President Trump issued an Executive Order entitled "Protecting the Meaning and Value of American Citizenship." ECF No. 1 ¶ 2; Declaration of Lane Polozola, Ex. 1. Section 1 of the Order declares that U.S. citizenship "does not automatically extend to persons born in the United States" if (1) the individual's mother was "unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth"; or (2) the "person's mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth." Polozola Decl., Ex. 1. Section 2 states that it is the "policy of the United States" that no department or agency of the federal government shall issue documents recognizing such persons as U.S. citizens or accept documents issued by State governments recognizing such persons as U.S. citizens. *Id.* This specific provision is effective for births occurring on or after February 19, 2025. *Id.* Section 3 directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order," and mandates that officials cannot "act, or forbear from acting, in any manner inconsistent with this order." *Id.* Finally, the Order directs that "the heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities." *Id.*

### B. The Citizenship Stripping Order Will Immediately Disrupt Plaintiff States' Programs and Upset the Lives of Hundreds of Thousands of Families

Citizenship confers the "right to full and equal status in our national community, a right conferring benefits of inestimable value upon those who possess it." *Fedorenko v. United States*, 449 U.S. 490, 522 (1981) (Blackmun, J., concurring). At the highest level, "citizenship confers

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

legal, political, and social membership in the United States, thus creating paths to mobility." Declaration of Caitlin Patler ¶ 9. It guarantees the opportunity to participate and belong in society—to live free from fear of deportation, vote, serve on a jury, and travel. ECF No. 1 ¶¶ 55-63; *see* Declaration of Mozhdeh Oskouian ¶¶ 5-9; Declaration of David Baluarte ¶¶ 12-15. It further provides the opportunity to achieve economic, health, and educational potential through the right to work legally and through eligibility for social supports, such as federally backed healthcare benefits, cash and food assistance during vulnerable times, and federal student financial aid. ECF No. 1 ¶¶ 64-65, 71-90; Patler Decl. ¶¶ 10-13, 16-22; Declaration of Tom Wong ¶¶ 11-14; Declaration of Sarah Peterson ¶¶ 5, 8-10.

By purporting to revoke birthright citizenship, the Citizenship Stripping Order seeks to immediately deny these rights and benefits to more than 150,000 children born each year in the United States, condemning most to a life without authorized immigration status and some to statelessness. ECF No. 1 ¶ 3; Declaration of Shelley Lapkoff ¶¶ 10, 16; Baluarte Decl. ¶¶ 8-10; Oskouian Decl. ¶¶ 5-10. Instead of the right to full participation and belonging in their home country—the United States—these children will be forced to live "in the shadow," under the constant risk of deportation and unable to obtain work authorization as they grow up, interrupting their "ability to count on the promise of the future." Patler Decl. ¶¶ 20-21; *see also* ECF No. 1 ¶¶ 56, 64-65; Oskouian Decl. ¶¶ 5, 9-10, 12; Baluarte Decl. ¶¶ 12-15.

"Denying birthright citizenship to children born in the U.S. to undocumented parents will create a permanent underclass of people who are excluded from U.S. citizenship and are thus not able to realize their full potential." Wong Decl. ¶ 9. Indeed, the consequences will be severe and long-lasting to the Plaintiff States and their communities, of which the children born under the Order are a part. Undocumented students are less likely to complete high school or enroll in higher education and will earn less at almost every stage of the lifetimes than their citizen counterparts. ECF No. 1 ¶ 64; Patler Decl. ¶¶ 10-12; Wong Decl. ¶¶ 11-12, 14. They will be more likely than their citizen peers to experience disease, depression, anxiety, and social

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1   isolation. ECF No. 1 ¶ 64; Patler Decl. ¶¶ 18-19, 22. Stated differently, "[b]irthright citizenship

2   is a cornerstone of the U.S. identity as a nation of immigrants, promoting social cohesion,

3   opportunity, and mobility. Ending birthright citizenship would erode those principles and divide

4   our national community, creating and reinforcing vast inequality for generations to come." Patler

5   Decl. ¶ 27.

6        The Citizenship Stripping Order will directly injure the Plaintiff States in other ways,

7   too, including by directly reducing their federal funding through programs that the Plaintiff

8   States administer, such as Medicaid, the Children's Health Insurance Program (CHIP), Title IV-

9   E foster care and adoption assistance programs, and programs to facilitate streamlined issuance

10   of SSNs to eligible babies—among others. ECF No. 1 ¶¶ 71-92; *see* Declaration of Charissa

11   Fotinos ¶¶ 21-28; Declaration of Jenny Heddin ¶¶ 11-21; Declaration of Katherine Hutchinson

12   ¶¶ 9-13; Declaration of Jeffrey Tegen ¶¶ 8-17, 21-26; Declaration of Krystal Colburn ¶¶ 12-15;

13   Declaration of Nadine O'Leary ¶¶ 19-22; Declaration of Jennifer Woodward ¶ 13; Declaration

14   of Aprille Flint-Gerner ¶¶ 12-16; Declaration of Heidi Mueller ¶¶ 16-30. In addition to these

15   direct and substantial financial losses, the Plaintiff States will also be required to immediately

16   begin modifying the funding, operational structure, and administration of large, statewide

17   programs to account for this change. ECF No. 1 ¶¶ 93-101; Fotinos Decl. ¶¶ 21-25, 28; Heddin

18   Decl. ¶¶ 18-21; Hutchinson Decl. ¶¶ 14-18; Tegen Decl. ¶¶ 18-20; O'Leary Decl. ¶¶ 7-13, 23;

19   Woodward Decl. ¶¶ 14-18; Flint-Gerner Decl. ¶¶ 16-18; Mueller Decl. ¶¶ 31-39.

20                   **III.    ARGUMENT**

21        A preliminary injunction is warranted where the moving party establishes that (1) it is

22   likely to succeed on the merits; (2) irreparable harm is likely absent preliminary relief; (3) the

23   balance of equities tips in the movant's favor; and (4) an injunction is in the public interest.

24   *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). All factors strongly favor the

25   Plaintiff States here. The Court should enter a nationwide preliminary injunction to prevent the

26   cascade of irreparable and immediate harm that will follow if the Order is implemented.

PLAINTIFF STATES' MOTION FOR        5        ATTORNEY GENERAL OF WASHINGTON
PRELIMINARY INJUNCTION                     Civil Rights Division
CASE NO. 2:25-CV-00127-JCC               800 Fifth Avenue, Suite 2000
                                     Seattle, WA 98104
                                     (206) 464-7744

**A.      The Plaintiff States Have Standing to Challenge the Citizenship Stripping Order**

The Plaintiff States have standing to obtain an injunction because the Citizenship Stripping Order harms both their sovereign and pecuniary interests. The Plaintiff States' sovereign interests involve "the exercise of sovereign power over individuals and entities within the relevant jurisdiction." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). "[T]his involves the power to create and enforce a legal code, both civil and criminal." *Id.*; *see also Diamond v. Charles*, 476 U.S. 54, 65 (1986) (the power to enforce a legal code "is one of the quintessential functions of a State," and gives the State a "direct stake . . . in defending the standards embodied in that code") (cleaned up). "This interest is sufficient to convey standing to . . . challenge a federal [law] that preempts or nullifies state law." *Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1176 (9th Cir. 2024).

Here, the Citizenship Stripping Order proclaims that thousands of the Plaintiff States' residents are not subject to the jurisdiction of the United States. While that assertion is based on a frivolous interpretation of the Fourteenth Amendment, *see infra* § III.B, if not enjoined the Order would render these residents the legal equivalents of "foreign ministers" who enjoy immunity from "national or municipal law." *Schooner Exch. v. McFaddon*, 11 U.S. 116, 138, 147 (1812); *see also Davis v. Packard*, 33 U.S. 312, 324 (1834) (affirming dismissal of civil suit against diplomat whose status "exempted him from being sued in [New York] state court"). Because the Plaintiff States have a "'sovereign interest' in the retention of [their] authority" to regulate individuals within their borders, they have standing to challenge the present attempt to gut it. *Washington*, 108 F.4th at 1176 (quoting *Snapp*, 458 U.S. at 601).

Next, the Plaintiff States may seek redress for the direct and immediate economic and administrative harms the Citizenship Stripping Order will impose. As the Supreme Court has recognized, "[m]onetary costs are of course an injury[,]" *United States v. Texas*, 599 U.S. 670, 676 (2023), and such losses constitute "sufficiently concrete and imminent injury to satisfy Article III," *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019). Indeed, where the federal

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

government's action causes a direct reduction in the number of individuals a state entity serves—and therefore a loss of revenue—the loss is unquestionably sufficient for standing. *Biden v. Nebraska*, --- U.S. ---, 143 S. Ct. 2355, 2365-66 (2023) (holding Missouri had standing to challenge federal action cancelling student loans because state entity serviced loans under contract with the federal government and the state alleged the challenged action would cost it millions in fees "it otherwise would have earned under its contract"). The Ninth Circuit has likewise confirmed that states have standing to challenge unlawful federal action that will directly reduce the number of individuals eligible for federally backed programs like Medicaid. *City & Cnty. of San Francisco v. U.S. Citizen & Immigr. Servs.*, 981 F.3d 742, 754 (9th Cir. 2020).

The Plaintiff States provide health, social, and administrative services to their residents and will, as a result of the Order, lose substantial federal funds they currently receive. Thousands of babies born each year will be impacted. At a minimum, there will be approximately 4,000 in Washington, 5,200 in Illinois, 3,400 in Arizona, and 1,500 in Oregon. ECF No. 1 ¶ 3; Lapkoff Decl. ¶¶ 11-16. If denied citizenship, these children will no longer be eligible for programs the Plaintiff States administer pursuant to federal law, including Medicaid, CHIP, and foster care and adoption assistance programs. ECF No. 1 ¶¶ 94-100; Fotinos Decl. ¶¶ 21-28; Heddin Decl. ¶¶ 6, 11-13; Tegen Decl. ¶¶ 8-17, 23-25; Flint-Gerner Decl. ¶ 6; Mueller Decl. ¶¶ 16-30. The result is that the Plaintiff States will necessarily lose federal reimbursement dollars for services provided through these programs. *See* Fotinos Decl. ¶¶ 21-28 (Washington's Health Care Authority (HCA) estimating likely loss of nearly $7 million per year if approximately 4,000 children become ineligible for Medicaid or CHIP coverage); Tegen Decl. ¶¶ 23-25 (Arizona Health Care Cost Containment System (AHCCCS) estimating expected reduction in federal revenue to the state for medical care for children of $321,844,600 over the first 18 years of life for the first cohort subject to the Order); Flint-Gerner Decl. ¶¶ 12-14 (Oregon Department of Human Services (ODHS) estimating that "even 45 fewer children being eligible for Title IV-E"

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

7

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  would reduce "Oregon's reimbursement by $3.4 million" and "even just eight fewer eligible

2  children per year equates to $596,850.49 in lost federal funding"); Heddin Decl. ¶¶ 11-19

3  (detailing how each loss of an eligible child will negatively impact Washington's foster care

4  reimbursements under Title IV-E); Mueller Decl. ¶¶ 16-30 (same). These losses will further

5  injure the Plaintiff States by harming children who are wards in their custody. *See* ECF No. 1

6  ¶¶ 89-90.

7  The Plaintiff States will likewise suffer direct losses of federal reimbursements under the

8  Social Security Administration's (SSA) longstanding Enumeration at Birth program. ECF No. 1

9  ¶¶ 91-92; Hutchinson Decl. ¶¶ 9-13 (detailing expected loss of $16,000 per year to Washington's

10  Department of Health (DOH) due to decrease in the number of newborns assigned SSNs at birth);

11  Colburn Decl. ¶¶ 12-15 (revocation of birthright citizenship to children born in Arizona will

12  result in reduced EAB funding to the state); O'Leary Decl. ¶¶ 19-22 (estimating loss to Illinois

13  of $21,788 to $38,129); Woodward Decl. ¶¶ 12-13 (estimating loss to Oregon of more than

14  $7,230 per year).

15  If no preliminary injunction issues, the Plaintiff States also will suffer immediate and

16  significant operational disruptions and administrative burdens within state agencies and state-

17  run-healthcare facilities as they try to navigate the chaos and uncertainty the Citizenship

18  Stripping Order creates. ECF No. 1 ¶¶ 93-101; *see* Declaration of Brian Reed ¶ 7 (detailing

19  disruptions to "services UW Medicine provides to newborns in the neonatal intensive care unit

20  (NICU)"); Fotinos Decl. ¶¶ 25-28 (detailing HCA's need to develop extensive training and

21  guidance in response to a denial of birthright citizenship to children born in the United States,

22  which it estimates will require 7-8 FTEs and take two to three years to complete); Hutchinson

23  Decl. ¶¶ 14-18 (detailing Washington DOH's likely need to devote "substantial operational time,

24  manpower resources, and technological resources" to change Washington's vital records

25  system); Heddin Decl. ¶¶ 20-21 (Washington's child-welfare agency will need to divert staff

26  resources from existing projects in order to amend and update processes related to Title IV-E

eligibility determinations and training); Tegen Decl. ¶¶ 18-20 (estimating it will cost $2.3-4.4 million and require 12 months to update Arizona's three systems to determine eligibility for Medicaid coverage); O'Leary Decl. ¶¶ 13, 23 (state-run healthcare facilities would incur new administrative costs to implement new systems for registration of newborns); Flint-Gerner Decl. ¶¶ 17-18 (identifying the "significant and costly administrative burden on [Oregon]" of developing a new system to determine the citizenship of children entering foster care system); Mueller Decl. ¶¶ 31-39 (discussing the "immediate and detrimental effect on the operations and finances" of Illinois child welfare system). These harms and more are detailed below, and there is no doubt that they confer standing upon the Plaintiff States to challenge the Citizenship Stripping Order.

**B.    The Plaintiff States' Claims Are Likely to Succeed on the Merits Because Birthright Citizenship Is a Cornerstone of American Constitutional and Statutory Law That Is Beyond Serious Dispute**

The Plaintiff States will succeed on the merits because the Citizenship Stripping Order unlawfully attempts to rob individuals born in the United States of their constitutionally conferred and statutorily protected citizenship. A wall of Supreme Court, Ninth Circuit, and Executive Branch authorities, as well as the INA, make clear that children born in the United States in the coming weeks are citizens—just like all children born in the United States for more than 150 years. The Court recognized this in issuing a TRO and should do so again by issuing a preliminary injunction.

### 1.    Birthright Citizenship Is Enshrined in the Constitution

The meaning of the Fourteenth Amendment begins with the text. As the Supreme Court has explained, "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008). The text is expressly broad: "*All persons* born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

(emphasis added). The Citizenship Clause contains no exceptions based on the citizenship, immigration status, or country of origin of one's parents. Rather, its only requirements are that an individual be born "in the United States" and "subject to the jurisdiction thereof."

The only U.S.-born individuals excluded are those who are *not* subject to the jurisdiction of United States' law at birth—the children of diplomats covered by diplomatic immunity and children born to foreign armies at war against the United States on U.S. soil. Not excepted are children born in the United States, even if their parents are undocumented or here lawfully but on a temporary basis. They must comply with U.S. law; so too must their parents. Undocumented immigrants pay taxes, must register for the Selective Service, and must otherwise follow—and are protected by—federal and state law just like anyone else within the United States' territorial sweep. *See Plyler v. Doe*, 457 U.S. 202, 211 (1982) ("That a person's initial entry into a State, or into the United States, was unlawful . . . cannot negate the simple fact of his presence within the State's territorial perimeter. Given such presence, he is subject to the full range of obligations imposed by the State's civil and criminal laws."). Indeed, it is absurd to suggest that undocumented immigrants are somehow not subject to the jurisdiction of the United States. They may be arrested and deported precisely *because* they are subject to the jurisdiction of the United States.

The history of the Citizenship Clause confirms this longstanding, well-recognized meaning of its plain language. Birthright citizenship stems from English common law's principle of *jus soli*—citizenship determined by birthplace. James C. Ho, *Defining "American" Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 367, 369 (2006). In response to *Dred Scott* and the Civil War, Congress and the States adopted the Fourteenth Amendment to reaffirm birthright citizenship as the law and "guarantee citizenship to virtually everyone born in the United States," with only narrow exceptions. James C. Ho, *Birthright Citizenship, The Fourteenth Amendment, and State Authority*, 42 U. Rich. L. Rev. 969, 971 (2008); *see also* Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade*

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

10

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1   *Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215,

2   2227 (2021) ("Congress had indeed identified a category of people who were not allowed to be

3   here, and who could be deported under federal law if found in the United States. Nevertheless,

4   through the Fourteenth Amendment, Congress made the children of illegally imported slaves

5   and free blacks U.S. citizens if born in the United States."); Ho, *Defining "American" Birthright*

6   *Citizenship*, *supra* at 369-72 (detailing ratification debate and concluding that "[t]ext and history

7   confirm that the Citizenship Clause reaches all persons who are subject to U.S. jurisdiction and

8   laws, regardless of race or alienage"); Garrett Epps, *The Citizenship Clause: A "Legislative*

9   *History*,*"* 60 Am. Univ. L. Rev. 331, 352-59 (2010) (detailing ratification debate); *see also*

10  *Plyler*, 457 U.S. at 214 ("Although the congressional debate concerning § 1 of the Fourteenth

11  Amendment was limited, that debate clearly confirms the understanding that the phrase 'within

12  its jurisdiction' was intended in a broad sense.").

13          This understanding of the Citizenship Clause is cemented by controlling U.S. Supreme

14  Court precedent which, more than 125 years ago, confirmed that the Fourteenth Amendment

15  guarantees citizenship to the children of immigrants born in the United States. *United States v.*

16  *Wong Kim Ark*, 169 U.S. 649, 704 (1898). As the Supreme Court explained: "Every citizen or

17  subject of another country, while domiciled here, is within the allegiance and the protection, and

18  consequently *subject to the jurisdiction*, of the United States." *Id.* at 693 (emphasis added).

19  Consequently, the Court held that a child born in San Francisco to Chinese citizens, who could

20  not themselves become citizens, was an American citizen. *Id.* at 704. In reaching this conclusion,

21  the Court reasoned that the Fourteenth Amendment "affirms the ancient and fundamental rule of

22  citizenship by birth within the territory, in the allegiance and under the protection of the country,

23  including all children here *born of resident aliens*." *Id.* at 693 (emphasis added). The Court noted

24  that the only exclusions involved individuals who were not, in fact, subject to U.S. jurisdiction:

25  "children born of alien enemies in hostile occupation, and children of diplomatic representatives

26  of a foreign state[]—both of which . . . had been recognized exceptions to the fundamental rule

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC                    11                    ATTORNEY GENERAL OF WASHINGTON
                                                                              Civil Rights Division
                                                                          800 Fifth Avenue, Suite 2000
                                                                              Seattle, WA  98104
                                                                                (206) 464-7744

of citizenship by birth within the country."[1] *Id.* at 682. In language that remains apt, the Court explained that the Citizenship Clause "is throughout affirmative and declaratory, intended to allay doubts and to settle controversies which had arisen, and not to impose any new restrictions upon citizenship." *Id.* at 688.

In addition to *Wong Kim Ark*, the Supreme Court has separately made clear that undocumented immigrants are "subject to the jurisdiction" of the United States. In *Plyler v. Doe*, the Court interpreted the Equal Protection Clause and explained that the term "within its jurisdiction" makes plain that "the Fourteenth Amendment extends to anyone, citizen or stranger, who *is* subject to the laws of a State, and reaches into every corner of a State's territory." 457 U.S. at 215. As the Court explained, "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." *Id.* at 211 n.10. The Court expressly confirmed that the phrases "within its jurisdiction" and "subject to the jurisdiction thereof" in the first and second sentences of the Fourteenth Amendment have the same meaning. *Id.*

These are merely the most notable examples of the judiciary's steadfast protection of the Fourteenth Amendment's birthright-citizenship guarantee. The Supreme Court, the Ninth Circuit, and other courts have repeatedly confirmed that individuals born in this country are citizens subject to its jurisdiction regardless of their parents' status or country of origin. *See*, *e.g.*, *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (recognizing that child of two undocumented immigrants "was a citizen of this country" by virtue of being "born in the United States"); *Perkins v. Elg*, 307 U.S. 325, 328 (1939) ("[A] child born here of alien parentage becomes a citizen of the United States."). Indeed, during World War II, the Ninth Circuit affirmed a district court's rejection of an attempt to strike from voter rolls 2,600 people of Japanese descent who

---

[1] Although the original understanding of the Fourteenth Amendment was that children born to tribal members are not subject to the United States' jurisdiction at birth, it is well established under a federal statute passed in 1924 that such children *are* granted U.S. citizenship at birth. *See* 8 U.S.C. § 1401(b).

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

12

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

were born in the United States. *Regan v. King*, 49 F. Supp. 222, 223 (N.D. Cal. 1942), *aff'd*, 134 F.2d 413 (9th Cir. 1943), *cert. denied*, 319 U.S. 753 (1943). As the district court explained, it was "unnecessary to discuss the arguments of counsel" challenging those individuals' citizenship because it was "settled" that a child born "within the United States" is a U.S. citizen. *Id.* Even before *Wong Kim Ark*, the Ninth Circuit confirmed the same. *Gee v. United States*, 49 F. 146, 148 (9th Cir. 1892) (Chinese exclusion laws "are inapplicable to a person born in this country, and subject to the jurisdiction of its government, even though his parents were not citizens, nor entitled to become citizens").[2]

The Executive Branch, too, has long endorsed this understanding of the Citizenship Clause. When the U.S. Department of Justice's Office of Legal Counsel (OLC) was asked in 1995 to assess the constitutionality of a bill that would deny citizenship to children unless a parent was a citizen or permanent resident alien, OLC concluded that the "legislation is unquestionably unconstitutional." *Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340, 341 (1995). As OLC recognized, "Congress and the States adopted the Fourteenth Amendment in order to place the right to citizenship based on birth within the jurisdiction of the United States beyond question." *Id.* at 340. The phrase "subject to the jurisdiction thereof," OLC explained, "was meant to reflect the existing common law exception for discrete sets of persons who were deemed subject to a foreign sovereign and immune from U.S. laws," such as "foreign diplomats." *Id.* at 342. OLC concluded: "Apart from these extremely limited exceptions, there can be no question that children born in the United States of aliens are subject to the full jurisdiction of the United States." *Id.* Thus, "as consistently recognized by courts and Attorneys General for over a century, most notably by the Supreme

---

[2] *Accord Chin v. United States*, 43 App. D.C. 38, 42 (D.C. App. Ct. 1915) ("If it be true that Chin Wah was born of Chinese parents domiciled in California, and not employed in any diplomatic or official capacity, he became at his birth a citizen of the United States."); *Moy Suey v. United States*, 147 F. 697, 698 (7th Cir. 1906) ("Nativity gives citizenship, and is a right under the Constitution. It is a right that congress would be without constitutional power to curtail or give away.").

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

13

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  Court in *United States v. Wong Kim Ark*, there is no question that they possess constitutional

2  citizenship under the Fourteenth Amendment." *Id.*

3      The Executive Branch has accepted this foundational understanding and built daily

4  government functions around the Citizenship Clause's plain meaning. For example, the U.S.

5  Department of State is granted the authority under federal law to issue U.S. passports. 22 U.S.C.

6  § 211a. As explained in the State Department's Foreign Affairs Manual, "[a]ll children born in

7  and subject, at the time of birth, to the jurisdiction of the United States acquire U.S. citizenship

8  at birth even if their parents were in the United States illegally at the time of birth[.]" Polozola

9  Decl., Ex. 4. The State Department's Application for a U.S. Passport confirms that for

10  "Applicants Born in the United States" a U.S. birth certificate alone is sufficient to prove one's

11  citizenship. *Id.*, Ex. 5. And U.S. Citizenship and Immigration Services (USCIS) likewise

12  confirms in public guidance that "[i]f you were born in the United States, you do not need to

13  apply to USCIS for any evidence of citizenship. Your birth certificate issued where you were

14  born is proof of your citizenship." *Id.*, Ex. 6.

15      In short, with the stroke of a pen, the Citizenship Stripping Order seeks to overrule 150

16  years of consensus as to the Citizenship Clause's established meaning. But the Constitution does

17  not confer upon the President the authority to deny birthright citizenship to children born on

18  American soil. The Citizenship Stripping Order is unconstitutional, and the Plaintiff States are

19  overwhelmingly likely to succeed on the merits of their Fourteenth Amendment claim.

20        **2.**      **Birthright Citizenship Is Protected Under the INA**

21      The Plaintiff States are equally likely to prevail on their claim under the INA. That statute

22  faithfully tracks the Citizenship Clause's language, stating: "The following shall be nationals

23  and citizens of the United States at birth:[] a person born in the United States, and subject to the

24  jurisdiction thereof[.]" 8 U.S.C. § 1401(a). Like any statute, it must be "interpret[ed] . . . in

25  accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v.*

26  *Clayton Cnty.*, 590 U.S. 644, 654 (2020). There is no doubt that the INA incorporates the

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

14

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Citizenship Clause's broad grant of birthright citizenship. It uses identical language and the legislative history confirms that it codified the Fourteenth Amendment's protections.[3] *See To Revise and Codify the Nationality Laws of United States into a Comprehensive Nationality Code: Hearings Before the Comm. on Immig. and Naturalization on H.R. 6127 Superseded by H.R. 9980*, 76th Cong., 1st Sess., at 38 (1940) (Section 201 language regarding citizenship at birth "is taken of course from the fourteenth amendment to the Constitution"); *Nationality Laws of the United States*, 76th Cong. 1st Sess., at 418 ("It accords with the provision in the fourteenth amendment to the Constitution[.]").[4]

As a result, the INA incorporates the same bright-line and near-universal grant of birthright citizenship as the Citizenship Clause itself. *See George v. McDonough*, 596 U.S. 740, 746 (2022) ("Where Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it.") (cleaned up). Like the Citizenship Clause and Supreme Court precedent interpreting it, the INA cannot be displaced by executive fiat. The Plaintiff States are highly likely to succeed in showing that the Citizenship Stripping Order violates the INA.

## C.    The Citizenship Stripping Order Will Immediately and Irreparably Harm the Plaintiff States

If not enjoined, the Citizenship Stripping Order will immediately and irreparably harm the Plaintiff States by injuring their sovereign interests and forcibly shifting unrecoverable financial costs and substantial administrative and operational burdens onto the Plaintiff States. Economic harm "is irreparable" when a state "will not be able to recover money damages," *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018), including when money damages are not recoverable due to the sovereignty of the defendant, *Idaho v. Coeur d'Alene Tribe*, 794 F.3d

---

[3] 8 U.S.C. § 1401 was first enacted as Section 201 of the Nationality Act of 1940 and reenacted as Section 301 of the Immigration and Nationality Act of 1952. *See* H.R. Rep. No. 82-1365 (1952), *as reprinted in* 1952 U.S.C.C.A.N. 1653, 1734 ("The bill carries forward substantially those provisions of the Nationality Act of 1940 which prescribe who are citizens by birth."); *id.* at 1675-78 (1952 House Report discussing the Citizenship Clause as interpreted by *Wong Kim Ark*).

[4] Available at: https://babel.hathitrust.org/cgi/pt?id=mdp.39015019148942&seq=1.

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

15

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    1039, 1046 (9th Cir. 2015). And when "[t]he State will bear the administrative costs of changing

2    its system to comply" and is unlikely to recover those costs in litigation, the harm is irreparable.

3    *Ledbetter v. Baldwin*, 479 U.S. 1309, 1310 (1986).

4         Under the new regime the Citizenship Stripping Order attempts to erect, the Plaintiff

5    States will suffer irreparable and immediate harm to their public health programs. Medicaid and

6    CHIP, created by federal law, support the Plaintiff States' provision of low-cost health insurance

7    to individuals whose family incomes fall below eligibility thresholds and who are U.S. citizens

8    or "qualified aliens." 42 U.S.C. § 1396b(v); 8 U.S.C. §§ 1611(a), (c)(1)(B); 42 C.F.R. § 435.406.

9    The programs are administered by States but funded in part by the federal government. *See*

10   Fotinos Decl. ¶¶ 4-7, 10-16. And under federal law, agencies like Washington's HCA must

11   provide Medicaid and CHIP coverage to citizens and qualified noncitizens whose citizenship or

12   qualifying immigration status is verified and who are otherwise eligible. *Id.* ¶ 17. To provide

13   legally mandated care, ensure that children within their jurisdiction have access to

14   comprehensive health insurance, and further the public health, certain states like Washington

15   also provide state-funded health insurance to undocumented children who otherwise are eligible

16   for Medicaid or CHIP. *Id.* ¶¶ 4-5, 11-16, 23-24.

17        Washington's Medicaid and CHIP programs rely on significant federal funding to

18   operate—including federal reimbursements of between 50 and 65 percent of expenditures for

19   coverage provided to eligible children. *Id.* ¶¶ 6, 14, 24, 26. In 2022, HCA administered coverage

20   for more than 4,000 children who, as citizens, were eligible for Medicaid or CHIP despite being

21   born to undocumented or non-qualifying mothers. *Id.* ¶ 27. If those children were not citizens at

22   birth, they would be ineligible for Medicaid or CHIP and the cost of their care would shift to

23   Washington's state-funded CHP health coverage for children, resulting in an increase to State

24   expenditures of $6.9 million. *Id.* ¶¶ 26-27. The Citizenship Stripping Order will impact at least

25   that many newborn children in Washington each year. Lapkoff Decl. ¶ 11.

26

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

16

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Nor can this harm be waved away as self-inflicted. These programs are established and operated pursuant to federal law that dictates services states *must* provide. State providers like UW Medicine's Harborview hospital are required by federal law to provide emergency care. Fotinos Decl. ¶ 26; *see* 42 U.S.C. § 1395dd(b); 42 C.F.R. § 440.255(c). For children who would be eligible for CHIP but for their status, the State will necessarily lose the 65 percent federal reimbursement for emergency care that is provided. Fotinos Decl. ¶ 26. Other Plaintiff States will similarly lose federal Medicaid and CHIP funding for babies stripped of citizenship. *See* Tegen Decl. ¶¶ 23-25 (estimating that removal of birthright citizenship would reduce federal revenue to Arizona for medical care provided to children by $321,844,600 over the first 18 years of life for the first cohort subject to the Order).

The Citizenship Stripping Order will likewise cause the direct loss of federal reimbursements for services provided in state foster care systems. For example, Washington State's Department of Children, Youth, and Families (DCYF), like other Plaintiff States' child welfare agencies, receives federal Title IV-E funding for the administration of its foster care program, including programs to support permanent placements and other critical functions. Heddin Decl. ¶¶ 4-10; Flint-Gerner Decl. ¶¶ 4-11 (Oregon); Mueller Decl. ¶¶ 16-30 (Illinois). State reliance on Title IV-E is substantial: In federal financial year 2024, Washington received $219 million in Title IV-E reimbursements. Heddin Decl. ¶ 17. Under the Citizenship Stripping Order, children born to undocumented parents will no longer be eligible under Title IV-E; the Plaintiff States will thus bear the full cost of serving children in their foster care systems. Heddin Decl. ¶¶ 11-18; *see also* Flint-Gerner Decl. ¶ 14 (estimating Oregon will lose $569,850 if even eight children become ineligible and $3.4 million if even 45 children become ineligible under Title IV-E); Mueller Decl. ¶¶ 16-30 (detailing likely loss to Illinois of "significant share of federal funds under Title IV-E").

The Plaintiff States will also face an immediate reduction in payments from SSA for administration of the Enumeration at Birth program. Hutchinson Decl. ¶ 13; Colburn Decl.

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

17

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

¶¶ 12-15; O'Leary Decl. ¶¶ 19-22; Woodward Decl. ¶¶ 12-13. Pursuant to contracts with SSA, Plaintiff States' vital statistics agencies, like Washington's DOH, collect newborn birth data, format it, and transmit it to the SSA to facilitate the assignment of SSNs to newborn babies. Hutchinson Decl. ¶¶ 7-13. This is how almost all SSNs are assigned in the United States today. *Id.* ¶ 10. In exchange, the SSA pays the State $4.19 for each SSN assigned through this process, for a total of nearly $440,000 per year. *Id.* ¶ 12; *see* O'Leary Decl. ¶ 19 (Illinois receives $4.19 per SSN, for a total of just under $500,000 in FY 2025); Woodward Decl. ¶ 12 (Oregon receives $4.82 per SSN, for a total of $158,381 in 2023); Colburn Decl. ¶ 12 (Arizona received $936,469.38 for FY2025 through the EAB process). The loss of revenue will begin occurring immediately if the Citizenship Stripping Order goes into effect and SSA ceases issuing SSNs to children whose citizenship the federal government no longer recognizes.

Finally, the Plaintiff States' agencies will suffer additional immediate harms due to the sudden and substantial new administrative and operational burdens created by the Order. The Plaintiff States are required under federal law to verify the eligibility of the residents they serve through programs like Medicaid and CHIP. Fotinos Decl. ¶¶ 17-20; Tegen Decl. ¶ 18. Likewise, the Plaintiff States must confirm citizenship or a qualifying immigration status of children in foster care to receive reimbursements under Title IV-E. Heddin Decl. ¶ 20; Flint-Gerner Decl. ¶ 17; Mueller Decl. ¶ 31. State agencies that previously relied on a child's place of birth, birth certificate, or SSN to automatically determine eligibility for federal programs will now be required to create new systems to affirmatively determine the citizenship or immigration status of *every* child born in their states to ascertain whether they are entitled to federally backed services, as well as update policies, training, and guidance to operationalize these new systems. *See* Fotinos Decl. ¶¶ 25, 28 (necessary system changes for HCA would require 7-8 FTEs and take two to three years); Tegen Decl. ¶¶ 18-20 (cost of implementing necessary changes to AHCCCS eligibility systems range from $2.3-4.4 million); *see also* Heddin Decl. ¶¶ 20-21; O'Leary Decl. ¶¶ 13, 23; Flint-Gerner Decl. ¶¶ 16-18; Mueller Decl. ¶¶ 31-39.

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

18

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

In sum, the Plaintiff States will be forced to bear the costs of reforming their systems for the administration of several programs due to the Citizenship Stripping Order. They will lose millions of dollars in federal reimbursements and be forced to expend significant resources addressing the "chaotic" change the Citizenship Stripping Order requires. Hutchinson Decl. ¶ 16. These types of financial, operational, and administrative burdens, which cannot be avoided, are precisely the types of irreparable harm that warrant an injunction. *See, e.g.*, *City & Cnty. of San Francisco*, 981 F.3d at 762 (affirming injunction where states showed "they likely are bearing and will continue to bear heavy financial costs because of withdrawal of immigrants from federal assistance programs and consequent dependence on state and local programs"); *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1084-86 (9th Cir. 2020) (entering emergency stay where sudden election-law change would "send[] the State scrambling to implement and to administer a new procedure" in less than two months); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1083 (W.D. Wash. 2017) ("Throughout the time it will take [plaintiff organizations] to adequately build programs to service other populations, the organizations will suffer irreparable harm.").

**D.    The Equities and Public Interest Weigh Strongly in the Plaintiff States' Favor**

The equities and public interest, which merge when the government is a party, could not tip more sharply in favor of the Plaintiff States. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024). The Citizenship Stripping Order attempts to return our Nation to a reprehensible chapter of American history when *Dred Scott* excluded Black Americans from citizenship—a view of citizenship soundly rejected by the people and their representatives through the Fourteenth Amendment. *See* 19 Op. O.L.C. at 349 ("From our experience with *Dred Scott*, we had learned that our country should never again trust to judges or politicians the power to deprive from a class born on our soil the right of citizenship."). The Court should not allow a return to a regime where Americans born on United States soil are excluded from our citizenry based on their class, race, status, or any other characteristic. This grave deprivation of rights belies any public interest in the Order because "public interest concerns are implicated when a constitutional right has

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

19

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    been violated, . . . all citizens have a stake in upholding the Constitution." *Betschart v. Oregon*,

2    103 F.4th 607, 625 (9th Cir. 2024) (quotations omitted).

3        The harms to Plaintiff States and their residents are not abstract. The Citizenship

4    Stripping Order deprives children born in the Plaintiff States of a foundational right enabling full

5    participation in our democracy, as citizens may exercise their fundamental right to vote in

6    federal, state, or local elections. U.S. Const. amend. XVI; ECF No. 1 ¶ 57 (citing state

7    constitutions). They may serve on federal and state juries. 28 U.S.C. § 1865(b)(1); ECF No. 1

8    ¶ 58 (citing state statutes). They may become the President, Vice President, or a member of

9    Congress, and hold offices in the Plaintiff States. U.S. Const. art. II, § 1; U.S. Const. art I, §§ 2-

10   3; ECF No. 1 ¶ 61 (citing state laws). Children subject to the Citizenship Stripping Order will be

11   denied each of these rights and benefits they would have had if they were born earlier.

12       The vast majority of those subject to the Order will be condemned to the additional harm

13   of living with undocumented legal status. Most of the babies denied citizenship will be left with

14   no legal immigration status and no prospects for legalization. Oskouian Decl. ¶¶ 5-10. Children

15   left without legal status "will be at immediate risk of removal from the United States," including

16   "being at risk of being arrested and detained" during removal proceedings. *Id.* ¶ 9. Others will

17   likely become stateless, "left in legal limbo" with "no home country to return to voluntarily or

18   otherwise." Baluarte Decl. ¶¶ 8-15. Statelessness would assign these children "a fate of ever-

19   increasing fear and distress." *Trop v. Dulles*, 356 U.S. 86, 102 (1958).

20       The harms of living in the United States without legal status are profound. One such harm

21   is the deprivation of one's fundamental right to travel: "Travel abroad, like travel within the

22   country . . . may be as close to the heart of the individual as the choice of what he eats, or wears,

23   or reads. Freedom of movement is basic in our scheme of values." *Aptheker v. Sec'y of State*,

24   378 U.S. 500, 505-506 (1964) (cleaned up). The Order deprives individuals of their right to travel

25   by denying eligibility to obtain a passport, 22 C.F.R. § 51.2, bars them from re-entry to the

26

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

20

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

United States, Oskouian Decl. ¶ 7, and makes them ineligible for identification needed for certain domestic travel. *Id.* ¶ 11; 6 C.F.R. §§ 37.11(g), 37.5.

Depriving children born and residing in the Plaintiff States of citizenship will further harm their economic, educational, and mental health outcomes, depriving the Plaintiff States of the human capital and economic contribution that results from the full social and economic integration of youth into society. Without legal status, individuals have worse educational outcomes: One study found that undocumented immigrant youth had more than double the probability of high school non-completion, relative to U.S. citizens. Patler Decl. ¶ 10; *see also* Wong Decl. ¶¶ 11-12 (finding 17.9% difference in unauthorized immigrants ages 18-24 with high school diploma compared to citizens). There are multiple causes of the disparity in education outcomes for undocumented students, including ineligibility for federal student financial aid. 34 C.F.R. § 668.33(a); *see also* Patler Decl. ¶ 13 (institutional characteristics, knowledge of future barriers, and feelings of despair and hopelessness also affect educational trajectories). In addition, the impacts on earning potential and mobility of undocumented status are stark. Children left without lawful status due to the Order will not be eligible for employment authorization. *See* 8 C.F.R. § 274a.12; Oskouian Decl. ¶ 12; Baluarte Decl. ¶ 14. While citizens and undocumented immigrants are both employed at similar rates, U.S. citizens earn significantly more annual total income. Wong Decl. ¶¶ 13-14; Patler Decl. ¶ 10 n.1.

"[I]mmigrant legal status is also a fundamental determinant of health." Patler Decl. ¶ 17. Children growing up undocumented experience "profound" health harms, "particularly with regard to mental health and emotional wellbeing." *Id.* ¶ 19. Barriers to health care, isolation and stigma, exclusion from normal rites of passage in American life, and fear of deportation contribute to undocumented individuals experiencing anxiety, chronic sadness, depression, and hopelessness, as well as poorer physical health. *Id.* ¶¶ 17-22. Furthermore, denial of critical cash and food assistance to children who would have been eligible but for the Order will deprive them of access to sufficient and healthy food and to shelter, warm clothing, and safety, "causing a

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

21

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

negative impact on children's health and risking increasing rates of child hunger." Peterson Decl. ¶¶ 7-10. An increase in the number of uninsured children will also exacerbate the harm to public health. *Id.* ¶¶ 13-14; Fotinos Decl. ¶ 24 (loss of federal eligibility for health coverage will "likely result in a significant number of children who may go uninsured and receive only emergency care when absolutely necessary, leading to worse health outcomes").

The Citizenship Stripping Order will additionally harm communities and civic life in the Plaintiff States. Threats to citizenship status trigger fear and cause young people to "distance themselves from their family, culture, and language[,]" and "[w]ithout lawful status, [young people] . . . cannot experience full belonging in U.S. culture and communities." Declaration of Magaly Solis Chavez ¶ 12. That is because "citizenship confers legal, political, and social membership in the United States," and is a "central determinant of immigrants' integration and mobility." Patler Decl. ¶¶ 9. "[D]enying citizenship to children born to undocumented parent(s) would be catastrophically harmful for children's development, wellbeing, and mobility. These harms would extend beyond the millions of impacted children themselves, impacting schools, neighborhoods, communities and, indeed, our nation as a whole." *Id.* ¶ 27. The Citizenship Stripping Order will create a permanent underclass of people excluded from American society, impeding community integration, self-sufficiency, and a thriving democracy. *See* Baluarte Decl. ¶ 15; Wong Decl. ¶ 8; Patler Decl. ¶¶ 9, 27; Peterson Decl. ¶¶ 7, 10; Solis Chavez Decl. ¶¶ 7-12; Oskouian Decl. ¶ 14.

Finally, the federal government has *no* legitimate public interest in enforcing the unlawful Citizenship Stripping Order. An executive order's "facially unconstitutional directives and its coercive effects weigh heavily against leaving it in place." *Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539 (N.D. Cal. 2017). The only justification offered is that the Citizenship Stripping Order may deter unlawful immigration, a hypothetical rationale and political motivation that can never justify an unlawful deprivation of constitutional rights. Indeed, the entire point of the Citizenship Clause was to *remove* the weaponization of citizenship status as a

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

22

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

policy tool. *See* 19 Op. O.L.C. at 347. The government has lawful means to effect immigration policy. The Citizenship Stripping Order is not one of them.

**E.    A Nationwide Injunction Barring Implementation of the Citizenship Stripping Order Is Needed to Provide Complete Relief**

A nationwide injunction is necessary due to the extraordinary nature of the Citizenship Stripping Order and the impossibility of fashioning an injunction of lesser scope that would provide complete relief to the Plaintiff States. As the Ninth Circuit has explained, "[t]he scope of an injunction is 'dependent as much on the equities of a given case as the substance of the legal issues it presents,' and courts must tailor the scope 'to meet the exigencies of the particular case.'" *Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020) (quoting *Azar*, 911 F.3d at 584). Here, American citizenship cannot be made to hinge on the state in which a child is born without causing the Plaintiff States the harms detailed herein. If an injunction is limited in geographic scope, the Plaintiff States would suffer the same harms insofar as babies born in non-party states (who would otherwise have been citizens) travel or move to the Plaintiff States and obtain healthcare and foster care services at the Plaintiff States' expense. Expecting parents would be restricted from travel—essentially trapped in the Plaintiff States—rather than risk their baby's birth as a non-citizen in a different state. State-based citizenship would also be unworkable at airports and other international ports of entry, which are controlled by federal authorities and require uniform rules.

In addition to these practical realities, the Supreme Court has acknowledged nationwide relief is necessary when "one branch of government [has] arrogated to itself power belonging to another." *Biden*, 143 S. Ct. at 2373 (reversing district court's refusal to issue preliminary injunction). The Citizenship Stripping Order's attempt to do precisely that—to unilaterally amend the Fourteenth Amendment and discard a federal statute—necessitates an injunction that preserves the status quo birthright citizenship guarantee as it has long existed: A uniform rule

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

23

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  that draws no lines based upon the citizenship or immigration status of one's parents or the

2  location of one's birth within the United States.

3                          **IV.    CONCLUSION**

4        Plaintiff States request that the Court issue a preliminary injunction barring the

5  Citizenship Stripping Order's enforcement or implementation.

6        DATED this 27th day of January 2025.

7                                    NICHOLAS W. BROWN
                                     Attorney General
8
                                     *s/ Lane M. Polozola*
9                                    COLLEEN M. MELODY, WSBA #42275
                                     Civil Rights Division Chief
10                                   LANE POLOZOLA, WSBA #50138
                                     DANIEL J. JEON, WSBA #58087
11                                   ALYSON DIMMITT GNAM, WSBA #48143
                                     Assistant Attorneys General
12                                   Wing Luke Civil Rights Division
                                     Office of the Washington State Attorney General
13                                   800 Fifth Avenue, Suite 2000
                                     Seattle, WA 98104-3188
14                                   (206) 464-7744
                                     colleen.melody@atg.wa.gov
15                                   lane.polozola@atg.wa.gov
                                     daniel.jeon@atg.wa.gov
16                                   alyson.dimmittgnam@atg.wa.gov

17                                   *Attorneys for Plaintiff State of Washington*

18                                   I certify that this memorandum contains 8395
                                     words, in compliance with the Local Civil Rules.
19
                                     KRIS MAYES
20                                   *Attorney General of Arizona*

21                                   *s/ Joshua Bendor*
                                     Joshua D. Bendor (AZ No. 031908)*
22                                   Luci D. Davis (AZ No. 035347)*
                                     Gabriela Monico Nunez (AZ No. 039652)*
23                                   Office of the Arizona Attorney General
                                     Firm State Bar No. 14000
24                                   2005 N. Central Ave.
                                     Phoenix, AZ 85004
25                                   (602) 542-3333
                                     Joshua.Bendor@azag.gov
26                                   Luci.Davis@azag.gov

Gabriela.MonicoNunez@azag.gov
ACL@azag.gov

*Pro hac vice*
*Attorneys for Plaintiff State of Arizona*

KWAME RAOUL
*Attorney General, State of Illinois*

*s/ Rebekah Newman*
REBEKAH NEWMAN, ARDC #6327372*
Assistant Attorney General
Special Litigation Bureau
Office of the Illinois Attorney General
115 South LaSalle St., Floor 35
Chicago, IL 60603
Tel. (773) 590-6961
rebekah.newman@ilag.gov

*Pro hac vice*
*Attorneys for Plaintiff State of Illinois*

DAN RAYFIELD
*Attorney General, State of Oregon*

*/s/ Carla A. Scott*
CARLA A. SCOTT, WSBA #39947
THOMAS H. CASTELLI, OSB #226448*
Senior Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Carla.A.Scott@doj.oregon.gov
Thomas.Castelli@doj.oregon.gov

*Pro hac vice*
*Attorneys for Plaintiff State of Oregon*

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

25

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed with the United State District Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated this 27th day of January 2025 in Seattle, Washington.

*s/ Tiffany Jennings*
Tiffany Jennings
Paralegal

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744