1

The Honorable Judge John C. Coughenour

2

3

4

5

6          **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
7                      **AT SEATTLE**

8

State of Washington, et al.,               Case No. 2:25-cv-00127-JCC
9
                        Plaintiffs,         **INDIVIDUAL PLAINTIFFS'**
10                                          **SUPPLEMENTAL MOTION FOR**
                                            **PRELIMINARY INJUNCTION**
11         v.
                                            Noting Date: February 4, 2025
12   Donald Trump, et al.,
                                            ORAL ARGUMENT REQUESTED
13                      Defendants.
                                            Hearing Scheduled for:
14                                          February 6, 2025 at 10:00 a.m.

15

16

17

18

19

20

21

22

23

24

## I.     INTRODUCTION

Individual Plaintiffs (hereinafter, "Plaintiffs"), on behalf of themselves and the class they seek to represent, ask the Court to enjoin implementation of a flagrantly unconstitutional executive order that purports to reinterpret the Fourteenth Amendment's Citizenship Clause and strip persons born in the United States of citizenship by "mere executive fiat." *Sterling v. Constantin*, 287 U.S. 378, 400 (1932). Plaintiffs Delmy Franco, Cherly Norales, and Alicia Chavarria are expectant mothers whose anticipated due date is on or after February 19, 2025. Because neither they nor the fathers of their children are lawful permanent residents (LPRs) or citizens of the United States, their children, once born—and despite being born in the United States—will not be recognized as U.S. citizens by operation of an executive order that President Trump signed shortly after his inauguration on January 20, 2025. *See* The White House, Executive Order, Protecting the Meaning and Value of American Citizenship, https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-meaning-and-value-of-american-citizenship/ (Jan. 20, 2025) (hereinafter, "EO").

The EO brazenly seeks to override the plain text of the Fourteenth Amendment, which affords citizenship to "[a]ll persons born . . . in the United States, and subject to the jurisdiction thereof." U.S. Const. amend. XIV, § 1, cl. 1. The Citizenship Clause thus guarantees for *all* people born in the United States, regardless of race or parentage, the "priceless treasure" that is U.S. citizenship. *Fedorenko v. United States*, 449 U.S. 490, 507 (1981) (citation omitted).

While the EO claims that the excluded children are "not subject to the jurisdiction" of the United States, EO § 1, that assertion is baseless. The persons targeted by the EO are subject to the jurisdiction of the United States, as they remain bound by its laws. The history of the Fourteenth Amendment—including the tradition of *jus soli* prior to Reconstruction, the

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 1
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

legislative debates surrounding passage of the Fourteenth Amendment, and caselaw since the Amendment's adoption—has made clear that the phrase regarding jurisdiction exempts only a narrow class of individuals. Indeed, the Supreme Court explicitly rejected the EO's legal basis long ago in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). As the Court explained there, the classes of persons exempted by the Amendment include only people such as the children of diplomats or of hostile foreign armies on U.S. soil. Thus, the EO is nothing more than a transparent attempt to rewrite the Constitution.

Plaintiffs and putative class members face irreparable harm if the Court does not enjoin this EO. The order's directive to strip persons of birthright citizenship amounts to "the total destruction of the individual's status in organized society" and constitutes "a form of punishment more primitive than torture." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). As the Supreme Court has recognized time and again, "[c]itizenship is a most precious right," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963), whose "value and importance" is "difficult to exaggerate," *Schneiderman v. United States*, 320 U.S. 118, 122 (1943). Without the protection of citizenship, the babies that will be born to Plaintiffs—and others similarly targeted by the EO—will lack any legal immigration status and accordingly will face the threat of removal and separation from family.[1] They will also lose access to public benefits available to U.S.-citizen children, and, later

---

[1] Plaintiffs seek a preliminary injunction for themselves and for putative class members. Temporary injunctive relief cannot be granted to a class before an order has been entered determining that class treatment is proper. *Nat'l Center for Immigrants Rts., Inc. v. INS*, 743 F.2d 1365, 1371 (9th Cir. 1984). Thus, Plaintiffs request provisional class certification to allow the Court to provide the preliminary injunctive relief required to protect the status quo and to prevent irreparable harm to putative class members as well as named plaintiffs. While "granting such provisional certification" still requires the Court to determine the Rule 23 requirements, "[i]ts analysis is tempered . . . by the understanding that such certifications may be altered or amended before the decision on the merits." *Damus v. Nielsen*, 313 F. Supp. 3d 317, 329 (D.D.C. 2018) (internal quotation marks and citation omitted).

1    in life, will lack work authorization, access to federal financial aid for higher education, the

2    ability to vote or travel, and the other precious rights that U.S. citizenship affords.

3        Fundamental constitutional rights "in our society [can]not . . . be decided by executive

4    fiat or by popular vote." *Patton v. Yount*, 467 U.S. 1025, 1054 (1984) (Stevens, J., dissenting).

5    The Constitution is clear in this case—and the consequences of the EO threaten Plaintiffs with

6    "the loss 'of all that makes life worth living.'" *Bridges v. Wixon*, 326 U.S. 135, 147 (1945)

7    (quoting *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922)). They accordingly request that the

8    Court enjoin any implementation of the EO to preserve the status quo while this case proceeds.

9                          **II.    LEGAL BACKGROUND**

10        This case centers on the Citizenship Clause of the Fourteenth Amendment. The

11   Amendment affirmed a Founding-era and antebellum legal consensus that *jus soli*—i.e.,

12   birthright citizenship—guaranteed U.S. citizenship to those born on U.S. soil. *See generally*

13   Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L. J. 405, 410–16 (2020).

14   But in many cases, that right was denied to black people, both free and enslaved, as well as their

15   descendants. *See, e.g.*, *id.* at 416–17. That racial limitation on *jus soli* reached its apex in the

16   Supreme Court's infamous decision in *Dred Scott v. Sanford*, 60 U.S. 393 (1857).

17        Following the Civil War, Congress passed, and the states ratified, the Fourteenth

18   Amendment. *See, e.g.*, Ramsey, *Originalism*, *supra*, at 417. The first section of that Amendment

19   includes the Citizenship Clause, which provides that "[a]ll persons born or naturalized in the

20   United States, and subject to the jurisdiction thereof, are citizens of the United States and of the

21   State wherein they reside." U.S. Const. amend. XIV, § 1, cl. 1. The Clause repudiated *Dred Scott*

22   and ensured that *jus soli* applied to *all* people in the United States. That broad language is subject

23

24

only to limited exceptions of people not "subject to the jurisdiction" of the United States—that is, of those who are not subject to our laws, such as diplomats.

In 1940, Congress enacted a statute that mirrors the Citizenship Clause. This birthright citizenship statute provides that "a person born in the United States, and subject to the jurisdiction thereof" is a citizen of the United States. 8 U.S.C. § 1401(a). The language "[wa]s taken . . . from the fourteenth amendment to the Constitution." *To Revise and Codify the Nat'y Laws of the United States into a Comprehensive Nat'y Code: Hearings Before the Comm. on Immig. and Naturalization on H.R. 6127 Superseded by H.R. 9980*, 76th Cong., 1st Sess., 38 (1940).

## III.     STATEMENT OF FACTS

### A.  The Birthright Citizenship Executive Order

On January 20, 2025, President Trump issued "Protecting the Meaning and Value of American Citizenship," the executive order at issue here. *See* EO. The EO states that, beginning thirty days after its signing, "no department or agency of the United States government shall issue documents recognizing United States citizenship" to newborn children whose "father was not a United States citizen or lawful permanent resident at the time of [the child's] birth" and mother was either "unlawfully present in the United States" or in a "lawful but temporary" status. EO § 2(a). In short, the order attempts to redefine the Citizenship Clause of the Fourteenth Amendment and restrict *jus soli* in the United States. The order only applies prospectively, so the constitutional text means one thing for certain people, and the opposite for similarly situated people born mere days apart.

Notably, the order fails to define who is "unlawfully present" or who has "temporary" status. To Plaintiffs' knowledge, Defendants have not provided any clarifying guidance. But the

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 4
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

most natural reading is that the order sweeps in any child born to parents who are neither LPRs nor U.S. citizens. This covers a wide range of immigration statuses, many of which allow noncitizens to reside in this country for years and even decades, such as asylum, withholding of removal, Temporary Protected Status, U status, and H-1B status. The order's arbitrary scope reflects the widespread and devastating impact it will have on thousands of immigrant families in this state. *See infra* Sec. IV, B.

### B. Plaintiffs' Pregnancies and the Harms They Will Face

#### 1. Plaintiff Delmy Franco

Ms. Franco is a noncitizen from El Salvador who currently resides in Lynnwood, Washington. Dkt. 59, Franco Decl., ¶ 2. She is around seven months pregnant, and her due date is March 26, 2025. *Id.* ¶ 9. Ms. Franco fled El Salvador in 2015 with her oldest daughter, who was six years old at the time, to escape violence and threats. Her partner had already fled El Salvador the year prior. *Id.* ¶¶ 6–7. An immigration judge (IJ) granted withholding of removal to Ms. Franco and asylum to her daughter. *Id.* ¶ 7. She has lived in the state of Washington for almost 10 years. *Id.* ¶ 3. Her brother and sister live in Washington, as does her immediate family, including a U.S.-citizen son born in 2018. *Id.* ¶ 8. She considers Washington her and her family's home. *Id.* Ms. Franco is also the primary caregiver for her niece and nephew, both of whom are teenagers and live with her immediate family. *Id.* ¶ 4.

When Ms. Franco heard about the EO in January 2025, she was immediately fearful that her child will be deemed undocumented at birth, as neither she nor her partner are U.S. citizens or LPRs. *Id.* ¶¶ 11–12. Ms. Franco fears her child may become the target of immigration enforcement, and that immigration agents could separate her and her family from her undocumented child because of the EO and her family's mixed immigration status. *Id.* ¶ 13. She

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 5
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

also fears that her child will lack educational opportunities and authorization to work legally in the United States. *Id.* Without the assurance of citizenship, Ms. Franco is concerned her child will feel unsafe and that she will have to live in hiding to protect the child and her family. *Id.* She is distressed at the prospect that her child will face removal to a country that the family had to flee due to persecution and violence. *Id.*

### 2. Plaintiff Cherly Norales

Ms. Norales is a noncitizen from Honduras who currently resides in Seattle, Washington. Dkt. 60, Norales Decl., ¶ 2. She is around seven months pregnant, and her due date is March 19, 2025. *Id.* ¶ 9. Ms. Norales fled Honduras in 2023 with her son, who was two years old at the time, to escape severe violence, abuse, and threats. *Id.* ¶ 6. Ms. Norales and her child have applied for asylum before an IJ. *Id.* ¶ 8.

When she heard about the EO, Ms. Norales feared that her child will be deemed undocumented at birth, as neither she nor her partner are U.S. citizens or LPRs. *Id.* ¶ 11. She worries that the child will not have access to certain public benefits that critically impact their well-being and, eventually, to access to higher education and work authorization. *Id.* ¶ 13. She does not want her child to ever risk removal to a country the child has never known—a country where she has suffered so much violence and abuse. *Id.*

### 3. Plaintiff Alicia Chavarria

Ms. Chavarria is a noncitizen from El Salvador who currently resides in Bothell, Washington. Dkt. 61, Chavarria Decl., ¶ 2. She is around three months pregnant, and her due date is July 21, 2025. *Id.* ¶ 8. Ms. Chavarria fled El Salvador in 2016 to escape violence and abuse, because the Salvadoran police could not help or protect her. *Id.* ¶¶ 5–6. She has applied for asylum with U.S. Citizenship and Immigration Services. *Id.* ¶ 6. She came to Washington,

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 6
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

where her brother lived, and met her partner here. *Id.* ¶ 7. Their first child was born in 2019. *Id.*
Ms. Chavarria has now lived in Washington about eight years and considers this state her and her
family's home. *Id.*

When she heard about the EO, Ms. Chavarria feared that her child will be deemed
undocumented at birth as neither she nor her partner are U.S. citizens or LPRs. *Id.* ¶ 10. She
worries that her expected child could be targeted for immigration enforcement and removed to a
country from which she was forced to flee. *Id.* ¶ 12.  It is imperative to her that her family remain
united and safe in the United States. *Id.* She is also concerned for how difficult her child's life
will be without proof of U.S. citizenship and the benefits it includes, like an unrestricted social
security number. *Id.* She worries that without work authorization, her child will face significant
barriers to educational and work opportunities. *Id.*

## IV. ARGUMENT

To obtain a preliminary injunction, Plaintiffs must demonstrate that (1) they are likely to
succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary
relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest.
*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Even if Plaintiffs raise only
"serious questions going to the merits," the Court can nevertheless grant relief if the balance of
hardships tips "sharply" in Plaintiffs' favor, and the remaining equitable factors are satisfied. *All.*
*For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

**A. Plaintiffs Franco, Norales, and Chavarria are likely to succeed on the merits of their
argument that the EO violates the Citizenship Clause of the Fourteenth Amendment
as well as 8 U.S.C. § 1401.**

Plaintiffs are likely to succeed on their claim that the EO is both unconstitutional and
illegal. The Citizenship Clause of the Fourteenth Amendment expressly provides that "[a]ll
persons born or naturalized in the United States, and subject to the jurisdiction thereof, are

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 7
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

citizens of the United States." U.S. Const. amend. XIV, § 1, cl. 1. The Immigration and

Nationality Act (INA) reinforces that constitutional directive, declaring that "a person born in

the United States, and subject to the jurisdiction thereof," "shall be [a] national[] and citizen[] of

the United States at birth." 8 U.S.C. § 1401(a). The text of both the Constitution and the INA

makes plain that someone born in the United States and subject to its jurisdiction is a U.S.

citizen. *See Amalgamated Transit Union Loc. 1309, AFL-CIO v. Laidlaw Transit Servs., Inc.*,

435 F.3d 1140, 1146 (9th Cir. 2006) ("As is oft said, the plain language of the statute is usually

the best indication of the drafters' intent.").

Moreover, the Supreme Court long ago ruled that children born in the United States to

noncitizens are U.S citizens. A few decades after the Citizenship Clause's drafting, in the

seminal case *United States v. Wong Kim Ark*, the Supreme Court ruled that a child born to two

Chinese nationals acquired U.S. citizenship at birth under the Fourteenth Amendment. 169 U.S.

649. Examining the text and history of the Citizenship Clause, the Court explained that to

acquire citizenship at birth, a child must simply be "born in the United States, and subject to the

jurisdiction thereof." *Id.* at 702. The Court clarified that the phrase "subject to the jurisdiction" of

the United States was intended "to exclude, by the fewest and fittest words," the common law

exceptions to birthright citizenship: namely, children born to "alien enemies in hostile

occupation" and children of "diplomatic representatives of a foreign state." *Id.* at 682. In line

with these common law exceptions, the Court noted that the Clause also excluded children born

aboard "foreign public ships" and those born to "members of the Indian tribes owing direct

allegiance to their several tribes"—groups who were then considered under the power of separate

sovereigns. *Id.* at 693.

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 8
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

Beyond these narrowly enumerated historical exceptions, the Court concluded that the Citizenship Clause "in clear words and in manifest intent, includes the children born within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States." *Id.* The Court explained that an individual's physical presence in a country inherently subjects an individual to the laws of that government, and thus to the jurisdiction thereof. *Id.* at 693–96. Examining the Citizenship Clause in concert with the Equal Protection Clause, the Court further reasoned that

> [i]t is impossible to construe the words 'subject to the jurisdiction thereof,' in the opening sentence, as less comprehensive than the words 'within its jurisdiction,' in the concluding sentence of the same section; or to hold that persons 'within the jurisdiction' of one of the states of the Union are not 'subject to the jurisdiction of the United States.'

*Id.* at 696; *see also, e.g.*, Christopher L. Eisgruber, *Birthright Citizenship and the Constitution*, 72 N.Y.U. L. Rev. 54, 65 (1997) ("[T]he children of illegal aliens are certainly 'subject to the jurisdiction of the United States' in the sense that they have no immunity from American law."); James C. Ho, *Defining "American:" Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367, 368 (2006) ("To be 'subject to the jurisdiction' of the U.S. is simply to be subject to the authority of the U.S. government."); Garrett Epps, *The Citizenship Clause: A "Legislative History,"* 60 Am. U. L. Rev. 331, 370 (2010) ("Can 'illegal aliens' be arrested, tried, and even executed? Can 'illegal aliens' buy and sell property? Can they make contracts and incur liability for breach? Can they be sued in tort if they, for example, drive unsafely and injure or kill other motorists? The answer to these questions is clear."); Ramsey, *Originalism*, *supra*, at 472 ("[T]he original meaning indicates that the [Citizenship] Clause does not exclude U.S.-born children of temporary visitors or of persons not lawfully present in the United States.").

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 9
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1    Subsequent Supreme Court precedent supports the same understanding of what it means

2    to be subject to the jurisdiction of the United States. In *Plyler v. Doe*, the Court relied on *Wong*

3    *Kim Ark* in holding that undocumented immigrants are "within [the] jurisdiction" of any state

4    where they are physically present. 457 U.S. 202, 215 (1982). The Court stated that an unlawful

5    entry into the United States "cannot negate the simple fact of [a person's] presence within the

6    State's territorial perimeter." *Id*. "Given such presence," the Court continued, "he is subject to

7    the full range of obligations imposed by the State's civil and criminal laws." *Id*. Critically, the

8    Court explained that "no plausible distinction with respect to Fourteenth Amendment

9    'jurisdiction' can be drawn between resident aliens whose entry into the United States was

10    lawful, and resident aliens whose entry was unlawful." *Id*. at 211 n.10 (citing C. Bouvé,

11    *Exclusion and Expulsion of Aliens in the United States* 425–27 (1912)). Notably, the dissenting

12    judges in the case did not dispute the basic proposition that the Fourteenth Amendment

13    encompasses noncitizens, whether lawfully present or not. *Id.* at 243 (Burger, C.J., dissenting).

14    Consistent with this understanding, the Supreme Court has repeatedly recognized that all

15    children born within the United States to noncitizen parents are entitled to citizenship by birth,

16    without distinction as to those born to parents without lawful immigration status. *E.g.*, *Morrison*

17    *v. California*, 291 U.S. 82, 85 (1934) (holding that individual of Japanese ancestry was a citizen

18    "if he was born within the United States" even though he would not have been eligible to

19    naturalize if born abroad); *Perkins v. Elg*, 307 U.S. 325, 329 (1939) (holding that "at birth

20    [plaintiff] became a citizen of the United States" notwithstanding parents' Swedish nationality);

21    *United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 73 (1957) (recognizing that a

22    child born to two "illegal[ly] presen[t]" noncitizens was "of course, an American citizen by

23    birth"); *Nishikawa v. Dulles*, 356 U.S. 129, 138 (1958) (Black, J., concurring) ("Nishikawa was

24

1    born in this country while subject to its jurisdiction; therefore American citizenship is his

2    constitutional birthright. What the Constitution has conferred neither the Congress, nor the

3    Executive, nor the Judiciary, nor all three in concert, may strip away." (citation omitted)); *INS v.*

4    *Errico*, 385 U.S. 214, 215 (1966) (acknowledging that child "acquired United States citizenship

5    at birth" even though born to two noncitizens who entered the United States fraudulently); *INS v.*

6    *Rios-Pineda*, 471 U.S. 444, 446 (1985) (same, for child of two noncitizens who had entered

7    unlawfully and were unlawfully present in the United States). Circuit courts, including the Ninth

8    Circuit, have naturally adhered to the same understanding. *E.g.*, *Regan v. King*, 134 F.2d 413

9    (9th Cir. 1943) (per curiam) (affirming, on the basis of Fourteenth Amendment, district court's

10   judgment that all persons of Japanese descent born in the United States are citizens by birth);

11   *United States v. Carvalho*, 742 F.2d 146, 148 (4th Cir. 1984) (child born to noncitizen parents

12   subject to deportation order was "citizen by virtue of her birth in the United States"); *Mariko v.*

13   *Holder*, 632 F.3d 1, 8 n.4 (1st Cir. 2011) (noting that asylum seekers' daughter, "born in the

14   United States," is a citizen).

15          Despite the plain text and well-established precedent on this issue, the EO attempts to

16   draw support for its unconstitutional action by claiming the language "subject to the jurisdiction"

17   has been misinterpreted. EO § 1. In interpreting the meaning of constitutional text, courts must

18   "interpret the words consistent with their 'ordinary meaning . . . at the time'" of their enactment.

19   *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (alteration in original) (quoting

20   *Perrin v. United States*, 444 U.S. 37, 42 (1979)); *see also, e.g.*, *Tabares v. City of Huntington*

21   *Beach*, 988 F.3d 1119, 1122 (9th Cir. 2021) (analysis of constitutional text must be grounded "in

22   an understanding of the text's original public meaning at ratification"). That is precisely what the

23   Supreme Court did when analyzing the text of the Citizenship Clause just three decades after its

24

drafting. *See Wong Kim Ark*, 169 U.S. at 653–54 (declaring that ascertaining the Citizenship

Clause's meaning required "regard . . .  not only to all parts of the act itself, and of any former

act of the same lawmaking power, of which the act in question is an amendment, but also to the

condition and to the history of the law as previously existing"); *see also id.* at 654–99

(consulting, inter alia, common law sources, Attorney General opinions, early Republic caselaw,

and legislative debate over the Fourteenth Amendment to interpret and contextualize the

Citizenship Clause).

Indeed, the Fourteenth Amendment's qualifying phrase—"subject to the jurisdiction"—

had an accepted meaning prior to its inclusion in that Amendment. The "use of particular phrases

and concepts [by the drafters of the Fourteenth Amendment] reflected legal meanings and ideas

that had emerged in antebellum judicial cases and legal commentary—both of which were

regularly quoted on the floor during debate." Kurt T. Lash, *The Origins of the Privileges or*

*Immunities Clause, Part I: "Privileges and Immunities" As an Antebellum Term of Art*, 98 Geo.

L.J. 1241, 1246 (2010).

Specifically, use of the word "jurisdiction" or "subject to the jurisdiction" conveyed the

idea that a person was subject to the authority or sovereign power of a country or government.

Dictionaries at the time defined the word "jurisdiction" not only in terms of a court's power to

decide cases but also as the "power of governing or legislating; the right of making or enforcing

law; the power or right of exercising authority." *Jurisdiction*, Noah Webster et al., *An American*

*Dictionary of the English Language* (1865). Indeed, Congress used the phrase this same way in

legislation in the antebellum period. *See* Act of March 27, 1804, § 2, 2 Stat. 298, 299 (making

the Act applicable in all places that were "subject to the jurisdiction of the United States"). While

courts often used this phrase to reference their own jurisdiction, they also used it in this other

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 12
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

sense—i.e., that of sovereign power. *See, e.g.*, *The Schooner Exch. v. McFaddon*, 11 U.S. 116, 136 (1812) (Marshall, C.J.) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself."); *United States v. Bailey*, 24 F. Cas. 937, 939 (C.C.D. Tenn. 1834) (asking if "Cherokee territory" was "subject to the jurisdiction of" the United States). Legislators used the phrase in this sense too. *See, e.g.*, Matthew Ing, *Birthright Citizenship, Illegal Aliens, and the Original Meaning of the Citizenship Clause*, 45 Akron L. Rev. 719, 727–28 (2012) (chronicling uses of "jurisdiction" in this sense by members of Congress during the 1860s).

Notably, the principle that "ambassadors were exempted from all local jurisdiction, civil and criminal," was widely accepted in pre-civil war cases and legal commentary. James Kent, *Commentaries on American Law* 15 (9th ed. 1858); *see also, e.g.*, *The Schooner Exch.*, 11 U.S. at 138–39 ("The assent of the sovereign to the very important and extensive exemptions from territorial jurisdiction which are admitted to attach to foreign ministers, is implied from the considerations that, without such exemption, every sovereign would hazard his own dignity by employing a public minister abroad."); *see also id.* at 125, 127, 132 (argument of counsel for both parties agreeing with this principle). This use of "jurisdiction"—and the principle that ambassadors and foreign ministers were exempt from such jurisdiction—also provides important context for the Fourteenth Amendment's Citizenship Clause, which incorporated the principle in its text.

The legislative history supports this established understanding of what the "subject to the jurisdiction thereof" phrase refers to. *See D.C. v. Heller*, 554 U.S. 570, 584–615 (2008) (consulting a wide range "founding-era sources" to understand the meaning of the Second Amendment, including the ratification debates). When the language of the Citizenship Clause

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 13
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

was first proposed by Senator Howard from Michigan, vigorous debate ensued over the meaning

of the "subject to the jurisdiction thereof" language. But that debate focused only on whether the

clause included "wild Indians" and Native Americans living in reservations. *See* Cong. Globe,

39th Cong., 1st Sess. Pt. 4, 2890–97 (1866). Senator Howard's position—that "Indians born

within the limits of the United States, and who maintain their tribal relations, are not, in the sense

of this amendment, born subject to the jurisdiction of the United States. They are regarded, and

always have been in our legislation and Jurisprudence, as being *quasi* foreign nations"—

eventually won the day, and the proposal to add "excluding Indians not taxed" to the Citizenship

Clause to make the exclusion explicit was rejected. *Id.* at 2890, 2897.

Prior to that conversation, Senator Howard clarified one group of U.S.-born children

who, "of course," were not granted birthright citizenship by the amendment: those born to

"foreigners, aliens, who belong to the families of embassors [sic] or foreign ministers." *Id.* at

2890. Notably, Senator Howard then stated the amendment "will include every other class of

persons"—including, of course, those noncitizens not born to ambassadors. *Id.* Other exchanges

during the debates also reflected the common understanding that the Citizenship Clause applied

to noncitizens. Criticizing the Clause, Senator Cowan of Pennsylvania decried the idea that "the

child of the Chinese immigrant" and "the child of a Gypsy" would be considered citizens under

the clause, given that they, like "a sojourner," "ha[ve] a right to the protection of the laws." *Id.*;

*see also id.* (lamenting that "the mere fact that a man is born in the country" should be enough to

grant him citizenship).[2] Invoking the specter of an invasion by undesirable noncitizens, Senator

---

[2]    As Professor Garrett Epps argues, "the discussion of Gypsies provides about the closest
thing we are likely to get to the issue of illegal immigration," as they were described by Senator
Cowan with the same vitriol used to describe undocumented noncitizens today. Epps, *The
Citizenship Clause, supra*, at 361.

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 14
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1    Cowan then questioned, "[I]s it proposed that the people of California are to remain quiescent

2    while they are overrun by a flood of immigration of the Mongol race? Are they to be immigrated

3    out of house and home by Chinese?" *Id.* at 2890–91. In response, Senator Conness of California

4    noted his support for the clause's declaration "that the children of all parentage whatever, born in

5    California, should be regarded and treated as citizens of the United States." *Id.* at 2891.  No one

6    questioned that which was readily apparent—the children of Chinese (and other noncitizens)

7    were "subject to the jurisdiction" of the United States. Instead, the primary question regarding

8    the meaning of the "subject to the jurisdiction" language was with respect to Native Americans.

9    *See, e.g.*, *id.* 2890, 2892–97.

10          The legislative history also makes clear that the framers intended to enshrine the concept

11    of birthright citizenship. When Senator Howard first introduced the language of the Citizenship

12    Clause, he affirmed that it was "simply declaratory of what I regard as the law of the land

13    already, that every person born within the limits of the United States, and subject to their

14    jurisdiction, is by virtue of natural law and national law a citizen of the United States." *Id.* at

15    2890. This is because the Fourteenth Amendment's guarantee of birthright citizenship for *all*

16    people born in the United States (with limited exceptions) was not a novel concept at the time it

17    was drafted. Prior to the passage of the amendment, courts and legal commentators already

18    generally understood that the doctrine of *jus soli*, that is, citizenship by birth, made people born

19    in the United States citizens. *See, e.g., Lynch v. Clarke*, 1 Sand. Ch. 583, 663 (N.Y. Ch. 1844);

20    *see also, e.g.*, *Gardner v. Ward*, 2 Mass. (1 Tyng) 244 (1805) ("I take it, then, to be established,

21    with a few exceptions not requiring our present notice, that a man, born within the jurisdiction of

22    the common law, is a citizen of the country wherein he is born."); *Kilham v. Ward*, 2 Mass. (1

23    Tyng) 236, 264–65 (1806) (opinion of Sewall, J.) ("The doctrine of the common law is, that

24

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 15
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1    every man born within its jurisdiction is a subject of the sovereign of the country where he is

2    born . . . ."); *State v. Manuel*, 20 N.C. (3 & 4 Dev. & Bat.) 144, 151 (1838) ("[A]ll free persons

3    born within the State are born citizens of the State."); *Barzizas v. Hopkins*, 23 Va. (2 Rand.) 276,

4    278 (1824) ("The place of birth, it is true, in general, determines the allegiance.").[3]

5         Notably, the question of whether *jus soli* applied to children born to noncitizens arose

6    prior to Reconstruction, and there too courts applied the doctrine to hold that such children were

7    U.S. citizens. For example, in *McCreery's Lessee v. Somerville*, the Court's decision observed

8    that the U.S.-born daughters of an Irish citizen were "native born citizens of the United States."

9    22 U.S. 354, 354 (1824). Several other cases around the time of the Civil War held or observed

10   the same. *See, e.g.*, *Munro v. Merchant*, 28 N.Y. 9, 40 (1863) (assuming that plaintiff "born in

11   this state of non-resident alien parents . . . is *prima facie* a citizen"); *Ludlam v. Ludlam*, 26 N.Y.

12   356, 371 (1863) ("[B]y the law of England the children of alien parents, born within the

13   kingdom, are held to be citizens."). The Department of Justice held the same view at the time.

14   *See* Citizenship of Children Born in the United States of Alien Parents, 10 Op. Att'ys Gen. 328,

15   328 (1862) ("I am quite clear in the opinion that children born in the United States of alien

16   parents, who have never been naturalized, are native-born citizens of the United States, and, of

17   course, do not require the formality of naturalization to entitle them to the rights and privileges

18   of such citizenship."); Citizenship of Children Born Abroad of Naturalized Parents, 10 Op.

19   Att'ys Gen. 329, 330 (1862) (similar); Citizenship, 9 Op. Att'ys Gen. 373, 374 (1859) (similar).

20

21

22   [3]     Of course, prior to the Fourteenth Amendment, this principle had a racial component:

23   enslaved people born in the United States were not considered citizens. The citizenship status of
     free black people prior to the Civil War is a complex one that was determined by state law, *see,*

24   *e.g.*, Martha S. Jones, *Birthright Citizens: A History of Race and Rights in Antebellum America*
     25–34 (2018), and also federal law, *see, e.g.*, *Dred Scott*, 60 U.S. 393.

Indeed, the Constitution in 1789 assumed people obtained citizenship at birth. For example, Article II requires that the President be a "natural born citizen" to hold that office. U.S. Const. art. II, § 1, cl. 5. That the Constitution assumes some people are "born citizens" reflects that the Founders assumed *jus soli* would apply on U.S. soil.

Leading legal commentators agreed. As one stated:

> Therefore every person born within the United States, its territories or districts, whether the parents are citizens or aliens, is a natural born citizen in the sense of the constitution . . . . Under our constitution the question is settled by its express language, and when we are informed that, excepting those who were citizens, (however the capacity was acquired,) at the time the Constitution was adopted, no person is eligible to the office of president unless he is a natural born citizen, the principle that the place of birth creates the relative quality is established as to us.

William Rawle, *A View of the Constitution of the United States of America* 80–81 (1825); *see also* Ramsey, *Originalism*, *supra*, at 414 (citing additional founding-era legal commentators agreeing with these principles).

These sources reflect the common law background that the Founders inherited. English law applied *jus soli*, including as to noncitizens residing in English territory. In 1608, English courts held in *Calvin's Case* that birthright citizenship made "subjects" of all people born within territories held by the English crown. *See Calvin v. Smith*, 77 Eng. Rep. 377, 382 (K.B. 1608). Specifically, the case "determined that all persons born within any territory held by the King of England were to enjoy the benefits of English law as subjects of the King. A person born within the King's dominion owed allegiance to the sovereign and in turn was entitled to the King's protection." Polly J. Price, *Natural Law and Birthright Citizenship in* Calvin's Case (1608), 9 Yale J.L. & Humans. 73, 73–74 (1997). A century and a half later, Blackstone's Commentaries continued to reflect that this remained the law of the land, including as to noncitizens. As Blackstone explained, allegiance was due to the King by all people born on English soil. 1 William Blackstone, *Commentaries on the Laws of England* 354–62 (1765). And as a result,

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 17
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1   the same people were also considered "subjects." Indeed, Blackstone explicitly noted that

2   because of the "natural allegiance" everyone born on English soil owed to the monarch, "[t]he

3   children of aliens, born here in England, are, generally speaking, natural-born subjects, and

4   entitled to all the privileges of such." *Id.* at 362.

5       In sum, the EO flatly contravenes the Citizenship Clause's plain text, legislative history,

6   historical context, and binding judicial precedent. All these sources demonstrate that the Clause's

7   grant of birthright citizenship encompasses the children of noncitizens, irrespective of their

8   parents' immigration status. And no provision of the Constitution gives the Executive the right to

9   restrict the birthright citizenship recognized in the Citizenship Clause. *See generally* U.S. Const.

10  art. II; *see also Wong Kim Ark*, 169 U.S at 703 (explaining that the government has "no authority

11  . . . to restrict the effect of birth, declared by the constitution to constitute a sufficient and

12  complete right to citizenship").[4]

13      **B.  Plaintiffs will suffer irreparable harm absent an injunction.**

14      Parties seeking preliminary injunctive relief must also show they are "likely to suffer

15  irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Irreparable harm is

16  harm for which there is "no adequate legal remedy, such as an award of damages." *Ariz. Dream*

17  *Act Coal. v. Brewer* (*Ariz. I*), 757 F.3d 1053, 1068 (9th Cir. 2014).

18      The implementation of the EO violates the Citizenship Clause, and such "deprivation of

19  constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695

20

---

21  [4]    Similarly, the EO contravenes the plain text of the INA. *See* 8 U.S.C. § 1401 (stating that
    the following "shall be nationals and citizens of the United States at birth: (a) a person born in

22  the United States, and subject to the jurisdiction thereof"). As noted above, Congress lifted this
    language directly from the Fourteenth Amendment. *Supra* p. 4. Moreover, Congress's use of

23  "shall" imposes a "discretionless obligation[]." *Lopez v. Davis*, 531 U.S. 230, 241 (2001). The
    EO's directive that "no department or agency of the United States government shall issue

24  documents recognizing United States citizenship" to Plaintiffs' expected children and putative
    class members, EO § 2(a), therefore violates the INA.

F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also, e.g.*, *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) ("We have stated that an alleged constitutional infringement will often alone constitute irreparable harm." (quoting *Associated Gen. Contractors v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991)). Accordingly, the Ninth Circuit has explained that where a plaintiff establishes "that the government's current policies are likely unconstitutional . . . Plaintiffs have also carried their burden as to irreparable harm." *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017); *see also, e.g.*, *Matsumoto v. Labrador*, 122 F.4th 787, 816 (9th Cir. 2024) (holding that "[i]reparable harm is a given" where plaintiffs established "a colorable First Amendment claim"); *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) ("If a plaintiff bringing . . . a [constitutional] claim shows he is likely to prevail on the merits, that showing will almost always demonstrate he is suffering irreparable harm as well."). Here, Plaintiffs have amply demonstrated that they are likely to succeed on the merits of their claim that the EO violates the Fourteenth Amendment and have thus established irreparable harm. *See supra* Sec. IV, A.

The loss of citizenship under the EO will result in "severe and unsettling consequences." *Fedorenko*, 449 U.S. at 505; *see also, e.g.*, *Kennedy*, 372 U.S. at 160 ("Deprivation of citizenship . . . has grave practical consequences."); *Trop*, 356 U.S. at 101 (noting that "denationalization" results in "total destruction of the individual's status in organized society"); *Schneiderman*, 320 U.S. at 122 (explaining that deprivation of citizenship is "more serious than a taking of one's property, or the imposition of a fine or other penalty"). Deprivation of citizenship signifies a denial of fundamental rights, as citizens at birth are "entitled . . . to the full protection of the United States, to the absolute right to enter its borders, and to full participation in the political

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 19
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

process." *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 67 (2001). No adequate legal remedy exists for the loss of "priceless benefits that derive from [citizenship]." *Schneiderman*, 320 U.S. at 122.

Citizenship also affords full protection from deportation—"the loss of all that makes life worth living." *Bridges*, 326 U.S. at 147 (quotation marks omitted). Serious and irreparable injury is imminent, as Plaintiffs' children and putative class members targeted by the EO will not only be stripped of citizenship but they will be deemed to be without any legal status, for the INA provides no alternative legal status to persons born in the United States. Accordingly, Plaintiffs' children face the prospect of detention and removal to countries they have never known and, in some instances, separation from their family members with lawful status. Dkt. 59, Franco Decl., ¶ 13; Dkt. 60, Norales Decl., ¶ 13; Dkt. 61, Chavarria Decl., ¶ 12. This prospect of detention and removal constitutes irreparable harm. *Moreno Galvez v. Cuccinelli*, 387 F. Supp. 3d 1208, 1218 (W.D. Wash. 2019). Moreover, such uncertainty subjects Plaintiffs and proposed class members to "ever-increasing fear and distress," *Trop*, at 356 U.S. at 102, further supporting a finding of irreparable harm, *see, e.g.*, *Moreno Galvez*, 387 F. Supp. 3d at 1218 (finding that "feelings of stress, devastation, fear, and depression arising from" the challenged immigration policy constitute irreparable harm because "[s]uch emotional and psychological harms will not be remedied by an award of damages").

Even if they are not removed, the individuals targeted by the EO will grow up and live undocumented, forced to remain in the legal shadows of the country where they were born. Most will have no pathway to legal status throughout the course of their lifetime. For example, none of the parents of persons targeted by the EO are eligible to file family visa petitions for their newborn children, as only U.S. citizens and LPRs are eligible to do so. 8 U.S.C. §§ 1151(b)(2)(A)(i); 1153(a). Nor are employment visas an option. Even if they eventually

graduate from college with a specialized skill and are offered qualifying employment, they still

lack key eligibility requirements. Specifically, persons targeted by the EO would be ineligible to

obtain LPR status through employment visa petitions because they were never "inspected and

admitted or paroled" into the United States. *Id.* § 1255(a). Moreover, they would be

independently barred by 8 U.S.C. § 1255(c), which renders a person ineligible "who is in

unlawful immigration status on the date of filing the application for adjustment of status."

Furthermore, by rendering Plaintiffs' children undocumented, the EO threatens to deprive

the children of access to federally-funded public benefits that are critical to their well-being and

stability. Only "qualified" noncitizens enumerated under 8 U.S.C. § 1641(b) are eligible to

receive "any retirement, welfare, health, disability, public or assisted housing, postsecondary

education, food assistance, unemployment benefit, or any other similar benefit for which

payments or assistance are provided . . . by an agency of the United States or by appropriated

funds of the United States." *Id.* § 1611(c)(1)(B); *see also id.* § 1612 (limiting eligibility for

Supplemental Security Income and Supplemental Nutritional Assistance Program (food stamps)).

While Washington state provides food and cash assistance to certain noncitizens who do not

qualify for similar federal benefits, the state's eligibility requirements exclude most noncitizens

without *any* lawful status. *See* WASH. ADMIN. CODE § 388-424-0030 (defining eligibility for food

assistance program); *id.* § 388-400-0010 (defining eligibility for state family assistance).

Notably, the State Medicaid Director for the Washington State Health Care Authority anticipates

that the EO will "result in direct loss of federal reimbursements to the State for [healthcare]

coverage" for children that will be deemed noncitizens without lawful status. Dkt. 14, Fotinos

Decl., ¶ 24. The EO thus "poses a direct threat to the ability of the State to provide meaningful

healthcare to all in need without interruption." *Id.* While Washington State currently provides

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 21
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

healthcare coverage to all pregnant women without respect to their immigration status, the removal of birthright citizenship will result in "substantial uncertainty and administrative burdens" that jeopardize "streamlined coverage to women in need." *Id.* ¶ 25.

The EO will severely limit the educational opportunities of the children in the proposed class, including rendering them ineligible for federal financial aid. *See* 20 U.S.C. § 1091(a)(5); 34 C.F.R. § 668.33(a)–(b). Thus, putative class members will face significant limitations in their education and career opportunities. Such "loss of opportunity to pursue one's chosen profession constitutes irreparable harm." *Ariz. Dream Act Coal. v. Brewer (Ariz. II)*, 855 F.3d 957, 978 (9th Cir. 2017); *see also Medina v. U.S. DHS*, 313 F. Supp. 3d 1237, 1251 (W.D. Wash. 2018) (finding Deferred Action for Childhood Arrivals recipient's potential loss of opportunity to pursue his profession constituted irreparable harm).

Finally, the EO's purported stripping of citizenship has cascading effects on other civil rights protected by the Constitution. Most notably, it eliminates the right of those targeted to vote upon turning eighteen. As noted above, the loss of this constitutional right, *see* U.S. Const. amend. XV, § 1, constitutes irreparable harm, *supra* pp. 18–19; *see also, e.g.*, *Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

In sum, Plaintiffs will suffer numerous and irreparable harms absent an injunction. The grave nature of these harms underscores "the basic function of a preliminary injunction": "to preserve the status quo ante litem." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980).

**C.  The balance of hardships and public interest weigh heavily in Plaintiffs' favor.**

The final two factors for a preliminary injunction—the balance of hardships and public

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 22
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). As with the irreparable harm analysis, "in cases involving a constitutional claim, a likelihood of success on the merits . . . strongly tips the balance of equities and public interest in favor of granting a preliminary injunction." *Baird*, 81 F.4th at 1048.

The violation of the Fourteenth Amendment that will result absent a preliminary injunction strongly favors Plaintiffs, as "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (internal quotation marks and citation omitted); *see also, e.g.*, *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."); *Moreno Galvez*, 387 F. Supp. 3d at 1218 (concluding that because "the government's . . . policy is inconsistent with federal law, . . . the balance of hardships and public interest factors weigh in favor of a preliminary injunction"). Similarly, the balance of hardships also favors ensuring that Plaintiffs' children and putative class members are not deprived of their birthright U.S. citizenship and its accompanying benefits. *See supra* pp. 19–22. The balance tips further in Plaintiffs' favor when "consider[ing]. . . the indirect hardship to their friends and family members." *Hernandez*, 872 F.3d at 996 (alteration in original) (quoting *Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1126 (9th Cir. 2008)). Defendants, by contrast, cannot allege that they will suffer any hardships absent a preliminary injunction, as all they are being required to do is maintain the status quo and follow the law.

Accordingly, the balance of hardships and the public interest overwhelmingly favor injunctive relief to ensure that Defendants comply with the Constitution and federal law.

INDIVIDUAL PLS.' SUPP.
MOT. FOR PRELIM. INJ. - 23
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs Franco, Norales, and Chavarria respectfully request the Court to grant their motion for a preliminary injunction.

Respectfully submitted this 29th of January, 2025.

s/ Matt Adams                                    s/ Leila Kang
Matt Adams, WSBA No. 28287            Leila Kang, WSBA No. 48048
matt@nwirp.org                                   leila@nwirp.org

s/ Glenda M. Aldana Madrid              s/ Aaron Korthuis
Glenda M. Aldana Madrid, WSBA No. 46987     Aaron Korthuis, WSBA No. 53974
glenda@nwirp.org                              aaron@nwirp.org

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Ave., Suite 400
Seattle, WA 98104
(206) 957-8611

*Counsel for Individual Plaintiffs*

1

**WORD COUNT CERTIFICATION**

2       I certify that this memorandum contains 7762 words, in compliance with the Local Civil

3 Rules.

4

5                                    s/ Leila Kang
                                     Leila Kang, WSBA No. 48048
6                                    NORTHWEST IMMIGRANT RIGHTS PROJECT
                                     615 Second Ave., Suite 400
7                                    Seattle, WA 98104
                                     (206) 816-3847
8                                    leila@nwirp.org

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24