District Judge John C. Coughenour

1

2

3

4

5

6

7       UNITED STATES DISTRICT COURT FOR THE
        WESTERN DISTRICT OF WASHINGTON
8                     AT SEATTLE

9

10   STATE OF WASHINGTON, *et al.*,              CASE NO.  2:25-cv-00127-JCC

11                      Plaintiffs,               OPPOSITION TO PLAINTIFFS'
                                                  MOTIONS FOR PRELIMINARY
12              v.                                INJUNCTION

     DONALD J. TRUMP, in his official
13   capacity as President of the United States, *et
     al.*,
14
                       Defendants.
15

16        Pursuant to the Court's Orders of January 23 (ECF No. 44) and January 27, 2025 (ECF

17   No. 56), Defendants submit this consolidated brief in opposition to the plaintiff states' motion

18   for preliminary injunction (ECF No. 63) and the individual plaintiffs' supplemental motion for

19   preliminary injunction (ECF No. 74).

20

21   Opposition to Plaintiffs' Motions for
     Preliminary Injunction
22   2:25-cv-00127-JCC

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 4

I.      The Executive Order............................................................................................ 4

II.     This Litigation .................................................................................................... 6

STANDARD OF REVIEW ............................................................................................ 7

ARGUMENT.................................................................................................................. 7

I.      The State Plaintiffs Lack Standing. .................................................................... 7

II.     Plaintiffs Lack A Valid Cause of Action............................................................ 13

        A.      The Class Plaintiffs' APA Claim Fails. ..................................................... 13

        B.      Plaintiffs Lack a Cause of Action to Assert Their Constitutional and INA
                Claims........................................................................................................... 15

III.    Plaintiffs Are Not Likely To Succeed On the Merits.......................................... 17

        A.      The Term "Jurisdiction" in the Citizenship Clause Does Not Refer to
                Regulatory Power. ....................................................................................... 18

        B.      Children Born of Unlawfully Present Aliens or Lawful But Temporary
                Visitors Fall Outside the Citizenship Clause................................................ 23

        C.      Applicable Interpretive Principles Support the Government's Reading of
                the Citizenship Clause. ................................................................................ 31

        D.      Plaintiffs' Contrary Arguments Are Unpersuasive. .................................... 34

        E.      The Citizenship EO Does Not Violate the INA. ......................................... 40

IV.     Plaintiffs Will Not Suffer Irreparable Harm During the Pendency of This
        Lawsuit. ......................................................................................................... 41

V.      The Public Interest Does Not Favor an Injunction................................................ 44

VI.     Any Relief Should Be Limited. ........................................................................... 44

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -i

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

1  CONCLUSION ........................................................................................................ 46

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -ii

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
202-616-8098

1

# TABLE OF AUTHORITIES

2

## Cases

*Afroyim v. Rusk,*
    387 U.S. 253 (1967) ..................................................................................................39

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ..................................................................................................17

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
    458 U.S. 592 (1982) ..................................................................................................11

*Alsaidi v. U.S. Dep't of State,*
    292 F. Supp. 3d 320 (D.D.C. 2018) ........................................................................15

*Arcam Pharm. Corp. v. Faria,*
    513 F.3d 1 (1st Cir. 2007) ........................................................................................37

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) .................................................................................9, 45

*Arizona v. United States,*
    567 U.S. 387 (2012) ..................................................................................................44

*Benny v. O'Brien,*
    32 A. 696 (N.J. 1895) ...............................................................................................29

*Berenyi v. Dist. Dir., INS,*
    385 U.S. 630 (1967) ..................................................................................................34

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ................................................................................................9

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ....................................................................................45

*Cambranis v. Blinken,*
    994 F.3d 457 (5th Cir. 2021) ....................................................................................15

*Cap. Area Immigrants' Rts. Coal. v. Trump,*
    471 F. Supp. 3d 25 (D.D.C. 2020) ...........................................................................42

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -iii

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

*Caribbean Marine Servs. Co. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988) ...................................................................................41, 43

*Carlisle v. United States,*
    83 U.S. (16 Wall.) 147 (1872) ...................................................................................23

*Cherokee Nation v. Georgia,*
    30 U.S. (5 Pet.) 1 (1831) ...........................................................................................25

*Chin Bak Kan v. United States,*
    186 U.S. 193 (1902) ...................................................................................................36

*City & County of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) ...................................................................................45

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ...................................................................................................10

*DeVillier v. Texas,*
    601 U.S. 285 (2024) ...................................................................................................16

*Doe #1 v. Trump,*
    957 F.3d 1050 (9th Cir. 2020) ...................................................................................44

*E. Bay Sanctuary Covenant v. Barr,*
    934 F.3d 1026 (9th Cir. 2019) ...................................................................................45

*E. Bay Sanctuary Covenant v. Biden,*
    102 F.4th 996 (9th Cir. 2024) .....................................................................................9

*Elk Run Coal Co. v. U.S. Dep't of Labor,*
    804 F. Supp. 2d 8 (D.D.C. 2011) ...............................................................................14

*Elk v. Wilkins,*
    112 U.S. 94 (1884) ........................................................................................... *passim*

*Elkins v. Moreno,*
    435 U.S. 647 (1978) ...................................................................................................24

*Esparza v. Clinton,*
    No. 6:12-cv-925-AA, 2012 WL 6738281 (D. Or. Dec. 21, 2012) ...................................15

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -iv

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ...................................................................................................11

*Franchise Tax Bd. of Cal. v. Hyatt,*
    587 U.S. 230 (2019) ...................................................................................................26

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ..............................................................................................14, 45

*Garcia v. Vilsack,*
    563 F.3d 519 (D.C. Cir. 2009)...................................................................................14

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania,*
    458 U.S. 375 (1982) ...................................................................................................20

*Great Northern Res., Inc. v. Coba,*
    No. 3:20-cv-01866-IM, 2020 WL 6820793 (D. Or. Nov. 20, 2020) ..................................41

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) .............................................................................12, 13, 19, 25

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952) ...................................................................................................31

*Inglis v. Trs. of Sailor's Snug Harbor,*
    28 U.S. (3 Pet.) 99 (1830)..........................................................................................34

*INS v. Legalization Assistance Project,*
    510 U.S. 1301 (1993) .................................................................................................44

*Kaiser v. Blue Cross of Cal.,*
    347 F.3d 1107 (9th Cir. 2003).....................................................................................41

*Kawakita v. United States,*
    343 U.S. 717 (1952) ...................................................................................................33

*Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter,*
    575 U.S. 650 (2015) ...................................................................................................40

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) ...................................................................................................12

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -v

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC  20005
202-616-8098

*Kwock Jan Fat v. White,*
   253 U.S. 454 (1920) ...................................................................................36

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin,*
   599 U.S. 382 (2023) ...................................................................................25

*Lamar v. Micou,*
   112 U.S. 452 (1884) ...................................................................................24

*Liu v. SEC,*
   591 U.S. 71 (2020) .....................................................................................32

*Lone Wolf v. Hitchcock,*
   187 U.S. 553 (1903) ...................................................................................19

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ...................................................................................44

*Marbury v. Madison,*
   5 U.S. (1 Cranch) 137 (1803) ....................................................................20

*Martinez v. Bynum,*
   461 U.S. 321 (1983) ...................................................................................24

*Maryland v. King,*
   567 U.S. 1301 (2012) .................................................................................44

*Massachusetts v. Mellon,*
   262 U.S. 447 (1923) ...................................................................................12

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ...................................................................................21

*Metro. Stevedore Co. v. Rambo,*
   515 U.S. 291 (1995) .....................................................................................3

*Miller v. Albright,*
   523 U.S. 420 (1998) ...................................................................................33

*Minor v. Happersett,*
   88 U.S. 162 (1874) .....................................................................................22

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -vi

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

*Mississippi Band of Choctaw Indians v. Holyfield*,
  490 U.S. 30 (1989) ...........................................................................................24

*Mississippi v. Johnson*,
  71 U.S. 475 (1866) ...........................................................................................45

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ...........................................................................................12

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010)........................................................................45

*Nishimura Ekiu v. United States*,
  142 U.S. 651 (1892) .........................................................................................32

*Nken v. Holder*,
  556 U.S. 418 (2009) .........................................................................................44

*NYSRPA v. Bruen*,
  597 U.S. 1 (2022) ........................................................................................38, 39

*Oceanic Navigation Co. v. Stranahan*,
  214 U.S. 320 (1909) .........................................................................................32

*Optinrealbig.com, LLC v. Ironport Sys., Inc.*,
  323 F. Supp. 2d 1037 (N.D. Cal. 2004)............................................................41

*Ortega-Morales v. Lynch*,
  168 F. Supp. 3d 1228 (D. Ariz. 2016) ..............................................................15

*Pennsylvania v. New Jersey*,
  426 U.S. 660 (1976) .........................................................................................10

*Pizarro*,
  15 U.S. (2 Wheat.) 227 (1817) .................................................................. 23-24

*Plyler v. Doe*,
  457 U.S. 202 (1982) .........................................................................................37

*Richards v. Sec'y of State*,
  752 F.2d 1413 (9th Cir. 1985)..........................................................................15

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -vii

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

*Robertson v. Cease*,
   97 U.S. 646 (1878) .........................................................................................22

*Rogers v. Bellei*,
   401 U.S. 815 (1971) .......................................................................................33

*Savorgnan v. United States*,
   338 U.S. 491 (1950) .......................................................................................33

*Schooner Exchange v. McFaddon*,
   11 U.S. (7 Cranch) 116 (1812) .....................................................................20

*Se. Arkansas Hospice, Inc. v. Burwell*,
   815 F.3d 448 (8th Cir. 2016) .................................................................. 10-11

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) .......................................................................................12

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) .........................................................................7

*Taggart v. Lorenzen*,
   587 U.S. 554 (2019) .......................................................................................40

*The Slaughterhouse Cases*,
   83 U.S. 36 (1873) ................................................................................... 28-29

*Titaness Light Shop, LLC v. Sunlight Supply, Inc.*,
   585 F. App'x 390 (9th Cir. 2014) .................................................................43

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) .........................................................................................8

*Trump v. Hawaii*,
   585 U.S. 667 (2018) .......................................................................................31

*U.S. Army Corps of Eng'rs  v. Hawkes Co.*,
   578 U.S. 590 (2016) .......................................................................................14

*United States v. Antelope*,
   430 U.S. 641 (1977) .......................................................................................38

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -viii

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

*United States v. Holliday,*
   70 U.S. (3 Wall.) 407 (1866) ................................................................................19

*United States v. Kagama,*
   118 U.S. 375 (1886) ...........................................................................................19

*United States v. Manzi,*
   276 U.S. 463 (1928) ...........................................................................................34

*United States v. Rahimi,*
   602 U.S. 680 (2024) ......................................................................................38, 46

*United States v. Texas,*
   599 U.S. 670 (2023) ........................................................................................2, 8

*United Sates v. Wong Kim Ark,*
   169 U.S. 649 (1898) ..................................................................................*passim*

*Vance v. Terrazas,*
   444 U.S. 252 (1980) ...........................................................................................15

*Verlinden BV v. Central Bank of Nigeria,*
   461 U.S. 480 (1983) ...........................................................................................19

*Warth v. Seldin,*
   422 U.S. 490 (1975) ...........................................................................................12

*Washington v. FDA,*
   108 F.4th 1163 (9th Cir. 2024) .......................................................................9, 11

*Wilkins v. United States,*
   598 U.S. 152 (2023) ...........................................................................................18

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .................................................................................................7

*Winton v. Amos,*
   255 U.S. 373 (1921) ...........................................................................................19

**Constitution**

U.S. Const. Art. I, § 8, Cl. 4 ..................................................................................32

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -ix

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

U.S. Const. amend. XIV, § 1 ........................................................................1, 17, 22, 26

**Statutes**

5 U.S.C. § 704 ...............................................................................................................14

8 U.S.C. § 1185(d)(5)(C) ..............................................................................................16

8 U.S.C. § 1225(b)(3) ....................................................................................................16

8 U.S.C. § 1226(f) .........................................................................................................16

8 U.S.C. § 1231(a)(2)(B) ...............................................................................................16

8 U.S.C. § 1252(b)(5) ...............................................................................................15, 42

8 U.S.C. § 1253(e) .........................................................................................................16

8 U.S.C. § 1401 .......................................................................................17, 18, 33, 40

8 U.S.C. § 1503 .....................................................................................................14, 1543

28 U.S.C. § 2201 ...........................................................................................................15

42 U.S.C. § 1395dd(e)(2) ..............................................................................................10

Civil Rights Act of 1866,
    14 Stat. 27 ...........................................................................................................21, 27

Laken Riley Act,
    Pub. L. No. 119-1, 139 Stat. 3 (2025) ........................................................................16

Nationality Act of 1940,
    ch. 876, § 201(a), 54 Stat. 1137 .................................................................................21

Naturalization Act of 1790,
    ch. 3, 1 Stat. 103 .......................................................................................................33

**Rules**

Fed. R. Civ. P. 65(a)(2) .................................................................................................46

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -x

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

**Legislative Materials**

2 Cong. Rec. 3279 (1874) ...................................................................................29, 30

Cong. Globe, 39th Cong., 1st Sess. 572 (1866) .......................................................21

Cong. Globe, 39th Cong., 1st Sess. 1117 (1866) .....................................................27

Cong. Globe, 39th Cong., 1st Sess. 1262 (1866) .....................................................21

Cong. Globe, 39th Cong., 1st Sess. 2768 (1866) .....................................................28

Cong. Globe, 39th Cong., 1st Sess. 2769 (1866) .....................................................28

Cong. Globe, 39th Cong., 1st Sess. 2893 (1866) .....................................................22

Cong. Globe, 39th Cong., 1st Sess. 2894 (1866) .....................................................22

Cong. Globe, 40th Cong., 2nd Sess. 868 (1868) ......................................................39

Cong. Globe, 40th Cong., 2nd Sess. 967 (1868) ......................................................39

Cong. Globe, 40th Cong., 2nd Sess. 1130-31 (1868) ...............................................39

**Administrative & Executive Materials**

Exec. Order No. 14159, Protecting the American People Against Invasion (Jan. 20, 2025) ................................................................................................................4, 31

Exec. Order No. 14160, Protecting the Meaning and Value of American Citizenship (Jan. 20, 2025) ...........................................................................................1, 5, 6, 42

Exec. Order No. 14165, Securing Our Borders (Jan. 20, 2025) ................................4

Proclamation No. 10866, Declaring a National Emergency at the Southern Border of the United States (Jan. 20, 2025) .............................................................................4

**Other Authorities**

2 *A Digest of the International Law of the United States* (Francis Wharton ed., 2d. ed. 1887) (*Wharton's Digest*) ..............................................................................................30

2 *James Kent, Commentaries on American Law* (6th ed. 1848) ............................26

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -xi

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC  20005
202-616-8098

Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881) ...........................29

Amy Swearer, Heritage Found., Legal Memorandum No. 250, *The Political Case for Confining Birthright Citizenship to Its Original Meaning* at 8-11 (2019) .........................4

Emmerich de Vattel, *The Law of Nations* (London, printed for G.G. and J. Robinson, Paternoster-Row, 1797 ed.) ...............................................26

Hannis Taylor, *A Treatise on International Public Law* (1901) ...........................36

John Westlake, *International Law* (1904) ...........................36

Joseph Story, *Commentaries on the Conflict of Laws* (1834) ...............................27

Justin Lollman, Note, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455 (2015) ...............................30

M.A. Lesser, *Citizenship and Franchise*, 4 Colum. L. Times 145 (1891) ...............................22

Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351 (2010) ...............................27-28

Samuel F. Miller, *Lectures on the Constitution of the United States* at 279 (1891) ...............29

Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney General* (1910) ...............................36

William Edward Hall, *A Treatise on International Law* (4th ed. 1895) .........................25, 29

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -xii

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC  20005
202-616-8098

**INTRODUCTION**

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. On January 20, 2025, President Donald J. Trump issued an Executive Order addressing what it means to be "subject to the jurisdiction" of the United States. *See* Exec. Order No. 14160, Protecting the Meaning and Value of American Citizenship (Citizenship EO or EO). That EO recognizes that the Constitution does not grant birthright citizenship to the children of aliens who are unlawfully present in the United States or the children of aliens whose presence is lawful but temporary. Prior misimpressions of the Citizenship Clause have created a perverse incentive for illegal immigration that has negatively impacted this country's sovereignty, national security, and economic stability. But the generation that enacted the Fourteenth Amendment did not fate the United States to such a reality. Instead, text, history, and precedent support what common sense compels: the Constitution does not harbor a windfall clause granting American citizenship to, *inter alia*, the children of those who have circumvented (or outright defied) federal immigration laws.

The plaintiffs—in the lead case, four states, and in the other, a putative class of Washington residents—immediately filed suit. But their dramatic assertions about the supposed illegality of the EO cannot substitute for a showing of entitlement to extraordinary

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -1

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

emergency relief.  And as to each factor of that analysis, all plaintiffs have failed to carry their burden.

To start, the states lack standing.  While they largely concede that the EO does not operate directly upon them, they nonetheless complain that the EO will force them to spend more money on public benefits.  But that is the exact sort of incidental expenditure the Supreme Court has held insufficient.  Just two years ago, the Supreme Court rejected Texas's argument for standing based on expenditures on public programs in response to a federal policy that increased the number of illegal aliens in the state.  *See United States v. Texas*, 599 U.S. 670 (2023).  Similarly, the states here cannot satisfy Article III by claiming that they will choose to spend more money on public programs in response to a federal policy that will result in more individuals in their states being classified as illegal aliens.  Moreover, all Plaintiffs lack a cause of action—these suits cannot be brought under the Citizenship Clause or the Immigration and Nationality Act (INA), and the individuals cannot proceed under the Administrative Procedure Act (APA).

Plaintiffs are also unlikely to succeed on the merits.  As was apparent from the time of its enactment, the Citizenship Clause's use of the phrase "subject to the jurisdiction" of the United States contemplates something more than being subject to this country's regulatory power.  It conveys that  persons must be "completely subject to [the] political jurisdiction" of the United States, *i.e.*, that they have a "direct and immediate allegiance" to this country, unqualified by an allegiance to any other foreign power.  *Elk v. Wilkins*, 112 U.S. 94, 102

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -2

1    (1884).  Just as that does not hold for diplomats or occupying enemies, it similarly does not

2    hold for foreigners admitted temporarily or individuals here illegally.  "[N]o one can become

3    a citizen of a nation without its consent." *Id.* at 103.  And if the United States has not consented

4    to someone's enduring presence, it follows that it has not consented to making citizens of that

5    person's children.

6        Although Plaintiffs contend that the Citizenship EO upends well-settled law, it is their

7    maximalist reading which runs headlong into existing law.  Not only is it inconsistent with the

8    Supreme Court's holding in *Elk* that the children of Tribal Indians did not fall within the

9    Citizenship Clause, even though they were subject to the regulatory power of the United States,

10   *id.* at 101-02, but it would have made the Civil Rights Act of 1866 (which defined citizenship

11   to cover those born in the United States, not "subject to any foreign power") unconstitutional

12   just two years after it was passed.  But the Citizenship Clause was an effort to *constitutionalize*

13   the Civil Rights Act.  Plaintiffs also lean on the Supreme Court's decision in *United Sates v.*

14   *Wong Kim Ark*, 169 U.S. 649 (1898).  The Court, however, was careful to cabin its actual

15   holding to the children of those with a "permanent domicile and residence in the United

16   States," *id.* at 652-53, and "[b]reath spent repeating dicta does not infuse it with life." *Metro.*

17   *Stevedore Co. v. Rambo*, 515 U.S. 291, 300 (1995).  The Court in *Wong Kim Ark* did not

18   suggest that it was overturning *Elk* or jeopardizing the 1866 Civil Rights Act, and reading that

19   decision to leave open the question presented here is consistent with contemporary accounts,

20

21   Opposition to Plaintiffs' Motions for
     Preliminary Injunction
22   2:25-cv-00127-JCC -3

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

1  prior practices of the political branches, and Supreme Court decisions in the years following

2  *Wong Kim Ark*.  Finally, the balance of the equities does not favor injunctive relief.

3      The Court should deny the pending preliminary injunction motions.

4                                    **BACKGROUND**

5  **I.      The Executive Order**

6      The Citizenship EO is an integral part of President Trump's broader effort to repair the

7  United States' immigration system and to address the ongoing crisis at the southern border.

8  *See, e.g.*, Exec. Order No. 14165, Securing Our Borders (Jan. 20, 2025); Proclamation No.

9  10866, Declaring a National Emergency at the Southern Border of the United States (Jan. 20,

10  2025); Exec. Order No. 14159, Protecting the American People Against Invasion (Jan. 20,

11  2025) (Invasion EO).  As the President has recognized, individuals unlawfully in this country

12  "present significant threats to national security and public safety," Invasion EO § 1, and the

13  severity of these problems warrants a full panoply of immigration measures.  Some of these

14  threats are related to the United States' prior, erroneous policy of recognizing near-universal

15  birthright citizenship.  For instance, "the nation's current policy of universally granting

16  birthright citizenship to individuals who lack any meaningful ties to the United States provides

17  substantial opportunities for abuse by motivated enemies."  Amy Swearer, Heritage Found.,

18  Legal Memorandum No. 250, *The Political Case for Confining Birthright Citizenship to Its*

19  *Original Meaning* 8-11 (2019).

20

21  Opposition to Plaintiffs' Motions for
    Preliminary Injunction

22  2:25-cv-00127-JCC -4

1     The EO seeks to correct the Executive Branch's prior misreading of the Citizenship

2 Clause.  It recognizes that the Constitution and the INA provide for citizenship for all persons

3 who are born in the United States and subject to the jurisdiction thereof, and identifies two

4 circumstances in which a person born in the United States is not automatically extended the

5 privilege of United States citizenship:

6     (1) when that person's mother was unlawfully present in the United States
      and the father was not a United States citizen or lawful permanent resident at
7     the time of said person's birth, or (2) when that person's mother's presence
      in the United States at the time of said person's birth was lawful but
8     temporary (such as, but not limited to, visiting the United States under the
      auspices of the Visa Waiver Program or visiting on a student, work, or tourist
9     visa) and the father was not a United States citizen or lawful permanent
      resident at the time of said person's birth.

10    Citizenship EO § 1.

11    Section 2(a) of the EO directs the Executive Branch (1) not to issue documents

12 recognizing U.S. citizenship to persons born in the United States under the conditions

13 described in section 1, and (2) not to accept documents issued by state, local, or other

14 governments purporting to recognize the U.S. citizenship of such persons.  The EO specifies,

15 however, that those directives "apply only to persons who are born within the United States

16 after 30 days from the date of this order," or February 19.  Citizenship EO § 2(b).  The

17 Citizenship EO makes clear that its provisions do not "affect the entitlement of other

18 individuals, including children of lawful permanent residents, to obtain documentation of their

19 United States citizenship."  *Id*. § 2(c).

20

21

22

1    The EO directs the Secretary of State, the Attorney General, the Secretary of Homeland

2    Security, and the Commissioner of Social Security to take "all appropriate measures to ensure

3    that the regulations and policies of their respective departments and agencies are consistent

4    with this order," and not to "act, or forbear from acting, in any manner inconsistent with this

5    order." *Id*. § 3(a).  It further directs the heads of all federal agencies to issue public guidance

6    within 30 days (by February 19) "regarding this order's implementation with respect to their

7    operations and activities." *Id*. § 3(b).

8    **II.    This Litigation**

9    The states of Washington, Arizona, Illinois, and Oregon (the state plaintiffs or the

10   states) filed suit the day after the EO issued. *See* ECF No. 1.  Claiming harm to "their

11   residents," *id.* ¶ 3, and the loss of federal reimbursement for services the states voluntarily

12   choose to provide, *id.* ¶ 5, the states assert claims via the Citizenship Clause (Count 1) and the

13   INA (Count 2).  The states moved for a temporary restraining order (TRO), which the Court

14   entered on January 23, to remain in effect "pending further orders from the Court."  *See* ECF

15   Nos. 43 & 44.  The TRO enjoins Defendants from enforcing or implementing Section 2(a),

16   Section 3(a), or Section 3(b) of the Citizenship EO.  ECF No. 43.  The state plaintiffs then

17   moved for a preliminary injunction on January 27.  *See* ECF NO. 63 (State PI Mot.).

18   The individual plaintiffs (or class plaintiffs) filed a complaint on January 24, asserting

19   claims under the Citizenship Clause, the INA, and the APA. *See* Compl. *Franco Aleman, et.*

20   *al. v. Trump, et. al.*, Case No. 2:25-cv-163, ECF No. 1.  These plaintiffs are "three expecting

21

22

1    mothers who are not U.S. citizens or lawful permanent residents with due dates after the

2    implementation date" of the Citizenship EO, *id*. ¶ 5., who seek to represent a class of "similarly

3    situated parents and their children" within the state of Washington, *id*. ¶¶ 5, 100.  On January

4    27, the Court ordered the cases consolidated and established a schedule for briefing on the

5    individual plaintiffs' requests for preliminary injunctive relief.  *See* ECF No. 56.  Pursuant to

6    that schedule, the class plaintiffs filed a supplementary preliminary injunction motion on

7    January 29, *see* ECF No. 74 (Class PI Mot.).

8                                   **STANDARD OF REVIEW**

9           A preliminary injunction is "an extraordinary remedy that may only be awarded upon

10   a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council,*

11   *Inc.*, 555 U.S. 7, 22 (2008).  To obtain such extraordinary relief, a plaintiff must demonstrate

12   "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

13   absence of preliminary relief, that the balance of equities tips in his favor, and that an

14   injunction is in the public interest."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir.

15   2009) (citation omitted).

16                                        **ARGUMENT**

17   **I.     The State Plaintiffs Lack Standing.**

18          The state plaintiffs' motion should be denied at the outset because the states have not

19   established that they are likely to meet Article III standing requirements.  First, the direct harms

20   that they allege to have suffered as states are insufficient to confer Article III standing.  And

21

22   Opposition to Plaintiffs' Motions for
     Preliminary Injunction
     2:25-cv-00127-JCC -7

1  second, the states lack third-party standing to assert Citizenship Clause claims on behalf of

2  their residents.

3       1.     To establish Article III standing, the states must show that they have suffered a

4  judicially cognizable injury that is fairly traceable to the defendant and likely redressable by

5  judicial relief.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  The states attempt

6  to satisfy that requirement primarily by asserting incidental "economic and administrative

7  harms."  State PI Mot. at 6.  Those alleged harms—essentially, that the EO will indirectly

8  reduce the measure of federal funding the states receive—do not satisfy Article III.

9       As an initial matter, the Supreme Court rejected those types of incidental economic

10  harms as a basis for standing in *United States v. Texas*.  There, Texas and Louisiana challenged

11  federal actions that, in their view, increased the number of noncitizens in their states, which

12  imposed various costs on the states (*e.g.*, costs from continuing to "supply social services . . .

13  to noncitizens").  *See Texas*, 599 U.S. at 674.  Those costs were insufficient for standing:

> [I]n our system of dual federal and state sovereignty, federal policies
> frequently generate indirect effects on state revenues or state spending. And
> when a State asserts, for example, that a federal law has produced only those
> kinds of indirect effects, the State's claim for standing can become more
> attenuated. In short, none of the various theories of standing asserted by the
> States in this case overcomes the fundamental Article III problem with this
> lawsuit.

18  *Id.* at 680 n.3 (citations omitted).

19       That holding forecloses the state plaintiffs' standing here.  Just as in *Texas*, where it

20  was insufficient for the challenger states to identify monetary costs stemming from the

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -8

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

presence of aliens, these states cannot rely on social services expenditures to challenge the federal government's regulation of others.  The Citizenship EO simply regulates how the federal government will approach certain individuals' citizenship status.  The state where such individuals live has no legally cognizable interest in the recognition of citizenship by the federal government of a particular individual—let alone economic benefits or burdens that are wholly collateral to citizenship status.  Whatever potential downstream effects might arise for state programs in response cannot establish standing.  *See Washington v. FDA*, 108 F.4th 1163, 1174-76 (9th Cir. 2024) (reasoning that increased costs to state Medicaid system were the sort of "indirect" fiscal injuries that fell short of Article III); *E. Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1002 (9th Cir. 2024) (holding that states lack "a significant protectable interest in minimizing their expenditures" from immigration-related policy changes because "such incidental effects are … attenuated and speculative.").[1]

Accepting the states' theory of injury here—that states suffer Article III injury whenever a federal policy allegedly results in an increase in state expenditures or loss in state revenues—would eliminate any limits on state challenges to federal policies.  *See Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) ("Are we really going to say that any federal regulation of individuals through a policy statement that imposes peripheral costs on a State

---

[1] The indirect, downstream nature of the states' claimed harm is what distinguishes this case from *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), where the challenged federal policy would have directly deprived a state government corporation of ongoing fees that it would have otherwise continued earning under a federal contract.  *See id*. at 2366.

1   creates a cognizable Article III injury for the State to vindicate in federal court? If so, what

2   limits on state standing remain?").  Indeed, the states' claimed interest in future fees under

3   their contract with the Social Security Administration (SSA), State PI Mot. at 8, highlights the

4   breadth of their theory—asserting that a discrete contract with SSA grants them Article III

5   license to challenge any federal action that conceivably lowers the birthrate within their states.

6       Moreover, the states' asserted injuries regarding "health, social, and administrative

7   services" are not traceable to the Citizenship EO, because the EO does not require the states

8   to provide those services to aliens.  *See* State PI Mot. at 7.  Nor have the states identified any

9   other source of federal law that compels them to provide the referenced services.  Because the

10  states have *voluntarily* chosen to provide certain benefits to aliens, the costs they incur to do

11  so are the result of an independent choice made by the states' legislatures and not attributable

12  to the Citizenship EO itself.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417-18 (2013)

13  (holding that "respondents' self-inflicted injuries" were insufficient for Article III standing,

14  because they "are not fairly traceable" to the challenged government action); *Pennsylvania v.*

15  *New Jersey*, 426 U.S. 660, 664 (1976) ("No State can be heard to complain about damage

16  inflicted by its own hand.").[2]

17  ───────────────────

18      [2] The states assert that "federal law dictates" that they "*must* provide" some of these
    services.  State PI Mot. at 17.  The only example they cite is one state hospital that is allegedly
19  "required by federal law to provide emergency care" that is unreimbursed for alien children.
    *Id*. But that requirement to provide emergency care—stemming from the Emergency Medical
20  Treatment and Labor Act (EMTALA)—exists solely because the state-operated hospital
    voluntarily chose to participate in Medicare. *See* 42 U.S.C. § 1395dd(e)(2) (confirming that
21  EMTALA applies only to hospitals participating in Medicare); *Se. Arkansas Hospice, Inc. v.*

Opposition to Plaintiffs' Motions for
Preliminary Injunction
22  2:25-cv-00127-JCC -10

1   The states likewise cannot rely on "operational disruptions and administrative burdens"

2   that they claim will result from the Citizenship EO, State PI Mot. at 8, which does not require

3   states to change their systems or impose any penalty for failing to do so.  These claimed harms

4   are not attributable to the federal policy itself.  And again, the notion that states can assert

5   standing based on putative harms from changing their systems to adapt to new federal policies

6   would create automatic standing to challenge every new federal policy.  That is not the law,

7   for states or other organizations.  *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394-95

8   (2024).

9   Finally, the states' purported harm to their "sovereign interests," *see* State PI Mot. at 6,

10  provides no basis for Article III standing.  The Citizenship EO sets forth a federal government

11  policy with respect to United States citizenship.  As discussed above, its impacts on states are

12  indirect, and it has no effect on the states' ability to "create and enforce a legal code."  *Alfred*

13  *L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982); *see also*

14  *Washington*, 108 F.4th at 1176 (a state's interest in the "preservation of sovereign authority

15  . . . does not convey standing to challenge federal action that affects state law enforcement

16  indirectly").

17  2.     "[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or

18  controversy' requirement," "the plaintiff generally must assert his own legal rights and

19

20  *Burwell*, 815 F.3d 448, 450 (8th Cir. 2016) (acknowledging that Medicare participation is a
    voluntary choice by hospitals).

21  Opposition to Plaintiffs' Motions for
    Preliminary Injunction

22  2:25-cv-00127-JCC -11

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC  20005
202-616-8098

interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (citation omitted). A plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* Thus, constitutional claims generally may be brought only by "one at whom the constitutional protection is aimed." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (citation omitted).

Relatedly, the Supreme Court has foreclosed states from suing the federal government in *parens patriae* actions to protect their citizens. *See, e.g.*, *Massachusetts v. Mellon*, 262 U.S. 447, 485-486 (1923) ("[I]t is no part of [a state's] duty or power to enforce [its people's] rights in respect of their relations with the federal government."); *Murthy v. Missouri*, 603 U.S. 43, 76 (2024) ("States do not have standing as *parens patriae* to bring an action against the Federal Government." (internal quotation marks & citation omitted)).

Applying those principles, the Supreme Court has held that states lack standing to bring claims under Section 1 of the Fourteenth Amendment against the federal government. For example, in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), the Court held that South Carolina lacked standing to challenge a federal statute under the Due Process Clause. *See id.* at 323-324. The "States of the Union" have no rights of their own under that clause; "[n]or does a State have standing as the parent of its citizens to invoke these constitutional provisions against the Federal Government." *Id.* at 323-24. Similarly, in *Haaland v. Brackeen*, 599 U.S. 255 (2023), the Court held that Texas lacked standing to challenge a federal statute under the Equal Protection Clause. Texas "ha[d] no equal protection rights of its own," and Texas could not "assert equal protection claims on behalf of its citizens because 'a State does not have

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -12

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

1  standing as *parens patriae* to bring an action against the Federal Government.'"  *Id.* at 294-

2  295 (brackets and citation omitted).

3  Those precedents control this case.  Just as South Carolina and Texas could not sue the

4  federal government under the Fourteenth Amendment's Due Process and Equal Protection

5  Clauses, the state plaintiffs here may not sue the federal government under the Citizenship

6  Clause. The states do not "ha[ve] [any] [citizenship] rights of their own," and given established

7  "limits on *parens patriae* standing," they also may not "assert [Citizenship Clause] claims"—

8  or any other claims—on behalf of [their residents]."  *Brackeen*, 599 U.S. at 294-95 & n.11.

9  **II.    Plaintiffs Lack A Valid Cause of Action.**

10  The Court should also deny both motions for the threshold reason that neither group of

11  plaintiffs are likely to show that they have a valid cause of action.  The plaintiffs cannot assert

12  the claims at issue in this lawsuit directly under the Citizenship Clause or the INA.  And while

13  the individual plaintiffs invoke the APA in one of their claims, they cannot proceed under that

14  statute because they fail to identify any final agency action and because the INA provides an

15  adequate remedy.

16  **A.    The Class Plaintiffs' APA Claim Fails.**

17  The class plaintiffs assert, in conclusory fashion, an APA challenge to agency actions

18  "that are required or permitted by the Executive Order."  Class Compl. ¶¶ 116-17.  But the

19

20

21

22

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -13

APA only authorizes judicial review over "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Neither requirement is met here.

*First*, Plaintiffs do not attempt to "identify the final agency action being challenged." *Elk Run Coal Co. v. U.S. Dep't of Labor*, 804 F. Supp. 2d 8, 30 (D.D.C. 2011). They do not identify *any* agency action that has been taken, much less final agency action that is reviewable under the APA. The EO does not qualify as an agency action because the President is not an "agency" within the meaning of the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). Until such time as an agency named in the complaints takes action by determining rights or obligations, or otherwise causes legal consequences, *see, e.g.*, *U.S. Army Corps of Eng'rs  v. Hawkes Co.*, 578 U.S. 590, 597 (2016), Plaintiffs' APA claims are not cognizable.

*Second*, the INA provides an adequate alternate remedy for review of citizenship determinations. *See Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) ("[T]he Supreme Court interpreted [5 U.S.C.] § 704 as precluding APA review where Congress has otherwise provided a 'special and adequate review procedure.'" (citation omitted)). Pursuant to the INA's comprehensive statutory framework for judicial review, disputes regarding the citizenship of an individual within the United States are resolved by the individual filing an action for declaratory relief once he is denied a right or privilege as a U.S. national. 8 U.S.C. § 1503(a). Thus, "[i]f any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -14

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC  20005
202-616-8098

States," then that person may institute an action under 8 U.S.C. § 1503(a), in conjunction with 28 U.S.C. § 2201, for a declaratory judgment that he is a U.S. national. *See id*. § 1503(a).[3] Under section 1503, district courts conduct *de novo* proceedings as to the person's nationality status. *See Vance v. Terrazas*, 444 U.S. 252, 256 (1980); *Richards v. Sec'y of State*, 752 F.2d 1413, 1417 (9th Cir. 1985).

Because "Congress intended § 1503(a) to be the exclusive remedy for a person within the United States to seek a declaration of U.S. nationality following an agency or department's denial of a privilege or right of citizenship upon the ground that the person is not a U.S. national," *Cambranis v. Blinken*, 994 F.3d 457, 466 (5th Cir. 2021), courts have consistently concluded that section offers an adequate alternative remedy to—and thus precludes—APA review. *See, e.g.*, *Alsaidi v. U.S. Dep't of State*, 292 F. Supp. 3d 320, 326-27 (D.D.C. 2018); *Esparza v. Clinton*, 2012 WL 6738281, at *1 (D. Or. Dec. 21, 2012); *Ortega-Morales v. Lynch*, 168 F. Supp. 3d 1228, 1233-34 (D. Ariz. 2016).

**B.    Plaintiffs Lack a Cause of Action to Assert Their Constitutional and INA Claims.**

Both groups of plaintiffs primarily assert claims under the Fourteenth Amendment's Citizenship Clause. As discussed above, the state plaintiffs lack standing to assert such claims.

---

[3] If an individual is placed in removal proceedings, Section 1503 is unavailable and the individual can raise the issue of citizenship in those proceedings. 8 U.S.C. § 1252(b)(5) (if an alien appeals a removal order to a circuit court, that court, upon finding a genuine issue of material fact as to U.S. citizenship, transfers the proceeding to the district court for an evidentiary hearing).

1    But even setting that aside, it is well established that the Constitution does not generally

2    provide a cause of action to pursue affirmative relief.  *See, e.g.*, *DeVillier v. Texas*, 601 U.S.

3    285, 291 (2024) ("[C]onstitutional rights are generally invoked defensively in cases arising

4    under other sources of law, or asserted offensively pursuant to an independent cause of action

5    designed for that purpose.").  Neither group of plaintiffs identifies any "independent cause of

6    action"[4] that would enable them to enforce the Citizenship Clause.  *Id*. at 291.

7         As for the INA claims, Congress provided a specific remedy for individuals within the

8    United States to seek judicial resolution of disputes concerning their citizenship.  *See supra*

9    Sec. II.A.  The exclusive remedy for an individual in the U.S. who claims to be a U.S. citizen

10   denied a right or privilege of citizenship is to institute an action for declaratory relief under

11   section 1503(a).  The INA does not provide for states to sue under section 1503(a), either on

12   their own account or on behalf of residents or members—a particularly telling omission, given

13   that some provisions of the INA—as amended by the Laken Riley Act, Pub. L. No. 119-1, 139

14   Stat. 3 (2025)—expressly authorize states to bring enforcement actions.  *See* 8 U.S.C.

15   §§ 1185(d)(5)(C), 1225(b)(3), 1226(f), 1231(a)(2)(B), 1253(e).  And even with respect to

16   individuals, the statute requires any dispute over a citizenship determination to be resolved in

17   individual declaratory judgment proceedings once a right or privilege is actually denied.  It

18   does not permit this facial challenge seeking to permanently enjoin enforcement of an

19

---

20        [4] As discussed above, the class plaintiffs assert a separate claims under the APA.  But
they do not allege that their constitutional or INA claims are pursuant to the APA cause of
21   action, and in any event have failed to assert a proper APA claim.

Opposition to Plaintiffs' Motions for
Preliminary Injunction
22   2:25-cv-00127-JCC -16

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC  20005
202-616-8098

1  executive order on a class basis before any right has been denied to them.  *See, e.g.*, *Alexander*

2  *v. Sandoval*, 532 U.S. 275, 287 (2001) ("Raising up causes of action where a statute has not

3  created them may be a proper function for common-law courts, but not for federal tribunals."

4  (citation omitted)).

5  **III.    Plaintiffs Are Not Likely To Succeed On the Merits.**

6      The Citizenship Clause provides that "[a]ll persons born or naturalized in the United

7  States, and subject to the jurisdiction thereof, are citizens of the United States and of the State

8  wherein they reside."  U.S. Const. amend. XIV, § 1.  And the INA grants U.S. citizenship to

9  any "person born in the United States, and subject to the jurisdiction thereof."  8 U.S.C.

10  § 1401(a).  Plaintiffs contend that the EO violates both the Citizenship Clause and the INA,

11  but they are mistaken.

12      To obtain U.S. citizenship under the Citizenship Clause, a person must be:  (1) "born

13  or naturalized in the United States" and (2) "subject to the jurisdiction thereof."  U.S. Const.

14  amend XIV, § 1.  The Supreme Court has identified multiple categories of persons who,

15  despite birth in the United States, are not constitutionally entitled to citizenship because they

16  are not subject to the jurisdiction of the United States: children of foreign sovereigns or their

17  diplomats, children of alien enemies in hostile occupation, children born on foreign public

18  ships, and certain children of members of Indian tribes.[5]  *United States v. Wong Kim Ark*, 169

19

20      [5] Although the Citizenship Clause has always been understood to exclude certain
children of members of Indian tribes from a constitutional right to citizenship by birth,

U.S. 649, 682, 693 (1898).  The Citizenship EO recognizes an additional category of persons not subject to the jurisdiction of the United States: children born in the United States of illegal aliens or temporary visitors.

## A.    The Term "Jurisdiction" in the Citizenship Clause Does Not Refer to Regulatory Power.

"Jurisdiction . . . is a word of many, too many, meanings."  *Wilkins v. United States*, 598 U.S. 152, 156 (2023) (citation omitted).  Plaintiffs equate "jurisdiction" with something akin to regulatory power, arguing that the children of illegal aliens or temporary visitors are subject to the jurisdiction of the United States because they "must comply with U.S. law." State PI Mot. at 10; *see also* Class PI Mot. at 12 (asserting that jurisdiction means "subject to the authority or sovereign power of a country or government").  But that interpretation is incorrect.  It conflicts with both Supreme Court precedent and ample evidence as to the provision's original public meaning.

1.    Most importantly,  the plaintiffs' understanding of the term "jurisdiction" conflicts with Supreme Court precedents identifying the categories of persons who are not subject to the United States' jurisdiction within the meaning of the Citizenship Clause.  For example, the Supreme Court has held that children of members of Indian tribes, "owing immediate allegiance" to those tribes, do not acquire citizenship by birth in the United States. *Elk*, 112 U.S. at 102; *see Wong Kim Ark*, 169 U.S. at 680-82.  Yet members of Indian tribes

---

Congress has by statute extended U.S. citizenship to any "person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe."  8 U.S.C. § 1401(b).

1    and their children are plainly subject to the United States' regulatory power. "It is thoroughly

2    established that Congress has plenary authority over the Indians and all their tribal relations."

3    *Winton v. Amos*, 255 U.S. 373, 391 (1921); *see Brackeen*, 599 U.S. at 272-73. For example,

4    Congress may regulate Indian commercial activities, *see United States v. Holliday*, 70 U.S. (3

5    Wall.) 407, 416-18 (1866); Indian property, *see Lone Wolf v. Hitchcock*, 187 U.S. 553, 565

6    (1903); and Indian adoptions, *see Brackeen*, 599 U.S. at 276-280. And the United States may

7    punish Indians for crimes. *See United States v. Kagama*, 118 U.S. 375, 379-385 (1886). If,

8    as plaintiffs argue, "subject to the jurisdiction thereof" means subject to U.S. law, this

9    longstanding exception for Indians would be inexplicable.

10       In fact, the plaintiffs' reading cannot even explain the exception to birthright citizenship

11   for "children of foreign sovereigns or their ministers." *Wong Kim Ark*, 169 U.S. at 693.

12   Although foreign leaders and diplomats have traditionally enjoyed immunity as a matter of

13   common law, the Constitution allows Congress to abrogate that immunity or to make

14   exceptions to it. *See Verlinden BV v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983). And

15   to the extent plaintiffs argue that children of foreign leaders or diplomats are not subject to the

16   United States' jurisdiction because the U.S. *chooses* to extend immunity to them, their theory

17   would allow Congress to turn the Citizenship Clause on and off at will by extending or

18   retracting immunity.

19       Against the surplusage canon, on plaintiffs' reading, the phrase "subject to the

20   jurisdiction thereof" adds nothing to the phrase "born . . . in the United States." Because the

21   Opposition to Plaintiffs' Motions for
     Preliminary Injunction
22   2:25-cv-00127-JCC -19

1   United States is sovereign over its territory, everyone who is born (and so present) in the

2   United States would necessarily be subject, at least to some extent, to the United States'

3   regulatory authority.  *See Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136

4   (1812).  But "[i]t cannot be presumed that any clause in the [C]onstitution is intended to be

5   without effect; and therefore such a construction is inadmissible." *Marbury v. Madison*, 5 U.S.

6   (1 Cranch) 137, 174 (1803).

7          2.      Instead of equating "jurisdiction" with regulatory authority, the Supreme Court

8   has held that a person is "subject to the jurisdiction" of the United States under the Citizenship

9   Clause if he is born "in the allegiance and under the protection of the country." *Wong Kim*

10  *Ark*, 169 U.S. at 693.  That allegiance to the United States, the Court has further held, must be

11  "direct," "immediate," and "complete," unqualified by "allegiance to any alien power." *Elk*,

12  112 U.S. at 101-02.  In other words, a person is subject to the jurisdiction of the United States

13  within the meaning of the Clause only if he is *not* subject to the jurisdiction of a foreign power,

14  and the "nation" has "consent[ed]" to him becoming part of its own "jurisdiction." *Elk*, 112

15  U.S. at 102-03; *see also Schooner Exchange*, 11 U.S. at 136 (explaining a nation's "jurisdiction

16  … must be traced up to the consent of the nation itself").

17         That reading of the Citizenship Clause reflects its statutory background.  Months before

18  Congress proposed the Fourteenth Amendment, it enacted the Civil Rights Act of 1866.  That

19  Act served as "the initial blueprint" for the Amendment, *Gen. Bldg. Contractors Ass'n, Inc. v.*

20  *Pennsylvania*, 458 U.S. 375, 389 (1982), and the Amendment in turn "provide[d] a

21

1    constitutional basis for protecting the rights set out" in the Act, *McDonald v. City of Chicago*,

2    561 U.S. 742, 775 (2010). The Act stated, as relevant here, that "all persons born in the United

3    States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared

4    to be citizens of the United States." Civil Rights Act § 1, 14 Stat. 27 (1866) (emphasis added).

5    There is no reason to read the phrase "subject to the jurisdiction thereof" in the Amendment

6    as broader than the phrase "not subject to any foreign power" in the Act—in no small part,

7    because doing so would render the Civil Rights Act unconstitutional. And as telling, the Act's

8    citizenship language remained on the books until revised by the Nationality Act of 1940, ch.

9    876, § 201(a), 54 Stat. 1137, 1138—suggesting that Congress regarded the Act's "not subject

10   to any foreign power" requirement as consistent with the Amendment's "subject to the

11   jurisdiction" requirement. The Act thus confirms that, to be subject to the jurisdiction of the

12   United States under the Clause, a person must owe "no allegiance to any alien power." *Elk*,

13   112 U.S. at 101.

14       Debates on the Act and the Amendment show that members of Congress shared that

15   understanding. During debates on the Act, Senator Lyman Trumbull explained that the

16   purpose of the Act was "to make citizens of everybody born in the United States who owe[d]

17   allegiance to the United States." Cong. Globe, 39th Cong., 1st Sess. 572 (1866). And

18   Representative John Broomall explained that the freed slaves were properly regarded as U.S.

19   citizens by birth because they owed no allegiance to any foreign sovereign. *See id*. at 1262.

20   Trumbull went on to equate "being subject to our jurisdiction" with "owing allegiance solely

21

22

1    to the United States." *Id.* at 2894.  And Senator Reverdy Johnson agreed that "all that this

2    amendment provides is, that all persons born in the United States and not subject to some

3    foreign Power . . . shall be considered as citizens." *Id.* at 2893.

4        The full text of the Citizenship Clause reinforces that reading of the Clause's

5    jurisdictional element.  The Clause provides that persons born in the United States and subject

6    to its jurisdiction "are citizens of the United States and of the States wherein they reside." U.S.

7    Const. amend. XIV, § 1.  The Clause uses the term "reside[nce]" synonymously with

8    "domicile." *See Robertson v. Cease*, 97 U.S. 646, 650 (1878) (explaining that state citizenship

9    requires "a fixed permanent domicile in that State").  And then as now, domicile was

10   understood to have two components—presence that is both permanent and lawful.  *See* M.A.

11   Lesser, *Citizenship and Franchise*, 4 Colum. L. Times 145, 146 n.3 (1891) (explaining the

12   term "'resident' … 'is applied exclusively to one who lives in a place and has a fixed *and legal*

13   settlement'") (emphasis added).  The Clause thus confirms that citizenship flows from lawful

14   domicile.

15       Finally, the government's reading, unlike the plaintiffs' interpretation, is the only one

16   that fully explains the Supreme Court's precedents on citizenship by birth in the United States.

17   It was "never doubted" that "children born of citizen parents" owe allegiance to the United

18   States and are subject to its jurisdiction. *Minor v. Happersett*, 88 U.S. 162, 167 (1874).  In

19   *Wong Kim Ark*, the Court held that a child born in the United States "of parents of Chinese

20   descent, who at the time of his birth [were] subjects of the emperor of China, but have a

21
Opposition to Plaintiffs' Motions for
Preliminary Injunction
22   2:25-cv-00127-JCC -22

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

1    permanent domicile and residence in the United States, and are there carrying on business, and

2    are not employed in any diplomatic or official capacity" by China are likewise subject to the

3    jurisdiction of the United States.  169 U.S. at 653.  The Court explained that "[e]very citizen

4    or subject of another country, while domiciled here, is within the allegiance . . . of the United

5    States."  *Id*. at 693.  By contrast, children of diplomats, children of certain alien enemies, and

6    children born on foreign public ships are not subject to the jurisdiction of the United States

7    because they all owe allegiance to foreign sovereigns under background principles of common

8    law.  *See id.* at 655.  And the Court has held that certain children of members of Indian tribes

9    are not subject to U.S. jurisdiction in the necessary sense because they "owe[] immediate

10    allegiance to their several tribes."  *Elk*, 112 U.S. at 99.

11    **B.    Children Born of Unlawfully Present Aliens or Lawful But Temporary Visitors Fall Outside the Citizenship Clause.**

12

13    1.    To determine which sovereign may properly claim a person's allegiance, the

14    Supreme Court has looked to the background principles of the common law and the law of

15    nations, as understood in the United States at the time of the ratification of the Fourteenth

16    Amendment.  *See Wong Kim Ark*, 169 U.S. at 653-55.  Under those principles, a child born of

17    foreign parents other than lawful permanent residents is domiciled in, and owes a measure of

18    allegiance to, his parents' home country.  As a result, such a child is not subject to the

19    jurisdiction of the United States within the meaning of the Citizenship Clause.

20    Under the common law, a person owes a form of "allegiance" to the country in which

21    he is "domiciled."  *Carlisle v. United States*, 83 U.S. (16 Wall.) 147, 155 (1872); *see Pizarro*,

22

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -23

15 U.S. (2 Wheat.) 227, 246 (1817) (Story, J.) ("[A] person domiciled in a country . . . owes allegiance to the country."). A child's domicile, and thus his allegiance, "follow[s] the independent domicile of [his] parent." *Lamar v. Micou*, 112 U.S. 452, 470 (1884); *see Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989).

Temporary visitors and unlawfully present aliens, however, are not domiciled here but in foreign countries. As touched on above, "[i]n general, the domicile of an individual is his true, fixed and permanent home." *Martinez v. Bynum*, 461 U.S. 321, 331 (1983). Temporary visitors to the United States, by definition, retain permanent homes in foreign countries. And illegal aliens, by definition, have no right even to be present in the United States, much less a right to make *lawful* residence here. Instead, as a matter of law, illegal aliens formally retain their foreign domiciles, because they have not yet been accepted to reside anywhere else. *See*, *e.g.*, *Elkins v. Moreno*, 435 U.S. 647, 665-66 (1978) (recognizing that federal immigration law restricts the ability of foreigners to establish domiciles in the United States). And if a temporary visitor or illegal alien domiciled in a foreign country has a child with another temporary visitor or illegal alien while in the United States, the child's domicile also lies in the foreign country, and the child owes allegiance to that country. That "allegiance to [an] alien power" precludes the child from being "completely subject" to the United States' jurisdiction, as the Fourteenth Amendment requires. *Elk*, 112 U.S. at 101-02.

Indeed, the Citizenship EO follows directly from Supreme Court precedent recognizing that distinction, and the established exception to birthright citizenship for certain "children of

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -24

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

members of the Indian tribes." *Wong Kim Ark*, 169 U.S. at 682.  Indian tribes form "an intermediate category between foreign and domestic states." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 396 n.7 (2023) (citation omitted).  The Supreme Court long ago determined that Indian tribes are not "foreign nations," instead describing them as "domestic dependent nations." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831) (Marshall, C.J.).  Yet the Court has held that "an Indian, born a member of one of the Indian tribes," has no constitutional birthright to U.S. citizenship given his "immediate allegiance" to his tribe. *Elk*, 112 U.S. at 99, 101-02; *see Wong Kim Ark*, 169 U.S. at 680-82.

Illegal aliens and temporary visitors have far weaker connections to the United States than do members of Indian tribes.  "Our Constitution reserves for the Tribes a place—an enduring place—in the structure of American life." *Brackeen*, 599 U.S. at 333 (Gorsuch, J., concurring).  If the United States' link with Indian tribes does not suffice as a constitutional matter for birthright citizenship, its weaker link with illegal aliens and temporary visitors even more obviously does not do so. *See, e.g.*, William Edward Hall, *A Treatise on International Law* 237 n.1 (4th ed. 1895) ("[A] fortiori the children of foreigners in transient residence are not citizens, their fathers being subject to the jurisdiction less completely than Indians.").

2.     The Fourteenth Amendment's historical background provides additional support for the conclusion that, while children born here of U.S. citizens and permanent residents are entitled to U.S. citizenship by birth, children born of parents whose presence is either unlawful

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -25

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

or lawful but temporary are not.  Under the common law, "[t]wo things usually concur to create citizenship; [f]irst, birth locally within the dominions of the sovereign; and, secondly, birth . . . within the ligeance of the sovereign."  *Wong Kim Ark*, 169 U.S. at 659 (citation omitted); *see also* 2 James Kent, *Commentaries on American Law* 42 (6th ed. 1848).  The phrase "born . . . in the United States," U.S. Const. amend. XIV, § 1, codifies the traditional requirement of "birth within the territory," *Wong Kim Ark*, 169 U.S. at 693, and the phrase "subject to the jurisdiction thereof," U.S. Const. Amend. XIV, § 1, codifies the traditional requirement of birth "in the allegiance" of the country, *Wong Kim Ark*, 169 U.S. at 693.

Drawing from the same tradition, Emmerich de Vattel—"the founding era's foremost expert on the law of nations," *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 239 (2019)— explained that citizenship under the law of nations depended not only on the child's place of birth, but also on the parents' political status.  "[N]atural-born citizens," Vattel wrote, include "those born in the country, of parents who are citizens."  Emmerich de Vattel, *The Law of Nations* § 212, at 101 (London, printed for G.G. and J. Robinson, Paternoster-Row, 1797 ed.). Citizenship by virtue of birth in the country also extends to the children of "perpetual inhabitants" of that country, whom Vattel regarded as "a kind of citize[n]."  *Id.* § 213, at 102 (emphasis omitted); *see also id.* § 215, at 102.  According to Vattel, citizenship does not extend, however, to children of those foreigners who lack "the right of perpetual residence" in the country.  *Id.* § 213, at 102.

Justice Story also understood that birthright citizenship required more than mere

physical presence.  He wrote in a treatise:

> Persons, who are born in a country, are generally deemed citizens and subjects of that country.  A reasonable qualification of this rule would seem to be, that it should not apply to the children of parents, who were *in itinere* in the country, or abiding there for temporary purposes, as for health, or occasional business.

Joseph Story, *Commentaries on the Conflict of Laws* § 48, at 48 (1834).

3.     Congressional debates over the Civil Rights Act and Fourteenth Amendment also confirm that children born in the United States to non-resident aliens lack a right to U.S. citizenship because they are not subject to U.S. jurisdiction.  For instance, Representative James Wilson explained during a debate over the Civil Rights Act that, under "the general law relating to subjects and citizens recognized by all nations," a "person born in the United States" ordinarily "is a natural-born citizen."  Cong. Globe, 39th Cong., 1st Sess. 1117 (1866).  But he recognized "except[ions]" to that general rule for "children born on our soil to *temporary sojourners* or representatives of foreign Governments."  *Id.* (emphasis added).

As noted above, the Civil Rights Act provided that "all persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens."  Civil Rights Act § 1, 14 Stat. 27 (emphasis added).  Senator Trumbull, "who wrote [the Act's] citizenship language and managed the Act in the Senate," summarized that provision as follows: "The Bill declares 'all persons *born of parents domiciled in the United States*, except untaxed Indians, to be citizens of the United States."  Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J.

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -27

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

1351, 1352-53 (2010) (citations omitted). "Trumbull thus understood the Act's 'not subject to any foreign [p]ower' requirement as equivalent to 'child of parents domiciled in the United States.'" *Id.* at 1353 (footnote omitted).

During a debate over the Fourteenth Amendment, Senator Benjamin Wade proposed a version of the Amendment that would have referred to "persons born in the United States" (without the additional qualification of being "subject to the jurisdiction"). Cong. Globe, 39th Cong., 1st Sess. 2768 (1866). One of his colleagues objected that "persons may be born in the United States and yet not be citizens," giving the example of "a person [who] is born here of parents from abroad temporarily in this country." *Id.* at 2769. Senator Wade acknowledged that the unadorned phrase "born in the United States" would indeed encompass those individuals, but he argued that the situation would arise so infrequently that "it would be best not to alter the law for that case." *Id.* at 2768-69. That exchange concludes that "a person [who] is born here of parents from abroad temporarily in this country" is not subject to the jurisdiction of the United States, *id.* at 2769, and is accordingly not constitutionally entitled to citizenship by birth.

4.    Contemporary understanding following ratification accords with that reading of the Fourteenth Amendment. Perhaps most telling, right on the heels of the Citizenship Clause, the Supreme Court described its scope as such: "The phrase, 'subject to its jurisdiction,' was intended to exclude from its operation children of ministers, consuls, *and citizens or subjects of foreign States* born within the United States." *The Slaughterhouse Cases*, 83 U.S. 36, 73

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -28

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

(1873) (emphasis added).  That is wholly consistent with the Citizenship EO.

Contemporary commentators expressed similar views.  *See, e.g.*, Hall, *supra*, 236-237("In the United States it would seem that the children of foreigners in transient residence are not citizens."); Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881) ("The words 'subject to the juris); Samuel F. Miller, *Lectures on the Constitution of the United States* at 279 (1891) (similar).

The Supreme Court of New Jersey similarly linked birthright citizenship with parental domicile in *Benny v. O'Brien*, 32 A. 696 (N.J. 1895).  In a passage that was later quoted in *Wong Kim Ark*, the court interpreted the Citizenship Clause to establish "the general rule that, *when the parents are domiciled here*, birth establishes the right of citizenship."  *Id.* at 698 (emphasis added) (quoted in *Wong Kim Ark*, 169 U.S. at 692).  And it explained that the Citizenship Clause's jurisdictional element excludes "those born in this country of foreign parents who are temporarily traveling here" because "[s]uch children are, in theory, born within the allegiance of [a foreign] sovereign." *Id.*

The political branches operated from the same understanding in the years following the Fourteenth Amendment's enactment.  For instance, six years after ratification, Representative Ebenezer Hoar proposed a bill "to carry into execution the provisions of the [F]ourteenth [A]mendment . . . concerning citizenship." 2 Cong. Rec. 3279 (1874).  The bill would have provided that, as a general matter, "a child born within the United States of parents who are not citizens, and who do not reside within the United States, . . . shall not be regarded as a

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -29

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

citizen thereof." *Id.* Although the bill ultimately failed because of "opposition to its expatriation provisions," its "parental domicile requirement" generated little meaningful "debate or controversy." Justin Lollman, Note, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 475 (2015). The bill thus suggests that, soon after the ratification of the Fourteenth Amendment, members of Congress accepted that children born of non-resident alien parents are not subject to the United States' jurisdiction under the Citizenship Clause.

The Executive Branch, too, at times took the position that the Citizenship Clause did not confer citizenship upon children born in the United States to non-resident alien parents. In 1885, Secretary of State Frederick T. Frelinghuysen issued an opinion denying a passport to an applicant who was "born of Saxon subjects, temporarily in the United States." 2 *A Digest of the International Law of the United States* § 183, at 397 (Francis Wharton ed., 2d. ed. 1887) (*Wharton's Digest*). Secretary Frelinghuysen explained that the applicant's claim of birthright citizenship was "untenable" because the applicant was "subject to [a] foreign power," and "the fact of birth, under circumstances implying alien subjection, establishes of itself no right of citizenship." *Id.* at 398. Later the same year, Secretary Frelinghuysen's successor, Thomas F. Bayard, issued an opinion denying a passport to an applicant born "in the State of Ohio" to "a German subject" "domiciled in Germany." *Id.* at 399. Secretary Bayard explained that the applicant "was no doubt born in the United States, but he was on his birth 'subject to a foreign power' and 'not subject to the jurisdiction of the United States.'" *Id.* at 400.

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -30

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

5.      Finally, *Wong Kim Ark* recognized an exception to birthright citizenship for "children born of alien enemies in hostile occupation," *Wong Kim Ark*, 169 U.S. at 682.  Here, the President has determined that the United States has experienced "an unprecedented flood of illegal immigration" in which "[m]illions of illegal aliens"—many of whom "present significant threats to national security and public safety"—have entered the country in violation of federal law.  Invasion EO § 1; *see also id.* (explaining that "[o]thers are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities").  Plaintiffs' maximalist reading of the Citizenship Clause would require extending birthright citizenship to the children of individuals who present such threats, including even unlawful enemy combatants who enter this country in an effort to create sleeper cells or other hostile networks.

## C.      Applicable Interpretive Principles Support the Government's Reading of the Citizenship Clause.

1.      "[A]ny policy toward aliens is vitally and intricately interwoven with . . . the conduct of foreign relations." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952).  "Any rule of constitutional law that would inhibit the flexibility" of Congress or the President "to respond to changing world conditions should be adopted only with the greatest caution." *Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (citation omitted).

The government's reading of the Citizenship Clause respects that principle, while Plaintiffs' reading violates it.  The Citizenship Clause sets a constitutional floor, not a constitutional ceiling.  Although Congress may not deny citizenship to those protected by the

Clause, it may, through its power to "establish an uniform Rule of Naturalization," extend citizenship to those who lack a constitutional right to it.  U.S. Const. Art. I, § 8, Cl. 4; *see Wong Kim Ark*, 169 U.S. at 688.  The government's reading would thus leave Congress with the ability to extend citizenship to the children of illegal aliens or of temporary visitors, just as it has extended citizenship to the children of members of Indian tribes.  Plaintiffs' reading, by contrast, would for all time deprive the political branches of the power to address serious problems caused by near-universal birthright citizenship.

As a "sovereign nation," the United States has the constitutional power "to forbid the entrance of foreigners within its dominions, or to admit them only in such cases upon such conditions as it may see fit to prescribe."  *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892).  "[O]ver no conceivable subject" is federal power "more complete" than it is over the admission of aliens.  *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909).  Interpreting the Constitution to require the extension of birthright citizenship to the children of illegal aliens directly undermines that power by holding out a powerful incentive for illegal entry.  Contrary to the principle that no wrongdoer should "profit out of his own wrong," *Liu v. SEC*, 591 U.S. 71, 80 (2020) (citation omitted), it also allows foreigners to secure U.S. citizenship for their children (and, potentially, later immigration benefits for themselves) by entering the United States in violation of its laws.

2.    The Supreme Court has resisted reading the Citizenship Clause in a manner that would inhibit the political branches' ability to address "problems attendant on dual

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -32

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC  20005
202-616-8098

1   nationality." *Rogers v. Bellei*, 401 U.S. 815, 831 (1971).  Although the United States tolerates

2   dual citizenship in some circumstances, it has "long recognized the general undesirability of

3   dual allegiances." *Savorgnan v. United States*, 338 U.S. 491, 500 (1950).  "One who has a

4   dual nationality will be subject to claims from both nations, claims which at times may be

5   competing or conflicting," and "[c]ircumstances may compel one who has a dual nationality

6   to do acts which otherwise would not be compatible with the obligations of American

7   citizenship." *Kawakita v. United States*, 343 U.S. 717, 733, 736 (1952).

8       Plaintiffs' reading of the Citizenship Clause invites just such problems given that, for

9   centuries, countries have extended citizenship to the foreign-born children of their citizens.

10  England, for example, has extended citizenship to certain foreign-born children of English

11  subjects since at least the 14th century.  *See Wong Kim Ark*, 169 U.S. at 668-71.  In 1790, the

12  First Congress extended citizenship to "children of citizens" born "out of the limits of the

13  United States," with the proviso that "the right of citizenship shall not descend to persons

14  whose fathers have never been resident in the United States."  Naturalization Act of 1790, ch.

15  3, 1 Stat. 103, 104.  Today, federal law recognizes as a citizen any "person born outside of the

16  United States . . . of parents both of whom are citizens of the United States and one of whom

17  has had a residence in the United States."  8 U.S.C. § 1401(c).  Many other countries have

18  similar laws.  *See Miller v. Albright*, 523 U.S. 420, 477 (1998) (Breyer, J., dissenting).

19      3.    Finally, "[c]itizenship is a high privilege, and when doubts exist concerning a

20  grant of it, generally at least, they should be resolved in favor of the United States and against

21

22

1    the claimant." *United States v. Manzi*, 276 U.S. 463, 467 (1928); *see Berenyi v. Dist. Dir.,*

2    *INS*, 385 U.S. 630, 637 (1967).  For the reasons discussed above, the Citizenship Clause is

3    best read not to extend citizenship to children born in the U.S. of illegal aliens or of temporary

4    visitors.  To the extent any ambiguity remains in the Clause, however, the Court should resolve

5    it against extending citizenship.

6    **D.    Plaintiffs' Contrary Arguments Are Unpersuasive.**

7    1.    Plaintiffs rely heavily on *Wong Kim Ark*, *see* State PI Mot. at 11-12; Class PI

8    Mot. at 8, but they misread that precedent.  *Wong Kim Ark* did not concern the status of children

9    born in the United States to parents who were illegal aliens or temporary visitors.   To the

10   contrary, the Court precisely identified the specific question presented:

11           whether a child born in the United States, of parents of Chinese descent,
             who at the time of his birth, are subjects of the emperor of China, *but have*
12           *a permanent domicile and residence in the United States*, and are there
             carrying on business, and are not employed in any diplomatic or official
13           capacity under the emperor of China, becomes at the time of his birth a
             citizen of the United States.
14
     *Wong Kim Ark*, 169 U.S. at 653 (emphasis added).
15
             In analyzing that question, the Court repeatedly relied on fact that the parents were
16
     permanent residents.  For example, it quoted an opinion in which Justice Story recognized that
17
     "the children, even of aliens, born in a country, *while the parents are resident there* under the
18
     protection of the government, . . . are subjects by birth."  *Wong Kim Ark*, 169 U.S. at 660
19
     (emphasis added) (quoting *Inglis*, 28 U.S. (3 Pet.) at 164 (Story, J., dissenting).  It quoted the
20
     New Jersey Supreme Court's observation that the Fourteenth Amendment codifies "the
21

22
     U.S. DEPARTMENT OF JUSTICE
     CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
     1100 L STREET, NW
     WASHINGTON, DC  20005
     202-616-8098

general rule, that *when the parents are domiciled here*, birth establishes the right to citizenship." *Id.* at 692 (emphasis added; citation omitted). It explained that "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States." *Id.* at 693 (emphasis added). And it noted that "Chinese persons . . . owe allegiance to the United States, *so long as they are permitted by the United States to reside here*; and are 'subject to the jurisdiction thereof,' in the same sense as all other aliens *residing* in the United States." *Id.* at 694 (emphasis added).

After reviewing the relevant history, the Court reached the following "conclusions": "The Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children born of *resident* aliens." *Wong Kim Ark*, 169 U.S. at 693 (emphasis added). Although the Amendment is subject to certain "exceptions" (*e.g.*, for "children of foreign sovereigns or their ministers"), the Amendment extends citizenship to "children born within the territory of the United States, of all other persons, of whatever race or color, *domiciled within the United States*." *Id.* (emphasis added). The Court then summed up its holding as follows:

> [A] child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the emperor of China, *but have a permanent domicile and residence in the United States*, . . . and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States.

*Id.* at 705 (emphasis added).

No doubt some statements in *Wong Kim Ark* could be read to support Plaintiffs'

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -35

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

1  position.  But *Wong Kim Ark* never purported to overrule any part of *Elk*, and the Supreme

2  Court has previously (and repeatedly) recognized *Wong Kim Ark*'s limited scope.  In one case,

3  the Court stated that

> [t]he ruling in [*Wong Kim Ark*] was to this effect: "A child born in the United
> States, of parents of Chinese descent, who, at the time of his birth, are
> subjects of the Emperor of China, *but have a permanent domicile and
> residence in the United States*, and are there carrying on business, and are
> not employed in any diplomatic or official capacity under the Emperor of
> China, becomes at the time of his birth a citizen."

*Chin Bak Kan v. United States*, 186 U.S. 193, 200 (1902) (emphasis added; citation

omitted).  In another, the Court cited *Wong Kim Ark* for the proposition that a person is a U.S.

citizen by birth if "he was born to [foreign subjects] when they were permanently domiciled

in the United States."  *Kwock Jan Fat v. White*, 253 U.S. 454, 457 (1920) (citation omitted).

About a decade after *Wong Kim Ark* was decided, the Department of Justice likewise

explained that the decision "goes no further" than addressing children of foreigners "domiciled

in the United States."  Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of

William Wallace Brown, Assistant Attorney General* 121 (1910).  "[I]t has never been held,"

the Department continued, "and it is very doubtful whether it will ever be held, that the mere

act of birth of a child on American soil, to parents who are accidentally or temporarily in the

United States, operates to invest such child with all the rights of American citizenship.  It was

not so held in the Wong Kim Ark case."  *Id.* at 124.  Commentators, too, continued to

acknowledge the traditional rule denying citizenship to children of non-resident foreigners.

*See, e.g.*, John Westlake, *International Law* 219-20 (1904) ("[W]hen the father has domiciled

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -36

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC  20005
202-616-8098

1   himself in the Union . . . his children afterwards born there . . . are citizens; but . . . when the

2   father at the time of the birth is in the Union for a transient purpose his children born within it

3   have his nationality."); Hannis Taylor, *A Treatise on International Public Law* 220 (1901)

4   ("[C]hildren born in the United States to foreigners here on transient residence are not citizens,

5   because by the law of nations they were not at the time of their birth 'subject to the

6   jurisdiction.'").

7       In short, only "those portions of [an] opinion necessary to the result . . . are binding,

8   whereas dicta is not," *Arcam Pharm. Corp. v. Faria*, 513 F.3d 1, 3 (1st Cir. 2007), and the

9   *Wong Kim Ark* Court itself warned that "general expressions, in every opinion, are to be taken

10  in connection with the case in which those expressions are used."  169 U.S. at 679 (citation

11  omitted).  The only question that was presented, investigated, and resolved in *Wong Kim Ark*

12  concerned children of parents with "a permanent domicile and residence in the United States."

13  *Id.* at 653; *see id.* at 705.  The case should not be read as doing anything more than answering

14  that question.

15      2.    Other arguments asserted by the plaintiffs are likewise incorrect.  The other

16  Supreme Court cases they cite, State PI Mot. at 12-13; Class PI Mot. at 10-11, like *Wong Kim*

17  *Ark*, do not contain holdings that resolve the precise questions raised here.  In particular,

18  plaintiffs do not advance their argument by relying on *Plyler v. Doe*, 457 U.S. 202 (1982), a

19  case interpreting the Equal Protection Clause.  *See* State PI Mot. at 12; Class PI Mot. at 10.

20  The phrase "*within* its jurisdiction" in the Equal Protection Clause, which focuses on a person's

21

22  Opposition to Plaintiffs' Motions for
    Preliminary Injunction
    2:25-cv-00127-JCC -37

1   geographic location, differs from the phrase "*subject to* the jurisdiction thereof" in the

2   Citizenship Clause, which focuses on an individual's personal subjection or allegiance to the

3   United States.  Notwithstanding *Plyler*'s dicta about the scope of the latter clause, Supreme

4   Court precedent illustrates that a person may fall outside the scope of the Citizenship Clause

5   even if the person or his parents falls within the scope of the Equal Protection Clause.  For

6   example, certain children of members of Indian tribes lack a constitutional right to U.S.

7   citizenship by birth, *see Elk*, 112 U.S. at 102, but Indians *are* entitled to the equal protection

8   of the laws, *see United States v. Antelope*, 430 U.S. 641, 647-50 (1977).  Children of foreign

9   diplomats also are not entitled to birthright citizenship, *see Wong Kim Ark*, 169 U.S. at 682,

10  but plaintiffs do not offer any authority suggesting such individuals are not subject to the Equal

11  Protection Clause.

12      Plaintiffs also lean on the "English common law's principle of *jus soli*—citizenship

13  determined by birthplace," State PI Mot. at 10, contending that the Citizenship Clause was

14  meant to "ensure[] that *jus soli* applied to *all* people in the United States," Class PI Mot. at 3.

15  But the Supreme Court "has long cautioned that the English common law 'is not to be taken

16  in all respects to be that of America.'"  *NYSRPA v. Bruen*, 597 U.S. 1, 39 (2022) (citation

17  omitted).  And that admonition holds particular force here.  *Cf. United States v. Rahimi*, 602

18  U.S. 680, 722 & n.3 (2024) (Kavanaugh, J., concurring).  The English *jus soli* tradition was

19  premised on an unalterable allegiance to the King (which was conferred via birth on his soil).

20  But this nation was founded on breaking from that idea, and grounded citizenship in the social

21

22  Opposition to Plaintiffs' Motions for
    Preliminary Injunction
    2:25-cv-00127-JCC -38

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC  20005
202-616-8098

contract, premised on mutual consent between person and polity.  *See, e.g.*, Cong. Globe, 40th

Cong., 2nd Sess. 868 (1868) (statement of Rep. Woodward) (calling the British tradition an

"indefensible feudal doctrine of indefeasible allegiance"); *id.* at 967 (statement of Rep. Bailey)

(calling it a "slavish" doctrine); *id.* at 1130-31 (statement of Rep. Woodbridge) (saying it

conflicts with "every principle of justice and of sound public law" animating America and its

independent identity).

Indeed, the Supreme Court has already held that the Citizenship Clause departs from

English common law in important respects.  For example, the Clause's exception for certain

children of members of Indian tribes has no parallel in English law, *see Wong Kim Ark*, 169

U.S. at 693; and the Clause permits voluntary renunciation of citizenship, even though English

common law did not, *see Afroyim v. Rusk*, 387 U.S. 253, 257-262 (1967).  This Court should

thus interpret the Citizenship Clause in light of *American* common-law principles, and as

shown above, those principles do not support birthright citizenship for children of illegal aliens

or temporary visitors.

The states also point to 20th century Executive Branch precedent that accords with their

view.  *See* State PI Mot. at 13-14.  But the scope of the Citizenship Clause turns on what it

meant in 1868, not on what the Executive Branch assumed it meant during parts of the 20th

century.  *See*, *e.g.*, *Bruen*, 597 U.S. at 66 n.28 (declining to consider "20th-century evidence"

in interpreting the Constitution).

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -39

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

**E.    The Citizenship EO Does Not Violate the INA.**

Both groups of plaintiffs make passing arguments that the Citizenship EO also violates the INA.  *See* State PI Mot. at 14-15; Class PI Mot. at 18 n.4.  These claims are also unlikely to succeed on the merits because they depend on the plaintiffs' incorrect construction of the Fourteenth Amendment.

The INA recognizes citizenship for "a person born in the United States, and subject to the jurisdiction thereof," 8 U.S.C. § 1401(a), in language the class plaintiffs concede is "lifted . . . directly from the Fourteenth Amendment," Class PI Mot. at 18 n.4.  And Plaintiffs do not identify any authority suggesting that Congress intended any delta between the statute and the Amendment; rather, they fully acknowledge that it "codified the Fourteenth Amendment's protections."  State PI Mot. at 15.  Defendants agree that in using the exact text of the Citizenship Clause in the INA, Congress imported its exact scope.  *See Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) ("When a statutory term is obviously transplanted from another legal source, it brings the old soil with it.") (citation and quotation marks omitted); *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 661 (2015).  Accordingly, the INA provides no independent basis to enjoin the Citizenship EO, and if the Court properly concludes that the Citizenship Clause does not extend to the children of illegal aliens or temporary visitors, then neither does the near-identical text of the INA.

**IV.    Plaintiffs Will Not Suffer Irreparable Harm During the Pendency of This Lawsuit.**

As discussed above, the state plaintiffs lack standing to challenge the Citizenship EO; by definition, they cannot show that the EO will cause them irreparable harm.  In any event, the states fail to establish that their claimed pecuniary harms are irreparable.  For example, routine "administrative and operative" costs associated with verifying eligibility for state and federal programs, *see* State PI Mot. at 18, are not directly attributable to the EO and hardly "threaten[] the existence of [their] business."  *Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1051 (N.D. Cal. 2004).  The state plaintiffs also fail to show that their feared loss of federal funding and reimbursements would not be "recoverable," State PI Mot. at 15.  For instance, they do not explain how they would be unable to adjudicate their claims in separate proceedings when they seek reimbursement or whether there are any available administrative processes to recover federal monies to which the states claim entitlement after the conclusion of this litigation.  *Cf. Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107, 1115-16 (9th Cir. 2003) (finding that a party asserting a claim for Medicare reimbursement would not be irreparably harmed by exhausting claims through an administrative review process).

The class plaintiffs similarly fail to demonstrate an "immediate threatened injury" required to obtain preliminary injunctive relief.  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  To start, it is not the case, as the class plaintiffs suggest, that any constitutional violation constitutes per se irreparable harm.  *See, e.g.*, *Great Northern Res., Inc. v. Coba*, 2020 WL 6820793, at *2 (D. Or. Nov. 20, 2020) ("the Ninth Circuit has required

1    more than a constitutional claim to find irreparable harm').  In any event, the class plaintiffs

2    are not likely to succeed on the merits of their constitutional claim, and their mere assertion of

3    it does not demonstrate irreparable injury.

4        Turning to the actual harms alleged, the class plaintiffs claim that the Citizenship EO

5    creates "the prospect of detention and removal" for their children.  Class PI Mot. at 20.  But

6    the EO does not, by its terms, mandate that outcome with certainty for the named plaintiffs'

7    children.  As discussed above, Section 1 declares the Executive Branch's policy against

8    recognizing birthright citizenship in certain situations, but the implementation and

9    enforcement of the Citizenship EO are left to agencies under Section 3.  *See* Citizenship EO

10   § 3(a)-(b).  That implementation and enforcement have yet to occur, and no agency has taken

11   any action pursuant to the EO to determine the immigration status of any of the named

12   plaintiffs or their children, much less initiate any deportation actions.

13       Indeed, one of the named plaintiffs (Ms. Franco) has already been granted withholding

14   of removal (and her daughter has been granted asylum).  Class PI Mot. at 5-6.  The other two

15   (Ms. Norales and Ms. Chavarria) have applied for asylum, *id*. at 5-7, which, if granted, can

16   provide "a path to citizenship, eligibility for certain government benefits, and the chance for

17   family members to receive asylum as well."  *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471

18   F. Supp. 3d 25, 32 (D.D.C. 2020).  Moreover, if any removal action were initiated against the

19   child of any plaintiff, the subject of the action could assert her claim to citizenship as a defense

20   in that proceeding.  *See* 8 U.S.C. § 1252(b)(5).  Because the precise effects of the EO are yet

21

22

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -42

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC  20005
202-616-8098

1   to materialize, the class plaintiffs can only speculate at what specific harms the Citizenship

2   EO might ultimately cause.  *See Caribbean Marine Servs Co.*, 844 F.2d at 674 ("Speculative

3   injury does not constitute irreparable injury . . . .").

4       A similar rationale undercuts the class plaintiffs' arguments about the potential effects

5   of the EO more generally.  Many of the harms the plaintiffs assert cannot form the basis for

6   emergency preliminary relief because they are remote or could not happen to anyone covered

7   by the EO for many years in the future.  *See, e.g.*, Class PI Mot. at 22 (alleging that putative

8   class members will lose "the right . . . to vote upon turning eighteen" and will one day face

9   "limitations in their education and career opportunities").  And in any event, if an individual

10  were actually "denied" any "right or privilege" of citizenship, 8 U.S.C. § 1503 provides an

11  adequate legal remedy to avoid any irreparable harm.  *See supra* Sec. II.A.

12      Finally, class plaintiffs assert that the EO "threatens to deprive the[ir] children of access

13  to federally-funded public benefits."  Class PI Mot. at 21.  But by the class plaintiffs' own

14  account, Washington currently provides at least some of the referenced benefits without regard

15  to citizenship, and the EO merely creates "uncertainty" about their continued availability.  *See*

16  *id*. at 21-22.  These plaintiffs fail to show with sufficient certainty that they or their children

17  are at imminent risk of losing public health benefits during the pendency of this lawsuit.  *See,*

18  *e.g.*, *Titaness Light Shop, LLC v. Sunlight Supply, Inc.*, 585 F. App'x 390, 391 (9th Cir. 2014)

19  (the "mere 'possibility of irreparable harm'" is insufficient to justify preliminary injunctive

20  relief (citation omitted)).

21

Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -43

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

22

1    **V.      The Public Interest Does Not Favor an Injunction.**

2    Plaintiffs' asserted harms are outweighed by the harm to the government and public

3    interest that would result from the requested relief. *See Nken v. Holder*, 556 U.S. 418, 435

4    (2009) (noting that the balancing of harms and public interest requirement for emergency

5    injunctive relief merge when "the Government is the opposing party").  As the Supreme Court

6    has recognized, Executive officials must have "broad discretion" to manage the immigration

7    system.  *Arizona v. United States*, 567 U.S. 387, 395-96 (2012).  It is the United States that

8    has "broad, undoubted power over the subject of immigration and the status of aliens," *id*. at

9    394, and providing Plaintiffs with their requested relief would mark a severe intrusion into this

10   core executive authority, *see INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06

11   (1993) (O'Connor, J., in chambers) (warning against "intrusion by a federal court into the

12   workings of a coordinate branch of the Government"); *see also Doe #1 v. Trump*, 957 F.3d

13   1050, 1084 (9th Cir. 2020) (Bress, J., dissenting) (an injunction that limits presidential

14   authority is "itself an irreparable injury" (citing *Maryland v. King*, 567 U.S. 1301 (2012)).

15   **VI.     Any Relief Should Be Limited.**

16   For the reasons above, the Court should deny the plaintiffs' motions in their entirety.

17   But even if the Court determines that a preliminary injunction is appropriate, it should limit its

18   scope in at least three ways.  *First*, nationwide relief would be improper because "injunctive

19   relief should be no more burdensome to the defendant than necessary to provide complete

20   relief to the plaintiffs."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)

21
Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -44

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098
22

1  (citation omitted).  Relying on that principle, the Ninth Circuit has repeatedly vacated or stayed

2  nationwide injunctions.  *See, e.g.*, *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029

3  (9th Cir. 2019); *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018); *City & County of San*

4  *Francisco v. Trump*, 897 F.3d 1225, 1233-35 (9th Cir. 2018).

5       The state plaintiffs argue that a geographically limited injunction would have spillover

6  effect on state expenditures, *see* State PI Mot. at 23, but that is the case with any nationwide

7  policy and is not sufficient to justify nationwide relief.  To prevent ordering "the government

8  to act or refrain from acting toward nonparties in the case," *Arizona v. Biden*, 40 F.4th 375,

9  396 (6th Cir. 2022) (Sutton, C.J., concurring), the Court should limit any relief to any party

10 before it that is able to establish its entitlement to preliminary injunctive relief.

11      *Second*, "courts do not have jurisdiction to enjoin [the President] . . . and have never

12 submitted the President to declaratory relief."  *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C.

13 Cir. 2010) (citations omitted); *see Franklin*, 505 U.S. at 802–03 ("[I]n general 'this court has

14 no jurisdiction of a bill to enjoin the President in the performance of his official duties.'"

15 (citation omitted)); *id*. at 827 (Scalia, J., concurring in part) ("[W]e cannot issue a declaratory

16 judgment against the President.");  *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866).

17 Accordingly, the Court lacks jurisdiction to enter Plaintiffs' requested relief against the

18 President and should dismiss him as a defendant in both actions.

19      *Third*, the Court should reject the plaintiffs' facial challenges to the Citizenship EO so

20 that its lawfulness can be determined in individual as-applied challenges, consistent with the

21

22
Opposition to Plaintiffs' Motions for
Preliminary Injunction
2:25-cv-00127-JCC -45

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC  20005
202-616-8098

process established by the INA.  To mount a successful facial challenge, a plaintiff must show that "no set of circumstances exists" under which the challenged provision "would be valid," *Rahimi*, 602 U.S. at 693 (citation omitted), and as explained in the merits section of the brief, Plaintiffs have failed to do so here.  *See supra* Sec. III.[6]

**CONCLUSION**

For the foregoing reasons, the Court should deny the plaintiffs' motions for preliminary injunction.

DATED this 31st day of January, 2025.

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Branch Director

BRAD P. ROSENBERG
Special Counsel

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT (VA Bar No. 89400)
YURI S. FUCHS
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
Washington, DC 20005

---

[6] Because the plaintiffs' claims are purely legal and fully addressed in the parties' briefing on the instant motions, defendants request that the Court consolidate the February 6 preliminary injunction hearing with a trial on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2).

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098

Phone: (202) 616-8098
Fax: (202) 616-8460
Email: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

*I certify that this memorandum contains 12,767 words, in compliance with the Local Civil Rules as modified by this Court's January 31, 2025 Minute Order (ECF No. 77).*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET, NW
WASHINGTON, DC 20005
202-616-8098