1    The Honorable Judge John C. Coughenour

2

3

4

5

6

7

8                **UNITED STATES DISTRICT COURT**
           **WESTERN DISTRICT OF WASHINGTON**
9                        **AT SEATTLE**

10   STATE OF WASHINGTON, *et al.*,        NO. 2:25-cv-00127-JCC

11                   Plaintiffs,

12        v.                                REPLY IN SUPPORT OF PLAINTIFF
                                            STATES' MOTION FOR
                                            PRELIMINARY INJUNCTION
13   DONALD TRUMP, in his official capacity
     as President of the United States, *et al.*,   NOTE ON MOTION CALENDAR:
14                                          FEBRUARY 6, 2025
                     Defendants.
15

16

17

18

19

20

21

22

23

24

25

26

1

## **TABLE OF CONTENTS**

2

I.    INTRODUCTION ......................................................................................................... 1

II.   ARGUMENT .............................................................................................................. 1

    A.   The Court Has Authority to Declare the Citizenship Stripping Order Unlawful and Enjoin Its Implementation ............................................................ 1

        1.   The Plaintiff States have standing to protect their sovereign interests ............. 2

        2.   The Plaintiff States have standing to protect their pecuniary interests ............. 3

        3.   The Plaintiff States have standing to bring challenges under the Citizenship Clause ............................................................................. 6

        4.   The Plaintiff States can obtain declaratory and injunctive relief directly under the Fourteenth Amendment and the INA ............................... 8

    B.   The Plaintiff States Are Extremely Likely to Succeed on the Merits ..................... 10

        1.   The Citizenship Stripping Order is blatantly unconstitutional ......................... 10

        2.   The Citizenship Stripping Order independently violates the INA .................. 15

    C.   The Remaining Injunction Factors Decisively Favor the Plaintiff States .............. 16

    D.   A Nationwide Injunction Is Required for Complete Relief ..................................... 17

III.  CONCLUSION .......................................................................................................... 18

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

i

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1

# TABLE OF AUTHORITIES

2

## <u>Cases</u>

3

*Afroyim v. Rusk*,
4      387 U.S. 253 (1967)...................................................................................... 1, 8, 17

5      *Alaska v. U.S. Dep't of Transp.*,
        868 F.2d 441 (D.C. Cir. 1989) ........................................................................... 3
6
*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
7      458 U.S. 592 (1982)........................................................................................ 2, 7

8      *Arizona v. United States*,
        567 U.S. 387 (2012)........................................................................................... 16
9
*Armstrong v. Exceptional Child Ctr., Inc.*,
10     575 U.S. 320 (2015) ............................................................................................ 8

11     *Biden v. Nebraska*,
        --- U.S. ---, 143 S. Ct. 2355 (2023)................................................................... 3
12
*Bresgal v. Brock*,
13     843 F.2d 1163 (9th Cir. 1987) ......................................................................... 17

14     *California v. Azar*,
        911 F.3d 558 (9th Cir. 2018) ............................................................................. 5
15
*City & Cnty. of San Francisco v. Trump*,
16     897 F.3d 1225 (9th Cir. 2018) ........................................................................... 8

17     *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
        944 F.3d 773 (9th Cir. 2019) ............................................................................. 5
18
*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
19     981 F.3d 742 (9th Cir. 2020) ......................................................................... 4, 5

20     *Clapper v. Amnesty Int'l USA*,
        568 U.S. 398 (2013)............................................................................................ 5
21
*Colgate v. Harvey*,
22     296 U.S. 404 (1935)............................................................................................ 6

23     *Dep't of Com. v. New York*,
        588 U.S. 752 (2019)..................................................................................... 1, 3, 5
24
*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
25     591 U.S. 1 (2020) ............................................................................................... 9

26

*DeVillier v. Texas*,
   601 U.S. 285 (2024).................................................................................................. 9

*Doe #1 v. Trump*,
   957 F.3d 1050 (9th Cir. 2020) ............................................................................... 17

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021) ................................................................................. 17

*Elk v. Wilkins*,
   112 U.S. 94 (1884).................................................................................................. 13

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)................................................................................................ 16

*Gen. Land Office v. Biden*,
   722 F. Supp. 3d 710 (S.D. Tex. 2024).................................................................... 4

*George v. McDonough*,
   596 U.S. 740 (2022)................................................................................................ 15

*Haaland v. Brackeen*,
   599 U.S. 255 (2023)................................................................................................ 7

*HIAS, Inc. v. Trump*,
   985 F.3d 309 (4th Cir. 2021) ................................................................................. 18

*Kantor v. Wellesley Galleries, Ltd.*,
   704 F.2d 1088 (9th Cir. 1983) ............................................................................... 6

*Karnoski v. Trump*,
   No. C17-1297-MJP, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017)................... 8

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014)................................................................................................ 6

*Madden v. Kentucky*,
   309 U.S. 83 (1940).................................................................................................. 6

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994)................................................................................................ 17

*Maine v. Taylor*,
   477 U.S. 131 (1986)................................................................................................ 2

*McPherson v. Blacker*,
   146 U.S. 1 (1892).................................................................................................... 12

*Murphy Co. v. Biden*,
   65 F.4th 1122 (9th Cir. 2023) ................................................................................ 9

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

iii

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

*Nebraska v. Su*,
   121 F.4th 1 (9th Cir. 2024) ................................................................................................. 4

*Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*,
   766 F.2d 228 (6th Cir. 1985) ............................................................................................... 2

*Plyler v. Doe*,
   457 U.S. 202 (1982) ................................................................................................... 10, 13

*Schooner Exch. v. McFaddon*,
   11 U.S. (7 Cranch) 116 (1812) ......................................................................................... 11

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019) ........................................................................................... 8, 9

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966), ........................................................................................................ 7

*Sprint Commc'ns., Inc. v. Jacobs*,
   571 U.S. 69 (2013) ............................................................................................................ 6

*Texas v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   737 F. Supp. 3d 426 (N.D. Tex. 2024) .............................................................................. 4

*Texas v. United States*,
   787 F.3d 733 (5th Cir. 2015) .............................................................................................. 3

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ........................................................................................................... 9

*Trump v. Int'l Refugee Assistance Project*,
   582 U.S. 571 (2017) ......................................................................................................... 17

*United States v. Rice*,
   17 U.S. (4 Wheat.) 246 (1819) ........................................................................................ 10

*United States v. Texas*,
   599 U.S. 670 (2023) ...................................................................................................... 3, 4

*United States v. Wong Kim Ark*,
   169 U.S. 649 (1898) ................................................................................................. passim

*Warth v. Seldin*,
   422 U.S. 490 (1975) ........................................................................................................... 6

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ........................................................................................ 8, 9

*Washington v. U.S. Food & Drug Admin.*,
   108 F.4th 1163 (9th Cir. 2024). ......................................................................................... 2

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

iv

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................. 7

*Wyoming ex rel. Crank v. United States*,
    539 F.3d 1236 (10th Cir. 2008) ...................................................................... 3

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ............................................................................... 6

U.S. Const. amend. XV, § 1 ................................................................................. 7

Ariz. Const. art. V, § 2 ......................................................................................... 2

Ariz. Const. art. VII, § 2 ...................................................................................... 2

Ill. Const. art. III, § 1 .......................................................................................... 2

Ill. Const. art. V, § 3 ........................................................................................... 2

Or. Const. art. II, § 2 ........................................................................................... 2

Wash. Const. art. VI, § 1 ..................................................................................... 2

**Statutes**

8 U.S.C. § 1401 ................................................................................................. 10

8 U.S.C. § 1503 ................................................................................................... 9

705 Ill. Comp. Stat. 305/2(a) ............................................................................. 2

Ariz. Rev. Stat. § 21-201(1) ................................................................................ 2

Or. Rev. Stat. Ann. § 10.030(2) .......................................................................... 2

Or. Rev. Stat. Ann. § 181A.490 .......................................................................... 2

Or. Rev. Stat. Ann. § 181A.520 .......................................................................... 2

Or. Rev. Stat. Ann. § 181A.530 .......................................................................... 2

Wash. Rev. Code § 2.36.070 ............................................................................... 2

**Other Authorities**

Cong. Globe, 39th Cong., 1st Sess. .................................................................. 14

Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and
    the Origins of Federal Immigration Regulation*,
    54 U.C. Davis L. Rev. 2215 (2021) .............................................................. 13

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

v

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Garrett Epps, *The Citizenship Clause: A "Legislative History,"*
  60 Am. U. L. Rev. 331 (2010) .................................................................... 14

Gerald L. Neuman, *Back to* Dred Scott*?,*
  24 San Diego L. Rev. 485 (1987) .............................................................. 13

*Legislation Denying Citizenship at Birth to Certain Children Born in the United States*,
  19 Op. O.L.C. 340 (1995) ......................................................................... 10

Michael D. Ramsey, *Originalism and Birthright Citizenship*,
  109 Geo. L.J. 405 (2020) ............................................................. 6, 11, 13, 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

vi

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1

## I.    INTRODUCTION

2    Defendants' opposition fails to rebut what the Plaintiff States have shown: Defendants

3    should be enjoined from implementing the Citizenship Stripping Order on a nationwide basis.

4    Anything less will result in direct, substantial, and irreparable harm to the Plaintiff States and

5    their residents. It would also return the Nation to a shameful episode of our history in which

6    entire classes of people born on American soil are treated as undeserving of inclusion in

7    American civic life. That is the approach to citizenship embodied in *Dred Scott* that the people

8    and the states rejected in ratifying the Fourteenth Amendment. It is "undeniable," the Supreme

9    Court has said, that the Citizenship Clause's drafters "wanted to put citizenship beyond the

10    power of any governmental unit to destroy." *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967). The

11    Plaintiff States ask the Court to honor the Fourteenth Amendment's promise and *keep* birthright

12    citizenship beyond the power of the Administration to destroy.

13

## II.    ARGUMENT

14 **A.    The Court Has Authority to Declare the Citizenship Stripping Order Unlawful and Enjoin Its Implementation**

15

16    Defendants first challenge the Plaintiff States' standing and otherwise argue that the

Citizenship Stripping Order should be shielded from judicial scrutiny. ECF No. 84 (Opp.) at 7.

17
But the Plaintiff States have offered undisputed evidence that the Order will directly harm their

18
legally protected interests, causing harm that is actual or imminent, "fairly traceable" to the

19
Order, and redressable by an injunction. *See Dep't of Com. v. New York*, 588 U.S. 752, 766-67

20
(2019). Specifically, the Plaintiff States' sovereign and pecuniary interests will be immediately

21
harmed as a direct result of the Order's attempted denial of citizenship to thousands of the

22
Plaintiff States' residents. ECF No. 63 (States' Mot.) at 6-9. Defendants wave away these harms

23
as too indirect or self-inflicted, but their assertions ignore governing law and the facts presented.

24
Nor do Defendants' remaining procedural complaints hold water.

25

26

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    **1.    The Plaintiff States have standing to protect their sovereign interests**

2    Defendants do not dispute that the Plaintiff States have a sovereign interest in protecting

3    their "power to create and enforce a legal code, both civil and criminal[.]" *Alfred L. Snapp &*

4    *Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982); *see also Maine v. Taylor*, 477

5    U.S. 131, 137 (1986) ("[A] State clearly has a legitimate interest in the continued enforceability

6    of its own statutes."). Nor do they dispute that the Plaintiff States are injured if thousands of

7    residents are suddenly immune from state regulatory jurisdiction. Their only response is the

8    conclusory assertion that the Citizenship Stripping Order "has no effect on the states' ability to

9    'create and enforce a legal code.'" Opp. at 11. But that is plainly wrong. Under the Citizenship

10   Stripping Order, thousands of state residents will be deemed not subject to the jurisdiction of the

11   United States, directly injuring the Plaintiff States' "'sovereign interest' in the retention of [their]

12   authority" to regulate individuals within their borders. *Washington v. U.S. Food & Drug Admin*.,

13   108 F.4th 1163, 1176 (9th Cir. 2024).

14   Moreover, many of the Plaintiff States' constitutions and laws rely on the settled meaning

15   of "United States citizen." This includes laws requiring citizenship to vote in state elections,

16   serve on state juries, hold local offices, and serve as a police or corrections officers. *See, e.g.*,

17   Wash. Const. art. VI, § 1 (right to vote in state elections); Ariz. Const. art. VII, § 2 (same); Or.

18   Const. art. II, § 2 (same); Ill. Const. art III, § 1 (same); Wash. Rev. Code § 2.36.070 (juror

19   qualifications); Ariz. Rev. Stat. § 21-201(1) (same); Or. Rev. Stat. Ann. § 10.030(2) (same); 705

20   Ill. Comp. Stat. 305/2(a) (same); Ariz. Const. art. V, § 2 (eligibility to hold certain state offices);

21   Ill. Const. art. V, § 3 (same); Or. Rev. Stat. Ann. §§ 181A.490, .520 .530 (qualifications for

22   police, corrections, and probation officers).

23   As a result of the Citizenship Stripping Order, the meaning of "citizen" for purposes of

24   these state laws is suddenly "endangered and rendered uncertain." *Ohio ex rel. Celebrezze v.*

25   *U.S. Dep't of Transp.*, 766 F.2d 228, 233 (6th Cir. 1985). If federal citizenship changes, the

26   Plaintiff States will need to re-evaluate these state laws and decide whether state voting rights,

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    state jury service, and more should turn on a state-specific definition of "citizenship." *See Texas*

2    *v. United States*, 787 F.3d 733, 749 (5th Cir. 2015) (federal "pressure to change state law in some

3    substantial way," including "laws [that] exist for the administration of a state program,"

4    constitutes a sovereign injury); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242

5    (10th Cir. 2008) (federal action gives rise to sovereign standing where it "preempts state law" or

6    "interferes with [a state's] ability to enforce its legal code"); *Alaska v. U.S. Dep't of Transp.*,

7    868 F.2d 441, 443-44 (D.C. Cir. 1989) (federal rule's "preemptive effect" on "construction of

8    state laws" is sufficient for sovereign standing). The Plaintiff States easily have sovereign

9    standing here.

10        **2.        The Plaintiff States have standing to protect their pecuniary interests**

11        Defendants' attempt to downplay the financial and administrative harms to the Plaintiff

12   States fares no better. They contend that under *United States v. Texas*, 599 U.S. 670 (2023), *any*

13   injury is too "indirect" and "downstream." They also make the laughable assertion that the

14   Plaintiff States' harm is "self-inflicted" because the States may simply withdraw from critical

15   federal-state programs like Medicaid, CHIP, Title IV-E, and SSA's Enumeration at Birth

16   program. Defendants are wrong for three reasons.

17        First, Defendants' position cannot be squared with the Supreme Court's decision in

18   *Biden v. Nebraska*, --- U.S. ----, 143 S. Ct. 2355, 2365-66 (2023). There, the Supreme Court held

19   that Missouri had standing to challenge federal action cancelling student loans because a state

20   entity serviced loans under contract with the federal government and Missouri alleged the

21   challenged action would cost it millions in fees "it otherwise would have earned under its

22   contract." *Id.* at 2366. That harm was neither too indirect nor "self-inflicted," even though

23   Missouri was under no obligation to contract with the federal government to service student

24   loans. *See id.* at 2365-66. The Plaintiff States here face the same situation. States' Mot. at 6-9;

25   *see also New York*, 588 U.S. at 767 (holding that plaintiff states had standing where inclusion of

26   a citizenship question on the census would cause states to "lose out on federal funds that are

1   distributed on the basis of state population"); *City & Cnty. of San Francisco v. U.S. Citizenship*
2   *& Immigr. Servs.*, 981 F.3d 742, 754 (9th Cir. 2020) (holding that states had standing to challenge
3   federal action that would reduce the number of individuals eligible for federally backed programs
4   like Medicaid). The cases Defendants cite, Opp. at 8-10, involved generalized assertions
5   regarding speculative future impacts and do not undercut the Plaintiff States' standing here.

6        Second, Defendants' "indirect, downstream" harms argument relies on a single footnote
7   in *Texas* taken out of context. *Id.* In that case, Texas and Louisiana asserted standing to challenge
8   DHS's guidelines setting forth discretionary immigration enforcement priorities. *Texas*, 599 U.S.
9   at 674. The Supreme Court held that the states' injuries in the form of increased costs to
10  incarcerate and provide social services to non-citizens were not redressable because the judiciary
11  could not interfere in the exercise of Article II executive discretion, which courts generally lack
12  meaningful standards to review. *Id.* at 677-80. The Court did not disturb the district court's
13  conclusion that the states suffered cognizable injuries and no one "dispute[d] that even one
14  dollar's worth of harm is traditionally enough to 'qualify as concrete injur[y] under Article III.'"
15  *Id.* at 688 (Gorsuch, J., concurring) (citation omitted).

16       The *Texas* holding by its own terms was "narrow" and limited to the redressability
17  concerns of arrest and prosecutorial discretion policies. *Id.* at 683-84. Indeed, as the Ninth Circuit
18  has explained, *Texas* "pertained to prosecutorial inaction where the injury was not redressable"
19  and does not pose a barrier where, as here, an asserted injury is "more than merely speculative"
20  and will be redressed by the requested injunction. *Nebraska v. Su*, 121 F.4th 1, 13 n.5 (9th Cir.
21  2024). Other courts likewise have refused to accept the federal government's overbroad reading
22  of footnote 3. *See, e.g.*, *Texas v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 737 F.
23  Supp. 3d 426, 435 (N.D. Tex. 2024); *Gen. Land Office v. Biden*, 722 F. Supp. 3d 710, 723-24
24  (S.D. Tex. 2024). The Court should reject Defendants' strained reading here, too.

25       Third, Defendants' boundless "self-inflicted injuries" argument, Opp. at 10, has been
26  squarely rejected by the Ninth Circuit. *See California v. Azar*, 911 F.3d 558, 573-74 (9th Cir.

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

2018) (rejecting argument that state plaintiffs' economic injuries "will be self-inflicted because the states voluntarily chose to provide money for contraceptive care to its residents through state programs" because "[c]ourts regularly entertain actions brought by states and municipalities that face economic injury, even though those governmental entities theoretically could avoid the injury by enacting new legislation"). The Supreme Court's decision in *Clapper v. Amnesty International USA*, 568 U.S. 398, 417-18 (2013), which Defendants quote out of context, does not support their position, either. *Clapper* held that the domestic plaintiffs' voluntary actions based on subjective fears of possible government surveillance of foreigners were insufficient to confer standing because the alleged harm was not fairly traceable to the Government's purported foreign surveillance activities. *Id.* The Supreme Court's "too many links in the chain" traceability holding does not suggest that plaintiffs can suffer cognizable harm only when a federal law or directive compels their action, as Defendants argue.[1] Opp. at 10-11.

Defendants' arguments, if accepted, would seal the courthouse doors shut to nearly all plaintiffs. There is simply no way to reconcile Defendants' arguments with precedent. *See Nebraska*, 143 S. Ct. at 2365-66 (lost fees sufficient despite Missouri's choice to enter student loan market); *New York*, 588 U.S. at 766-67 (lost funding sufficient without concern for whether states could withdraw from federally backed funding programs); *City & Cnty. of San Francisco*, 981 F.3d at 754 (same); *see also City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 788 (9th Cir. 2019) (rejecting DHS's reliance on *Clapper* where state plaintiffs demonstrated disenrollment in public programs and rising administrative costs). The questions the Court must answer are whether the Plaintiff States will suffer cognizable harm and whether that harm will be redressed by an injunction. The answer to both is yes.

---

[1] Defendants also ignore that the Plaintiff States are obligated by law to care for wards within their custody. By inflicting pecuniary injuries on the Plaintiff States' programs, the Citizenship Stripping Order injures the Plaintiff States' sovereign interests in caring for children within their custody.

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1

2

**3.    The Plaintiff States have standing to bring challenges under the Citizenship Clause**

Defendants next make a much bolder claim, arguing that the Plaintiff States can *never* have standing to assert claims under the Citizenship Clause. Opp. at 11-12. The Fourteenth Amendment's text and history show otherwise.

The Citizenship Clause renders individuals born in the United States "citizens of the United States *and of the State wherein they reside*." U.S Const. amend. XIV, § 1 (emphasis added). This text squarely implicates the states, and the history of the Citizenship Clause is in accord. In ratifying the Fourteenth Amendment, the states actively agreed to nationalize and constitutionalize the baseline rule of birthright citizenship. *See, e.g.*, Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 417 (2020) ("The Amendment also, by its plain language, nationalized the idea of citizenship: state citizenship was linked directly to national citizenship, and states would not have power to deny state citizenship to national citizens living within the state."); *Kantor v. Wellesley Galleries, Ltd.*, 704 F.2d 1088, 1090 (9th Cir. 1983) (recognizing that the Fourteenth Amendment "broadened the national scope of the Government under the Constitution by causing citizenship of the United States to be paramount and dominant instead of being subordinate and derivative [to state citizenship]") (quoting *Colgate v. Harvey*, 296 U.S. 404, 427-28 (1935), *overruled on other grounds*, *Madden v. Kentucky*, 309 U.S. 83 (1940)). Because the Citizenship Clause's meaning directly affects the states, the Plaintiff States have a direct "stake in the outcome of the controversy." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).[2]

---

[2] Defendants cite *Warth*, but fail to note that the quoted portion, which purports to limit plaintiffs from raising claims that implicate the rights of others, is not part of the Article III analysis but rather a "limitation[]" that is "essentially [a] matter[] of judicial self-governance . . . ." 422 U.S. at 500. Since *Warth*, the Supreme Court has clarified that so-called "prudential standing" is in tension with the principle that "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26 (2014) (cleaned up); *see also Sprint Commc'ns., Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) ("Federal courts, it was early and famously said, have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'") (citation omitted).

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Defendants' cited cases stand at most for the principle that states cannot generally bring *parens patriae* claims against the federal government. *See* Opp. at 12-13.[3] But the Plaintiff States are not bringing *parens* claims here, and the law is clear that state standing may exist against the federal government where the state is not proceeding as *parens patriae*. For example, in *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966), the Court explained "at the outset" that South Carolina would lack standing to challenge the Voting Rights Act of 1965 if it brought suit as "the parent of its citizens." But the Court did not dismiss South Carolina's lawsuit for lack of standing—it evaluated the state's Fifteenth Amendment claims on the merits. *Id.* at 325-37. That was so even though the Fifteenth Amendment speaks to "[t]he right of citizens of the United States to vote," and does not expressly assign rights to the states. U.S. Const. amend. XV, § 1. But, of course, the challenged federal action *did* affect South Carolina—it "temporarily barred [the state] from enforcing the [literacy test] portion of its voting laws." *Katzenbach*, 383 U.S. at 319. Accordingly, South Carolina had standing. *Id.* at 334-37.

The same is true of *Haaland v. Brackeen*, 599 U.S. 255 (2023). *See* Opp. at 12-13. In *Brackeen*, Texas brought an equal protection challenge to the Indian Child Welfare Act. *Id.* at 294-95. As Defendants correctly cite, the Court held that Texas could not "assert equal protection claims on behalf of its citizens" as "*parens patriae*." *Id.* (citing *Snapp*, 458 U.S. at 610 n.16). But the analysis did not end there. The Court separately considered whether Texas had "alleged costs" that were "fairly traceable" to the challenged federal statute. *Id.* at 296. Although Texas failed to make an adequate showing of financial harm to the state, that analysis would have been irrelevant if states *never* have standing to bring Fourteenth Amendment claims. The rule is that *parens patriae* claims are off limits where states do not identify a separate harm to their own interests, but claims based on a "direct pocketbook injury" are fair game. *Id.* Because the Plaintiff States have demonstrated sovereign injuries and concrete, direct funding losses as a result of the

---

[3] Of course, the Plaintiff States' considerable evidence of the harms to their residents from the Citizenship Stripping Order *are* squarely relevant to the Court's consideration of the "balance of equities" and the "public interest," two mandatory *Winter* factors that Defendants essentially ignore. *See* Opp. at 44.

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

7

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Order—tens of thousands of dollars that will be lost under contracts with SSA and millions in lost Medicaid, CHIP, and Title IV-E funding—the Plaintiff States have standing.

### 4. The Plaintiff States can obtain declaratory and injunctive relief directly under the Fourteenth Amendment and the INA

The final procedural barrier Defendants assert is a passing argument that the Plaintiff States "lack a cause of action." Opp. at 15-17. But it is well established that plaintiffs who have demonstrated Article III standing, including states, can obtain prospective declaratory and injunctive relief to prevent unlawful and *ultra vires* federal action that violates the Constitution and federal statutes. *See, e.g.*, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233-35 (9th Cir. 2018) (affirming judgment in favor of local government plaintiffs on ground that Executive Order was an unconstitutional violation of the separation of powers); *Washington v. Trump*, 847 F.3d 1151, 1164-65 (9th Cir. 2017) (denying motion to stay injunction that barred Executive Order's enforcement or implementation where Washington was likely to prevail on constitutional due process claims); *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305, at *7-9 (W.D. Wash. Dec. 11, 2017) (enjoining enforcement of President Trump's Presidential Memorandum excluding transgender individuals from the military where Washington and individual plaintiffs asserted claims under the First and Fifth Amendments).

Indeed, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *see also Sierra Club v. Trump*, 929 F.3d 670, 694, 696-97 (9th Cir. 2019) ("The Supreme Court has 'long held that federal courts may in some circumstances grant injunctive relief against' federal officials violating federal law.") (quoting *Armstrong*, 575 U.S. at 326-27). The Court likewise has authority to declare even duly enacted laws unconstitutional under the Citizenship Clause. *See Afroyim*, 387 U.S. at 254-67 (federal statute that stripped citizenship under certain circumstances violated the Citizenship Clause).

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    None of Defendants' authority, *see* Opp. at 15-17, stands for the extraordinary

2    proposition that the Court is powerless to review the legality of the Citizenship Stripping Order.

3    The only case Defendants cite, *DeVillier v. Texas*, 601 U.S. 285, 291 (2024), dealt with the

4    availability of a cause of action *for damages* against the federal government under the Fifth

5    Amendment's Takings Clause. It said nothing to suggest that plaintiffs cannot seek declaratory

6    and injunctive relief—equitable relief—to prevent constitutional violations. *Id.* at 292. It in fact

7    recognized the opposite. *Id.* That makes sense because it is "beyond question that the federal

8    judiciary retains the authority to adjudicate constitutional challenges to executive action."

9    *Washington*, 847 F.3d at 1164.

10    For the same reasons, the INA provision that allows individuals already denied certain

11    discrete benefits to pursue declaratory judgment lawsuits, 8 U.S.C. § 1503, presents no barrier

12    to the Plaintiff States' claims. Defendants cite no authority for the proposition that this provision,

13    which says individuals "may" bring a declaratory judgment action, somehow shields from

14    judicial review the Executive Branch's rewriting of the Fourteenth Amendment to declare entire

15    classes of U.S.-born individuals to be non-citizens. Opp. at 16-17. And even when provisions of

16    the INA purport to restrict judicial review, the Supreme Court has interpreted limitations

17    narrowly. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020).

18    Courts can and do entertain challenges to executive action that violates the constitution and

19    federal statutory provisions. *See Trump v. Hawaii*, 585 U.S. 667, 683 (2018) (reviewing states'

20    claims that presidential restriction on immigration violated INA); *Sierra Club*, 929 F.3d at 699

21    ("Here, no statute expressly makes Plaintiffs' claims reviewable, but, as we have explained,

22    Plaintiffs do have an adequate remedy in a court: an equitable cause of action for injunctive

23    relief."); *Murphy Co. v. Biden*, 65 F.4th 1122, 1128-31 (9th Cir. 2023) (discussing authority to

24    review executive action that is *ultra vires* and violates federal statute). The Court should do the

25    same here.

26

**B.      The Plaintiff States Are Extremely Likely to Succeed on the Merits**

The plain text of the Fourteenth Amendment and the INA guarantee citizenship to all born in the United States and subject to its jurisdiction, regardless of one's race, ethnicity, alienage, or the immigration status of one's parents. The Citizenship Clause's history confirms this understanding. *See* States' Mot. at 10-11. Binding precedent confirms this understanding. *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898); *see also Plyler v. Doe*, 457 U.S. 202, 211-15 (1982). And every branch of government has confirmed this understanding for the past 150 years. *See* 8 U.S.C. § 1401; *Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340, 342 (1995); States' Mot. at 9-14. Defendants' counterarguments are meritless.

**1.      The Citizenship Stripping Order is blatantly unconstitutional**

Defendants' core contention is that children born to undocumented and many legal immigrants are not actually "subject to the jurisdiction" of the United States, and thus not entitled to birthright citizenship, under a theory never before adopted by any court. They are wrong as a matter of constitutional text and history, and their arguments are foreclosed by the Supreme Court's decision in *Wong Kim Ark*.

As the Supreme Court explained in *Wong Kim Ark*, "[t]he real object" of including the "subject to the jurisdiction thereof" language was "to exclude, by the fewest and fittest words (besides children of members of the Indian tribes, standing in a peculiar relation to the national government, unknown to the common law), the two classes of cases . . . recognized [as] exceptions to the fundamental rule of citizenship by birth within the country." 169 U.S. at 682. Those two classes are "children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign state[.]" *Id.* The Court explained at length how in each of these cases, the United States' exercise of sovereign power was limited either in fact, as a matter of common law and practice, or in the case of Native American tribes, as a result of their tribal sovereignty. *Id.* at 683 (discussing *United States v. Rice*, 17 U.S. (4 Wheat.) 246 (1819)

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

10

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1   (regarding hostile invasion and the suspension of sovereign power over occupied territory), and

2   *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812) (explaining why diplomats

3   are not subject to the United States' jurisdiction even though the Nation's sovereign power is

4   necessary and absolute in its territory)); *see also* Ramsey, *Originalism*, *supra*, at 436-58

5   (detailing mid-Nineteenth Century understanding of what it meant to be "subject to the

6   jurisdiction" of the United States).

7        The Supreme Court, reviewing many of the authorities Defendants now cite, concluded

8   that "[t]he fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth

9   within the territory, in the allegiance and under the protection of the country, including all

10  children here born of resident aliens[.]" *Wong Kim Ark*, 169 U.S. at 693. The *only* individuals

11  understood not to be subject to the United States' jurisdiction at birth were children born to

12  diplomats or enemies during hostile occupation, those born on foreign ships, and those born to

13  members of Native American tribes. *Id.* The Court made clear, in language that forecloses

14  Defendants' modern-day interpretation:

15      The amendment, in clear words and in manifest intent, includes the children born
16      within the territory of the United States of all other persons, of whatever race or
        color, domiciled within the United States. Every citizen or subject of another
17      country, while domiciled here, is within the allegiance and the protection, and
        consequently subject to the jurisdiction, of the United States. His allegiance to the
18      United States is direct and immediate, and, although but local and temporary,
        continuing only so long as he remains within our territory, is . . . "strong enough to
19      make a natural subject, for, if he hath [a child] here, that [child] is a natural-born
        subject"; and his child . . . "[i]f born in the country, is as much a citizen as the
20      natural-born child of a citizen . . . ."

21

22  *Id.* (cleaned up). The Court reiterated that "[i]t can hardly be denied that an alien is completely

23  subject to the political jurisdiction of the country in which he resides[.]" *Id.* "Independently of a

24  residence with intention to continue such residence; independently of any domiciliation;

25  independently of the taking of any oath of allegiance, or of renouncing any former allegiance,"

26  the Court stated, "it is well known that by the public law an alien, or a stranger born, for so long

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

11

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

a time as he continues within the dominions of a foreign government, owes obedience to the laws of that government[.]" *Id.* at 693-94. That is, such persons are subject to the United States' jurisdiction.

The Court's reasoning is complete and its holding dispositive. None of the individuals targeted in the Citizenship Stripping Order today enjoy any type of immunity from general laws or represent another sovereign nation or political entity. The Defendants' "surplusage" argument, Opp. at 19-20, is accordingly resolved by simply reading the Fourteenth Amendment's plain text. Without "subject to the jurisdiction thereof," the Citizenship Clause would extend to the narrow categories that have long been recognized by courts, Congress, and the Executive to be exempt from the Citizenship Clause's grant of birthright citizenship.

Defendants nonetheless attempt to import two new non-textual requirements, complete "allegiance" and "lawful domicile," by chaining together selective quotes from cases unrelated to the interpretation of the Citizenship Clause. Opp. at 20-25. But allegiance and lawful domicile appear nowhere in the Fourteenth Amendment. *McPherson v. Blacker*, 146 U.S. 1, 27 (1892) ("The framers of the constitution employed words in their natural sense; and, where they are plain and clear, resort to collateral aids to interpretation is unnecessary, and cannot be indulged in to narrow or enlarge the text . . . ."). And with respect to the requirement of being "subject to the jurisdiction thereof," it was clear at ratification that this phrase included all non-citizens who were physically present in the United States, absent the very narrow exceptions recognized at common law and noted above. *Wong Kim Ark* interpreted the Citizenship Clause's language and directly forecloses Defendants' argument. 169 U.S. at 693.

Nor do those non-textual requirements comport with the Citizenship Clause's history. Illegally imported enslaved individuals were not "lawfully domiciled" in the United States under Defendants' interpretation, yet there is no question that the Citizenship Clause applied to their children. *See, e.g.*, Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215,

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

12

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

2250 (2021) ("This history demonstrates that there were clearly 'illegal aliens,' both free migrants banned under the 1803 law and illegally imported slaves, in the United States before and during the consideration of the Fourteenth Amendment."); Gerald L. Neuman, *Back to* Dred Scott*?*, 24 San Diego L. Rev. 485, 497-99 (1987) (detailing the history of enslaved individuals who were imported illegally and recognizing that the Fourteenth Amendment was intended to grant citizenship to all native-born individuals of African descent).[4]

Defendants also turn to *Elk v. Wilkins*, 112 U.S. 94 (1884), the *Slaughter-House Cases*, 83 U.S. 36 (1872), and a slew of nonbinding authorities that predate *Wong Kim Ark* and *Plyler* to try to read extra requirements into the Citizenship Clause. Opp. at 20-21, 28-30. Defendants' arguments re-hash well-trodden and widely rejected bases for attempting to adopt exclusionary views of the Citizenship Clause. *See, e.g.*, Ramsey, *Originalism*, *supra*, at 436-58 (analyzing common arguments for reading "subject to the jurisdiction thereof" narrowly with respect to undocumented immigrants and concluding they are all contrary to the Fourteenth Amendment's text and history). In short, *Wong Kim Ark* cemented the meaning of the Citizenship Clause in a manner consistent with *Elk*. *See Wong Kim Ark*, 169 U.S. at 682 (recognizing that *Elk* "concerned only members of the Indian tribes within the United States and had no tendency to deny citizenship to children born in the United States of foreign parents . . . not in the diplomatic service of a foreign country"); *accord* Ramsey, *Originalism*, *supra*, at 419-20 (discussing *Elk*). The Supreme Court likewise dismissed the dicta in the *Slaughter-House Cases* that suggested a narrow view of the Citizenship Clause. *Id.* at 677-80.

Nowhere in *Wong Kim Ark* did the Supreme Court recognize a "lawful domicile" or "exclusive allegiance" requirement for one to be subject to the United States' jurisdiction. Indeed, the dissent made similar arguments to those Defendants offer today. *Id.* at 729 (Fuller, C.J., dissenting) ("If children born in the United States were deemed presumptively and generally citizens, this was not so when they were born of aliens whose residence was merely

---

[4] Available at: https://digital.sandiego.edu/sdlr/vol24/iss2/8/.

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC                    13                    ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    temporary, either in fact or in point of law."). Those arguments were rejected, and the Citizenship

2    Clause's broad scope was established. *Id.* at 694.

3        Defendants further point to the Civil Rights Act of 1866, but that Act confirms that they

4    are wrong. The Act provided that "[a]ll persons born in the United States, and not subject to any

5    foreign Power, are hereby declared to be citizens of the United States, without distinction of

6    color." Civil Rights Act of 1866 § 1; *see* Cong. Globe, 39th Cong., 1st Sess. 474, 498 (1866).

7    All involved in its passage understood that this language included the children of immigrants,

8    regardless of their background. When one senator asked whether this language "would have the

9    effect of naturalizing the children of Chinese and Gypsies born in this country[,]" for example,

10   Senator Trumbull, the Act's author, responded, "Undoubtedly." Cong. Globe, 39th Cong., 1st

11   Sess. 498.[5] This was true even though, at the time, Chinese immigrants could not become

12   naturalized U.S. citizens and "Gypsies" were, if present, likely present unlawfully. *See* Garrett

13   Epps, *The Citizenship Clause: A "Legislative History,"* 60 Am. U. L. Rev. 331, 350-52 (2010);

14   Ramsey*, Originalism*, *supra*, at 451-52 (discussing 1866 Act).

15       Finally, even if the Civil Rights Act of 1866 did not include immigrants in its citizenship

16   clause—and it did—the Fourteenth Amendment's Citizenship Clause certainly confers

17   citizenship to the children subject to the Citizenship Stripping Order. All involved in its passage

18   understood that the Citizenship Clause guaranteed citizenship to virtually all U.S.-born children

19   regardless of the race or citizenship of their parents. Indeed, it was introduced to confirm that

20   "every person born within the limits of the United States, and subject to their jurisdiction, is by

21   virtue of natural law and national law a citizen of the United States." Cong. Globe, 39th Cong.,

22   1st Sess. 2890 (statement of Sen. Howard). Senator Cowan, notably, argued against ratification

23   because "[i]f the mere fact of being born in the country confers that right," of citizenship, then

24       [5] Defendants stitch the legislative history of the Civil Rights Act of 1866 and the Fourteenth Amendment's

25   ratification debates together to argue that Senator Trumbull equated being "subject to our jurisdiction" with "owing allegiance solely to the United States." Opp. at 21-22. Senator Trumbull made the latter statement in explaining

26   why Native American tribes are not subject to the jurisdiction of the United States, not as a blanket statement about the Citizenship Clause. *See* Cong. Globe, 39th Cong., 1st Sess. 2894; *see also* Ramsey*, Originalism*, *supra*, at 449.

1    the children of parents "who have a distinct, independent government of their own," "who owe

2    [the state] no allegiance," and who would "settle as trespassers" would also be citizens. *Id.* at

3    2891; *id.* at 2890 (statement of Sen. Cowan) ("Is the child of the Chinese immigrant in California

4    a citizen? Is the child of a Gypsy born in Pennsylvania a citizen? . . . Have they any more rights

5    than a sojourner in the United States?"). All agreed that Senator Cowan properly understood the

6    Citizenship Clause's broad scope, and the Senate adopted that broad language anyway. *See id.*

7    at 2891 (Senator Conness confirming that the Clause as proposed would provide citizenship to

8    "children begotten of Chinese parents in California," because the 1866 Act made that the case

9    by law and "it is proposed to incorporate the same provision in the fundamental instrument of

10    the nation" and "declare that the children of all parentage whatever . . . should be regarded and

11    treated as citizens of the United States.").

12        Ultimately, the Citizenship Clause was adopted to "remove[] all doubt as to what persons

13    are or are not citizens of the United States." *Id.* (statement of Sen. Howard). *Wong Kim Ark*

14    confirmed the Citizenship Clause's proper interpretation, and there is still no doubt today. The

15    Plaintiff States are likely to succeed on the merits.

16        **2.    The Citizenship Stripping Order independently violates the INA**

17        Defendants argue that the Plaintiff States' INA claim fails "because [it] depend[s] on the

18    plaintiffs' incorrect construction of the Fourteenth Amendment." Opp. at 40. But they miss the

19    point. Because Congress "employ[ed] a term of art obviously transplanted from another legal

20    source," the INA brought "the old soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022)

21    (cleaned up). The "old soil" was, and is, the established understanding of the Citizenship Clause

22    set forth in *Wong Kim Ark. See* States' Mot. at 14-15. Because Defendants do not dispute that

23    the Citizenship Stripping Order attempts to exclude a *new* category of individuals from the

24    Citizenship Clause's reach based on a theory that has never been accepted, it is contrary to the

25    INA as properly construed. The Plaintiff States are likely to prevail on their INA claim.

26

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

15

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**C.    The Remaining Injunction Factors Decisively Favor the Plaintiff States**

The irreparable harm, public interest, and equities factors compel an injunction. Defendants offer no serious response regarding the extensive harms the Citizenship Stripping Order will cause to the Plaintiff States and their residents. Defendants suggest merely that the operational chaos and financial losses the Plaintiff States will suffer "are not directly attributable to the EO" and muse that there might be another way to recover certain lost reimbursements. Opp. at 41. They are wrong on all accounts.

The Plaintiff States' harms flow directly from the unilateral reclassification of *thousands* of individuals as non-citizens—individuals whose citizenship the Plaintiff States must verify to be reimbursed under longstanding programs like Medicaid, CHIP, and Title IV-E. *See* States' Mot. at 7-9, 16-19. Likewise, the Plaintiff States are integral participants in SSA's Enumeration at Birth program. *See id.* at 8, 17-18. It is not speculative that the Plaintiff States will lose money under their existing agreements with SSA; thousands of children born in each Plaintiff State will be deemed ineligible for SSNs, and as a result, the Plaintiff States will not be able to receive SSA payments for processing their birth data. *Id.* Despite these direct harms, Defendants nowhere acknowledge that money damages are not recoverable against sovereign defendants like the federal government. *See id.* at 15-16. Nor do they rebut the overwhelming evidence that the Plaintiff States will have to expend significant resources to update and modify systems used to verify citizenship and immigration status *now* for the programs the Plaintiff States administer. *See id.* at 18-19.

Defendants instead invite the Court to grant them unchecked power to determine citizenship by executive fiat, invoking the federal government's "broad, undoubted power over the subject of immigration and the status of aliens." Opp. at 44 (citing *Arizona v. United States*, 567 U.S. 387, 394 (2012)).[6] But this is not a case that threatens a "severe intrusion into [a] core

---

[6] Defendants assert that the Court should dismiss the President, Opp. at 45, but the Supreme Court has recognized that "the president's actions may [] be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

16

1  executive authority." Opp. at 44. It is a case about citizenship rights that are intentionally *beyond*

2  the President's authority. And as the Supreme Court has confirmed, "[t]he very nature of our

3  free government makes it completely incongruous to have a rule of law under which a group of

4  citizens temporarily in office can deprive another group of citizens of their citizenship." *Afroyim*,

5  387 U.S. at 268. Neither the equities nor the public interest favor allowing the Defendants to

6  wage a war on the citizenship of children born on American soil. *See E. Bay Sanctuary Covenant*

7  *v. Biden*, 993 F.3d 640, 679 (9th Cir. 2021) ("[T]he public has an interest in ensuring that the

8  '[laws] enacted by [their] representatives are not imperiled by executive fiat.'") (cleaned up).

9  **D.     A Nationwide Injunction Is Required for Complete Relief**

10        Absent an injunction preserving the 157-year-old status quo nationwide, the Plaintiff

11  States' ultimate remedy—requiring the federal government to recognize U.S. citizens *as*

12  *citizens*—would lose its meaning. Defendants do not dispute that the Court has discretion to

13  fashion an appropriate injunction, including a nationwide injunction, as necessary to provide the

14  Plaintiff States with complete relief. Opp. at 44-45 (citing *Madsen v. Women's Health Ctr., Inc.*,

15  512 U.S. 753, 765 (1994)). Nor could they. The Supreme Court and Ninth Circuit have

16  confirmed as much. *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579, 581

17  (2017) (allowing nationwide injunction as to enforcement of portions of Executive Order that

18  exceeded presidential authority); *Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020)

19  (declining to stay nationwide injunction and explaining that "there is no bar" against such

20  injunctions "when it is appropriate") (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir.

21  1987)).

22        Defendants' request for a more limited injunction ignores the practical realities that

23  would accompany a geographically checkered rule of birthright citizenship and glosses over the

24  extraordinary nature of the Citizenship Stripping Order. Nationwide injunctions are particularly

25  warranted where, as here, the fact that individuals can and do move between states exposes the

26  plaintiffs to irreparable harm. *See, e.g.*, *E. Bay Sanctuary Covenant*, 993 F.3d at 680-81 (holding

REPLY IN SUPPORT OF PLAINTIFF STATES' MOTION FOR PRELIMINARY INJUNCTION -- No. 2:25-cv-00127-JCC

17

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    that district court did not abuse discretion in entering nationwide injunction of rule that conflicted

2    with the INA where plaintiff organizations would be harmed by losing clients who may have

3    entered the United States at a location not covered under a geographically limited injunction);

4    *HIAS, Inc. v. Trump*, 985 F.3d 309, 327 (4th Cir. 2021) (affirming nationwide injunction

5    prohibiting enforcement of Executive Order where organizations "place[d] refugees throughout

6    the country" and demonstrated irreparable harm from the order taking effect in other

7    jurisdictions). If individuals born in other states are deemed non-citizens under the Order and

8    move to the Plaintiff States, the Plaintiff States will suffer the same irreparable injuries to their

9    sovereign interests and substantial financial losses and administrative burdens that they would

10    without any injunction at all.

## III.    CONCLUSION

12        The Plaintiff States request that the Court issue a nationwide preliminary injunction

13    barring the Citizenship Stripping Order's enforcement or implementation.

15        DATED this 4th day of February 2025.

16                                          NICHOLAS W. BROWN
                                            Attorney General
17
                                            *s/ Lane M. Polozola*
18                                          COLLEEN M. MELODY, WSBA #42275
                                            Civil Rights Division Chief
19                                          LANE POLOZOLA, WSBA #50138
                                            DANIEL J. JEON, WSBA #58087
20                                          ALYSON DIMMITT GNAM, WSBA #48143
                                            Assistant Attorneys General
21                                          Wing Luke Civil Rights Division
                                            Office of the Washington State Attorney General
22                                          800 Fifth Avenue, Suite 2000
                                            Seattle, WA 98104-3188
23                                          (206) 464-7744
                                            colleen.melody@atg.wa.gov
24                                          lane.polozola@atg.wa.gov
                                            daniel.jeon@atg.wa.gov
25                                          alyson.dimmittgnam@atg.wa.gov

26                                          *Attorneys for Plaintiff State of Washington*

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC                    18                    ATTORNEY GENERAL OF WASHINGTON
                                                                                      Civil Rights Division
                                                                                  800 Fifth Avenue, Suite 2000
                                                                                  Seattle, WA  98104-3188
                                                                                       (206) 464-7744

1

2    I certify that this memorandum contains 6,383
     words, in compliance with the Local Civil Rules.

3    KRIS MAYES
     *Attorney General of Arizona*
4
     *s/ Joshua Bendor*
5    Joshua D. Bendor (AZ No. 031908)*
     Luci D. Davis (AZ No. 035347)*
6    Gabriela Monico Nunez (AZ No. 039652)*
     Office of the Arizona Attorney General
7    Firm State Bar No. 14000
     2005 N. Central Ave.
8    Phoenix, AZ 85004
     (602) 542-3333
9    Joshua.Bendor@azag.gov
     Luci.Davis@azag.gov
10   Gabriela.MonicoNunez@azag.gov
     ACL@azag.gov
11
     *Pro hac vice*
12   *Attorneys for Plaintiff State of Arizona*

13   KWAME RAOUL
     *Attorney General, State of Illinois*
14
     *s/ Rebekah Newman*
15   REBEKAH NEWMAN, ARDC #6327372*
     Assistant Attorney General
16   Special Litigation Bureau
     Office of the Illinois Attorney General
17   115 South LaSalle St., Floor 35
     Chicago, IL 60603
18   Tel. (773) 590-6961
     rebekah.newman@ilag.gov
19
     *Pro hac vice*
20   *Attorneys for Plaintiff State of Illinois*

21   DAN RAYFIELD
     *Attorney General, State of Oregon*
22
     */s/ Carla A. Scott*
23   CARLA A. SCOTT, WSBA #39947
     THOMAS H. CASTELLI, OSB #226448*
24   Senior Assistant Attorneys General
     Oregon Department of Justice
25   100 SW Market Street
     Portland, OR 97201
26   (971) 673-1880

Carla.A.Scott@doj.oregon.gov
Thomas.Castelli@doj.oregon.gov

*Pro hac vice*
*Attorneys for Plaintiff State of Oregon*

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

20

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that the foregoing document was electronically filed with the United

3

State District Court using the CM/ECF system. I certify that all participants in the case are

4

registered CM/ECF users and that service will be accomplished by the CM/ECF system.

5

6

Dated this 4th day of February 2025 in Seattle, Washington.

7

8

*s/ Tiffany Jennings*
Tiffany Jennings

9

Paralegal

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

21