1      The Honorable Judge John C. Coughenour

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**
             **WESTERN DISTRICT OF WASHINGTON**
9                     **AT SEATTLE**

10  STATE OF WASHINGTON; STATE OF          NO. 2:25-cv-00127-JCC
    ARIZONA; STATE OF ILLINOIS; and
11  STATE OF OREGON,                       CONSOLIDATED COMPLAINT
                                           FOR DECLARATORY AND
12              Plaintiff States,          INJUNCTIVE RELIEF—CLASS
                                           ACTION
13  and

14  Cherly NORALES CASTILLO and Alicia
    CHAVARRIA LOPEZ, on behalf of
15  themselves as individuals and on behalf of
    others similarly situated,
16

17              Individual Plaintiffs,

18      v.

19  DONALD TRUMP, in his official capacity
    as President of the United States; U.S.
20  DEPARTMENT OF HOMELAND
    SECURITY; KRISTI NOEM in her official
21  capacity as Secretary of Homeland Security;
    U.S. SOCIAL SECURITY
22  ADMINISTRATION; MICHELLE KING,
    in her official capacity as Acting
23  Commissioner of the Social Security
    Administration; U.S. DEPARTMENT OF
24  STATE; MARCO RUBIO, in his official
    capacity as Secretary of State; U.S.
25  DEPARTMENT OF HEALTH AND
    HUMAN SERVICES; DOROTHY FINK,
26  in her official capacity as Acting Secretary

CONSOLIDATED COMPLAINT FOR          ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND INJUNCTIVE                    Civil Rights Division
RELIEF – CLASS ACTION –                    800 Fifth Avenue, Suite 2000
No. 2:25-cv-00127-JCC                       Seattle, WA 98104-3188
                                              (206) 464-7744

1

of Health and Human Services; U.S.
DEPARTMENT OF JUSTICE; JAMES

2

MCHENRY, in his official capacity as
Acting Attorney General; U.S.

3

DEPARTMENT OF AGRICULTURE;
GARY WASHINGTON, in his official

4

capacity as Acting Secretary of Agriculture;
and the UNITED STATES OF AMERICA,

5

6

Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

# I.    INTRODUCTION

1.      Plaintiffs bring this action to stop the illegal Executive Order issued by President Donald J. Trump that purports to unilaterally alter the meaning of the Fourteenth Amendment's guarantee of birthright citizenship. The Executive Order directs federal agencies to bar certain persons born in the United States from citizenship and the many benefits to which citizenship entitles them by unlawful executive fiat.

2.      The Executive Order, issued on January 20, 2025, and entitled "Protecting the Meaning and Value of American Citizenship" (Citizenship Stripping Order), is contrary to the plain terms of the Fourteenth Amendment's Citizenship Clause and Section 1401 of the Immigration and Nationality Act (INA).[1] The President has no authority to amend the Constitution or supersede the Citizenship Clause's grant of citizenship to individuals born in the United States. Nor is he empowered by any other constitutional provision or law to determine who shall or shall not be granted U.S. citizenship at birth. The Fourteenth Amendment and federal law automatically confer citizenship upon individuals born in the United States and subject to its jurisdiction.

3.      The States of Washington, Arizona, Illinois, and Oregon (Plaintiff States) bring this action to protect the States—including their public agencies, public programs, public fiscs, and state residents—from the irreparable harm that will result to the States and their residents as a result of the illegal actions of the President and federal government that purport to unilaterally strip U.S. citizens of their citizenship.

4.      Cherly Norales Castillo and Alicia Chavarria Lopez (Individual Plaintiffs) bring this action on behalf of themselves and a class of similarly situated persons to stop the Order's deprivation of citizenship to their unborn children.[2] Individual Plaintiffs are expecting mothers

---

[1] Attached as Ex. A, *also available at* https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-meaning-and-value-of-american-citizenship/. The Order was subsequently published in the Federal Register as Exec. Order No. 14,160, 90 Fed. Reg. 18 (Jan. 29, 2025).

[2] Individual Plaintiffs previously filed a separate action challenging the Executive Order, which the Court consolidated with the instant case. *See Franco Aleman v. Trump*, Complaint, No. 2:25-cv-00163 (W.D. Wash. Jan.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

who are not U.S. citizens or lawful permanent residents (LPRs) and who have due dates after the implementation date of the Order's prohibition on issuance of citizenship documents. By the terms of the Citizenship Stripping Order—though not by the terms of the Fourteenth Amendment—their children born after the Order's date of implementation will be deprived of U.S. citizenship and be considered without legal status in this country. They seek to represent a class of similarly situated parents and their expected children. These children, although born in the United States and subject to its jurisdiction, will be deprived of U.S. citizenship under the Order.

5.     This deprivation of citizenship strikes at the core of this country's identity as a nation that, following Reconstruction, affirmed that all persons born in the United States are citizens, regardless of race, parentage, creed, or other markers of identity. The Citizenship Stripping Order's attempt to deny citizenship to those born on U.S. soil amounts to "the total destruction of the individual's status in organized society" and "is a form of punishment more primitive than torture." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). This is because, as the Supreme Court has recognized time and again, "[c]itizenship is a most precious right," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963), whose "value and importance" is "difficult to exaggerate," *Schneiderman v. United States*, 320 U.S. 118, 122 (1943).

6.     If the Citizenship Stripping Order is allowed to stand, the Plaintiff States and their residents (including Individual Plaintiffs) will suffer immediate and irreparable harm. Nationally, in 2022 alone, there were approximately 255,000 births of U.S. citizen children to noncitizen mothers without lawful status (undocumented) and approximately 153,000 births to two undocumented parents. In Washington, in 2022 alone, approximately 7,000 U.S. citizen children were born to mothers who lacked legal status and approximately 4,000 U.S. citizen children were born to two parents who lacked legal status. In Arizona, in 2022 alone, there were

24, 2025), ECF No. 1. One of the named plaintiffs, Delmy Franco Aleman, has chosen to withdraw from the case following the Court's Consolidation Order, ECF No. 56. Accordingly, she no longer seeks to represent the proposed class.

CONSOLIDATED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CLASS ACTION – No. 2:25-cv-00127-JCC

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

approximately 6,000 U.S. citizen children born to mothers who lacked legal status and approximately 3,400 U.S. citizen children born to two parents who lacked legal status. Likewise, in Illinois, in 2022 alone, there were approximately 9,100 U.S. citizen children born to mothers who lacked legal status and approximately 5,200 U.S. citizen children born to two parents who lacked legal status. And in Oregon, in 2022 alone, there were approximately 2,500 U.S. citizen children born to mothers who lacked legal status and approximately 1,500 U.S. citizen children born to two parents who lacked legal status. Using these numbers, likely more than 12,000 babies born in the United States each month who are entitled to citizenship—including more than 1,100 babies born each month in the Plaintiff States—will no longer be considered U.S. citizens under the Citizenship Stripping Order and will be left with no immigration status. This estimate is conservative, because it includes only a subset of the newborns that would be stripped of citizenship. The actual number of newborns affected in Plaintiff States is certainly higher.

7.    The individuals who are stripped of their U.S. citizenship, including the States' residents, Individual Plaintiffs' expected children, and members of the proposed class, will be left without any legal immigration status, vulnerable to removal from this country, and threatened with the loss of "all that makes life worth living." *Bridges v. Wixon*, 326 U.S. 135, 147 (1945) (cleaned up). Many will be left stateless—that is, citizens of no country at all. They will be left on the outside of society and forced to remain in the shadows in fear of immigration enforcement actions that could result in their separation from family members and removal from their country of birth. They will lose eligibility for myriad federal benefits programs. They will lose their right to travel freely and re-enter the United States. They will lose their ability to obtain a Social Security number (SSN) and work lawfully. They will lose the opportunity to qualify for many educational opportunities. They will lose their right to vote, serve on juries, and run for most public offices. They will be placed into lifelong positions of instability and insecurity as part of a new underclass in the United States. In short, despite the Constitution's guarantee of their citizenship, Individual Plaintiffs' children and the thousands of newborns who would be

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    subject to the Citizenship Stripping Order will lose their ability to fully and fairly be a part of

2    American society as a citizen with all its benefits and privileges.

3        8.    The Citizenship Stripping Order will also directly injure the Plaintiff States in

4    additional ways. The Plaintiff States will suffer immediate and irreparable harm by losing federal

5    funding or reimbursements to programs that the Plaintiff States administer, such as Medicaid,

6    the Children's Health Insurance Program (CHIP), foster care and adoption assistance programs,

7    and programs to facilitate streamlined issuance of SSNs to eligible babies—among others. By

8    purporting to unilaterally strip citizenship from individuals born in the Plaintiff States based on

9    their parents' citizenship or immigration status, the Plaintiff States will be forced to bear

10   significantly increased costs to operate and fund programs that ensure the health and well-being

11   of their residents. The Plaintiff States will also be required—on no notice and at their

12   considerable burden and expense—to immediately begin modifying their funding and

13   operational structures and administration of programs to account for this change. This will

14   impose significant administrative and operational burdens for multiple of the Plaintiff States'

15   agencies that operate programs for the benefit of their residents.

16       9.    To prevent the President's and the federal government's unlawful action from

17   harming Plaintiffs, as well as the proposed class that Individual Plaintiffs seek to represent, they

18   ask this Court to invalidate the Citizenship Stripping Order in its entirety and enjoin any actions

19   taken to implement its directives.

20                    **II.    JURISDICTION AND VENUE**

21       10.   The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2). The

22   Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a)

23   and 2202, 5 U.S.C. § 706, and Federal Rule of Civil Procedure 65.

24       11.   Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and

25   1391(e)(1). Defendants are United States agencies or officers sued in their official capacities.

26   The State of Washington is a resident of this judicial district, the Individual Plaintiffs reside in

CONSOLIDATED COMPLAINT FOR                    4            ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND INJUNCTIVE                                       Civil Rights Division
RELIEF – CLASS ACTION –                                      800 Fifth Avenue, Suite 2000
No. 2:25-cv-00127-JCC                                          Seattle, WA 98104-3188
                                                                  (206) 464-7744

1   this judicial district, and a substantial part of the events or omissions giving rise to this Complaint

2   occurred within the Seattle Division of the Western District of Washington, including the harms

3   to UW Medicine at its Montlake and Northwest campuses, as well as at Harborview Medical

4   Center in Seattle.

5                           **III.    PARTIES**

6                           <u>**PLAINTIFFS**</u>

7       12.    The State of Washington is a sovereign state of the United States of America.

8       13.    The Attorney General of Washington is the chief legal adviser to the State and is

9   authorized to act in federal court on behalf of the State on matters of public concern.

10      14.    The State of Arizona is a sovereign state of the United States of America.

11      15.    The Attorney General of Arizona is the chief legal officer of the State and is

12  authorized to act in federal court on behalf of the State.

13      16.    The State of Illinois is a sovereign state of the United States of America.

14      17.    The Attorney General of Illinois is the chief legal officer of the State and is

15  authorized to act in federal court on behalf of the State on matters of public concern.

16  *See* Ill. Const. art. V, § 15; 15 ILCS 205/4.

17      18.    The State of Oregon is a sovereign state of the United States of America.

18      19.    The Attorney General of Oregon is the chief legal officer of the State of Oregon

19  and is authorized to act in federal court on behalf of the State on matters of public concern.

20      20.    The Plaintiff States are aggrieved and have standing to bring this suit because

21  Defendants' action purporting to strip citizenship from U.S. citizens born and residing in the

22  Plaintiff States, receiving benefits in the Plaintiff States, and receiving government services in

23  the Plaintiff States—including children who are wards of the Plaintiff States and in their

24  custody—harms the Plaintiff States' sovereign, proprietary, and quasi-sovereign interests and

25  will continue to cause injury unless and until enforcement of the Citizenship Stripping Order is

26  permanently enjoined.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

21.     Plaintiff Cherly Norales Castillo is a noncitizen from Honduras. She is in removal proceedings and has filed an application for asylum before the immigration court. She is pregnant, and her due date is March 19, 2025.

22.     Plaintiff Alicia Chavarria Lopez is a noncitizen from El Salvador. She has filed an application for asylum before United States Citizenship and Immigration Services (USCIS). She is pregnant, and her due date is July 21, 2025.

## DEFENDANTS

23.     Defendant Donald Trump is the President of the United States. He is sued in his official capacity.

24.     Defendant Department of Homeland Security (DHS) is a federal cabinet agency responsible for implementing the Citizenship Stripping Order, including by issuing regulations, policies, and guidance consistent with the Order. DHS is a department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552. DHS is comprised of USCIS, U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Protection (CBP). USCIS is responsible for adjudicating immigration benefits applications, as well as certain applications to recognize a person's citizenship. ICE is responsible for, among other things, the detention and removal of unlawfully present noncitizens in the United States and prosecuting removal cases of noncitizens. CBP is responsible for, among other things, operating U.S. ports of entry.

25.     Defendant Kristi Noem is the Secretary of Homeland Security. She is responsible for implementing and enforcing the INA and oversees USCIS, ICE, and CBP. She is sued in her official capacity.

26.     Defendant United States Social Security Administration (SSA) is a federal agency responsible for administering federal retirement, survivors, and disability income programs, as well as the program of supplemental security income for the aged, blind, and disabled. SSA processes applications for and issues Social Security numbers (SSNs) to eligible

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

applicants. SSA is responsible for implementing the Citizenship Stripping Order, including by ceasing issuance of SSNs to children born in the United States but subject to the Citizenship Stripping Order's interpretation of the Citizenship Clause. SSA is a department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552.

27.     Defendant Michelle King is the Acting Commissioner of the SSA. The Office of the Commissioner is directly responsible for all programs administered by the SSA, including the development of policy, administrative and program direction, and program interpretation and evaluation. She is sued in her official capacity.

28.     Defendant United States Department of State is responsible for implementing the Citizenship Stripping Order, including by issuing regulations, policies, and guidance consistent with the Order. The State Department is a department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552. It is authorized by law to grant and issue passports.

29.     Defendant Marco Rubio is the Secretary of State. He is responsible for carrying out the President's foreign policies through the State Department and Foreign Service of the United States. He is sued in his official capacity.

30.     Defendant United States Department of Health and Human Services (HHS) is a federal cabinet agency responsible for implementing the Citizenship Stripping Order, including through the administration of Medicaid, CHIP, and Title IV-E. HHS is a department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552. HHS is responsible for implementing the Citizenship Stripping Order in its agency program, operations, and activities.

31.     Defendant Dorothy Fink is the Acting Secretary of Health and Human Services. She is responsible for overseeing and administering all HHS programs through the Office of the Secretary and HHS's Operating Divisions. She is sued in her official capacity.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

7

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

32.     Defendant United States Department of Justice (DOJ) is a federal cabinet agency responsible for the federal government's legal affairs. The DOJ is a department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552. DOJ is responsible for implementing the Citizenship Stripping Order, including by ensuring agency regulations are consistent with the Order.

33.     Defendant James McHenry is the Acting Attorney General of the United States. He is responsible for overseeing and administering all duties and programs of the DOJ, including overseeing and administering the Executive Office for Immigration Review, which adjudicates the removal proceedings of noncitizens charged with being inadmissible or removable from the United States. He is also responsible for overseeing the Department of Justice's immigration-related prosecutions, such as prosecutions for illegal entry and reentry to the United States. He is sued in his official capacity.

34.     Defendant United States Department of Agriculture (USDA) is a cabinet-level department of the United States. USDA is in charge of administering the Supplemental Nutrition Assistance Program (SNAP), which provides food benefits to eligible low-income families to supplement their grocery budget. USDA is a department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552. USDA is responsible for implementing the Citizenship Stripping Order in its agency operations and activities.

35.     Defendant Gary Washington is the Acting Secretary of Agriculture. He is responsible for overseeing and administering all USDA programs. He is sued in his official capacity.

36.     Defendant the United States of America includes all government agencies and departments responsible for the implementation, modification, and execution of the Citizenship Stripping Order.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# IV.    ALLEGATIONS

**A.    The United States Constitution Confers Automatic Citizenship on All Individuals Born in the United States and Subject to the Jurisdiction Thereof**

37.    Section 1 of the Fourteenth Amendment to the United States Constitution states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. This provision is known as the Citizenship Clause. The Citizenship Clause's automatic conferral of citizenship on all individuals born in the United States and subject to its jurisdiction, regardless of the citizenship or immigration status of their parents, is confirmed by the Fourteenth Amendment's text and history, judicial precedent, and longstanding Executive Branch interpretation.

38.    The Citizenship Clause was passed and ratified as part of the Fourteenth Amendment following the Civil War to overturn the Supreme Court's infamous holding in *Dred Scott v. Sandford*, 60 U.S. 393 (1857), where the Supreme Court ruled that Black Americans who were enslaved or were descended from enslaved persons could not be citizens. The Citizenship Clause reaffirmed the longstanding common law principle of *jus soli* as the default rule of citizenship in the United States: All individuals born in the United States and subject to its jurisdiction are citizens. Its operation is automatic. No further action is required for individuals born in the United States to "become" citizens and no additional limitations are imposed.

39.    Unlike the Naturalization Clause, U.S. Const. art. I, § 8, cl. 4, which empowers Congress to set rules for naturalization, the Constitution nowhere empowers the President or Congress to set additional requirements that override or conflict with the Citizenship Clause's plain and broad grant of automatic citizenship to individuals born in the United States.

40.    The Citizenship Clause contains no exceptions based on the citizenship or immigration status of one's parents or their country of origin. Rather, the Citizenship Clause's

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

only requirements are that an individual be born "in the United States" and "subject to the jurisdiction thereof[.]" The only individuals who are excluded under the "subject to the jurisdiction thereof" language are the extremely limited number of individuals who are in fact *not* subject to the jurisdiction of the United States at birth—the children of diplomats covered by diplomatic immunity or children born to enemy combatants engaged in war against the United States while on United States soil.[3] Indeed, before the Fourteenth Amendment's adoption, there was explicit legislative debate and clarity that the Citizenship Clause was meant to reach all persons born in the United States, with only the limited exceptions above. *See* Garrett Epps, *The Citizenship Clause: A "Legislative History,"* 60 Am. Univ. L. Rev. 331, 355-56 (2010) (detailing congressional debate). By embedding this protection in the Constitution with such clear language, the framers "put citizenship beyond the power of any governmental unit to destroy." *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967).

41.    The Supreme Court cemented this longstanding and established understanding of the Citizenship Clause more than 125 years ago in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). There, the Supreme Court held that a child born in the United States to noncitizen parents was entitled to automatic citizenship by birth under the Fourteenth Amendment. In so holding, the Court explained:

> The fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes. The amendment, in clear words and in manifest intent, includes the children born within the territory of the United States of all other persons, of whatever race or color . . . . To hold that the fourteenth amendment of the constitution excludes

---

[3] Another exception recognized by the drafters of the Fourteenth Amendment, children born to Native American tribes with their own sovereign status, are granted U.S. citizenship at birth by a federal statute passed in 1924. *See* 8 U.S.C. § 1401(b) (declaring to be a national and citizen of the United States at birth "a person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe").

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

10

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

from citizenship the children born in the United States of citizens or subjects of other countries, would be to deny citizenship to thousands of persons of English, Scotch, Irish, German, or other European parentage, who have always been considered and treated as citizens of the United States.

*Id.* at 693-94.

42.     In addition to *Wong Kim Ark*, the Supreme Court has separately made clear that undocumented immigrants are "subject to the jurisdiction" of the United States. In *Plyler v. Doe*, 457 U.S. 202, 215 (1982), the Supreme Court interpreted the Fourteenth Amendment's Equal Protection Clause—the sentence immediately following the Citizenship Clause—and explained that the term "within its jurisdiction" makes plain that "the Fourteenth Amendment extends to anyone, citizen or stranger, who *is* subject to the laws of a State, and reaches into every corner of a State's territory." The Court concluded:

> That a person's initial entry into a State, or into the United States, was unlawful, and that he may for that reason be expelled, cannot negate the simple fact of his presence within the State's territorial perimeter. Given such presence, he is subject to the full range of obligations imposed by the State's civil and criminal laws.

*Id.* As the Supreme Court explained, "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." *Id.* at 211 n.10. The Supreme Court further confirmed that the phrases "within its jurisdiction" and "subject to the jurisdiction thereof" in the first and second sentences of the Fourteenth Amendment have the same meaning. *Id.*

43.     The Executive Branch has accepted and endorsed this reading and understanding of the Citizenship Clause for more than a century. Indeed, in 1995, the U.S. Justice Department's Office of Legal Counsel (OLC) provided a statement to Congress explaining why proposed legislation that would deny citizenship to certain children born in the United States based on their parents' immigration or citizenship status would be "unconstitutional on its face" and "unquestionably unconstitutional." 19 Op. O.L.C. 340, 341 (1995). The OLC's statement and

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

11

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

opinion recognize that "[t]hroughout this country's history, the fundamental legal principle governing citizenship has been that birth within the territorial limits of the United States confers United States citizenship." *Id.* at 340. As OLC explained: "Congress and the States adopted the Fourteenth Amendment in order to place the right to citizenship based on birth within the jurisdiction of the United States *beyond question*. Any restriction on that right contradicts both the Fourteenth Amendment and the underlying principle that the amendment safeguards." *Id.* (emphasis added). Indeed, OLC explained that "children born in the United States of aliens are subject to the full jurisdiction of the United States[,]" and that "as consistently recognized by courts and Attorneys General for over a century, most notably by the Supreme Court in *United States v. Wong Kim Ark*, there is no question that they possess constitutional citizenship under the Fourteenth Amendment." *Id.* at 342.

44.     Congress likewise has reaffirmed through statute the Citizenship Clause's commandment regarding birthright citizenship. The Immigration and Nationality Act states: "The following shall be nationals and citizens of the United States at birth: (a) a person born in the United States, and subject to the jurisdiction thereof[.]" 8 U.S.C. § 1401(a). This language was originally enacted in 1940, well after *Wong Kim Ark*, and taken directly from the Fourteenth Amendment.

45.     Federal and state agencies rely on this fundamental and longstanding constitutional grant of birthright citizenship in implementing various federal programs. For example, the U.S. State Department is granted the authority under federal law to issue U.S. passports. 22 U.S.C. § 211a. As explained in the State Department's Foreign Affairs Manual, "[a]ll children born in and subject, at the time of birth, to the jurisdiction of the United States acquire U.S. citizenship at birth even if their parents were in the United States illegally at the time of birth."[4] The U.S. State Department's Application for a U.S. Passport confirms that

---

[4] 8 FAM 301.1 (Acquisition By Birth in the United States) (2021), *available at* https://fam.state.gov/FAM/08FAM/08FAM030101.html (attached as Ex. B).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

12

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

for "Applicants Born in the United States," a U.S. birth certificate alone is sufficient to prove one's citizenship.[5] USCIS likewise confirms in public guidance that "[i]f you were born in the United States, you do not need to apply to USCIS for any evidence of citizenship. Your birth certificate issued where you were born is proof of your citizenship."[6]

46.    SSA also has long accepted that all children born in the United States are citizens. Under current public guidance, SSA states that "[t]he easiest way to get a Social Security number (SSN) for your newborn is to apply when you provide information for your baby's birth certificate in the hospital."[7] With respect to citizenship, SSA explains that for children born in the United States, the child's U.S. birth certificate is proof of U.S. citizenship.[8] SSA's guidance is consistent with federal regulations, which establish that "[g]enerally, an applicant for an original or replacement social security number card may prove that he or she is a U.S. citizen by birth by submitting a birth certificate or other evidence . . . that shows a U.S. place of birth." 20 C.F.R. § 422.107(d). Indeed, for newborn babies, SSA utilizes what is called "Enumeration at Birth." Under that program, SSA enters into agreements with states to streamline the process for obtaining SSNs. Where a parent requests an SSN as part of an official birth registration process, the state vital statistics office electronically transmits the request to SSA along with the child's name, date and place of birth, sex, mother's maiden name, father's name, address of the mother, and birth certificate number. 20 C.F.R. § 422.103(c)(2). That information alone is used to establish the age, identity, and U.S. citizenship of the newborn child. *Id.* States receive payment from the federal government under this program for each record transmitted to the SSA for purposes of issuing an SSN—approximately $4.19 per SSN that is issued. Currently,

---

[5] U.S. Dep't of State, *Application for a U.S. Passport*, DS-11 04-2022, 2 (expiration date April 30, 2025) (attached as Ex. C).

[6] U.S. Citizenship & Immigr. Servs*., A4--I am a U.S. citizen…How do I get proof of my U.S. citizenship?*, M-560B, 1 (October 2013) *available at* https://www.uscis.gov/sites/default/files/document/guides/A4en.pdf (attached as Ex. D).

[7] Soc. Sec. Admin., *Social Security Numbers for Children*, Pub. No. 05-10023, 1 (Jan. 2024), *available at* https://www.ssa.gov/pubs/EN-05-10023.pdf (attached as Ex. E).

[8] *Id.* at 2-3.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

13

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Washington receives approximately $440,000 per year for administering this process and

2    transmitting birth data for newborn babies in Washington to SSA. Arizona, likewise, has

3    received approximately $874,000 for FY 2024 and more than $935,000 for FY 2025 through the

4    Enumeration at Birth program, and is expected to receive more than $1 million in FY 2026.

5    Oregon received approximately $158,000 in 2023 and $129,000 through the first three quarters

6    of 2024 through the program. Illinois likewise participates in this program and receives federal

7    funds for each record transmitted.

8         47.    State law also relies on the basic constitutional principle that a person born in the

9    territorial United States is an American citizen. For example, Arizona has unique and

10   complicated proof of citizenship requirements for voter registration. Birth certificates play an

11   important role in this process. One of the documents that qualifies as "satisfactory evidence of

12   citizenship" for voter registration in Arizona is "the applicant's birth certificate that verifies

13   citizenship to the satisfaction of the county recorder." Ariz. Rev. Stat. § 16-166(F)(2). Another

14   document that qualifies as "satisfactory evidence of citizenship" for voter registration in Arizona

15   is a "driver license" number, if the driver license indicates that the applicant previously submitted

16   proof of citizenship to the Arizona Department of Transportation or equivalent agency of another

17   state. Ariz. Rev. Stat. § 16-166(F)(1). Applicants often use their birth certificate to meet this

18   requirement.

19        48.    If a U.S. birth certificate were to stop being sufficient for proof of citizenship,

20   voter registration in Arizona would become substantially more difficult and time-consuming.

21   This is because election officials in Arizona would face a dilemma each time a prospective voter

22   submits a birth certificate or driver license number. Under current registration procedures, the

23   assumption is that these kinds of documents prove U.S. citizenship and nothing further is

24   required. Without this assumption, a new and more complex set of procedures would need to be

25   developed to try to identify which birth certificates and driver license numbers qualify as proof

26   of U.S. citizenship.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

14

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**B.    The President Acted Without Legal Authority in Purporting to Strip Individuals of Their U.S. Citizenship**

49.    President Trump's public statements make clear that he wishes to end birthright citizenship purely as a policy tactic to purportedly deter immigration to the United States. Despite a president's broad powers to set immigration policy, the Citizenship Stripping Order falls far outside the legal bounds of the president's authority.

50.    During his most recent campaign for President, for example, then-candidate Trump made clear that an Executive Order would issue "[o]n Day One" to "stop federal agencies from granting automatic U.S. citizenship to the children of illegal aliens."[9] As he explained, the goal is for this Executive Order to "eliminate a major incentive for illegal immigration, discourage future waves of illegal immigration to exploit this misapplication of citizenship, and encourage illegal aliens in the U.S. to return home."[10] He explained that the Executive Order would do this by instructing agencies not to issue passports, Social Security numbers, and otherwise have the federal government treat those children as noncitizens.

51.    After the 2024 election, President-Elect Trump continued to state that birthright citizenship should be ended. In December 2024, for example, President-Elect Trump again promised an Executive Order "directing federal agencies to require a child to have at least one parent be either a U.S. citizen or legal permanent resident to automatically become a U.S. citizen."[11]

52.    The Citizenship Stripping Order, issued January 20, 2025, is the promised Executive Order. It declares that U.S. citizenship "does not automatically extend to persons born in the United States" if (1) the individual's mother is "unlawfully present in the United States"

---

[9] Trump Vance 2025, *Agenda47: Day One Executive Order Ending Citizenship for Children of Illegals and Outlawing Birth Tourism* (May 30, 2023), https://www.donaldjtrump.com/agenda47/agenda47-day-one-executive-order-ending-citizenship-for-children-of-illegals-and-outlawing-birth-tourism (attached as Ex. F).

[10] *Id.*

[11] Tarini Parti & Michelle Hackman, *Trump Prepares for Legal Fight Over His 'Birthright Citizenship' Curbs*, Wall Street Journal (Dec. 8, 2024), https://www.wsj.com/politics/policy/trump-birthright-citizenship-executive-order-battle-0900a291 (attached as Ex. G).

CONSOLIDATED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CLASS ACTION – No. 2:25-cv-00127-JCC

15

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

and the father "was not a citizen or lawful permanent resident at the time of said person's birth"; or (2) the "person's mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth." The Citizenship Stripping Order affects at least hundreds of thousands of newborns in the United States, including those who are born to two undocumented parents.

53.    Section 2 of the Order states that, effective in 30 days, it is the "policy of the United States" that no department or agency of the federal government "shall issue documents recognizing U.S. citizenship" to persons within those categories or "accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship." Section 3 of the Order directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order." The Order further directs that "the heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities."

54.    The Citizenship Stripping Order thus attempts to redefine the Fourteenth Amendment and restrict *jus soli*—or birthright citizenship—in the United States. If implemented, the Fourteenth Amendment's text would mean one thing for certain people, and the opposite for the same class of persons born mere days apart.

55.    Its language underscores its arbitrary nature, particularly by failing to define who is considered "unlawfully present" or who has "temporary status." The INA contains many "non-immigrant" and other forms of status that do not provide or guarantee a pathway to lawful permanent residence. Many noncitizen parents-to-be covered by the Order include people who

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

16

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

have lived in this country for decades and built their lives here. This includes people who have no status, as well as those who have or are seeking other forms of lawful status (including asylum and other humanitarian forms of relief provided by the INA).

56. The Constitution does not empower the President to set rules regarding citizenship at birth.

57. The Constitution does not empower the President to condition citizenship at birth on the citizenship or immigration status of one's parents.

58. The Constitution does not empower the President to unilaterally amend the Fourteenth Amendment.

59. The Constitution does not empower the President to grant or deny citizenship to individuals born in the United States.

60. The Constitution and federal law confer automatic citizenship to individuals born in the United States and subject to its jurisdiction. The Constitution removes control over the grant of birthright citizenship from the category of legitimate policy options the President and Congress may exercise to address immigration policy issues. As the Office of Legal Counsel explained when discussing the unconstitutionality of such proposals: "In short, the text and legislative history of the citizenship clause as well as consistent judicial interpretation make clear that the amendment's purpose was to remove the right of citizenship by birth from transitory political pressures." 19 Op. O.L.C. at 347.

C.    **United States Citizens Are Entitled to All Rights and Benefits of Citizenship as Defined by Law**

61. U.S. citizens are entitled to a broad array of rights and benefits as a result of their citizenship. U.S. citizenship is a "priceless treasure." *Fedorenko v. United States*, 449 U.S. 490, 507 (1981). Not only does citizenship provide a sense of belonging, but it carries with it immense privileges and benefits—all of which the President claims to wipe away at the stroke of a pen.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

17

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Withholding citizenship or stripping individuals of their citizenship will result in an immediate and irreparable harm to those individuals and to the Plaintiff States.

62.    Among other rights, citizens are "entitled as of birth to the full protection of the United States, to the absolute right to enter its borders, and to full participation in the political process." *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001).

63.    The implication of these rights is equally important: U.S. citizens cannot be detained by immigration authorities, removed from this country, separated from their families, or deprived of their friends and communities. *See, e.g.*, 18 U.S.C. § 4001 (preventing the U.S. government from detaining U.S. citizen absent authorization by Congress); 8 U.S.C. § 1229a(a)(1) (removal proceedings are to "decid[e] the inadmissibility or deportability of [a noncitizen]"). Such rights to belong and remain are among the most fundamental and valuable rights that the Constitution protects.

64.    U.S. citizens are entitled to obtain a U.S. passport and may travel abroad for an unlimited period of time and with unlimited frequency without risk of being denied re-entry to the United States. Such travel may be needed to visit family, receive healthcare, travel for work or pleasure, or for many other reasons.

65.    Individuals over 18 years of age who are U.S. citizens are eligible to vote in federal, state, and local elections. U.S. Const. amend. XXVI; Wash. Const. art. VI, § 1; Ariz. Const. art. VII, § 2; Or. Const. art. II, § 2; Ill. Const. art III, § 1. The right to vote is a fundamental political right.

66.    Individuals over 18 years of age who are U.S. citizens are eligible to serve on federal and state juries. 28 U.S.C. § 1865(b)(1); Wash. Rev. Code § 2.36.070; Ariz. Rev. Stat. § 21-201(1); Or. Rev. Stat. Ann. § 10.030(2); 705 ILCS 305/2(a).

67.    Individuals who are U.S. citizens may petition for immigration status for family members including spouses, children, parents, and siblings. *See* 8 U.S.C. §§ 1151(b)(2)(A)(i), 1153(a).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

18

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

68.     Individuals who are natural born U.S. citizens are eligible for election to the offices of President and Vice President of the United States. U.S. Const. art. II, § 1; U.S. Const. amend. XII.

69.     Individuals who are U.S. citizens are eligible for election to the United States House of Representatives and the United States Senate, and to certain state offices. U.S. Const. art I, §§ 2-3; Wash. Const. art. II, § 7, art. III, § 25; Ariz. Const. art. IV pt. 2 § 2, art. V § 2; Or. Const. art. V, § 2, art. IV, § 8; Or. Rev. Stat. Ann. § 204.016(1); Ill. Const. art. V, § 3, art. IV § 2.

70.     Individuals who are U.S. citizens or nationals are eligible for appointment to competitive service federal jobs. Exec. Order No. 11,935, 5 C.F.R. § 7.3(b) (Sept. 3, 1976).

71.     Depending on immigration or citizenship status, residents of Plaintiff States may also be eligible to participate in a number of federal and state programs that ensure the health and welfare of individuals, families, and communities. Those include programs administered by the Plaintiff States and funded by federal and state dollars. These programs provide healthcare coverage for newborns and children, foster care and custodial services for children in need, and other forms of social and economic assistance to those in need.

72.     Longer term, a child stripped of birthright citizenship who remains undocumented will face the effects of a lack of legal status over their lifespan. While U.S. citizens of sufficient age are authorized to work in the United States, only noncitizens granted particular immigration statuses are or can be authorized to work. *See* 8 C.F.R. § 274a.12. A noncitizen who is unlawfully present is ineligible for employment authorization, affecting their lifetime earning potential and job opportunities. Undocumented individuals are not eligible for federal student financial aid, affecting their educational opportunities. Research also shows that undocumented individuals are more likely to report greater depression, social isolation, longer hospital stays, and higher levels of stress.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

19

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

73.    A person without legal immigration status is not generally eligible to be issued a social security number. *See* 20 C.F.R. § 422.107. This creates cascading barriers to basic needs and milestones, such as accessing traditional mortgages or banking services, as well as eligibility for federal housing programs, among other things. Likewise, undocumented individuals are not eligible for a REAL ID Act compliant driver's license or identification card, which will be required for all air travel, including domestic flights, as of May 7, 2025. 6 C.F.R. §§ 37.5(b), 37.11(g).

**D.    Plaintiff States Will Be Irreparably Injured by Defendants' Citizenship Stripping Order**

74.    The Plaintiff States will be immediately and irreparably injured by Defendants' Citizenship Stripping Order separate and apart from the grievous harms its residents will suffer as a result of the Order.

75.    As noted above, in Washington in 2022 alone, approximately 7,000 U.S. citizen children were born to mothers who lacked legal status and approximately 4,000 U.S. citizen children were born to two parents who lacked legal status. This is a conservative estimate of the number of children affected by the Citizenship Stripping Order, and the full number of children affected will be greater.

76.    In Arizona in 2022 alone, approximately 6,000 U.S. citizen children were born to mothers who lacked legal status and approximately 3,400 U.S. citizen children were born to two parents who were noncitizens and lacked legal status. This is a conservative estimate of the number of children affected by the Citizenship Stripping Order, and the full number of children affected will be greater.

77.    In Illinois in 2022 alone, approximately 9,100 U.S. citizen children were born to mothers who lacked legal status and approximately 5,200 U.S. citizen children were born to two parents who were noncitizens and lacked legal status. This is a conservative estimate of the

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

20

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

number of children affected by the Citizenship Stripping Order, and the full number of children affected will be greater.

78.     In Oregon in 2022 alone, approximately 2,500 U.S. citizen children were born to mothers who lacked legal status and approximately 1,500 U.S. citizen children were born to two parents who were noncitizens and lacked legal status. This is a conservative estimate of the number of children affected by the Citizenship Stripping Order, and the full number of children affected will be greater.

79.     The Plaintiff States administer numerous programs for the benefit of their residents, including for newborns and young children, some of whom are wards of the Plaintiff States who are entitled to care by statute. Some of these programs are funded in part by federal dollars, with federal funding frequently tied to the citizenship and immigration status of the individuals served. As detailed below, stripping individuals of their citizenship and leaving them without a qualifying immigration status will render them ineligible to receive federally funded benefits, leaving them to rely on state-only funded benefits and services that the Plaintiff States must provide, and causing direct, immediate, and measurable financial harm to Plaintiff States.

80.     The Medicaid and CHIP health insurance programs were created by federal law and are jointly funded by the federal and state governments. Medicaid provides health insurance for individuals, including children, whose household incomes fall below certain eligibility thresholds that vary slightly by state. CHIP is a program through which health insurance coverage is provided for children whose household incomes exceed the eligibility thresholds for Medicaid but fall below a separate threshold. The federal government pays states a percentage of program expenditures for individuals enrolled in Medicaid and CHIP. This percentage varies by program, state, covered population, and service, but generally ranges between 50% and 90% of the total expenditure.

81.     Only individuals who are U.S. citizens or have a qualifying immigration status are eligible for Medicaid and CHIP except for certain emergency medical services that must be

provided and can be covered under Medicaid where the individual is otherwise qualified but for their immigration or citizenship status. 42 U.S.C. § 1396b(v); 8 U.S.C. §§ 1611(a), (c)(1)(B); 42 C.F.R. § 435.406. In all Plaintiff States, children who would be eligible for Medicaid or CHIP but for the fact that they are not U.S. citizens or qualifying noncitizens are eligible for certain health insurance or emergency services that are funded entirely by the State. The Citizenship Stripping Order will therefore result in newborn children who would otherwise be eligible for federally funded Medicaid or CHIP instead being enrolled in entirely state-funded health care programs or provided entirely state-funded healthcare services, transferring the cost for their health care to the States and causing a direct loss of federal funding. And for some Plaintiff States, those State-funded services may be underfunded or restricted to emergency care only, resulting in newborns and children not receiving regular or preventative care and ultimately leading to more expensive emergency care in the long term.

82.    One example is Washington's programs for ensuring healthcare coverage for its most vulnerable residents. The Washington State Health Care Authority (HCA) is the designated single state agency responsible for administering Washington's Medicaid program and CHIP. In Washington, Medicaid is called Apple Health. Coverage programs for children are provided under the name Apple Health for Kids and serve all kids regardless of immigration status up to 317% of the Federal Poverty Limit (FPL). Between 215% and 317% of the FPL, for children who are citizens or qualified and authorized immigrants, the funding for this coverage comes through CHIP, and households pay a minimal premium for children's coverage. Below that range, for children who are citizens or qualified and authorized immigrants, funding for coverage is provided through Medicaid. Under federal law, HCA must provide Medicaid and CHIP coverage to citizens and qualified noncitizens whose citizenship or qualifying immigration status is verified and who are otherwise eligible. For those children who would be eligible but for their lack of citizenship or a qualifying immigration status, the State provides coverage through what is called the Children's Health Plan (CHP).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

22

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

83.     As of December 2024, HCA administers federally-backed Medicaid and CHIP funded coverage for more than 860,000 children in Washington. HCA estimates that coverage on a per-child basis costs approximately $2,844 per year on average for physical health care coverage alone. For this coverage, Washington expended approximately $2.37 billion with approximately $1.3 billion coming from the federal government under Medicaid and CHIP. With respect to the division of funding in Washington, health coverage provided through CHIP generally receives a 65% federal match rate as opposed to Medicaid's 50% federal match rate.

84.     If deemed ineligible because they are no longer U.S. citizens, children enrolled in CHIP who do not meet the income eligibility guidelines for Medicaid would be left without health coverage unless Washington provides it using only state funding—even for emergency medical care that hospitals (including State-operated hospitals) are required by federal law to provide. *See, e.g.*, 42 U.S.C. § 1395dd. The result would be that federal law would *require* State-providers, like UW Medicine's Harborview hospital, to provide emergency and other care, but *withhold* federal contribution for that care at the normal CHIP rates. Washington would provide coverage to these individuals using State-only funds, and therefore be required to spend substantial funds it otherwise should receive from the federal government through the CHIP program.

85.     The CHIP program also enables certain healthcare services to be provided to children prior to birth in the form of prenatal care for their mother, regardless of the mother's status. Under CHIP, a child is defined as "an individual under the age of 19 including the period from conception to birth." 42 C.F.R. § 457.10. In Washington, children are eligible at conception for prenatal care through CHIP. This prenatal care coverage is provided regardless of the immigration status of the mother because the child is assumed to be a U.S. citizen. In State FY 2025, Washington expects to receive $161.5 million in federal CHIP funding to provide prenatal health care to children born in Washington to mothers ineligible for Medicaid and CHIP.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

23

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

86.    Certain children born whose health care would have been covered through Medicaid or CHIP as U.S. citizens will become ineligible for those programs because they are no longer deemed U.S. citizens or qualifying noncitizens under the Citizenship Stripping Order. This poses an immediate risk to HCA's federal funding stream used to provide healthcare coverage to vulnerable Washington newborns and children. In state fiscal year 2022, for example, there were more than 4,000 children born to unauthorized and non-qualifying mothers whose labor and delivery was covered by Emergency Medicaid. Those children, by being born in the United States and deemed citizens, were eligible for federally-backed coverage. If this number of children became ineligible due to a loss of citizenship and moved to the State-funded CHP coverage, however, that will result in a loss of $6.9 million in federal reimbursements to Washington and a corresponding increase to State expenditures of the same amount, based on the current expenditures for the complete physical and behavioral health package of benefits.

87.    In Arizona, in 2024 there were 4,519 births paid for by the Federal Emergency Services Program (FES births). For each of these births, the parent's household income fell under 133% of the Federal Poverty Level and the parent would have been eligible for Title XIX (Medicaid) if they were U.S. citizens or "lawfully residing." However, because these children were born in the United States, the children were eligible for Medicaid and qualified for Arizona's Medicaid program, the Arizona Health Care Cost Containment System (AHCCCS), but they would not be eligible if birthright citizenship were removed. If each of these children became ineligible for AHCCCS until 18, using FFY 2026 figures for FMAP of 64.34% (federal match) and capitation rates, then this would likely cost the State $39,400 in federal revenue per child used to pay $61,300 in total capitation payments over the first 18 years of that child's life.

88.    In addition, based on current data, AHCCCS estimates that approximately 3,126 births each year are for children whose family income are low enough to make them eligible for Title XXI (KidsCare) under birthright citizenship, but who would not be eligible if birthright

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

24

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   citizenship were removed. And given the scope of the Order, the number of children affected

2   will likely be higher.

3       89.     Removing birthright citizenship from the above 7,645 (4,519 + 3,126) children

4   would reduce federal revenues to Arizona by $321,844,600 used to pay $468,638,500 in total

5   capitation payments over the first 18 years of the children's lives. This amount is only for the

6   first "cohort" of children and only through their first 18 years of life. Each year additional

7   children would be born, adding to the lost revenue.

8       90.     In Illinois, the Department of Healthcare and Family Services (HFS) is

9   responsible for administering Illinois's Medicaid program and CHIP. HFS currently administers

10  federally-backed Medicaid and CHIP funded coverage for over 1 million children in Illinois.

11  Some of those children—children whose health care would have been covered through Medicaid

12  or CHIP as U.S. citizens—will become ineligible for those programs because they are no longer

13  deemed U.S. citizens or qualifying noncitizens under the Citizenship Stripping Order. That

14  threatens the federal funds that HFS uses to provide healthcare coverage to vulnerable Illinois

15  newborns and children and risks transferring the cost for their health care to Illinois.

16      91.     Similarly, Plaintiff States' child welfare systems are funded in part through an

17  annual appropriation based on an open-ended formula grant entitlement operated by the

18  Defendant HHS' federal Foster Care Program, known as "Title IV-E." For example, in Federal

19  Fiscal Year 2024, Washington received approximately $219 million in federal Title IV-E

20  funding.

21      92.     The Title IV-E grant amount is awarded to partially reimburse the States'

22  expenditures on allowable uses of funds for the direct costs of supporting eligible children in

23  foster care. The States receive no Title IV-E funding for the costs to care for foster children who

24  do not meet Title IV-E eligibility. Children who are neither citizens nor qualifying noncitizens,

25  which will include children who would be natural-born U.S. citizens but for the Citizenship

26  Stripping Order, are not covered by Title IV-E. 8 U.S.C. §§ 1611(a), (c)(1)(A).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

25

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

93.    Plaintiff States also receive federal funding under Title IV-E for certain program administrative costs based in part on the number of children eligible for Title IV-E. Washington's Department of Children, Youth, and Families (DCYF) receives reimbursements for foster care maintenance, adoption support, guardianship support, and associated legal, administrative, and training costs. Therefore, any decrease in the number of foster children who are Title IV-E eligible will reduce federal funding to States for foster care and related programs. As a result of the Citizenship Stripping Order, fewer children will be eligible for welfare and support services and Plaintiff States will suffer a negative financial impact to their child welfare programs.

94.    Washington's DCYF foster care services provide support for children and families when they may be most vulnerable and ensures that children have the tools they need to succeed. In Washington, those services will often be provided for a long period of time—the median length of stay for a child in out-of-home care is nearly two years. If that child is ineligible for Title IV-E because they are not a citizen, DCYF cannot receive federal reimbursements for any of the services they provide to that child. And any decrease in Title IV-E funding means that DCYF will have fewer resources to help all of the children it serves, including children whose citizenship status is unaffected by the Citizenship Stripping Order.

95.    Arizona's Department of Child Services (DCS) also relies on Title IV-E funding and operates on a limited budget appropriated by the State Legislature. The Citizenship Stripping Order will cause DCS to lose material amounts of federal funding that it would use for foster care maintenance payments for those children, as well as reimbursement for administrative expenses associated with their care.

96.    Illinois Department of Child and Family Services (DCFS) also relies on Title IV-E funding. The guaranteed reduction in Title IV-E funding—as well as other federal reimbursements—that will result from the Citizenship Stripping Order will have a meaningful effect and strain on DCFS's ability to fulfill its statutory mandate to provide care to the wards in its custody.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

26

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

97.    The loss of federal funding and reimbursement will have other significant and negative ripple effects on the Plaintiff States. For example, in Arizona, DCS prioritizes kinship placements for the children within its custody. In kinship placements, children are placed in the homes of relatives or individuals with a significant relationship to the children. Placements with relatives and kin provides children with more stability by maintaining connections to neighborhood, community, faith, family, tribe, school and friends. A family's willingness and ability to accept a kinship placement is often dependent on the family's ability to receive financial and resource assistance from DCS. If fewer children are considered U.S. citizens and therefore are ineligible for these vouchers and resources, DCS will not be able to provide the same assistance to support relative and kinship placements, and the number of these placements will decrease. That will harm these already vulnerable children. It will also increase costs for DCS, which will have to place those same children in group homes, which are significantly more expensive.

98.    Because the benefit is to the child, not the caregiver, an increase of children without legal status in DCS care will also impact community foster homes. Community foster homes may not be willing to take placement of a child if they are not able to receive benefits like childcare assistance. Many communities foster caregivers work outside of the home and rely on childcare assistance to pay for care while they work.

99.    Plaintiff States will also suffer a direct and immediate loss of federal reimbursements that they receive for every SSN that is assigned to a child born in their state through the Enumerated at Birth (EAB) program. Pursuant to this program, Plaintiff States are under contract with the SSA to collect and transmit to SSA certain birth information on behalf of parents who wish to obtain an SSN for their newborn child. For their services under this program, the States receive a payment from SSA of approximately $4.19 per assigned SSN. These funds are used to support general administrative expenses for state agencies beyond the cost of transmitting SSN applications to SSA.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

27

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

100.    As noted above, each year, the Citizenship Stripping Order is likely to impact—at a bare minimum—at least 4,000 children born in Washington; 3,400 children born in Arizona; 5,200 children born in Illinois; and 1,500 children born in Oregon. Those children will therefore be ineligible for SSNs, which in turn will cause the Plaintiff States to suffer an immediate decrease in the number of SSNs assigned and payments received through the EAB program. For example, withholding issuance of approximately 4,000 SSNs through the EAB process will cause Washington to lose approximately $16,000 per year at a minimum, because of the Citizenship Stripping Order's direction to SSA to stop issuing SSNs to these children. Withholding issuance of approximately 3,400 SSNs through the EAB process will cause Arizona to lose approximately $14,000 per year at a minimum, because of the Citizenship Stripping Order's direction to SSA to stop issuing SSNs to certain children. Withholding issuance of approximately 5,200 SSNs through the EAB process will cause Illinois to lose approximately $21,000 per year at a minimum. And withholding issuance of approximately 1,500 SSNs through the EAB process will cause Oregon to lose approximately $6,200 per year at a minimum, because of the Citizenship Stripping Order's direction to SSA to stop issuing SSNs to certain children.

101.    As noted above, the Citizenship Stripping Order will also harm Arizona's ability to implement its voter registration laws aimed at ensuring that only citizens register to vote.

102.    The Citizenship Stripping Order will immediately begin to upend administrative and operational processes within the Plaintiff States. States must immediately alter their systems for verifying which children they serve are eligible for federal reimbursement programs like Medicaid, CHIP, and Title IV-E; operationalize those altered systems; and plan for the fiscal impact of losing substantial federal funding that the Plaintiff States rely on receiving to support a range of programs.

103.    In Washington, for example, agencies rely on birthright citizenship in their internal processes to determine eligibility for federal programs. This includes Washington's HCA, which administers Washington's Medicaid and CHIP programs. The Citizenship Stripping

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

28

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Order will require HCA to develop updated training and guidance for staff, partners, and health care providers across Washington about which children are citizens and therefore eligible for Medicaid and CHIP. HCA anticipates this will take at least seven to eight full-time employees around two to three years to make these changes. These updates may then require training for up to 2,000 staff, on top of coordination with external community partners. Similarly, the Citizenship Stripping Order requires health care providers like UW Medicine to immediately update their understanding of how to assess coverage to assist patients and parents in understanding and navigating applications for coverage, when those parents may have a due date in just a few weeks.

104.    Washington's DCYF likewise relies on birthright citizenship to determine which services it may receive reimbursement for. Federal law requires DCYF to verify citizenship status of children it serves as a part of determining Title IV-E eligibility. Currently, the primary method of citizenship verification is through birth certificates issued by other state agencies. DCYF relies on those birth certificates to determine whether children are eligible for Title IV-E, and DCYF's services for children may begin as soon as they are born. The Citizenship Stripping Order requires DCYF to amend its processes, trainings, and materials to make any Title IV-E eligibility determinations. That will take staff time that would have been spent on other projects to better serve children and families in Washington.

105.    Washington's DOH also faces uncertainty and substantial administrative burdens under the Citizenship Stripping Order. DOH cannot modify State's newborn registration process immediately. Instead, doing so will require substantial operational time, manpower resources, and technological resources from DOH and healthcare facilities in Washington. Indeed, because more than 80,000 babies are born every year in Washington, DOH anticipates that any required updates to the birth registration process or birth certificates in Washington will impose serious burdens on DOH that it is not currently equipped to handle, as DOH has no way of determining the immigration status or citizenship of every newborn (or their parents).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

29

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

106.    Similarly, in Arizona, the State's Medicaid program, AHCCCS, is jointly funded by the federal and state governments for individuals and families who qualify based on income level. AHCCCS does not currently rely on a Social Security Number or parental immigration status to determine eligibility. Newborns are automatically approved for benefits through an automated process when a mother living in Arizona on AHCCCS gives birth. Citizenship is considered automatically verified if the child's birth is verified through this method since they are born in the United States. If this methodology no longer applied, AHCCCS would need to update its eligibility policy and update three systems it uses: HEAPlus, PMMIS and AHCCCS Online. This would take approximately 12 months to implement the change. Based on the complexity of the potential update, the expense to change HEAplus would be approximately $1 million to $2.5 million and would take about 12 months to develop. In addition, it would cost $1.3 million to 1.9 million to update PMMIS and AHCCCS Online.

107.    The Illinois Department of Public Health (IDPH) will also face substantive administrative burdens under the Citizenship Stripping Order in order to modify its newborn registration process immediately. IDPH would need to create systems for state-run healthcare facilities to use to verify parents' immigration statuses for purposes of issuing birth certificates and applying for a newborn's SSN. This would require training and hiring of staff and would potentially cause delays in the registration and issuance of a newborn's birth certificate.

108.    In Oregon, the sudden need to collect proof of citizenship information from parents at the birth of a child will cause the state to incur the expense of training its employees and staff at Oregon hospitals on new protocols.

109.    In sum, the Citizenship Stripping Order, if allowed to stand, will work direct and substantial injuries to Washington, Arizona, Illinois, and Oregon, in addition to their residents.

**E.    Individual Plaintiffs**

a) Cherly Norales Castillo

110.    Plaintiff Cherly Norales Castillo is a noncitizen from Honduras.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

30

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

111.    She has lived in the United States since 2023, and currently resides in Seattle, Washington.

112.    Ms. Norales lives with her partner and her four-year-old son.

113.    Ms. Norales and her son have a pending asylum application before the immigration court.

114.    In 2023, they fled a violent and abusive situation in Honduras to seek protection in the United States.

115.    Ms. Norales learned she is pregnant with her second child in or around July 2024.

116.    Her expected due date is March 19, 2025.

117.    When Ms. Norales learned of President Trump's Executive Order on birthright citizenship in January 2025, she became fearful for her unborn child, as neither she nor the child's father are citizens or LPRs.

118.    Ms. Norales fears for the safety and security of her family if her unborn child does not receive citizenship by birthright. She does not want her unborn child to ever face removal to Honduras, a country she had to flee due to abuse and violence. It is important to Ms. Norales that her family remain unified and safe in this country.

119.    Ms. Norales also desires that her soon-to-be-born child have access to an education, work authorization, and the many other benefits of U.S. citizenship. She fears the many obstacles her child will face if the child lacks citizenship.

b) <u>Alicia Chavarria Lopez</u>

120.    Plaintiff Alicia Chavarria Lopez is a noncitizen from El Salvador.

121.    She has lived in the United States since 2016, and currently resides in Bothell, Washington.

122.    Ms. Chavarria lives with her partner and their five-year-old child.

123.    Ms. Chavarria has a pending asylum application before USCIS.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

31

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

124.     In 2016, she fled a violent and abusive situation in El Salvador to seek protection in the United States.

125.     Ms. Chavarria learned she is pregnant with her second child in or around October or November 2024.

126.     Her anticipated due date is July 21, 2025.

127.     When Ms. Chavarria learned of President Trump's Executive Order on birthright citizenship in January 2025, she became fearful for her unborn child, as neither she nor the child's father are citizens or LPRs.

128.     Ms. Chavarria's family is one of mixed immigration status. She is seeking asylum, and her five-year-old child is a U.S. citizen.

129.     Ms. Chavarria fears that the Citizenship Stripping Order puts her family at risk of separation, and that her expected child may become a target for immigration enforcement. She does not want her unborn child to live in fear of removal to El Salvador, a country Ms. Chavarria had to flee for her own safety.

130.     Ms. Chavarria desires that her soon-to-be-born child have access to education, work opportunities, and the many other benefits of U.S. citizenship—the same benefits that are available to her other child who was born in this country. She fears the many obstacles her child will face if the child lacks citizenship.

**F.     The Effect of the Executive Order on the Plaintiff States' Residents, Individual Plaintiffs, and Proposed Class Members**

131.     The Citizenship Stripping Order will have widespread and destructive effects on the lives of the Plaintiff States' residents, Individual Plaintiffs, and proposed class members, which includes the Individual Plaintiffs' expected children.

132.     Without the protections of citizenship, the Plaintiff States' residents, Individual Plaintiffs, and proposed class members face the risk of family separation, as DHS could take away and remove resident and proposed class member children at any moment. This is not

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

32

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

speculative. *See Ms. L. v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018) (enjoining policy implemented by first Trump administration to deter immigration by separating parents and their children).

133. Some children subject to the Citizenship Stripping Order may also become stateless. A U.S.-born child deemed to be a noncitizen may not be recognized as a citizen under the laws of their parents' country or countries of origin. Even if legally possible, practical barriers may prevent these children from being recognized as citizens of any other country, especially where those countries offer no consular services in the United States (and thus no means to obtain a passport and verify citizenship). This is true for some large immigrant populations in the United States, like Venezuelans.[12]

134. The Order also deprives the Plaintiff States' residents, Individual Plaintiffs' expected children, and the other proposed class member children of the ability to obtain social security numbers and work lawfully once they are of lawful age. Without social security numbers, the Plaintiff States' residents, Individual Plaintiffs' children, and the other proposed class member children will be unable to provide for themselves or their families (including, eventually, the Individual Plaintiffs and class member parents themselves). *Gonzalez Rosario v. U.S. Citizenship & Immigr. Servs.*, 365 F. Supp. 3d 1156, 1162 (W.D. Wash. 2018) (recognizing a "negative impact on human welfare" when asylum seekers "are unable to financially support themselves or their loved ones").

135. In addition, and among other things, the Citizenship Stripping Order denies the Plaintiff States' residents, Individual Plaintiffs' expected children, and the other proposed class member children (once they become adults) the right to vote in federal elections, serve on federal juries, serve in many elected offices, and work in various federal jobs.

---

[12] U.S. Dep't of State, *International Travel, Learn About Your Destination, Venezuela* https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Venezuela.html (last updated Oct. 30, 2024) ("The Venezuelan embassy and consulates in the United States are not open.") (attached as Ex. H).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

33

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

136.    The Order will further deprive the Plaintiff States' residents, Individual Plaintiffs' children, and the other proposed class member children of access to higher education, as they will not qualify for federal financial aid to higher education, limiting their ability to develop their full potential.

137.    The Citizenship Stripping Order will also deprive the Plaintiff States' residents, Individual Plaintiffs' children, and the other proposed class member children of access to other critical public benefits. For example, as undocumented persons, children subject to the Order will not qualify for federally funded SNAP benefits. *See* 7 U.S.C. § 2015(f); 7 C.F.R. § 273.4. While Washington State provides supplemental, state-funded programs for many noncitizens, not all noncitizens (and thus not all class member children) would be covered. *See, e.g.*, Wash. Admin. Code § 388-424-0030 (addressing how immigration status affects eligibility for state-funded food assistance programs); Wash. Admin. Code § 388-424-0001 (identifying qualifying immigration statuses for state-funded food assistance programs).

138.    The Order will deprive the Plaintiff States' residents, Individual Plaintiffs' children, and the other proposed class member children of any immigration status. The INA and its implementing regulations do not provide any status to, and in fact do not contemplate, persons born in the United States who are not U.S. citizens, except for those born to foreign diplomatic officers. *See* 8 C.F.R. § 101.3(a); *see also* 8 U.S.C. §1401(a). Indeed, most persons born in the U.S. who are subject to the Order will have no other path to gain lawful status in this country.

139.    Finally, the Citizenship Stripping Order is a source of immense stress, anxiety, and concern for some of the Plaintiff States' residents, Individual Plaintiffs, and proposed class members. They are understandably apprehensive and distressed about the prospect that their families may be separated, rendered ineligible for benefits, and subject to many other harms.

## V.    CLASS ACTION ALLEGATIONS

140.    Individual Plaintiffs bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2). A class

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

34

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    action is proper because this action involves questions of law and fact common to the class, the

2    class is so numerous that joinder of all members is impractical, Individual Plaintiffs' claims are

3    typical of the claims of the class and will fairly and adequately protect the interests of the class.

4    Defendants have acted on grounds that apply generally to the class, so that injunctive and

5    declaratory relief and relief under the APA are appropriate with respect to the class as a whole.

6         141.    Individual Plaintiffs seek to represent the following class:

7           All pregnant persons residing in Washington State who will give birth in
8           the United States on or after February 19, 2025, where neither parent of
       the expected child is a U.S. citizen or lawful permanent resident at the
9           time of the child's birth; and,

10          all children residing in Washington State who are born in the United
       States on or after February 19, 2025, where neither of their parents is a
11          U.S. citizen or lawful permanent resident at the time of the child's birth.

12

13        142.    The proposed class meets the numerosity requirements of Federal Rule of Civil

14   Procedure 23(a)(1). The class is so numerous that joinder of all members is impracticable. The

15   precise number of class members will be determined by how Defendants define and implement

16   the key terms of the Citizenship Stripping Order. However, in 2021, Washington State estimated

17   that there were over 300,000 undocumented noncitizens in the state.[13] Even a conservative

18   estimate thus suggests that thousands of people, and perhaps many more, will be born this year

19   alone in the state that will now be considered noncitizens.[14] Additionally, as described above, in

20   2022 there were approximately 4,000 births in Washington State to parents who were

21   undocumented.

22

23

24        [13] *See* Wei Yen, *Washington state's immigrant population: 2010-21*, Office of Financial Management, 2
25   (May 2023), *available at* https://ofm.wa.gov/sites/default/files/public/dataresearch/researchbriefs/brief110.pdf
(attached as Ex. I).
26        [14] Washington State Dep't of Health, *All Births Dashboard*, https://doh.wa.gov/data-and-statistical-
reports/washington-tracking-network-wtn/county-all-births-dashboard (last accessed Jan. 23, 2025) (reflecting a
fertility rate of 53.5 births per 1,000 women aged 15–44 in 2022 in Washington) (attached as Ex. J).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

35

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

143.    The proposed class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2). The members of the class are all subject or will be subject to the Citizenship Stripping Order divesting them or their soon-to-be or future children of U.S. citizenship. The lawsuit raises questions of law common to members of the proposed class, including whether the Order violates the Fourteenth Amendment.

144.    The proposed class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because the claims of the representative Individual Plaintiffs are typical of the class. Individual Plaintiffs and the proposed class share the same legal claims, which assert the same claim under the Fourteenth Amendment, federal law, and the APA. All involve families where a child will be born in the United States where neither parent is a U.S. citizen or lawful permanent resident.

145.    The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). The representative Individual Plaintiffs seek the same final relief as the other members of the class—namely, an injunction that enjoins the President and federal agencies and personnel from enforcing the Order, a declaration clarifying the citizenship status of the children born in the United States targeted by the Citizenship Stripping Order, and appropriate relief under the APA. Individual Plaintiffs will fairly and adequately protect the interests of the proposed class members because they seek relief on behalf of the class as a whole and have no interest antagonistic to other class members.

146.    Individual Plaintiffs are represented by competent counsel with extensive experience in complex class actions and immigration law.

147.    The proposed class also satisfies Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds generally applicable to the proposed class, thereby making final injunctive, declaratory, and APA relief appropriate.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

36

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

## VI.    FIRST CAUSE OF ACTION
### (Fourteenth Amendment – Citizenship Clause)

148.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-139.

149.    The Fourteenth Amendment declares: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

150.    Section 1 of the Citizenship Stripping Order declares that U.S. citizenship does not automatically extend to individuals born in the United States when (1) the individual's mother is "unlawfully present in the United States" and the father "was not a citizen or lawful permanent resident at the time of said person's birth"; or (2) the "person's mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth."

151.    Section 2 of the Citizenship Stripping Order states that Defendants will not issue documents recognizing U.S. citizenship to those individuals, nor accept documents issued by State, local, or other governments recognizing U.S. citizenship of those individuals.

152.    Section 3 of the Citizenship Stripping Order requires Defendants to "take all appropriate measures to ensure" that Defendant agencies do not recognize the citizenship of certain U.S. citizens.

153.    The Citizenship Stripping Order expressly violates the Fourteenth Amendment's guarantee of birthright citizenship to all individuals born in the United States and subject to the jurisdiction thereof.

154.    The President has no authority to override or ignore the Fourteenth Amendment's Citizenship Clause or otherwise amend the Constitution, and therefore lacks authority to strip individuals of their right to citizenship.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

37

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

155.    The Citizenship Stripping Order will cause harm to Washington, Arizona, Illinois, Oregon, and the residents of each Plaintiff State.

156.    The Citizenship Stripping Order will cause harm to the Individual Plaintiffs and proposed class members.

## VII.    SECOND CAUSE OF ACTION
### (Immigration and Nationality Act – 8 U.S.C. § 1401)

157.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-139.

158.    Section 1401 of the Immigration and Nationality Act states that "a person born in the United States, and subject to the jurisdiction thereof" "shall be [a] national[] and citizen[] of the United States at birth." 8 U.S.C. § 1401(a).

159.    Section 1 of the Citizenship Stripping Order declares that U.S. citizenship does not automatically extend to individuals born in the United States when (1) the individual's mother is "unlawfully present in the United States" and the father "was not a citizen or lawful permanent resident at the time of said person's birth"; or (2) the "person's mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth."

160.    Section 2 of the Citizenship Stripping Order states that Defendants will not issue documents recognizing U.S. citizenship to those individuals, nor accept documents issued by State, local, or other governments recognizing U.S. citizenship of those individuals.

161.    Section 3 of the Citizenship Stripping Order requires Defendants to "take all appropriate measures to ensure" that Defendant agencies do not recognize the citizenship of certain U.S. citizens.

162.    The Citizenship Stripping Order expressly violates Section 1401's guarantee of birthright citizenship to all individuals born in the United States and subject to the jurisdiction thereof.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

38

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

163.    The President has no authority to override Section 1401's statutory guarantee of citizenship, and therefore lacks any authority to unilaterally strip individuals of their right to citizenship.

164.    The Citizenship Stripping Order will cause harm to Washington, Arizona, Illinois, Oregon, and the residents of each Plaintiff State.

165.    The Citizenship Stripping Order will cause harm to the Individual Plaintiffs and proposed class members.

## VIII.   THIRD CAUSE OF ACTION
### (Administrative Procedure Act – 5 U.S.C. § 706)

166.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-139.

167.    The actions of Defendants that are required or permitted by the Citizenship Stripping Order, as set forth above, are contrary to constitutional right, power, privilege, or immunity, including rights protected by the Fourteenth Amendment to the U.S. Constitution, in violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

168.    The actions of Defendants that are required or permitted by the Citizenship Stripping Order, as set forth above, violate 8 U.S.C. § 1401 *et seq*., and are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

169.    The Citizenship Stripping Order will cause harm to Washington, Arizona, Illinois, Oregon, and the residents of each Plaintiff State.

170.    The Citizenship Stripping Order will cause harm to the Individual Plaintiffs and proposed class members.

171.    Accordingly, Plaintiffs request that the Court set aside any and all agency action that implements the Citizenship Stripping Order.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

39

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a.    Declare that the Citizenship Stripping Order is contrary to the Constitution and laws of the United States;

b.    Certify the case as a class action as proposed by Individual Plaintiffs herein and in the previously filed motion for class certification, ECF No. 58;

c.    Preliminarily and permanently enjoin Defendants from implementing or enforcing the Citizenship Stripping Order, pending further orders from this Court;

d.    Declare that Individual Plaintiffs' children born on or after the implementation date of the Citizenship Stripping Order and others similarly situated are U.S. citizens, notwithstanding the terms of the Order;

e.    Award Individual Plaintiffs costs and reasonable attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

f.    Award such additional relief as the interests of justice may require.


DATED this 4th day of February 2025.

NICHOLAS W. BROWN
Attorney General

*s/ Lane M. Polozola*
COLLEEN M. MELODY, WSBA #42275
Civil Rights Division Chief
LANE POLOZOLA, WSBA #50138
DANIEL J. JEON, WSBA #58087
ALYSON DIMMITT GNAM, WSBA #48143
Assistant Attorneys General
Wing Luke Civil Rights Division
Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
colleen.melody@atg.wa.gov
lane.polozola@atg.wa.gov
daniel.jeon@atg.wa.gov
alyson.dimmittgnam@atg.wa.gov

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

40

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*Attorneys for Plaintiff State of Washington*

KRIS MAYES
*Attorney General of Arizona*

*s/ Joshua Bendor*
Joshua D. Bendor (AZ No. 031908)*
Luci D. Davis (AZ No. 035347)*
Gabriela Monico Nunez (AZ No. 039652)*
Office of the Arizona Attorney General
Firm State Bar No. 14000
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Luci.Davis@azag.gov
Gabriela.MonicoNunez@azag.gov
ACL@azag.gov

*Pro hac vice
Attorneys for Plaintiff State of Arizona*

KWAME RAOUL
*Attorney General, State of Illinois*

*s/ Rebekah Newman*
REBEKAH NEWMAN, ARDC #6327372*
Assistant Attorney General
Special Litigation Bureau
Office of the Illinois Attorney General
115 South LaSalle St., Floor 35
Chicago, IL 60603
Tel. (773) 590-6961
rebekah.newman@ilag.gov

*Pro hac vice
Attorneys for Plaintiff State of Illinois*

DAN RAYFIELD
*Attorney General, State of Oregon*

*/s/ Carla A. Scott*
CARLA A. SCOTT, WSBA #39947
THOMAS H. CASTELLI, OSB #226448*
Senior Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Carla.A.Scott@doj.oregon.gov

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

41

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

Thomas.Castelli@doj.oregon.gov

2

*Pro hac vice*
*Attorneys for Plaintiff State of Oregon*

3

NORTHWEST IMMIGRANT
RIGHTS PROJECT

4

5

*s/ Matt Adams*
Matt Adams, WSBA #28287

6

matt@nwirp.org

7

*s/ Leila Kang*
Leila Kang, WSBA #48048

8

leila@nwirp.org

9

*s/ Glenda M. Aldana Madrid*
Glenda M. Aldana Madrid, WSBA #46987

10

glenda@nwirp.org

11

*s/ Aaron Korthuis*
Aaron Korthuis, WSBA #53974

12

aaron@nwirp.org

13

NORTHWEST IMMIGRANT
RIGHTS PROJECT

14

614 Second Avenue, Suite 400
Seattle, WA 98104

15

(206) 957-8611

16

*Attorneys for Individual Plaintiffs and Proposed*
*Class Members*

17

18

19

20

21

22

23

24

25

26

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

42

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# EXHIBIT A



PRESIDENTIAL ACTIONS

# PROTECTING THE MEANING AND VALUE OF AMERICAN CITIZENSHIP

EXECUTIVE ORDER

January 20, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Purpose.  The privilege of United States citizenship is a priceless and profound gift.  The Fourteenth Amendment states:  "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  That provision rightly repudiated the Supreme Court of the United States's shameful decision in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), which

misinterpreted the Constitution as permanently excluding people of African descent from eligibility for United States citizenship solely based on their race. But the Fourteenth Amendment has never been interpreted to extend citizenship universally to everyone born within the United States.  The Fourteenth Amendment has always excluded from birthright citizenship persons who were born in the United States but not "subject to the jurisdiction thereof."  Consistent with this understanding, the Congress has further specified through legislation that "a person born in the United States, and subject to the jurisdiction thereof" is a national and citizen of the United States at birth, 8 U.S.C. 1401, generally mirroring the Fourteenth Amendment's text. Among the categories of individuals born in the United States and not subject to the jurisdiction thereof, the privilege of United States citizenship does not automatically extend to persons born in the United States:  (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

Sec. 2.  Policy.  (a)  It is the policy of the United States that no department or agency of the United States government shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship, to persons:  (1) when that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States was lawful but temporary, and the

person's father was not a United States citizen or lawful permanent resident at the time of said person's birth.

(b)  Subsection (a) of this section shall apply only to persons who are born within the United States after 30 days from the date of this order.

(c)  Nothing in this order shall be construed to affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship.

Sec. 3.  Enforcement.  (a)  The Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security shall take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order.

(b)  The heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities.

Sec. 4.  Definitions.  As used in this order:

(a)  "Mother" means the immediate female biological progenitor.

(b)  "Father" means the immediate male biological progenitor.

Sec. 5.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against

the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

January 20, 2025.

News

Administration

Issues

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

THE WHITE HOUSE

WH.GOV

Copyright

Privacy

# EXHIBIT B

UNCLASSIFIED (U)

# 8 FAM 300
# U.S. CITIZENSHIP AND NATIONALITY

# 8 FAM 301
# U.S. CITIZENSHIP

# 8 FAM 301.1
# ACQUISITION BY BIRTH IN THE UNITED STATES

*(CT:CITZ-50;   01-21-2021)*
*(Office of Origin:  CA/PPT/S/A)*

## 8 FAM 301.1-1  INTRODUCTION

*(CT:CITZ-50;   01-21-2021)*

a. U.S. citizenship may be acquired either at birth or through naturalization subsequent to birth.  U.S. laws governing the acquisition of citizenship at birth embody two legal principles:

   (1) Jus soli (the law of the soil) - a rule of common law under which the place of a person's birth determines citizenship.  In addition to common law, this principle is embodied in the 14th Amendment to the U.S. Constitution and the various U.S. citizenship and nationality statutes; and

   (2) Jus sanguinis (the law of the bloodline) - a concept of Roman or civil law under which a person's citizenship is determined by the citizenship of one or both parents.  This rule, frequently called "citizenship by descent" or "derivative citizenship", is not embodied in the U.S. Constitution, but such citizenship is granted through statute.  As U.S. laws have changed, the requirements for conferring and retaining derivative citizenship have also changed.

b. National vs. citizen:  While most people and countries use the terms "citizenship" and "nationality" interchangeably, U.S. law differentiates between the two.  Under current law all U.S. citizens are also U.S. nationals, but not all

U.S. nationals are U.S. citizens.  The term "national of the United States", as defined by statute (INA 101 (a)(22) (8 U.S.C. 1101(a)(22)) includes all citizens of the United States, and other persons who owe allegiance to the United States but who have not been granted the privilege of citizenship:

(1) Nationals of the United States who are not citizens owe allegiance to the United States and are entitled to the consular protection of the United States when abroad, and to U.S. documentation, such as U.S. passports with appropriate endorsements.  They are not entitled to voting representation in Congress and, under most state laws, are not entitled to vote in Federal, State, or local elections except in their place of birth.  (See 7 FAM 012 and 7 FAM 1300 Appendix B Endorsement 09.);

(2) Historically, Congress, through statutes, granted U.S. non-citizen nationality to persons born or inhabiting territory acquired by the United States through conquest or treaty.  At one time or other natives and certain other residents of Puerto Rico, the U.S. Virgin Islands, the Philippines, Guam, and the Panama Canal Zone **were** U.S. non-citizen nationals.  (See 7 FAM 1120 and 7 FAM 1100 Appendix P.);

(3) Under current law, only persons born in American Samoa and Swains Island are U.S. non-citizen nationals (INA 101(a)(29) (8 U.S.C. 1101(a)(29) and INA 308(1) (8 U.S.C. 1408)).  (See 7 FAM 1125.); and

(4) See 7 FAM 1126 regarding the citizenship/nationality status of persons born on the Commonwealth of the Northern Mariana Islands (CNMI).

c. Naturalization – Acquisition of U.S. Citizenship Subsequent to Birth:  Naturalization is "the conferring of nationality of a State upon a person after birth, by any means whatsoever" (INA 101(a)(23) (8 U.S.C. 1101(a)(23)) or conferring of citizenship upon a person (see INA 310, 8 U.S.C. 1421 and INA 311, 8 U.S.C. 1422).  Naturalization can be granted automatically or pursuant to an application.  (See 7 FAM 1140.)

d. "Subject to the Jurisdiction of the United States":  All children born in and subject, at the time of birth, to the jurisdiction of the United States acquire U.S. citizenship at birth even if their parents were in the United States illegally at the time of birth:

(1) The U.S. Supreme Court examined at length the theories and legal precedents on which the U.S. citizenship laws are based in U.S. v. Wong Kim Ark, 169 U.S. 649 (1898).  In particular, the Court discussed the types of persons who are subject to U.S. jurisdiction.  The Court affirmed that a child born in the United States to Chinese parents acquired U.S. citizenship even though the parents were, at the time, racially ineligible for naturalization;

(2) The Court also concluded that:  "The 14th Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on

foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes.  The Amendment, in clear words and in manifest intent, includes the children born within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States."  Pursuant to this ruling:

(a)  Acquisition of U.S. citizenship generally is not affected by the fact that the parents may be in the United States temporarily or illegally; and that; and

(b)  A child born in an immigration detention center physically located in the United States is considered to have been born in the United States and be subject to its jurisdiction.  This is so even if the child's parents have not been legally admitted to the United States and, for immigration purposes, may be viewed as not being in the United States.

# 8 FAM 301.1-2  WHAT IS BIRTH "IN THE UNITED STATES"?

*(CT:CITZ-45;   12-09-2020)*

a. INA 101(a)(38) (8 U.S.C. 1101 (a)(38)) provides that "the term 'United States,' when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States."

b. On November 3, 1986, Public Law 94-241, "approving the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America", (Section 506(c)),took effect.  From that point on, the Northern Mariana Islands have been treated as part of the United States for the purposes of INA 301 (8 U.S.C. 1401) and INA 308 (8 U.S.C. 1408) (see 8 FAM 302.1)

c. The Nationality Act of 1940 (NA), Section 101(d) (54 Statutes at Large 1172) (effective January 13, 1941 until December 23, 1952) provided that "the term 'United States' when used in a geographical sense means the continental United States, Alaska, Hawaii, Puerto Rico, and the Virgin Islands of the United States."  The 1940 Act did not include Guam or the Northern Mariana Islands as coming within the definition of "United States."

> See the text of the 1940 Act on the Intranet, Acquisition of Citizenship, Legal and Regulatory Documents.

d. Prior to January 13, 1941, there was no statutory definition of "the United States" for citizenship purposes.  The phrase "in the United States" as used in Section 1993 of the Revised Statues of 1878 clearly includes states that have been admitted to the Union (see 8 FAM 102.2).

e. INA 304 (8 U.S.C. 1404) and INA 305 (8 U.S.C. 1405) provide a basis for citizenship of persons born in Alaska and Hawaii, respectively, while they were territories of the United States.

# 8 FAM 301.1-3  NOT INCLUDED IN THE MEANING OF "IN THE UNITED STATES"

*(CT:CITZ-1;   06-27-2018)*

a. Birth on U.S. Registered Vessel On High Seas or in the Exclusive Economic Zone:  A U.S.-registered or documented ship on the high seas or in the exclusive economic zone is not considered to be part of the United States.  Under the law of the sea, an Exclusive Economic Zone (EEZ) is a maritime zone over which a State has special rights over the exploration and use of natural resources.  The EEZ extends up to 200 nautical miles from the coastal baseline.  A child born on such a vessel does not acquire U.S. citizenship by reason of the place of birth (Lam Mow v. Nagle, 24 F.2d 316 (9th Cir., 1928)).

> **NOTE**:  This concept of allotting nations EEZs to give better control of maritime affairs outside territorial limits gained acceptance in the late 20th century and was given binding international recognition by the United Nations Convention on the Law of the Sea (UNCLOS) in 1982.
>
> Part V, Article 55 of the Convention states:
>
> Specific legal regime of the EEZ:
>
> The EEZ is an area beyond and adjacent to the territorial sea, subject to the specific legal regime established in this Part, under which the rights and jurisdiction of the coastal State and the rights and freedoms of other States are governed by the relevant provisions of this convention.

b. A U.S.-registered aircraft outside U.S. airspace is not considered to be part of U.S. territory.  A child born on such an aircraft outside U.S. airspace does not acquire U.S. citizenship by reason of the place of birth.

> **NOTE**:  The United States of America is not a party to the U.N. Convention on Reduction of Statelessness (1961).  Article 3 of the Convention does not apply to the United States.  Article 3 provides
>
> > "For the purpose of determining the obligations of Contracting States under this Convention, birth on a ship or in an aircraft shall be deemed to have taken place in the territory of the State whose flag the ship flies or in the territory of the State in which the aircraft is registered, as the case may be."
>
> This is a frequently asked question.

c.  Birth on U.S. military base outside of the United States or birth on U.S. embassy or consulate premises abroad:

   (1)  Despite widespread popular belief, U.S. military installations abroad and U.S. diplomatic or consular facilities abroad are not part of the United

States within the meaning of the 14th Amendment.  A child born on the premises of such a facility is not born in the United States and does not acquire U.S. citizenship by reason of birth;

(2) The status of diplomatic and consular premises arises from the rules of law relating to immunity from the prescriptive and enforcement jurisdiction of the receiving State; the premises are not part of the territory of the United States of America.  (See Restatement (Third) of Foreign Relations Law, Vol. 1, Sec. 466, Comment a and c (1987).  See also, Persinger v. Iran, 729 F.2d 835 (D.C. Cir. 1984).

d. Birth on foreign ships in foreign government non-commercial service:

(1) A child born on a foreign merchant ship or privately owned vessel in U.S. internal waters is considered as having been born subject to the jurisdiction of the United States.  (See U.S. v. Wong Kim Ark.); and

(2) Foreign warships, naval auxiliaries, and other vessels or aircraft owned or operated by a State and used for governmental non-commercial service are not subject to jurisdiction of the United States.  Persons born on such vessels while in U.S. internal waters (or, of course, anywhere else) do not acquire U.S. citizenship by virtue of place of birth.

e. Alien enemies during hostile occupation:

(1) If part of the United States were occupied by foreign armed forces against the wishes of the United States, children born to enemy aliens in the occupied areas would not be subject to U.S. jurisdiction and would not acquire U.S. citizenship at birth; and

(2) Children born to persons other than enemy aliens in an area temporarily occupied by hostile forces would acquire U.S. citizenship at birth because sovereignty would not have been transferred to the other country.  (See U.S. v. Wong Kim Ark.)

# 8 FAM 301.1-4  BIRTH IN U.S. INTERNAL WATERS AND TERRITORIAL SEA

*(CT:CITZ-50;  01-21-2021)*

a. Persons born on ships located within U.S. internal waters (except as provided in 8 FAM 301.1-3) are considered to have been born in the United States.  Such persons will acquire U.S. citizenship at birth if they are subject to the jurisdiction of the United States.  Internal waters include the ports, harbors, bays, and other enclosed areas of the sea along the U.S. coast.  As noted above, a child born on a foreign merchant ship or privately owned vessel in U.S. internal waters is considered as having been born subject to the jurisdiction of the United States.  (See U.S. v. Wong Kim Ark.)

b. Twelve Nautical Mile Limit:  The territorial sea of the United States was formerly three nautical miles.  (See, e.g., Cunard S.S. Co. v Mellon, 262 U.S. 100, 122, 43 S. Ct. 504, 67 L. Ed. 894 (1923).)  However, the three-mile rule

was changed by a Presidential Proclamation in 1988, implementing the territorial-sea provision of the 1982 U.N. Convention on the Law of the Sea. (Presidential Proclamation 5928, signed December 27, 1988, published at 54 Federal Register 777, January 9, 1989.)  As decreed by that Proclamation, the territorial sea of the United States henceforth extends to 12 nautical miles from the baselines of the United States determined in accordance with international law.  (The Proclamation also stated that the jurisdiction of the United States extends to the airspace over the territorial sea.)  (See Gordon, Immigration Law and Procedure, Part 8 Nationality and Citizenship, 92.03(2)(b) territorial limits.)

c.  FAM guidance up until 1995 (7 FAM 1116.1-2  In U.S. Waters TL:CON-64; 11-30-95) advised that persons born within the 3-mile limit of the U.S. territorial sea were born "within the United States" and could be documented as U.S. citizens if they were also born subject to U.S. jurisdiction.  Some commentators took this view as well, such as Gordon.  Analysis of this issue undertaken in 1994-1995 revealed, however, that there is a substantial legal question whether persons born outside the internal waters of the United States but within the territorial sea are in fact born "within the United States" for purposes of the 14th Amendment and the INA.

d. Cases involving persons born outside the internal waters but within the U.S. territorial sea, must be referred to AskPPTAdjudication@state.gov for coordination with L/CA, L/OES, and other appropriate offices within the United States government.

NOTE:  This is not a public-facing e-mail address and public inquiries will not be replied to.

# 8 FAM 301.1-5  WHAT IS BIRTH IN U.S. AIRSPACE?

(CT:CITZ-45;   12-09-2020)

a. Under international law, the limits of a country's sovereign airspace correspond with the extent of its territorial sea.  The outer limit of the territorial sea of the United States is 12 nautical miles from the coastline.  Airspace above the land territory, internal waters, and territorial sea is considered to be part of the United States (Presidential Proclamation 5928, signed December 27, 1988, published at 54 Federal Register 777, January 9, 1989).

b. Comments on the applicability of the 14th Amendment to vessels and planes, are found in Gordon, Immigration Law and Procedure, Part 8, Nationality and Citizenship, Chapter 92, 92.03 (New York:  Matthew Bender, 2007).  This volume states:

"The rules applicable to vessels obviously apply equally to airplanes.  Thus a child born on a plane in the United States or flying over its territory would acquire United States citizenship at birth."

c.  Under the 1944 Convention on International Civil Aviation, articles 17–21, all aircraft have the nationality of the State in which they are registered, and may not have multiple nationalities.  For births, the nationality law of the aircraft's "nationality" may be applicable, and for births that occur in flight while the aircraft is not within the territory or airspace of any State, it is the only applicable law that may be pertinent regarding acquisition of citizenship by place of birth.  However, if the aircraft is in, or flying over the territory of another State, that State may also have concurrent jurisdiction.

d. Cases of citizenship of persons born on planes in airspace above the United States land territory or internal waters may be adjudicated by passport specialists at domestic passport agencies and centers or consular officers at posts abroad in accordance with 8 FAM 301.1-6.

e. Cases of persons born on planes in airspace outside the 12 nautical mile limit would be adjudicated as a birth abroad under INA 301 (8 U.S.C. 1401) or INA 309 (8 U.S.C. 1409) as made applicable by INA 301(g).

f. Cases of persons born on a plane in airspace above the U.S. territorial sea (12 nautical mile limit) must be referred to AskPPTAdjudication@state.gov for consultation with L/CA.

# 8 FAM 301.1-6  DOCUMENTING BIRTH IN U.S. WATERS AND U.S. AIRSPACE

*(CT:CITZ-1;   06-27-2018)*

a. Proof of birth in U.S. internal waters or U.S. airspace consists of a U.S. birth certificate certified by the issuing authority in the U.S. jurisdiction.

b. There is no U.S. Federal law governing the report of such births.

c.  Generally speaking, U.S. Customs and Border Protection (CBP) would require some documentation of the birth, generally an excerpt of the ship's/aircraft's medical log or master/captain's log, reflecting the time, latitude, and longitude when the birth occurred.

d. For ships/aircraft in-bound for the United States, the parents would then be responsible for reporting the birth to the civil authorities in the U.S. jurisdiction where the vessel put into port.  (See the Centers for Disease Control and Prevention (CDC) publication "Where to Write for Birth Certificates.")

(1)  The parents will have to contact the state vital records office to determine the exact procedures for report such a birth;

(2)  Parents should obtain a certified copy of the ship's medical log, airplane's log, or other statement from the attending physician or other attendant and attempt to obtain information on how to contact attendants in the future should further questions arise;

(3) If the mother and child were immediately taken to a U.S. hospital, authorities there may be of assistance in facilitating contact with the appropriate state authorities; and

(4) It is unlikely that the vital records office in the parents' state of residence will issue such a birth certificate.  Parents may be redirected to the vital records office in the state where the ship first put into port after the birth of the child.

# 8 FAM 301.1-7  NATIVE AMERICANS AND ESKIMOS

*(CT:CITZ-1;   06-27-2018)*

a. Before U.S. v. Wong Kim Ark, the only occasion on which the Supreme Court had considered the meaning of the 14th Amendment's phrase "subject to the jurisdiction" of the United States was in Elk v. Wilkins, 112 U.S. 94 (1884).  That case hinged on whether a Native American who severed ties with the tribe and lived among whites was a U.S. citizen and entitled to vote.  The Court held that the plaintiff had been born subject to tribal rather than U.S. jurisdiction and could not become a U.S. citizen merely by leaving the tribe and moving within the jurisdiction of the United States.  The Court stated that:  "The Indian tribes, being within the territorial limits of the United States, were not, strictly speaking, foreign States; but they were alien nations, distinct political communities, with whom the United States might and habitually did deal through treaties or acts of Congress.  They were never deemed citizens of the United States except under explicit provisions of treaty or statute to that effect, either declaring a certain tribe, or such members of it as chose to remain behind on the removal of the tribe westward, to be citizens, or authorizing individuals of particular tribes to become citizens upon application for naturalization."

b. The Act of June 2, 1924 was the first comprehensive law relating to the citizenship of Native Americans.  It provided:  That all non-citizen Indians born within the territorial limits of the United States be, and they are hereby, declared to be citizens of the United States:  Provided, That the granting of such citizenship shall not in any manner impair or otherwise affect the right of any Indian to tribal or other property.

c. Section 201(b) NA, effective January 13, 1941, declared that persons born in the United States to members of an Indian, Eskimo, Aleutian, or other aboriginal tribe were nationals and citizens of the United States at birth.

d. INA 301(b) (8 U.S.C. 1401(b)) (formerly INA 301(a)(2)), in effect from December 24, 1952, restates this provision.

# 8 FAM 301.1-8  FOUNDLINGS

*(CT:CITZ-1;  06-27-2018)*

a. Under INA 301(f) (8 U.S.C. 1401(f)) (formerly Section 301(a)(6)) INA), a child of unknown parents is conclusively presumed to be a U.S. citizen if found in the United States when under 5 years of age, unless foreign birth is established before the child reaches age 21.

b. Under Section 201(f) of the Nationality Act of 1940, a child of unknown parents, found in the United States, was presumed to have been a U.S. citizen at birth until shown not to have been born in the United States no matter at what age this might have been demonstrated.

**UNCLASSIFIED (U)**

# EXHIBIT C



U.S. Department of State

OMB Control No. 1405-0004
Expiration Date: 04-30-2025
Estimated Burden: 85 Minutes

# APPLICATION FOR A U.S. PASSPORT

**Please read all instructions first and type or print in black ink to complete this form.**
For information or questions, visit travel.state.gov or contact the National Passport Information Center (NPIC) at
1-877-487-2778  (TDD/TTY: 1-888-874-7793) or NPIC@state.gov**.**

## SECTION A. ELIGIBILITY TO USE THIS FORM

This form is used to apply for a U.S. passport book and/or card **in person** at an acceptance facility, a passport agency (by appointment only), or a U.S. embassy, consulate, or consular agency (if abroad). The U.S. passport is a travel document attesting to one's identity and issued to U.S. citizens or non-citizen U.S. nationals. To be eligible to use this form you must **apply in person** if at least one of the following is true:

✓  I am applying for my first U.S. passport
✓  I am under age 16

✓  My previous U.S. passport was either: a) issued under age 16;
   b) issued more than 15 years ago; c) lost, stolen, or damaged

**If none of the above statements apply to you, then you may be eligible to apply using form DS-82 or DS-5504 depending on your circumstances. Visit travel.state.gov for more information.**

- **Notice to Applicants Under Age 16:** You must appear in person to apply for a U.S. passport with your parent(s) or legal guardian(s). See Section D of these instructions or travel.state.gov for more details.
- **Notice to Applicants Ages 16 and 17:** At least one of your parent(s) or legal guardian(s) must know that you are applying for a U.S. passport. See Section D of these instructions or travel.state.gov for more details.
- **Notice to Applicants for No-Fee Regular, Service, Official, or Diplomatic Passports:** You may use this application if you meet all provisions listed; however, you must consult your sponsoring agency for instructions on proper routing procedures before forwarding this application. Your completed passport will be released to your sponsoring agency and forwarded to you.

## SECTION B. STEPS TO APPLY FOR A U.S. PASSPORT

1. Complete this form (Do not sign until requested to do so by an authorized agent).
2. Attach one color photograph 2x2 inches in size and supporting documents (See Section D of these instructions).
3. Schedule appointment to apply in person by visiting our website or calling NPIC (see contact info at the top page).
4. Arrive for appointment and present completed form and attachments to the authorized agent who will administer the oath, witness you signing your form, and collect your passport fee.
5. Track application status online at Passportstatus.state.gov.
6. Receive new passport and original supporting documents (that you submitted with your application).

## SECTION C. HOW TO COMPLETE THIS FORM

Please see the instructions below for items on the form that are not self-explanatory. The numbers match the numbered items of the form.

1. **Name (Last, First, Middle)**: Enter the name to appear in the passport. The name to appear in the passport should be consistent with your proof of citizenship and identification. If you have changed your name and are not eligible to use a DS-82 or DS-5504, you must use this form. Visit travel.state.gov/namechange for more information.

2. **Date of Birth**: Use the following format: Month, Date, and Year (MM/DD/YYYY).

3. **Gender**: The gender markers used are "M" (male), "F" (female) and "X" (unspecified or another gender identity). The gender marker that you check on this form will appear in your passport regardless of the gender marker(s) on your previous passport and/or your supporting evidence of citizenship and identity. If changing your gender marker from what was printed on your previous passport, select "Yes" in this field on Application Page 1. If no gender marker is selected, we may print the gender as listed on your supporting evidence or contact you for more information. **Please Note:** We cannot guarantee that other countries you visit or travel through will recognize the gender marker on your passport. Visit travel.state.gov/gender for more information.

4. **Place of Birth**: Enter the name of the city and state if in the U.S. or city and country as presently known.

5. **Social Security Number**: You must provide a Social Security number (SSN), if you have been issued one, in accordance with Section 6039E of the Internal Revenue Code (26 U.S.C. 6039E) and 22 U.S.C 2714a(f). If you do not have a Social Security number, you must enter zeros in this field and submit a statement, signed, and dated, that includes the phrase, "*I declare under penalty of perjury under the laws of the United States of America that the following is true and correct:  I have never been issued a Social Security Number by the Social Security Administration.*" If you reside abroad, you must also provide the name of the foreign country where you reside. The U.S. Department of State must provide your SSN and foreign residence information to the U.S. Department of the Treasury which will use it in connection with debt collection and check against lists of persons ineligible or potentially ineligible to receive a U.S. passport, among other authorized uses. If you fail to provide the information, we may deny your application and the Internal Revenue Service (IRS) may enforce a penalty. Refer all questions on this matter to the nearest IRS office.

| 6. **Email:** By providing your email you are consenting to us communicating with you by email about your application. | 7. **Primary Contact Phone Number:** If providing a mobile/cell phone number you are consenting to receive calls and/or text messaging about your application. |
| --- | --- |

8. **Mailing Address Line 1 and 2 "In Care Of"**: For line 1 enter applicant's Street/RFD #, or P.O. Box or URB. For line 2, if you do not live at the address listed in this field, put the name of the person who lives at this address and mark it "In Care Of". **If the applicant is a minor child, you must include the "In Care Of" name of the parent or adult registered to receive mail at this address.**

9. List all other names you have used: Enter all legal names previously used to include maiden name, name changes, and previous married names. You can enter up to two names one in item A and one in item B. If only your last name has changed just enter your last name. If you need more space to write additional names, please use a separate piece of paper and attach it to this form.

⚠ **Blue Section Application Page 1 - Identifying Documents and Signature Blocks: Skip this section and complete Application Page 2.**
**Do not sign this form until requested to do so by the authorized agent who will administer the oath to you.**

DS-11 04-2022

Instruction Page 1 of 4

U.S. Department of State

# APPLICATION FOR A U.S. PASSPORT

| SECTION D. ATTACHMENTS TO SUBMIT WITH THIS FORM |
|---|
| Once you have completed Application Pages 1 and 2, attach the supporting documents as outlined in this section. |

1.   **PROOF OF U.S. CITIZENSHIP** Information can be found on travel.state.gov/citizenship.

### Applicants Born in the United States

Your evidence will be returned to you if it is not damaged, altered, or forged. Submit an original or certified copy and a photocopy of the front and back if there is printed information on the back, of one of the following documents:

- U.S. Birth Certificate that meets all the following requirements:
  o Issued by the city, county, or state of birth
  o Lists your full name, birthdate, and birthplace
  o Lists your parent(s)' full names
  o Lists date filed with registrar's office (must be within one year of birth)
  o Shows registrar's signature and the seal of the issuing authority
- Fully valid, undamaged U.S. passport (may be expired)
- Consular Report of Birth Abroad or Certification of Birth Abroad
- Certificate of Naturalization or Citizenship

- Secondary documents may be submitted if the U.S. birth certificate was filed more than one year after your birth *or* if no birth record exists. For no birth record on file, submit a registrar's letter to that effect. For both scenarios, submit a combination of the evidence listed below, with your first and last name, birthdate and/or birthplace, the seal or other certification of the office (if customary), and the signature of the issuing official.
  o A hospital birth record
  o An early baptismal or circumcision certificate
  o Early census, school, medical, or family Bible records
  o Insurance files or published birth announcements (such as a newspaper article)
  o Notarized affidavits (or DS-10, Birth Affidavit) of older blood relatives having knowledge of your birth may be submitted in addition to some of the records listed above.

### Applicants Born Outside the United States

If we determine that you are a U.S. citizen, your lawful permanent resident card submitted with this application will be forwarded to U.S. Citizenship and Immigration Services.

- Claiming Citizenship through Naturalization of One or Both Parent(s), submit all the following:
  o Your parent(s) Certificate(s) of Naturalization
  o Your parents' marriage certificate and/or evidence that you were in the legal and physical custody of your U.S. citizen parent, if applicable
  o Your foreign birth certificate (and official translation if the document is not in English)
  o Your evidence of admission to the United States for legal permanent residence and proof you subsequently resided in the United States

- Claiming Citizenship through Birth Abroad to At Least One U.S. Citizen Parent, submit all the following:
  o Your Consular Report of Birth Abroad (Form FS-240), Certification of Birth (Form DS-1350 or FS-545), or your foreign birth certificate (and official translation if the document is not in English)
  o Your parent's proof of U.S. citizenship
  o Your parents' marriage certificate
  o Affidavit showing all your U.S. citizen parents' periods and places of residence and physical presence before your birth (DS-5507)

- Claiming Citizenship Through Adoption by a U.S. Citizen Parent(s), *if your birthdate is on or after October 5, 1978*, submit evidence of all the following:
  o Your permanent residence status
  o Your full and final adoption
  o You were in the legal and physical custody of your U.S. citizen parent(s)
  o You have resided in the United States

2.   **PROOF OF IDENTITY** Information can be found at travel.state.gov/identification.

Present your original identification and submit a front and back photocopy with this form. It must show a photograph that is a good likeness of you. Examples include:

- Driver's license (not temporary or learner's permit)
- Previous or current U.S. passport book/card
- Military identification

- Federal, state, or city government employee identification
- Certificate of Naturalization or Citizenship

3.   **A RECENT COLOR PHOTOGRAPH** See the full list of photo requirements on travel.state.gov/photos.

Attach one photo, 2x2 inches in size. U.S. passport photo requirements may differ from photo requirements of other countries. To avoid processing delays, be sure your photo meets all the following requirements (Refer to the photo template on Application Page 1):

- Taken less than six months ago
- Head must be 1-1 3/8 inches from the bottom of the chin to the top of the head
- Head must face the camera directly with full face in view

- No eyeglasses and head covering and no uniforms*
- Printed on matte or glossy photo quality paper
- Use a plain white or off-white background

*Head coverings are not acceptable unless you submit a signed statement verifying that it is part of recognized, traditional religious attire that is customarily or required to be worn continuously in public or a signed doctor's statement verifying its daily use for medical purposes. Glasses or other eyewear are not acceptable unless you submit a signed statement from a doctor explaining why you cannot remove them (e.g., during the recovery period from eye surgery). Photos are to be taken in clothing normally worn on a daily basis. You cannot wear a uniform, clothing that looks like a uniform, or camouflage attire.



# APPLICATION FOR A U.S. PASSPORT

## 4. PROOF OF PARENTAL RELATIONSHIP *(FOR APPLICANTS UNDER AGE 16)*

Parents/guardians must appear in person with the child and submit the following:

- Evidence of the child's relationship to parents/guardian(s) (Example: a birth certificate or Consular Report of Birth Abroad listing the names of the parent(s)/guardian(s) and child)
- Original parental/guardian government-issued photo identification and a photocopy of the front and back (to satisfy proof of identity)

If only one parent/guardian can appear in person with the child, you must also submit one of the following:

- The second parent's notarized written statement or DS-3053 (including the child's full name and date of birth) consenting to the passport issuance for the child. The notarized statement <u>cannot</u> be more than three months old, <u>must</u> be signed and notarized on the same day, and <u>must</u> come with a front and back photocopy of the second parent's government-issued photo identification.
- The second parent's death certificate (if second parent is deceased)
- Evidence of sole authority to apply (Example: a court order granting sole legal custody or a birth certificate listing only one parent)
- A written statement (made under penalty of perjury) or DS-5525 explaining, in detail, why the second parent cannot be reached

*OR*

## PROOF OF PARENTAL AWARENESS *(FOR APPLICANTS AGES 16 AND 17)*

We may request the consent of one legal parent/legal guardian to issue a U.S. passport to you. In many cases, the passport authorizing officer may be able to ascertain parental awareness of the application by virtue of the parent's presence when the minor submits the application or a signed note from the parent or proof the parent is paying the application fees. However, the passport authorizing officer retains discretion to request the legal parent's/legal guardian's notarized statement of consent to issuance (e.g., on Form DS-3053).

## 5. FEES
Passport service fees are established by law and regulation (see 22 U.S.C. 214, 22 C.F.R. 22.1, and 22 C.F.R. 51.50-56) and are collected at the time you apply for the passport service. By law, the passport fees are **non-refundable**. Visit travel.state.gov/passportfees for current fees and how fees are used and processed. Payment methods are as follows:

| Applicant Applying in the United States At Acceptance Facility | Applicant Applying at a Passport Agency or Outside the United States |
|---|---|
| - Passport fees must be made by check (personal, certified, cashier's, travelers) or money order (U.S. Postal, international, currency exchange) with the applicant's full name and date of birth printed on the front and payable to "U.S. Department of State." <br> - The execution fee **must be paid separately** and made payable to the acceptance facility in the form that they accept. | - We accept checks (personal, certified, cashier's, travelers); major credit cards (Visa, Master Card, American Express, Discover); money orders (U.S. Postal, international, currency exchange); or exact cash (no change provided). Make all fees payable to the "U.S. Department of State." <br> - <u>If applying outside the United States</u>: Please see the website of your embassy, consulate, or consular agency for acceptable payment methods. |

**Other Services Requiring Additional Fee** (Visit travel.state.gov for more details)**:**

- **Expedite Service:** Only available for passports mailed in the United States and Canada.
- **1-2 Day Delivery:** Only available for passport book (and not passport card) mailings in the United States.
- **Verification of a previous U.S. Passport or Consular Report of Birth Abroad:** Upon your request, we verify previously issued U.S. passport or Consular Report of Birth Abroad if you are unable to submit evidence of U.S. citizenship.
- **Special Issuance Passports:** If you apply for a no-fee regular, service, official, or diplomatic passport at a designated acceptance facility, you must pay the execution fee. No other fees are charged when you apply.

## SECTION E. HOW TO SUBMIT THIS FORM

Submitting your form depends on your location and how soon you need your passport.

- **Applicant Located Inside the United States:** For the latest information regarding processing times, scheduling appointments, and nearest designated acceptance facilities visit travel.state.gov or contact NPIC.

- **Applicant Located Outside the United States:** In most countries, you must apply in person at a U.S. embassy or consulate for all passport services. Each U.S. embassy and consulate has different procedures for submitting and processing your application. Visit travel.state.gov to check the U.S. embassy or consulate webpage for more information.

## SECTION F. RECEIVING YOUR PASSPORT AND SUPPORTING DOCUMENTS

- **Difference Between U.S. Passport Book and Card:** The book is valid for international travel by air, land, and sea. The card is not valid for international air travel, only for entry at land border crossings and seaports of entry when traveling from Canada, Mexico, Bermuda, and the Caribbean. The maximum number of letters provided for your given name (first and middle) on the card is 24 characters. If both your given names are more than 24 characters, you must shorten one of your given names you list on item #1 of Application Page 1.
- **Separate mailings:** You may receive your newly issued U.S. passport book and/or card and your citizenship evidence <u>in two separate mailings</u>. If you are applying for both a book and card, <u>you may receive three separate mailings</u>: one with your returned evidence, one with your newly issued book, and one with your newly issued card. **All documentary evidence that is not damaged, altered, or forged will be returned to you.** Photocopies will not be returned.
- **Passport numbers:** Each newly issued passport book or card will have a different passport number than your previous one.
- **Shipping and Delivery Changes:** If your mailing address changes prior to receipt of your new passport, please contact NPIC. **NOTE:** We will not mail a U.S. passport to a private address outside the United States or Canada.
- **Passport Corrections, Non-Receipt/Undeliverable Passports, and Lost/Stolen Passport:** For more information visit travel.state.gov or contact NPIC.

 U.S. Department of State

# APPLICATION FOR A U.S. PASSPORT

| WARNING |
| --- |
| False statements made knowingly and willfully in passport applications, including affidavits or other documents submitted to support this application, are punishable by fine and/or imprisonment under U.S. law including the provisions of 18 U.S.C. 1001, 18 U.S.C. 1542, and/or 18 U.S.C. 1621. Alteration or mutilation of a passport issued pursuant to this application is punishable by fine and/or imprisonment under the provisions of 18 U.S.C. 1543. The use of a passport in violation of the restrictions contained herein or of passport regulations is punishable by fine and/or imprisonment under 18 U.S.C. 1544. All statements and documents are subject to verification.<br><br>**Failure to provide information requested on this form, including your Social Security number, may result in significant processing delays and/or the denial of your application.** |

| ACTS OR CONDITIONS |
| --- |
| If any of the below-mentioned acts or conditions have been performed by or apply to the applicant, a supplementary explanatory statement under oath (or affirmation) by the applicant should be attached and made a part of this application.<br><br>*I have not been convicted of a federal or state drug offense or convicted of a statutory "sex tourism" crime, and I am not the subject of an outstanding federal, state, or local warrant of arrest for a felony; a criminal court order forbidding my departure from the United States; or a subpoena received from the United States in a matter involving federal prosecution for, or grand jury investigation of, a felony.* |

| PRIVACY ACT STATEMENT |
| --- |
| **AUTHORITIES:** Collection of this information is authorized by 22 U.S.C. 211 a et seq.; 8 U.S.C. 1104; 26 U.S.C. 6039E, 22 U.S.C. 2714a(f), Section 236 of the Admiral James W. Nance and Meg Donovan Foreign Relations Authorization Act, Fiscal Years 2000 and 2001; Executive Order 11295 (August 5, 1966); and 22 C.F.R. parts 50 and 51.<br><br>**PURPOSE:** We are requesting this information in order to determine your eligibility to be issued a U.S. passport. Your Social Security number is used to verify your identity.<br><br>**ROUTINE USES:** This information may be disclosed to another domestic government agency, a private contractor, a foreign government agency, or to a private person or private employer in accordance with certain approved routine uses. These routine uses include, but are not limited to, law enforcement activities, employment verification, fraud prevention, border security, counterterrorism, litigation activities, and activities that meet the Secretary of State's responsibility to protect U.S. citizens and non-citizen nationals abroad. Your Social Security number will be provided to the U.S. Department of the Treasury and may be used in connection with debt collection, among other purposes authorized and generally described in this section. More information on the routine uses for the system can be found in System of Records Notices State-05, Overseas Citizen Services Records and Other Overseas Records and State-26, Passport Records.<br><br>**DISCLOSURE:** Providing information on this form is voluntary. Be advised, however, that failure to provide the information requested on this form may cause delays in processing your U.S. passport application and/or could also result in the refusal or denial of your application. Failure to provide your Social Security number may result in the denial of your application (consistent with 22 U.S.C. 2714a(f)) and may subject you to penalty enforced by the Internal Revenue Service, as described in the Federal Tax Law on Instruction Page 1 (Section C) to this form. |

| PAPERWORK REDUCTION ACT STATEMENT |
| --- |
| Public reporting burden for this collection of information is estimated to average 85 minutes per response, including the time required for searching existing data sources, gathering the necessary data, providing the information and/or documents required, and reviewing the final collection. You do not have to supply this information unless this collection displays a currently valid OMB control number. If you have comments on the accuracy of this burden estimate and/or recommendations for reducing it, please send them to: Passport Forms Officer, U.S. Department of State, Bureau of Consular Affairs, Passport Services, Office of Program Management and Operational Support, 44132 Mercure Cir, PO Box 1199, Sterling, Virginia 20166-1199. |

**For more information about your application status, online tools, current fees, and processing times, please visit <u>travel.state.gov</u>.**

U.S. Department of State

OMB Control No. 1405-0004
Expiration Date: 04/30/2025
Estimated Burden: 85 Minutes

# APPLICATION FOR A U.S. PASSPORT

*Use **black ink** only. If you make an error, complete a new form. Do not correct.*

**Select document(s) for which you are submitting fees:**

☐ U.S. Passport Book    ☐ U.S. Passport Card    ☐ Both
The U.S. passport card is **not** valid for international air travel. See Instruction Page 3
☐ Regular Book (Standard)    ☐ Large Book (Non-Standard)
The large book is for frequent international travelers who need more visa pages.

**1. Name** Last

☐ D  ☐ O  ☐ S  ☐ NFR
End. # _____    Exp. _____

First                                              Middle

**2. Date of Birth** *(mm/dd/yyyy)*    **3. Gender (Read Instruction Page 1)**    **4. Place of Birth** *(City & State if in the U.S. or City & Country as it is presently known.)*
M   F   X   Changing gender marker?
Yes

**5. Social Security Number**    **6. Email** *(See application status at passportstatus.state.gov)*    **7. Primary Contact Phone Number**

**8. Mailing Address Line 1:** Street/RFD#, P.O. Box, or URB

**Address Line 2:** *(Include Apartment, Suite, etc. If applicant is a child, write "In Care Of" of the parent. Example: In Care Of - Jane Doe)*

**City**                          **State**    **Zip Code**    **Country,** *(if outside the United States)*

**9. List all other names you have used.** *(Examples: Birth Name, Maiden, Previous Marriage, Legal Name Change. Attach additional pages if needed.)*
A.                                              B.

## STOP! CONTINUE TO PAGE 2 ➡
### DO NOT SIGN APPLICATION UNTIL REQUESTED TO DO SO BY AUTHORIZED AGENT

STAPLE    STAPLE
2" X 2"    2" X 2"
FROM 1" TO 1 3/8"
STAPLE    STAPLE

Attach a color photograph
taken within the last six months

☐ Acceptance Agent    ☐ (Vice) Consul USA
☐ Passport Staff Agent

(Seal)

**Identifying Documents - Applicant or Mother/Father/Parent/Legal Guardian on Second Signature Line (if identifying minor)**
☐ Driver's License    ☐ State Issued ID Card    ☐ Passport    ☐ Military    ☐ Other
Name
Issue Date *(mm/dd/yyyy)*    Exp. Date *(mm/dd/yyyy)*    State of Issuance
ID No    Country of Issuance

**Identifying Documents - Applicant or Mother/Father/Parent/Legal Guardian on Third Signature Line (if identifying minor)**
☐ Driver's License    ☐ State Issued ID Card    ☐ Passport    ☐ Military    ☐ Other
Name
Issue Date *(mm/dd/yyyy)*    Exp. Date *(mm/dd/yyyy)*    State of Issuance
ID No    Country of Issuance

I declare under penalty of perjury all of the following: 1) I am a citizen or non-citizen national of the United States and have not performed any of the acts listed under "Acts or Conditions" on page 4 of the instructions of this application (unless explanatory statement is attached); 2) the statements made on the application are true and correct; 3) I have not knowingly and willfully made false statements or included false documents in support of this application; 4) the photograph attached to this application is a genuine, current photograph of me; and 5) I have read and understood the warning on page 4 of the instructions to the application form.

_____
Signature of person authorized to accept applications

*By signing this form, I certify that I have provided the verbal oath and witnessed the applicant's/legal guardian's signature.*

Date _____

Agent ID Number _____

Facility ID Number _____

_____
Print Facility Name/Location

_____
Name of courier company *(if applicable)*

x _____
**Applicant's Legal Signature - age 16 and older**

x _____
**Mother/Father/Parent/Legal Guardian's Signature** (if identifying minor)

x _____
**Mother/Father/Parent/Legal Guardian's Signature** (if identifying minor)

For Issuing Office Only ── Bk _____ Card _____ EF _____ Postage _____ Execution _____ Other _____

**DS 11 C 03 2022 1**

**Name of Applicant** (Last, First, & Middle)

**Date of Birth** (mm/dd/yyyy)

**10. Parental Information**

Mother/Father/Parent - First & Middle Name (at Parent's Birth)

Last Name (at Parent's Birth)

Date of Birth (mm/dd/yyyy)

Place of Birth (City & State if in the U.S. or City & Country as it is presently known)

Gender
- M
- F
- X

U.S. Citizen?
- Yes
- No

Mother/Father/Parent - First & Middle Name (at Parent's Birth)

Last Name (at Parent's Birth)

Date of Birth (mm/dd/yyyy)

Place of Birth (City & State if in the U.S. or City & Country as it is presently known)

Gender
- M
- F
- X

U.S. Citizen?
- Yes
- No

**11. Have you ever been married?** ☐ Yes ☐ No   *If yes, complete the remaining items in #11.*

Full Name of Current Spouse or Most Recent Spouse (Last, First & Middle)

Date of Birth (mm/dd/yyyy)

Place of Birth

U.S. Citizen? ☐ Yes ☐ No   Date of Marriage (mm/dd/yyyy)

Have you ever been widowed or divorced? ☐ Yes ☐ No   Widow/Divorce Date (mm/dd/yyyy)

**12. Additional Contact Phone Number** ☐ Home ☐ Work ☐ Cell

**13. Occupation** (if age 16 or older)

**14. Employer or School** (if applicable)

**15. Height**

**16. Hair Color**

**17. Eye Color**

**18. Travel Plans** (If no travel plans, please write "none")

Departure Date (mm/dd/yyyy)   Return Date (mm/dd/yyyy)   Countries to be Visited

**19. Permanent Address** (Complete if P.O. Box is listed under Mailing Address or if residence is different from Mailing Address. **Do not list a P.O. Box.**)

Street/RFD # or URB

Apartment/Unit

City

State

Zip Code

**20. Your Emergency Contact** (Provide the information of a person not traveling with you to be contacted in the event of an emergency.)

Name

Address: Street/RFD # or P.O. Box

Apartment/Unit

City

State

Zip Code

Phone Number

Relationship

**21. Have you ever applied for or been issued a U.S. Passport Book or Passport Card?** ☐ Yes ☐ No   *If yes, complete the remaining items in #21.*

Name as printed on your most recent passport book

Most recent passport book number

Most recent passport book issue date (mm/dd/yyyy)

Status of your most recent passport book: ☐ Submitting with application ☐ Stolen ☐ Lost ☐ In my possession (if expired)

Name as printed on your most recent passport card

Most recent passport card number

Most recent passport card issue date (mm/dd/yyyy)

Status of your most recent passport card: ☐ Submitting with application ☐ Stolen ☐ Lost ☐ In my possession (if expired)

## PLEASE DO NOT WRITE BELOW THIS LINE - FOR ISSUING OFFICE ONLY

Name as it appears on citizenship evidence

☐ Birth Certificate   SR   CR   City   Filed:   Issued:   ☐ Sole Parent

☐ Nat. / Citz. Cert.   USCIS   USDC   Date/Place Acquired:   A#

☐ Report of Birth   Filed/Place:

☐ Passport   C/R   S/R   See #21   #/DOI:

☐ Other:

☐ Attached:

☐ P/C of Citz ☐ P/C of ID ☐ DS-71 ☐ DS-3053 ☐ DS-64 ☐ DS-5520 ☐ DS-5525 ☐ PAW ☐ NPIC ☐ IRL ☐ Citz W/S

DS 11 C 03 2022 2

DS-11 04-2022

# EXHIBIT D



# I am a U.S. citizen

A4

## How do I get proof of my U.S. citizenship?



U.S. Citizenship
and Immigration
Services

**If you were born in the United States**, you do not need to apply to USCIS for any evidence of citizenship. Your birth certificate issued where you were born is proof of your citizenship.[1]

**If you were born outside the United States, but one or both of your parents were U.S. citizens when you were born**, you may still be a U.S. citizen. This is called citizenship through derivation. There are usually additional specific requirements, and sometimes citizenship can be through a combination of a parent and grandparent.

### What documents are usually accepted as proof of U.S. citizenship?

The most common documents that establish U.S. citizenship are:

- **Birth Certificate,** issued by a U.S. State (if the person was born in the United States), or by the U.S. Department of State (if the person was born abroad to U.S. citizen parents who registered the child's birth and U.S. citizenship with the U.S. Embassy or consulate);

- **U.S. Passport,** issued by the U.S. Department of State;

- **Certificate of Citizenship,** issued to a person born outside the United States who derived or acquired U.S. citizenship through a U.S. citizen parent; or

- **Naturalization Certificate,** issued to a person who became a U.S. citizen after 18 years of age through the naturalization process.

### I was born in the United States. Where can I get a copy of my birth certificate?

Check with the Department of Health (Vital Records) in the U.S. State in which you were born. For more information, visit the National Center for Health Statistics web page at **www.cdc.gov/nchs/births.htm**.

### I am a U.S. citizen. My child will be born abroad or recently was born abroad. How do I register his or her birth and U.S. citizenship?

Please contact the U.S. Department of State or the U.S. Embassy or consulate in the country where your child will be born for more information about eligibility requirements and how to register your child's U.S. citizenship.

### I was born overseas. My birth and U.S. citizenship were registered with the U.S. Embassy or consulate. I need a copy of the evidence of my citizenship. Whom should I contact?

Contact the U.S. Department of State. For more information, please see their Web site at **www.state.gov**.

### I was born overseas. I believe I was a U.S. citizen at birth because one or both my parents were U.S. citizens when I was born. But my birth and citizenship were not registered with the U.S. Embassy when I was born. Can I apply to have my citizenship recognized?

Whether or not someone born outside the United States to a U.S. citizen parent is a U.S. citizen depends on the law in effect when the person was born. These laws have changed over the years, but usually require a combination of the parent being a U.S. citizen when the child was born, and the parent having lived in the United States or its possessions for a specific period of time. Derivative citizenship can be quite complex and may require careful legal analysis.

### I was born overseas. One of my parents was a U.S. citizen but never lived in the United States. One of my grandparents was also a U.S. citizen. Could I have derived U.S. citizenship?

If your parent was a U.S. citizen when you were born but had not lived in the United States for the required amount of time before your birth, but one of your grandparents was also a U.S. citizen and had already met the residence requirements, then you may still

---

[1]An exception to this rule exists regarding children born in the United States to foreign diplomats.

A4—I am a U.S. citizen…How do I get proof of my U.S. citizenship?
M–560B (October 2013) N

1

have derived U.S. citizenship. The provisions of immigration law that govern derivative citizenship are quite precise and circumstances in individual cases can be complex. For specific information on how the law applies, please check our Web site at **www.uscis.gov**, or the U.S. Department of State Web site at **www.state.gov,** or call USCIS Customer Service at **1-800-375-5283**.

### I was born overseas. After I was born, my parent(s) became naturalized U.S. citizens. Could I have derived U.S. citizenship?

If **one** of your parents naturalized after February 27, 2001, and you were a permanent resident and under 18 years old at the time, then you may have automatically acquired U.S. citizenship. Before that date, you may have automatically acquired U.S. citizenship if you were a permanent resident and under 18 years old when **both** parents naturalized, or if you had only **one** parent when that parent naturalized.

However, if your parent(s) naturalized after you were 18, then you will need to apply for naturalization on your own after you have been a permanent resident for at least 5 years.

### How do I apply to have my citizenship recognized?

You have two options:

- You can apply to the U.S. Department of State for a U.S. passport. A passport is evidence of citizenship and also serves as a travel document if you need to travel. For information about applying for a U.S. passport, see the U.S. Department of State Web site at **www.state.gov**.
- If you are already in the United States, you also have the option of applying to USCIS using **Form N-600,** Application for Certificate of Citizenship. However, you may find applying for a passport to be more convenient because it also serves as a travel document and could be a faster process.

### How do I replace a lost, stolen, or destroyed Naturalization Certificate or Certificate of Citizenship?

To apply to replace your Naturalization Certificate or Certificate of Citizenship issued by USCIS or by the U.S. Immigration and Naturalization Service, file a **Form N-565,** Application for Replacement Naturalization Citizenship Document. Filing instructions and forms are available on our Web site at **www.uscis.gov**.

## Key Information

| Key USCIS forms referenced in this guide | Form # |
|---|---|
| Application for Certificate of Citizenship | N-600 |
| Application for Replacement Naturalization Citizenship Document | N-565 |

| Other U.S. Government Services–Click or Call | | |
|---|---|---|
| General Information | www.usa.gov | 1-800-333-4636 |
| New Immigrants | www.welcometoUSA.gov | |
| U.S. Dept. of State | www.state.gov | 1-202-647-6575 |
| National Center for Health Statistics | www.cdc.gov | 1-800-311-3435 |
| | www.cdc.gov/nchs /birth.htm | |

For more copies of this guide, or information about other customer guides, please visit **www.uscis.gov/howdoi**.

You can also visit **www.uscis.gov** to download forms, e-file some applications, check the status of an application, and more. It's a great place to start!

If you don't have Internet access at home or work, try your local library.

If you cannot find what you need, please call **Customer Service at: 1-800-375-5283** *Hearing Impaired TDD Customer Service: 1-800-767-1833*

**Disclaimer:** *This guide provides basic information to help you become generally familiar with our rules and procedures. For more information, or the law and regulations, please visit our Web site. Immigration law can be complex, and it is impossible to describe every aspect of every process. You may wish to be represented by a licensed attorney or by a nonprofit agency accredited by the Board of Immigration Appeals.*

A4—I am a U.S. citizen…How do I get proof of my U.S. citizenship?
M-560B (October 2013) N

2

# EXHIBIT E



Securing today
and tomorrow

# Social Security Numbers for Children

    

The easiest way to get a Social Security number (SSN) for your newborn is to apply when you provide information for your baby's birth certificate in the hospital.

If you wait to apply for a number at a Social Security office, there may be delays while we verify your child's birth certificate.

## Why should I get a Social Security number for my child?

You need an SSN to claim your child as a dependent on your income tax return. Your child may also need a number if you plan to:

- Open a bank account for the child.
- Buy savings bonds for the child.
- Get medical coverage for the child.
- Apply for government services for the child.

## Must my child have a Social Security number?

Getting an SSN for your newborn is voluntary, but may be necessary to obtain important services, such as those listed above, for your child. Therefore, getting a number when your child is born is a good idea.

**How do I apply?**

**At the hospital:** When you complete the application for your baby's birth certificate, you will be asked whether you want to apply for an SSN for your baby.

**1**

If you say "yes," you will be asked to provide both parents' SSNs. If you don't know both parents' SSNs, you still can apply for your child's SSN.

**At a Social Security office:** If you wait to apply for your child's number, you can use our online Social Security Number and Card application available at *www.ssa.gov/number-card*. You will start the application online and complete the process in a local Social Security office or card center. If you are not able to apply online, you can fill out and print our Application for a Social Security Card (Form SS-5), available at *www.ssa.gov/forms/ss-5.pdf*.

No matter where you apply, you will need to:

• Show us original documents proving your child's:

—U.S. citizenship.

—Age.

—Identity.

• Show us documents proving your identity and your relationship to your child.

Anyone age 12 or older who requests an original SSN must appear in person for an interview. This applies even if a parent or guardian will sign the application on the child's behalf.

### Citizenship

We can accept only certain documents as proof of U.S. citizenship. These include a:

**2**

- U.S. birth certificate.
- U.S. consular report of birth.
- U.S. passport (valid and unexpired).
- Certificate of Naturalization or Certificate of Citizenship.

Noncitizens should see *Social Security Numbers for Noncitizens* (Publication No. 05-10096) for more information.

## Age

If your child was born in the United States, you need to present your child's birth certificate. If your child does not have a birth certificate, we may be able to accept a:

- Religious record made before the age of 5 showing the date of birth.
- U.S. hospital record of birth.
- U.S. passport or passport card.

If your child was born outside the United States, you need to present your child's foreign birth certificate. You may already have it or can get a copy within 10 business days. If you can't get it, we may be able to accept your child's:

- Certificate of Birth Abroad (FS-545).
- Certificate of Report of Birth (DS-1350).
- Consular Report of Birth Abroad (FS-240).
- Certificate of Naturalization.
- Passport.

**3**

## Identity

**Your child:** We can accept only certain documents as proof of your child's identity. An acceptable document must be current (not expired) and show your child's name, identifying information, and, preferably, a recent photograph. We generally can accept a non-photo identity document if it has enough information to identify the child. Information may include the child's name and age, date of birth, or parents' names. We prefer to see the child's unexpired U.S. passport. If that document isn't available, we may accept the child's:

- Unexpired valid state-issued nondriver identification card.
- Adoption decree.
- Certified copy of medical record (doctor, clinic, or hospital).
- Religious record.
- Certified school record showing your child's name and your child's age or date of birth (must be for the current or prior year).
- School identification card showing your child's name and either a photograph of your child, your child's age, or date of birth (**must be for the current or prior year**).

**You:** If you're a U.S. citizen, we will ask to see your U.S. driver's license, state-issued nondriver identification card, or U.S. passport as proof of your identity. If you don't have these specific

documents, we'll ask to see other documents that may be available, such as:

- Unexpired U.S. passport or passport card.
- Certificate of U.S. Citizenship.
- Certificate of Naturalization.
- School identification card showing your name and either your photograph, age, or date of birth (**must be for the current or prior year**).
- Health insurance card (not a Medicare card) showing your name and either your photograph, or age, or date of birth.
- U.S. military identification card.
- Employee identification card showing your name and either your photograph or date of birth.
- Life insurance policy.

*All documents must be either originals or copies certified by the issuing agency. We can't accept photocopies or notarized copies of documents*. We may use 1 document for 2 purposes. For example, we may use your child's passport as proof of both citizenship and identity. Or, we may use your child's birth certificate as proof of age and citizenship. *However, you must provide at least 2 separate documents*.

**5**    *(over)*

We'll mail your child's number and card as soon as we have all of your child's information and have verified your child's documents.

## What if my child is adopted?

We can assign your adopted child an SSN before the adoption is complete, but you may want to wait until the adoption is finalized. Then, you can apply for the number using your child's new name, with your name as parent. You may want to claim your child for tax purposes while the adoption is still pending. If so, contact the Internal Revenue Service for Form W-7A, *Application for Taxpayer Identification Number for Pending U.S. Adoptions*.

## What does it cost?

There's no charge for issuing an SSN and card. If someone contacts you and wants to charge you for getting a number or card, please remember that these Social Security services are free. You can report anyone attempting to charge you by calling our Office of the Inspector General hotline at **1-800-269-0271 (TTY 1-866-501-2101 deaf or hard of hearing)** from 10:00 a.m. to 4:00 p.m. Eastern Time or visit *https://oig.ssa.gov*.

**6**

## What if I lose the card?

You can replace your Social Security card if it's lost or stolen. You're limited to 3 replacement cards in a year and 10 during your lifetime. Legal name changes and other exceptions don't count toward these limits. For example, changes in noncitizen status that require card updates may not count toward these limits. Also, you may not be affected by these limits if you can prove you need the card to prevent a significant hardship.

Your child's Social Security card is an important document. We recommend you keep it in a safe place. **Do not carry it with you**.

## Social Security number misuse

If you think someone is using your child's SSN fraudulently, you should file a complaint with the Federal Trade Commission via:

- Internet — *www.identitytheft.gov*.
- Telephone — **1-877-IDTHEFT** (**1-877-438-4338**).
- TTY — **1-866-653-4261**.

It's against the law to:

- Use someone else's SSN.
- Give false information when applying for a number.
- Alter, buy, or sell Social Security cards.

**7**

## Contacting Us

The most convenient way to do business with us is to visit *www.ssa.gov* to get information and use our online services. There are several things you can do online: apply for benefits; start or complete your request for an original or replacement Social Security card; get useful information; find publications; and get answers to frequently asked questions.

When you open a personal *my* Social Security account, you have more capabilities. You can review your *Social Security Statement*, verify your earnings, and get estimates of future benefits. You can also print a benefit verification letter, change your direct deposit information (Social Security beneficiaries only), and get a replacement SSA-1099/1042S. Access to your personal *my* Social Security account may be limited for users outside the United States.

If you don't have access to the internet, we offer many automated services by telephone, 24 hours a day, 7 days a week, so you may not need to speak with a representative.

If you need to speak with someone, call us toll-free at **1-800-772-1213** or at our TTY number, **1-800-325-0778**, if you're deaf or hard of hearing. A member of our staff can answer your call from 8 a.m. to 7 p.m., Monday through Friday. We provide free interpreter services

**8**

upon request. For quicker access to a representative, try calling early in the day (between 8 a.m. and 10 a.m. local time) or later in the day. **We are less busy later in the week (Wednesday to Friday) and later in the month.**

**Social Security Administration**
Publication No. 05-10023
January 2024 (Recycle prior editions)
Social Security Numbers for Children
Produced and published at U.S. taxpayer expense

# EXHIBIT F

TEXT TRUMP TO 88022!

PLATFORM   NEWS   EVENTS

GET INVOLVED
TRUMP FORCE 47
PROTECT THE VOTE

CONTRIBUTE

SHOP

BACK TO VIDEOS

# Agenda47: Day One Executive Order Ending Citizenship for Children of Illegals and Outlawing Birth Tourism

**May 30, 2023**

 



Agenda47: Day One Executive Order Ending Citizenship for Children of Illegals a…

**Mar-a-Lago, FL—** In a new Agenda47 video, President Donald J. Trump announced his plan to sign an executive order on Day One to end automatic citizenship for

children of illegal aliens.

"As part of my plan to secure the border, on Day One of my new term in office, I will sign an executive order making clear to federal agencies that under the correct interpretation of the law, going forward, the future children of illegal aliens will not receive automatic U.S. citizenship," President Trump said.

"My policy will choke off a major incentive for continued illegal immigration, deter more migrants from coming, and encourage many of the aliens Joe Biden has unlawfully let into our country to go back to their home countries."

**PRESIDENT TRUMP'S PLAN TO DISCOURAGE ILLEGAL IMMIGRATION BY ENDING AUTOMATIC CITIZENSHIP FOR THE CHILDREN OF ILLEGAL ALIENS AND OUTLAWING BIRTH TOURISM**

**A DAY-ONE EXECUTIVE ORDER TO SHUT OFF A MAGNET FOR ILLEGAL IMMIGRATION:**

- On Day One, President Trump will sign an Executive Order to stop federal agencies from granting automatic U.S. citizenship to the children of illegal aliens.

- It will explain the clear meaning of the 14th Amendment, that U.S. Citizenship extends only to those both born in AND "subject to the jurisdiction" of the United States.

- It will make clear that going forward, the children of illegal aliens will not be granted automatic citizenship, and should not be issued passports, Social Security numbers, or be eligible for certain taxpayer funded welfare benefits.

- It will direct federal agencies to require that at least one parent be a U.S. citizen or lawful permanent resident for their future children to become automatic U.S. citizens.

- This Executive Order ending automatic citizenship for the children of illegal aliens will eliminate a major incentive for illegal immigration, discourage future waves of illegal immigration to exploit this misapplication of citizenship, and encourage illegal aliens in the U.S. to return home.

- The Executive Order will also stop "**Birth Tourism**."

- Through "Birth Tourism," **tens of thousands** of foreign nationals fraudulently enter the U.S. each year during the final weeks of their pregnancies for the sole purpose of obtaining U.S. citizenship for their child.

- Under the current erroneous interpretation, the children of these foreign nationals are then eligible to **receive** a host of government benefits reserved for U.S. citizens, including a myriad of welfare programs and taxpayer funded healthcare, as well as chain migration and the right to vote.

- The Executive Order is part of a larger strategy to fully secure the Southern Border starting on Day One. It will remove a major incentive for illegal aliens and other foreign nationals to come to and remain in the United States in violation of our laws and National sovereignty.

- The announcement of today's Executive Order follows a historical slate of hundreds of executive actions, proclamations, and presidential memorandums on border security and immigration that President Trump implemented while in office to remake the immigration system in the United States for the interest of the American people, including:

- Executive Order Implementing the Travel Ban and Pausing Refugee Admissions

- Executive Order on Border Security and Immigration Enforcement

- Presidential Memorandum on the Extreme Vetting of Foreign Nationals

- Presidential Memorandum to Create a National Vetting Center

- Executive Order to Unleash Interior Immigration Enforcement

- Executive Order to Block Federal Grants to Sanctuary Cities

- Presidential Memorandum Ordering DHS to Train National Guard Troops to Assist with Border Enforcement

- Presidential Memorandum to End "catch and release" at the Border

- Presidential Proclamation Suspending Entry Across Southern Border Outside Ports of Entry to Bar Asylum Access

- Executive Order requiring the U.S. Government to Prioritize the Hiring of U.S. Workers in the Administration of all Immigration Programs

- Executive Order on Aligning Federal Contracting and Hiring Practices with the Interests of American Workers

- Presidential Proclamation Suspending Chain Migration, Visa Lottery, and All Non-Essential Foreign Workers

- Presidential Proclamation on Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System

- Presidential Memorandum to Cut Off Immigrant Access to the Welfare State

**PRESIDENT TRUMP'S EXECUTIVE ORDER WILL FINALLY ENSURE THAT THE FEDERAL GOVERNMENT NO LONGER ADHERES TO A PATENTLY INCORRECT INTERPRETATION OF THE 14TH AMENDMENT:**

- Constitutional scholars have shown for decades that granting automatic citizenship to the children of illegal aliens born in the United States is based on a patently incorrect interpretation of the 14th Amendment.

- The **14th Amendment** extends federal citizenship to "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof."

- The purpose of the 14th Amendment had nothing to do with the citizenship of immigrants, let alone the citizenship of the children of illegal aliens. Its purpose was to extend citizenship to people newly freed from slavery, whose status was left in question after the infamous case **Dred Scott v. Sandford**.

- The framers of the 14th Amendment made **clear** that "persons born in the United States who are foreigners, aliens [or] who belong to the families of ambassadors or foreign ministers" are not "subject to the jurisdiction" of the U.S.

- For years, open-borders proponents have deliberately misinterpreted "subject to the jurisdiction" in the 14th Amendment to mean merely subject to American law, which is the case for anyone physically present in the United States.

- This twisting of the amendment's meaning and intent has caused America to become one of the few countries in the world to extend citizenship to the children of illegal aliens even if both parents are not citizens nor even legally present in the United States, thus diluting the privileges that Americans are entitled to.

**BIDEN'S OPEN BORDER POLICY IS A NATIONAL SECURITY, ECONOMIC, AND HUMANITARIAN DISASTER:**

- A record number of illegal aliens crossed the southern border in both 2021 and 2022. In the official numbers alone, there have been over 6.6 million **illegal crossings** since Biden took office—but the true numbers are much higher.

- Biden has deliberately made his border disaster worse by abolishing Title 42 this month, allowing for an additional **400,000** illegal aliens from all corners of the globe to pour across our border each month.

- This invasion is wasting our resources, lowering our citizens' wages, poisoning our communities with lethal drugs, and threatening our national security.

- Illegal immigration **reduces** American workers' wages by $99 to $118 billion each year, with the burden falling most heavily on low-wage workers.

- Thousands of pounds of deadly drugs are pouring across our borders, poisoning over 100,000 of our citizens each year. Fueled in large part by Biden's border disaster, fentanyl poisoning has become the leading cause of death for Americans between the ages of 18 and 45.

- Nearly 100 known or suspected terrorists were **arrested** at the border last year—more than three times the total for the previous five years combined. Border arrests of illegal alien murderers **increased** by over 1,900% and arrests of illegal alien drug traffickers increased by 480% since 2020.

- Biden's open border policy has also created a humanitarian crisis, with migrant deaths reaching a record **high** last year and human smuggling arrests **up** 82% since

# EXHIBIT G

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/politics/policy/trump-birthright-citizenship-executive-order-battle-0900a291

POLITICS | POLICY

# Trump Prepares for Legal Fight Over His 'Birthright Citizenship' Curbs

Many constitutional scholars and civil-rights groups have said a change can't be done through executive action

*By* *Tarini Parti* Follow *and* *Michelle Hackman* Follow

*Updated* *Dec. 8, 2024 9:16 pm ET*



People riding the ferry to Ellis Island for a naturalization ceremony pass the Statue of Liberty. PHOTO: ALEX KENT/AFP/GETTY IMAGES

WASHINGTON—President-elect Donald Trump's transition team is drafting several versions of his long-promised executive order to curtail automatic citizenship for anyone born in the U.S., according to people familiar with the matter, as his aides prepare for an expanded legal fight.

Trump, who has railed against so-called birthright citizenship for years, said during his first term that he was planning an executive order that would outright ban it. Such an order was never signed, but the issue remained a focus of Trump's immigration proposals during his re-election campaign. He has said he would tackle the issue in an executive order on day one of his second term.

Weeks before he takes office, Trump's transition team is now considering how far to push the scope of such an order, knowing it would almost immediately be challenged in court, according to a transition official and others familiar with the matter. The eventual order is expected to focus on changing the requirements for documents issued by federal agencies that verify citizenship, such as a passport.

Through an executive order or the agency rule-making process, Trump is also expected to take steps to deter what Trump allies call "birth tourism," in which pregnant women travel to the U.S. to have children, who receive the benefit of citizenship. One option on the table is to tighten the criteria to qualify for a tourist visa, according to people familiar with the Trump team's thinking. Tourist visas are most often issued for a period of 10 years, though the tourist can't stay in the U.S. on each visit for longer than six months.



President-elect Donald Trump has said he would tackle birthright citizenship in an executive order on day one of his second term. PHOTO: OLIVIER TOURON/AFP/GETTY IMAGES

Karoline Leavitt, a spokeswoman for the Trump transition, said the president-elect "will use every lever of power to deliver on his promises, and fix our broken immigration system once and for all."

Some on the right have backed Trump's plans and argued that birthright citizenship is a misinterpretation of the 14th amendment, which dates back to the 19th century and in part granted full citizenship to former slaves. They have also criticized birth tourism. Companies in China have attracted attention in recent years for advertising such services, and airlines in Asia even started turning away some pregnant passengers they suspected of traveling to give birth.

"Because you happen to be in this country when your child is born, is not a reason for that child to be a U.S. citizen. It's just silly, and the reliance on it in law is utterly misplaced," said Ken Cuccinelli, a senior fellow at the Center for Renewing America, a pro-Trump think tank, who previously served as deputy secretary of Homeland Security.

Many constitutional scholars and civil-rights groups have said a change to birthright citizenship can't be done through executive action and would require amending the Constitution—a rare and difficult process. The most recent amendment was ratified in 1992, more than 200 years after it was first proposed.

Trump on the campaign trail this year offered more details on what executive action related to birthright citizenship could include compared with his first term, a change that some backers took as an indication that he is more willing to act on the issue.

Trump said he would sign a "day one" executive order directing federal agencies to require a child to have at least one parent be either a U.S. citizen or legal permanent resident to automatically become a U.S. citizen. It would also stop agencies from issuing passports, Social Security numbers and other welfare benefits to children who don't meet the new requirement for citizenship, the president-elect's campaign had said.

"My policy will choke off a major incentive for continued illegal immigration, deter more migrants from coming, and encourage many of the aliens Joe Biden has unlawfully let into our country to go back to their home countries," Trump said in a campaign video.

But the requirement that at least one parent be a U.S. citizen or legal permanent resident would also affect children born to parents who immigrated legally

through visas, excluding them from automatic citizenship.

"The new piece of it is them talking publicly about the mechanism they might try to use to operationalize this unconstitutional plan," said Omar Jadwat, director of the American Civil Liberties Union's Immigrants' Rights Project. "They just can't do that consistent with the constitution."



Portrait of Wong Kim Ark, whose case affirmed birthright citizenship. PHOTO: NATIONAL ARCHIVES/GETTY IMAGES

"Litigation is definitely going to follow," he added.

The Supreme Court affirmed birthright citizenship in its 1898 ruling in U.S. v. Wong Kim Ark. But critics of automatic citizenship argue Trump's proposed citizenship restrictions would be different from that case, which involved a child born to Chinese parents who were legal permanent residents in the U.S.

Trump's allies say a legal fight that makes its way to the Supreme Court is the point of the executive order.

"Force the issue and see what happens," said Mark Krikorian, executive director for the Center for Immigration Studies, a group favoring immigration restrictions that was close to Trump's first administration. Even with the court's conservative majority, Krikorian isn't optimistic about Trump's chances.

"I think they'll probably uphold the current interpretation of the 14th Amendment," he said. "They're going to want to start that court fight as soon as possible to see if they can see it through to the end before the administration ends," he said.

Write to Tarini Parti at tarini.parti@wsj.com and Michelle Hackman at michelle.hackman@wsj.com

# EXHIBIT H

# Venezuela International Travel Information

U.S. Embassy Colombia
Calle 24 Bis No. 48-50
Bogotá, D.C. Colombia
Telephone: +(57)(1) 275-2000
Emergency: +(57)(1) 275-2000
Fax: No fax
Online: https://co.usembassy.gov/services/contact-acs-form/
Website

The U.S. Department of State urges U.S. citizens not to travel to Venezuela, and recommends that U.S. citizens in Venezuela leave immediately. More information is in our Venezuela Travel Advisory.

The U.S. Embassy in Caracas suspended operations on March 11, 2019. It cannot provide consular services to U.S. citizens in Venezuela. The U.S. Embassy in Colombia assists U.S. citizens in Venezuela when possible.

If you are a U.S. citizen in Venezuela in need of assistance, or are concerned about a U.S. citizen in Venezuela, please contact us in one of the following ways:

- Contact us online at https://co.usembassy.gov/services/contact-acs-form/ or

- Call us at +1-888-407-4747 (from the U.S. & Canada) or +1-202-501-4444 (from overseas).

The U.S. Department of State strongly urges U.S. citizens not to travel to Venezuela. Detentions of U.S. citizens at formal or informal border crossings into Venezuela are common.

To enter Venezuela, you must have:

- A valid U.S. passport in good condition with at least six months of validity, and
- A valid Venezuelan visa. Visas are not available upon arrival.

**Visas:** The Venezuelan embassy and consulates in the United States are not open. For information about visa services, contact the Venezuelan Embassy in Mexico at +52 55 5203 4233. You must have the proper visa and appropriate accreditation before traveling to Venezuela. If not, you face refusal of admission, expulsion, or detention.

Immigration officials often require proof of accommodation while in Venezuela, adequate means of support, and an onward departure itinerary. Use only official crossing points when entering Venezuela. You must obtain an entry stamp upon entry.

If you reside in Venezuela as a non-citizen, you must obtain legitimate Venezuelan residency documentation and renew your residency visa well in advance of expiration. Do not use intermediaries to purchase resident visas and/or work permits.

**Traveling with Children:** Venezuela's child protection law mandates that minors (under 18) of any nationality who are traveling alone, with only one parent, or with a third party, must present extensive, specific, and notarized documentation granting permission for travel. Consult the nearest Venezuelan embassy or consulate for further information.

**Dual Nationality:** Venezuelan law requires Venezuelan citizens to enter and depart Venezuela using Venezuelan passports. If you hold dual U.S. and Venezuelan nationality, you must plan to travel between the United States and Venezuela with valid U.S. and Venezuelan passports. Dual-national minors are only allowed to depart Venezuela with both parents present or with a legal authorization signed by the absent parent in a family court.

**Immunizations:** Visit the CDC Traveler website for vaccination information, including Yellow Fever vaccination requirements. Carry your International Certificate of Vaccination (or yellow card) with you upon arrival or departure. Travel to Venezuela no longer requires evidence of COVID-19 vaccination.

**HIV/AIDS:** The U.S. Department of State is unaware of any HIV/AIDS entry restrictions for visitors to or foreign residents of Venezuela. Be aware that HIV/AIDS medications, like other medications, are often not available in Venezuela.

Find further information on dual nationality, prevention of international child abduction, and customs regulations on our websites.

Terrorism:  Terrorist groups and those inspired by such organizations are intent on attacking U.S. citizens abroad. Terrorists are increasingly using less sophisticated methods of attack – including knives, firearms, and vehicles – to more effectively target crowds. Frequently, their aim is focused on unprotected or vulnerable targets, such as:

- High-profile public events (sporting contests, political rallies, demonstrations, holiday events, celebratory gatherings, etc.)
- Hotels, clubs, and restaurants frequented by tourists
- Places of worship
- Schools
- Parks
- Shopping malls and markets
- Public transportation systems (including subways, buses, trains, and scheduled commercial flights)

Terrorist groups such as the Revolutionary Armed Forces of Colombia – People's Army (FARC-EP), Segunda Marquetalia, and the Colombian-origin National Liberation Army (ELN) have expanded in Venezuela in recent years. We are aware of reports of cooperation between FARC dissidents and the ELN in the areas of road/border checkpoints, forced displacement of communities, and narcotics trafficking.

For more information, see our Terrorism page.

**Crime:**  Violent crime is pervasive throughout Venezuela. Venezuela has one of the highest homicide rates in the world, and kidnappings are a serious concern.

If you are in Venezuela:

- Be alert of your surroundings at all times and take personal security precautions to avoid becoming a victim of crime.
- Maintain a low profile.
- Travel in groups of five or more, and
- Provide family or friends with your itineraries prior to departure.
- Avoid police activity. Corruption within the police forces is a concern, and criminals may be posing as police officers or National Guard members. National Guard members may target

U.S. citizens, especially at remote land border crossings, for bribery, extortion, or detention, possibly in collusion with criminal organizations.

Criminal gangs operate openly and with little repercussion, often setting up fake police checkpoints. Armed robberies, including with grenades and assault rifles, take place throughout the country, including in tourist areas and institutions such as banks and ATMs, national parks, shopping malls, public transportation stations, and universities.

**Drugs:**  Do not attempt to bring any narcotics or controlled substances into Venezuela, or substances that may be confused with illegal drugs.

- Do not accept packages from anyone.
- Always keep your luggage with you.
- U.S. citizens have been actively recruited as narcotics couriers or "drug mules." Arrestees can expect extended jail terms under extremely difficult prison conditions.

**Transportation:**

- Do not use any taxis hailed on the street. Use only radio-dispatched taxis from taxi services, hotels, restaurants, and airline staff. Some taxi drivers in Caracas are known to overcharge, rob, injure, and even kidnap passengers.
- Do not use public transportation such as city buses and the metro (subway) in Caracas.
- If you drive, be aware of attacks in tunnels and avoid obstacles in the road.

**Maiquetía International Airport:**  Only travel to and from Maiquetía International Airport near Caracas in daylight hours. Kidnappings, robberies at gunpoint, thefts, and muggings are common. Individuals wearing seemingly official uniforms and displaying airport or police credentials have been involved in crimes inside the airport, including extortion and robberies.

- Do not pack valuable items or documents in checked luggage.
- Make advance plans for transportation from the airport to your hotel or destination using a trusted party or dispatch taxi service.

**ATMs:**  Most ATMs do not accept U.S. debit or credit cards, and malfunctions are common. Many ATMs do not have cash. Criminals target ATM users for robberies. ATM data is often hacked and used to make unauthorized withdrawals.

- Use only ATMs located in well-lit, public places.

**Demonstrations** occur occasionally.  They may take place in response to political or economic issues, on politically significant holidays, and during international events.

- Demonstrations can be unpredictable; avoid areas around protests and demonstrations.
- Past demonstrations have turned violent.
- Check local media for updates and traffic advisories.

**International Financial Scams:**  See the Department of State and the FBI pages for additional information.

Internet romance and financial scams are prevalent in Venezuela.  Scams are often initiated through Internet postings/profiles or by unsolicited emails and letters.  Scammers almost always pose as U.S. citizens who have no one else to turn to for help.  Common scams include:

- Romance/online dating

- Money transfers
- Grandparent/relative targeting

**Victims of Crime:** The U.S. Embassy in Caracas suspended operations on March 11, 2019, and therefore cannot provide consular services to U.S. citizens in Venezuela. The U.S. Embassy in Colombia assists U.S. citizens in Venezuela when possible.

- U.S. citizen victims of crime are encouraged to contact the U.S. Embassy in Bogota.
- Report crimes to the local police and contact the U.S. Embassy in Bogota by completing our online form at https://co.usembassy.gov/services/contact-acs-form/ or dialing +57 (1) 275-2000 or +57 (1) 275-4021 after hours. Remember that local authorities are responsible for investigating and prosecuting crime. Note that emergency numbers may not function in Venezuela and travelers should be prepared to make direct contact with the nearest police station to reach emergency service personnel.

See our webpage on help for U.S. victims of crimes overseas.

We can:

- Help you find appropriate medical care
- Contact relatives or friends with your written consent
- Provide general information regarding local law enforcement investigations
- Provide a list of local attorneys
- Provide our information on victim's compensation programs in the United States
- Help you find accommodation and arrange flights home
- If you are able to travel to a U.S. Embassy, we can replace a stolen or lost passport and provide an emergency loan for repatriation to the United States and/or limited medical support in cases of destitution

**Domestic Violence:** U.S. citizen victims of domestic violence are encouraged to contact the U.S. Embassy in Bogota for assistance.

**Colombian Border:** The area within 50-miles of the entire Venezuela and Colombian border is extremely dangerous. U.S. citizens near the border are at risk of detention by authorities. U.S. citizens must obtain a visa to enter Venezuela legally. Visas are not available upon arrival. U.S. citizens attempting to enter Venezuela without a visa have been charged with terrorism and other serious crimes and detained for long periods. Maduro authorities do not notify the U.S. government of the detention of U.S. citizens and the U.S. government is not granted access to those citizens. Additionally, cross-border violence, kidnapping, drug trafficking, and smuggling are common. Some kidnapping victims are released after ransom payments, while others are murdered.

- Do not attempt to cross the land border.

**Tourism:** Tourists participate in activities at their own risk. Emergency response and subsequent appropriate medical treatment does not meet U.S. standards. Serious medical issues require costly medical evacuation complicated by restrictions on air travel to and from Venezuela. Air evacuations to the United States from Venezuela may not be possible.

- U.S. citizens are encouraged to purchase medical evacuation insurance. See our webpage for more information on insurance providers for overseas coverage.

**Criminal Penalties:** You are subject to local laws. If you violate local laws, even unknowingly, you may be expelled, arrested, or imprisoned. Individuals establishing a business or practicing a

profession that requires additional permits or licensing should seek information from the competent local authorities prior to practicing or operating a business. Application of local laws can at times be arbitrary and/or politically motivated.

In Venezuela, it is illegal to take pictures of sensitive buildings, including the presidential palace, military bases, government buildings, and airports.

Drug trafficking is a serious problem in Venezuela and treated as such by Venezuelan authorities. Convicted traffickers receive lengthy prison sentences.

Furthermore, some laws are also prosecutable in the United States, regardless of local law. For examples, see our website on crimes against minors abroad and the Department of Justice website.

**Arrest Notification:** If you are arrested or detained, attempt to have someone notify the U.S. Embassy in Bogota immediately. See our webpage for further information.

Please note that the U.S. Department of State may not be informed of your detention, particularly if you also hold Venezuelan citizenship. Due to the suspension of operations of the U.S. Embassy in Caracas, consular visits to detained U.S. citizens are not possible. There have been instances of U.S. citizens in recent years who have been detained without being afforded due process or fair trial guarantees, or as a pretext for an illegitimate purpose, often due to their U.S. citizenship. U.S. citizens in Venezuela are at risk of wrongful detention. See our Travel Advisory for Venezuela for additional information.

**Currency and Exchange:** Venezuela has started to allow dollarized commercial transactions and shopping, but policies and availability are subject to change. Some local businesses accept U.S. credit cards and electronic transfers through certain online vendors. "Black market" currency exchanges – often offering significantly favorable exchange rates – are technically prohibited under Venezuelan foreign exchange controls. Violators may be detained by Venezuelan authorities and face criminal penalties.

**Wire Transfers:** Wire transfers cannot be used reliably as a source of emergency funds, and receipt of funds is generally restricted to Venezuelan citizens and residents.

**Counterfeit and Pirated Goods:** Although counterfeit and pirated goods are prevalent in many countries, they may still be illegal according to local laws. You may also pay fines or forfeit the items if you attempt to bring them back to the United States. See the U.S. Department of Justice website for more information.

**Faith-Based Travelers:** See the following webpages for details:

- Faith-Based Travel Information
- International Religious Freedom Report – see country reports
- Human Rights Report – see country reports
- Hajj Fact Sheet for Travelers
- Best Practices for Volunteering Abroad

**LGB Travelers:** There are no legal restrictions on same-sex sexual relations or the organization of LGB events in Venezuela.

See our LGB Travel Information page and section 6 of our Human Rights report for further details.

**Travelers with Disabilities:** The law in Venezuela prohibits discrimination against persons with physical and mental disabilities, but the law is not enforced. Social acceptance of persons with

disabilities in public is not as prevalent as in the United States. Expect accessibility to be limited in public transportation, lodging, communication/information, and general infrastructure. Accessibility is more prevalent in the capital city of Caracas than in the rest of the country.

The availability of rental, repair, and replacement parts for aids/equipment/devices as well as service providers, such as sign language interpreters or personal assistants, is limited.

**Students:**  See our Students Abroad page and FBI travel tips.

**Women Travelers:** See our travel tips for Women Travelers.

Travel to Venezuela no longer requires evidence of COVID-19 vaccination.For emergency services in Venezuela, dial 171. Emergency numbers may not function, and travelers should be prepared to make direct contact with the nearest police station to reach emergency services personnel.

Ambulance services are:

- not widely available, depending on the individual's health insurance, training, and availability of emergency responders may be below U.S. standards.
- unreliable in most areas.
- not equipped with state-of-the-art medical equipment.

Injured or seriously ill travelers may prefer to take a taxi or private vehicle to the nearest major hospital rather than wait for an ambulance.

Direct emergency medical evacuation flights between the United States and Venezuela are notpossible.

**We do not pay medical bills.**  Be aware that U.S. Medicare/Medicaid does not apply overseas. Most hospitals and doctors overseas do not accept U.S. health insurance.

**Medical Insurance:**  Most care providers overseas only accept cash payments. See our webpage for more information on insurance providers for overseas coverage. Visit the U.S. Centers for Disease Control and Prevention for more information on types of insurance you should consider before you travel overseas.

- Make sure your health insurance plan provides coverage overseas. We strongly recommend supplemental insurance to cover medical evacuation.
- Always carry your prescription medication in original packaging, along with your doctor's prescription.
- Before travelling to Venezuela with prescription medications, travelers should research current Customs and Immigration restrictions in place at Venezuelan ports of entry.

**Vaccinations:**  You must be up to date on all vaccinations recommended by the U.S. Centers for Disease Control and Prevention. A Yellow Fever vaccination is required if coming from or transiting for more than 12 hours through Brazil.

- Confirm you have all vaccinations recommended by the U.S. Centers for Disease Control and Prevention.
- Carry your International Certificate of Vaccination (or yellow card) with you upon arrival.

**Health Facilities in General:**

- Do not depend on health care facilities in Venezuela for medical care. Serious medical issues

require costly medical evacuation complicated by restrictions on air travel to and from Venezuela. Direct air evacuations to the United States are not possible.

- Public medical clinics lack basic resources and supplies, including soap and water. In recent years, hospital infrastructure has deteriorated significantly, and medical staff are in short supply. Patients frequently must supply their own water, medication, and medical instruments to receive care.
- Adequate private health facilities are available in Caracas and other major cities, but health care in rural areas is well below U.S. standards. Many private hospitals and clinics may be overcrowded and may experience shortages of public utilities such as electricity and running water.
- Some private hospitals and doctors require cash payment "up front" prior to service or admission. Credit card payment and online transfers are sometimes available. If you cannot provide an up-front payment, you may be referred to a public institution.
- Medical staff may speak little to no English.
- Generally, in public hospitals only minimal staff is available overnight. Consider hiring a private nurse or having family spend the night with the patient, especially a minor child.
- Patients may be required to bear costs for transfer to or between hospitals.
- Psychological and psychiatric services are limited, even in the larger cities.

**Medical Tourism and Elective Surgery:**

- U.S. citizens have suffered serious complications or died during or after having cosmetic or other elective surgery overseas.
- Visit the U.S. Centers for Disease Control and Prevention website for information on medical tourism, the risks of medical tourism, and what you can do to prepare before traveling to Venezuela.
- We strongly recommend supplemental insurance to cover medical evacuation in the event of unforeseen medical complications.
- Your legal options in case of malpractice are very limited in Venezuela.

**Pharmaceuticals:**

- Some medical supplies are unavailable in Venezuela, and you should not expect to find all necessary medications in Venezuela. Travelers should carry over the counter and prescription drugs sufficient to cover the entire duration of their trips.
- Exercise caution when purchasing medication overseas. Pharmaceuticals, both over the counter and requiring prescription in the United States, are often readily available for purchase with little controls. Counterfeit medication is common and may prove to be ineffective, the wrong strength, or contain dangerous ingredients. Medication should be purchased in consultation with a medical professional and from reputable establishments.
- U.S. Customs and Border Protection and the Food and Drug Administration are responsible for rules governing the transport of medication back to the United States. Medication purchased abroad must meet their requirements to be legally brought back into the United States. Medication should be for personal use and must be approved for usage in the United States. Please visit the U.S. Customs and Border Protection and the Food and Drug Administration websites for more information.

**Assisted Reproductive Technology and Surrogacy :**

- There is no legal framework for foreigners or same-sex couples to pursue surrogacy in Venezuela. According to Venezuelan law, the birth mother of a child born in Venezuela is the legal mother. Surrogacy agreements between foreign or same sex intending parents and gestational mothers are not enforced by Venezuelan courts.

- If you decide to pursue parenthood in Venezuela via assisted reproductive technology (ART) with a gestational mother, be prepared for long and unexpected delays in documenting your child's citizenship. Be aware that individuals who attempt to circumvent local law risk criminal prosecution.
- If you are considering traveling to Venezuela to have a child through use of assisted reproductive technology (ART) or surrogacy, please see our ART and Surrogacy Abroad page.

**Water Quality:**

- Tap water is not potable, even in major cities. Bottled water and beverages are generally safe, although you should be aware that many restaurants and hotels serve tap water unless bottled water is specifically requested.  Be aware that ice for drinks may be made using tap water.
- Expect frequent shortages in running water.
- Gastrointestinal illnesses such as severe diarrhea are common throughout the country.

**Adventure Travel** :

- Visit the U.S. Centers for Disease Control and Prevention website for more information about Adventure Travel.

**General Health:**

The following diseases are prevalent:

- COVID-19
- Dengue
- Zika
- Chikungunya
- Chagas Disease (Trypanosomiasis)
- Measles (Rubeloa)
- Malaria
- Leishmaniasis
- Schistosomiasis (Bilharzia)
- Travelers' Diarrhea

The Ministry of Health has announced they will start an epidemiological plan at airports for those travelers coming from countries where there is a confirmation of Mpox outbreak: "To enter the country, they must report their health status and personal data in the epidemiological surveillance form, for medical follow-up".

- Use the U.S. Centers for Disease Control and Prevention recommended mosquito repellents and sleep under insecticide-impregnated mosquito nets. Chemoprophylaxis is recommended for all travelers even for short stays.
- Visit the U.S. Centers for Disease Control and Prevention website for more information about Resources for Travelers regarding specific issues in Venezuela.

**Road Conditions and Safety:**

- Avoid driving in Venezuela. If you do drive, drive defensively, as most drivers do not obey rules.
- Do not drive at night outside major cities. Police and national guard checkpoints are mandatory, and criminals often set up fake checkpoints during nighttime to rob or kidnap victims.

- Road damage is not clearly marked.
- Traffic jams are common within Caracas during most of the day and are frequently exploited by criminals. Armed motorcycle gangs operate in traffic jams. Comply with demands as victims may be killed for not complying.
- Do not use buses due to high levels of criminal activity.
- Venezuela experiences shortages in gasoline, and you should plan accordingly, especially when travelling to distant or rural areas. Be aware that the quality of gasoline is not the same as in the United States and may cause vehicle damage, requiring repairs and/or frequent maintenance.

**Traffic Laws:**

- Child car seats and seatbelts are not required and are seldom available in rental cars and taxis.
- Some Caracas municipalities have outlawed the use of handheld cell phones while driving.
- Stops at National Guard and local police checkpoints are mandatory. Follow all National Guard instructions and be prepared to show vehicle and insurance papers and passports. Vehicles may be searched.

**Public Transportation:**  Subways, buses, trains, and other means of public transport in Venezuela do not have the same safety standards as in the United States.

See our [Road Safety page](#) for more information.

**Aviation Safety Oversight:**  The U.S. Federal Aviation Administration (FAA) has assessed that Venezuela's Civil Aviation Authority is not in compliance with International Civil Aviation Organization (ICAO) aviation safety standards for oversight of Venezuela's air carrier operations. Further information may be found on the [FAA's safety assessment page](#).

The U.S. Department of Transportation issued an [order](#) suspending all nonstop flights between the United States and Venezuela. The Department of Homeland Security concluded that conditions in Venezuela threaten the safety and security of passengers, aircraft, and crew traveling to or from that country.

Due to risks to civil aviation operating within or in the vicinity of Venezuela, the Federal Aviation Administration (FAA) has issued a Notice to Air Missions (NOTAM) and/or a Special Federal Aviation Regulation (SFAR). For more information, U.S. citizens should consult the [Federal Aviation Administration's Prohibitions, Restrictions, and Notices](#). Emergency medical evacuation flights between the United States and Venezuela may not be possible.

**Maritime Travel:**

Mariners should not travel to Venezuela. If transiting near Venezuelan maritime boundaries, check for U.S. maritime [advisories](#) and [alerts](#). Information may also be posted to the [U.S. Coast Guard homeport](#) website, and [the NGA broadcast warnings website](#).

We reiterate that the U.S. Department of State urges citizens not to travel to Venezuela or to attempt to enter Venezuela without a visa.

Incidents of piracy off the coast of Venezuela remain a concern. Yachters should note that anchoring offshore is not considered safe. Marinas, including those in Puerto la Cruz and Margarita Island (Porlamar), provide only minimal security, and you should exercise a heightened level of caution in Venezuelan waters.

# EXHIBIT I

**OFM Health Care Research Center**

Research brief No. 110

# Washington state's immigrant population: 2010-21

*By Wei Yen, Ph.D.*                                                      *May 2023*

## Introduction

This brief presents changes in Washington's immigrant population from 2010 to 2021. We grouped the state's population in four categories: U.S.-born citizens, naturalized citizens, legal immigrants and undocumented immigrants. Our data source is the Census Bureau's American Community Survey (ACS) 1-year Public Use Microdata Sample files. Before we analyzed the ACS data, we applied an adjustment to the data to account for the underreport of Medicaid population in the ACS beginning in 2014.[1] Estimates for 2020 are not available due to data quality issues that year in the ACS because of national data collection challenges during COVID-19.[2]

### Our main findings

- *Immigrant population has increased by 29% in Washington during 2010-21, with a larger increase in the immigrant group of naturalized citizens (37%). In 2021, the total immigrant population was 1,149,000.*

- *Shares of females in each immigrant population group remained about the same across the years, although the shares varied among the groups, between 40% and 60%.*

- *While the share of adults 18-64 declined in the U.S.-born citizen group to 58%, it remained the same in the immigrant groups (around 75% for naturalized citizen group and legal immigrant group, and 90% for the undocumented immigrant group).*

- *The share of individuals with Hispanic origin had a gradual but steady increase in the U.S.-born citizen group (8% to 12%). However, the undocumented immigrant group share declined from 54% to 39%.*

- *The shares of non-Hispanic white population declined in the U.S.-born citizen group (80% to 72%)[3] and the legal immigrant group (32% to 23%).*

- *The shares of non-Hispanic Asians or Pacific Islanders increased in the legal*

---

[1] For more information on our adjustment to the ACS, see
https://ofm.wa.gov/sites/default/files/public/legacy/healthcare/healthcoverage/pdf/undercount_medicaid.pdf.
[2] For more information about data issues in the 2020 American Community Survey, see
https://ofm.wa.gov/sites/default/files/public/dataresearch/researchbriefs/brief106.pdf.
[3] There is a strong reason to believe that large decline from 75.3% in 2019 to 71.5% in 2021 is mostly due to change in the survey question adopted in 2021 ACS. See more details in the section "Non-Hispanic white."

*immigrant group (27% to 36%) and the undocumented immigrant group (27% to 43%).*

- *In the adult population age 18-64, all groups except the legal immigrant group had increased shares with a 4-year college degree or higher. The undocumented immigrant group had the largest change (22% to 47%).*

- *For all groups, shares of adults 18-64 who were employed increased to the highest point in 2019 (above 70%) and then declined in 2021.*

- *Shares of adults 18-64 in low-income families (less than 200% of the federal poverty level) declined in all groups, particularly in the undocumented immigrant group in which the share dropped by half (56% to 28%).*

## Immigrant population in 2010-21

Washington's total population increased by 15% from 2010 to 2021 (7.7 million). At the same time, U.S.-born citizen population increased by 13% and the immigrant population increased by 29%. Within the immigrant population, the naturalized citizen group had the largest increase, with 37%, while the legal immigrant group and the undocumented immigrant group increased by 20% and 23%.

U.S.-born citizens accounted for 86.7% of the total population in 2010 and 85.1% in 2021. The share of naturalized citizens increased slightly from 6.1% to 7.3%. The share of legal immigrants remained unchanged essentially, at about 3.6%. The share of undocumented immigrants also remained unchanged, at about 3.8%.

Table 1. Washington population (in thousands) by immigration status: 2010-21

| Immigration status | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2010-2021 change (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State total population | 6,744 | 6,830 | 6,897 | 6,971 | 7,062 | 7,170 | 7,288 | 7,406 | 7,536 | 7,615 | | 7,739 | 14.7% |
| U.S.-born citizen | 5,850 | 5,912 | 5,985 | 6,027 | 6,132 | 6,191 | 6,269 | 6,339 | 6,426 | 6,483 | | 6,589 | 12.6% |
| Immigrant | 894 | 918 | 912 | 944 | 930 | 979 | 1,019 | 1,067 | 1,110 | 1,132 | | 1,149 | 28.5% |
| Naturalized citizen | 411 | 414 | 428 | 439 | 429 | 464 | 483 | 515 | 542 | 532 | | 563 | 37.0% |
| Legal immigrant | 236 | 237 | 227 | 232 | 240 | 262 | 287 | 288 | 279 | 293 | | 283 | 20.0% |
| Undocumented immigrant | 247 | 268 | 257 | 274 | 261 | 254 | 249 | 264 | 289 | 307 | | 304 | 22.6% |

Figure 1. Percentage of total population by immigration status, 2010-21: Washington



# Changes in demographic characteristics, 2010-21

## Sex

There were no statistically significant changes in the share of females within any of the immigrant population groups from 2010 to 2021. However, across the groups, *differences* in the shares of females persisted. For example, while the share of females in the U.S.-born citizen group has been slightly below 50%, the share in the naturalized citizen group and legal immigrant groups has been higher, in the mid-50% and the share has been lower in the undocumented immigrant group, in the mid-40%.

Figure 2. Percentage of female in population groups by immigration status, 2010-21: Washington



## Children under 18

From 2010 to 2021, the share of children under 18 declined in the U.S.-born citizen, naturalized citizen and legal immigrant groups. In the undocumented immigrant group, the change in the share was not significant. There were, however, considerable differences across these four groups in their shares of children under 18.

The U.S.-born citizen group had the highest share, above 25%. The share was lowest in the naturalized citizen group, below 5% in all years except 2010. In the legal immigrant group, the share dropped from approximately 20% to about 11%. Finally, the share in the undocumented immigrant group remained between 5% and 10% at all times.

Figure 3. Percentage of children under 18 in population groups by immigration status, 2010-21: Washington



## Adults 18-64

The only group that had a significant change from 2010 to 2021 in the share of adults 18-64 was the U.S.-born citizen group.

When the four groups' shares are ranked, the U.S.-born citizen group had the lowest share, at or slightly below 60%. The undocumented immigrant group had the highest share, around 90%. For the naturalized citizen group and the legal immigrant group, their shares were similar, between 70% and 80%.

Figure 4. Percentage of adults 18-64 in population groups by immigration status, 2010-21: Washington



## Adults 65 and older

Washington's population has been aging over the past decade due to Baby Boomers entering the retirement age. This phenomenon manifested itself in the share of adults 65 and older in the U.S.-born citizens. This group's increased from 12.5% in 2010 to 16.6% in 2021. In all three immigrant groups, although the share was higher in 2021 than in 2010, the change was not statistically significant. Notable differences existed in the shares when we compared the four groups. The naturalized citizen group had the highest share, about 20%, followed by the U.S.-born citizen group (around 15%), the legal immigrant group (around 10%) and the undocumented immigrant group (around 2.5%).

Figure 5. Percentage of adults 65 and older in population groups by immigration status, 2010-21: Washington



## Hispanic origin

Two groups, the U.S.-born citizen group and the undocumented immigrant group, had opposite trends in their shares of people with Hispanic origin. The share in the U.S.-born citizen group rose steadily while the share in the undocumented immigrant group had an overall decline. The shares in the other two groups, naturalized citizen group and legal immigrant group, show little change over time. Despite the steady increase, the share (around 10%) in the U.S.- born citizen was the lowest when we compared all four groups. And despite the declining trend from mid-50% to approximately 40% in the undocumented immigrant group, its share remained the highest. The second highest share, between 30% and 35%, belonged to the legal immigrant group. The naturalized citizen group had the third highest share, around 15%. Note that in the U.S.-born citizen group, the average annual change from

2010 to 2019 was an increase of approximately a quarter of a percent (0.24%). However, from 2019 to 2021, the average annual change was an increase of slightly over half of a percent (0.55%), more than twice the change in previous years.

This change from 2019 to 2021 is partially due to a change first implemented in 2020 in how the U.S. Census Bureau asked race/ethnicity questions in the American Community Survey.[4]

Figure 6. Percentage of people of Hispanic origin in population groups by immigration status, 2010-21: Washington



### Non-Hispanic white

Changes in the shares of non-Hispanic white persons are notable in the U.S.-born citizen group and the legal immigrant group, with declines in both groups. Changes in the other two groups were not statistically significant. The change from 75.3% in 2019 to 71.5% in 2021 among U.S.-born citizens was particularly large for this group. However, this large change is mostly the result of the change in how the race questions were asked in the American Community Survey.[5] If we apply the average annual decline from 2010 to 2019 to the 2020 and 2021 ACS for Washington, we should expect the non-Hispanic white share in the U.S.-born citizen group to be approximately 74.4%. (This is true if we assume the ACS race/ethnicity questions did not change). In other words, it is reasonable to attribute a nearly 3 percentage point decline (74.4%-71.5%) in this group's share to the change based on how the race/ethnicity questions were asked in the ACS.

---

[4] For the change in the race/ethnicity questions, see https://www.census.gov/newsroom/blogs/random-samplings/2021/08/improvements-to-2020-census-race-hispanic-origin-question-designs.html.
[5] See the previous note for details about the change in the race/ethnicity questions in the ACS.

Across the four groups, there was a large variation in the share of non-Hispanic white people. The U.S.-born citizen group had the highest share. The naturalized citizen group and the legal immigrant group had the second highest shares. These two groups had shares ranging between 20% and 35% and there was no statistical difference between these two groups in any single year. The undocumented immigrant group had the lowest share, between 11% and 15%.

Figure 7. Percentage of non-Hispanic white in population groups by immigration status, 2010-21: Washington



### Non-Hispanic Asian and Pacific Islander

The share of non-Hispanic Asians/Pacific Islanders in the U.S.-born citizen group had a gradual and steady increase during 2010-21. However, the average annual increase in 2019-21 appeared to be much larger than any previous year-to-year increase. The larger increases in 2019-21 may be caused by the change in the ACS questions on race/ethnicity.

In the naturalized citizen group, there was no apparent change. In the legal immigrant group, there was an increase in 2013 and the share afterwards remained at the increased level. In the undocumented immigrant group, the increase started in 2014 and continued to increase through 2021.

When compared across the four groups, the share of non-Hispanic Asian/Pacific Islander people was the highest in the naturalized citizen group (more than 40%) and the lowest in the U.S.-born citizen group (below 5%). In the remaining two groups, their shares appear to be similar (between high 20% to mid-30%), except that the share in the undocumented immigrant group appeared to have a faster increase in recent years than the share in the legal immigrant group.

Figure 8. Percentage of non-Hispanic Asian or Pacific Islander people in population groups by immigration status, 2010-21: Washington



## Changes in socio-economic characteristics of adults 18-64 from 2010 to 2021

### Education

The share of adults 18-64 years with a four-year college degree or higher increased in three of the four groups. The one with inconclusive trend was the legal immigrant group.

The highest share of the four groups was in the naturalized citizen group and it increased from 33% in 2010 to 43% in 2021. The undocumented immigrant group, for most of the years, had the lowest share.

However, in the last few years, this group's share had a rather fast increase, so much that it was tied statistically with the highest share in the naturalized citizen group by 2021. Over time, this group's share increased from 22% to 47%. The share in the legal immigrant group hovered around 30%, which placed the group's share between the second lowest and the lowest. The U.S.-born citizen group had a gradual yet steady increase in its share (from below 30% to 35%) and its rank among the four groups changed from the second highest to the third highest.

Figure 9. Percentage of adults aged 18-64 with a 4-year college degree or higher in population groups by immigration status, 2010-21: Washington



### Employment

The share of adults 18-64 years who were employed in each group showed an upward trend from 2010 to 2019 and then a decline from 2019 to 2021. The decline from 2019 to 2021 can be attributed to the COVID-19 pandemic because many businesses were

recovering in 2021. For all four groups, the share of the employed was at or above 60%. However, the share in the naturalized citizen group, between 75% and 80%, was consistently the highest in all years, except in 2021. The group with the lowest share at all

times was the legal immigrant group, with a share between 60% and 75%. The share of the U.S.-born citizen group had a narrow range, between 70% and 75%, with a ranking of the second highest early on and the third highest in the last few years. The group with

the second highest share in the last few years was the undocumented immigrant group. Its share increased from 65% in 2010 to its highest point of 78% in 2019 and then dropped slightly to 76% in 2021.

Figure 10. Percentage of adults aged 18-64 who were employed in population groups by immigration status, 2010-21: Washington



## Low income (family income below 200 percent of the federal poverty level)

The share of adults 18-64 with low income dropped in all four groups from 2010 to 2021. In the legal immigrant group and the undocumented immigrant group, there was a slight increase from 2019 to 2021, but the increase was not statistically significant for either group. The shares in the U.S.-born citizen group and the naturalized citizen

group were quite similar, dropping from high 20% to about 20%. Their shares were much lower than the shares in the other two groups, especially in earlier years. The undocumented immigrant group had the highest share in earlier years, at about 50%. However, in the last two years, its share dropped to a level similar to that of the legal immigrant group, below 30%.

Figure 11. Percentage with low family income (less than 200% of federal poverty level), adults aged 18-64 by immigration status, 2010-21: Washington



## Evolving demographic and socio-economic characteristics of the undocumented immigrants

Changes in the demographic and socio-economic characteristics of the undocumented immigrants are worth mention. In many cases, this group's changes were the most dramatic change during 2010-21. In the early years of this period, the undocumented immigrants were nearly all in the age range of 18-64, mostly male, individuals of Hispanic origin, non-white, and non-Asian/Pacific Islander. For those in the age range of 18-64, few had a 4-year college degree and beyond and most were in low-income, though the majority of them were employed.

By the end of this period, although undocumented immigrants continued to be nearly all in the 18-64 age range, mostly male and non-white, most of them were now no longer of Hispanic origin. For those

in the age range of 18-64, their share of having a 4-year college degree and beyond was approaching 50% and was the highest of all groups in 2021. The proportion with low-income dropped by half, the largest decline of all groups. Their share of being employed increased further and it was tied with the highest share.

We did not attempt to determine the cause(s) for the changes in the characteristics of the undocumented immigrant population because doing so requires data we do not have and also requires a more complex analysis. However, the higher employment share, the dramatic increase in the share holding a 4-year college degree and beyond, and the dramatic decrease in the share of low-income people appear to suggest that current undocumented immigrants were more likely to be here on expired temporary documents (e.g., student visa and temporary work visa) than in earlier years.

## Data source and notes

### Data source

The original data source for this research brief is the US Census Bureau's American Community Survey (ACS) 1-year Public Use Microdata Sample files for 2010 to 2019 and 2021. The Health Care Research Center at the Office of Financial Management adjusted the ACS sample weights to correct the undercount of Medicaid enrollment found in ACS beginning in 2014.[6] This adjustment may have resulted in minor changes in estimates besides counts of Medicaid enrollment. We based estimates reported in this brief for 2014-20 and 2021 on the adjusted ACS data.

### Immigrant status

This brief classifies Washington's population into four groups according to their immigration statuses: U.S.-born citizen, naturalized citizen, legal immigrant and undocumented immigrant. U.S.-born citizen and naturalized citizen are determined by the citizenship and nativity data fields in the ACS. If a person is a citizen and was born native, that person is classified as U.S.-born citizen. A citizen reported to be a foreign-born is classified as a naturalized citizen. The remainder of the population are non-citizens. The ACS does not have direct data fields that can be used to classify a non-citizen as either legal immigrant or undocumented immigrant. To help make

that distinction, we applied an algorithm published in the journal of Labor Economics by George Jo. Borjas to the ACS data.[7] The Borjas algorithm uses existing information in federal surveys such as the Current Population Survey and the ACS to impute a non-citizen's legal status. Such information includes their arrival in U.S. before 1980, participation in public assistance programs, employment in government positions, veteran or person currently in armed forces, etc. Surveys may have sampling and response errors that may result in under-report of non-citizens, probably more so of undocumented immigrants. Estimates of the non-citizen populations in this brief may contain those errors. In addition, there may be an over-report of naturalized citizens in this brief since people born outside the U.S. but to parents who are U.S. citizens are classified as "naturalized citizens" in the brief's analysis.

### Missing income

The ACS data include a small number of records that have no income information. We excluded those records when we calculated the percentage of population in low income.

### Statistical difference between estimates

The difference between two estimates is considered statistically significant if their 95% confidence intervals of the two estimates do not overlap.

---

[6] See footnote 1.
[7] Borjas, GJ. The Labor supply of undocumented immigrants. Labor Economics 46(2017):1-13.

# Appendixes

Table A1. Total population by immigration status (in percentage), Washington, 2010-19 and 2021

| Immigration status | '10 | '11 | '12 | '13 | '14 | '15 | '16 | '17 | '18 | '19 | '20 | '21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| U.S.-born citizen | 86.7 | 86.6 | 86.8 | 86.5 | 86.8 | 86.3 | 86.0 | 85.6 | 85.3 | 85.1 | | 85.1 |
| Naturalized citizen | 6.1 | 6.1 | 6.2 | 6.3 | 6.1 | 6.5 | 6.6 | 7.0 | 7.2 | 7.0 | | 7.3 |
| Legal immigrant | 3.5 | 3.5 | 3.3 | 3.3 | 3.4 | 3.6 | 3.9 | 3.9 | 3.7 | 3.9 | | 3.7 |
| Undocumented immigrant | 3.7 | 3.9 | 3.7 | 3.9 | 3.7 | 3.5 | 3.4 | 3.6 | 3.8 | 4.0 | | 3.9 |
| Total population | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | | 100 |

Table A2. Demographic characteristics by Immigration status (in percentage), total population, Washington, 2010-19 and 2021

| Characteristic | Immigration Status | '10 | '11 | '12 | '13 | '14 | '15 | '16 | '17 | '18 | '19 | '20 | '21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Female | U.S.-born citizen | 49.8 | 49.8 | 49.9 | 49.8 | 49.7 | 49.8 | 49.7 | 49.7 | 49.7 | 49.7 | | 49.3 |
| | Naturalized citizen | 55.9 | 54.7 | 55.1 | 55.8 | 55.1 | 55.1 | 54.5 | 55.6 | 54.8 | 54.4 | | 54.4 |
| | Legal immigrant | 56.8 | 56.4 | 54.5 | 54.7 | 54.7 | 53.9 | 55.0 | 53.4 | 52.6 | 55.2 | | 52.8 |
| | Undocumented immigrant | 43.6 | 44.3 | 44.7 | 42.5 | 43.6 | 43.4 | 45.4 | 44.2 | 45.4 | 42.7 | | 44.8 |
| Age 0-17 | U.S.-born citizen | 27.1 | 26.8 | 26.7 | 26.6 | 26.5 | 26.4 | 26.2 | 26.2 | 26.0 | 26.0 | | 25.6 |
| | Naturalized citizen | 6.4 | 4.8 | 4.8 | 4.7 | 4.4 | 3.8 | 4.1 | 4.1 | 3.9 | 2.8 | | 3.4 |
| | Legal immigrant | 19.5 | 16.5 | 14.4 | 15.9 | 14.3 | 12.8 | 15.1 | 14.3 | 13.3 | 11.3 | | 11.4 |
| | Undocumented immigrant | 8.9 | 8.7 | 8.1 | 6.1 | 7.4 | 7.0 | 5.6 | 6.9 | 7.3 | 8.7 | | 9.1 |
| Age 18-64 | U.S.-born citizen | 60.5 | 60.5 | 60.1 | 59.5 | 59.3 | 59.0 | 58.8 | 58.6 | 58.2 | 57.8 | | 57.8 |
| | Naturalized citizen | 74.1 | 75.7 | 76.5 | 75.8 | 75.4 | 76.0 | 74.1 | 74.4 | 74.0 | 74.4 | | 75.4 |
| | Legal immigrant | 71.6 | 72.8 | 73.3 | 72.1 | 74.3 | 76.0 | 75.4 | 74.0 | 77.3 | 78.7 | | 76.6 |
| | Undocumented immigrant | 89.6 | 89.7 | 90.0 | 92.7 | 89.9 | 90.5 | 92.2 | 90.4 | 90.8 | 89.3 | | 88.5 |
| Age 65 and older | U.S.-born citizen | 12.5 | 12.7 | 13.3 | 13.8 | 14.2 | 14.6 | 15.0 | 15.2 | 15.7 | 16.2 | | 16.6 |
| | Naturalized citizen | 19.5 | 19.5 | 18.7 | 19.5 | 20.2 | 20.2 | 21.8 | 21.5 | 22.1 | 22.8 | | 21.2 |
| | Legal immigrant | 8.9 | 10.7 | 12.3 | 12.0 | 11.5 | 11.2 | 9.5 | 11.6 | 9.4 | 10.1 | | 12.0 |
| | Undocumented immigrant | 1.5 | 1.6 | 1.9 | 1.2 | 2.6 | 2.5 | 2.2 | 2.7 | 1.9 | 2.0 | | 2.3 |
| Hispanic | U.S.-born citizen | 8.3 | 8.7 | 8.7 | 9.2 | 9.5 | 9.6 | 9.7 | 10.1 | 10.2 | 10.5 | | 11.6 |
| | Naturalized citizen | 14.5 | 14.5 | 15.1 | 14.4 | 14.5 | 15.7 | 15.5 | 15.2 | 17.0 | 16.6 | | 14.3 |
| | Legal immigrant | 33.3 | 31.0 | 34.2 | 29.3 | 34.8 | 35.0 | 34.8 | 34.6 | 31.9 | 32.1 | | 34.0 |
| | Undocumented immigrant | 54.4 | 52.0 | 55.3 | 54.1 | 49.7 | 49.7 | 49.5 | 45.8 | 45.3 | 41.0 | | 39.4 |
| Non-Hispanic white | U.S.-born citizen | 79.5 | 79.1 | 78.4 | 78.1 | 77.2 | 77.0 | 76.8 | 76.1 | 75.7 | 75.3 | | 71.5 |
| | Naturalized citizen | 30.9 | 30.0 | 32.1 | 30.3 | 29.8 | 29.5 | 28.4 | 29.9 | 27.3 | 27.1 | | 27.7 |
| | Legal immigrant | 31.6 | 33.2 | 28.1 | 28.9 | 24.3 | 25.8 | 25.2 | 23.2 | 24.0 | 21.2 | | 22.8 |
| | Undocumented immigrant | 15.4 | 12.9 | 14.1 | 13.2 | 14.6 | 11.6 | 11.9 | 11.8 | 10.8 | 12.9 | | 14.1 |
| Non-Hispanic Asian and Pacific Islander | U.S.-born citizen | 3.3 | 3.3 | 3.5 | 3.5 | 3.6 | 3.5 | 3.8 | 3.8 | 4.0 | 4.0 | | 4.3 |
| | Naturalized citizen | 47.3 | 46.8 | 45.3 | 47.3 | 49.1 | 46.3 | 46.2 | 46.1 | 45.7 | 46.9 | | 46.9 |
| | Legal immigrant | 26.8 | 28.7 | 28.6 | 35.2 | 31.8 | 33.6 | 29.9 | 34.0 | 33.4 | 32.9 | | 35.6 |
| | Undocumented immigrant | 27.4 | 30.2 | 26.7 | 27.5 | 32.1 | 36.2 | 34.8 | 37.0 | 39.0 | 40.4 | | 42.7 |

Table A3. Education, employment and income by immigration status (in percentage): adults 18-64, 2010-19 and 2021

| Characteristic | Immigration status | '10 | '11 | '12 | '13 | '14 | '15 | '16 | '17 | '18 | '19 | '20 | '21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4-year college education or higher | U.S.-born citizen | 28.8 | 29.1 | 29.1 | 29.9 | 30.1 | 30.3 | 31.6 | 32.0 | 32.7 | 32.8 | | 34.7 |
| | Naturalized citizen | 33.4 | 33.5 | 34.7 | 34.2 | 36.8 | 37.4 | 39.1 | 37.5 | 40.4 | 41.0 | | 43.1 |
| | Legal immigrant | 27.5 | 27.3 | 28.1 | 31.7 | 25.3 | 29.1 | 31.2 | 31.4 | 34.1 | 32.4 | | 32.9 |
| | Undocumented immigrant | 22.0 | 22.6 | 21.8 | 25.5 | 27.1 | 30.7 | 30.7 | 37.0 | 37.5 | 40.9 | | 46.6 |
| Employed | U.S.-born citizen | 69.0 | 69.0 | 70.3 | 70.4 | 70.1 | 71.1 | 72.0 | 73.7 | 74.1 | 74.3 | | 71.7 |
| | Naturalized citizen | 74.9 | 75.6 | 75.0 | 74.5 | 78.2 | 76.9 | 77.2 | 78.3 | 78.0 | 80.3 | | 75.8 |
| | Legal immigrant | 61.6 | 61.4 | 61.5 | 64.1 | 59.3 | 65.6 | 63.5 | 65.0 | 68.0 | 74.0 | | 65.1 |
| | Undocumented immigrant | 64.9 | 66.8 | 70.5 | 71.0 | 72.8 | 71.1 | 73.1 | 73.1 | 74.5 | 77.6 | | 76.1 |
| Low-income (below 200% of FPL) | U.S.-born citizen | 24.3 | 25.7 | 26.2 | 26.6 | 26.0 | 25.2 | 23.3 | 22.0 | 21.6 | 20.6 | | 19.9 |
| | Naturalized citizen | 25.2 | 28.3 | 25.6 | 27.6 | 23.8 | 26.5 | 22.3 | 19.7 | 20.8 | 19.3 | | 19.2 |
| | Legal immigrant | 41.7 | 40.8 | 41.3 | 41.4 | 47.8 | 42.4 | 39.9 | 34.4 | 35.6 | 29.6 | | 31.0 |
| | Undocumented immigrant | 56.2 | 55.8 | 51.4 | 51.7 | 47.1 | 43.5 | 41.5 | 40.2 | 33.3 | 26.5 | | 27.8 |

# EXHIBIT J



# All Births Dashboard - County

| Top 50 Baby Names to WA Residents | General Fertility Rate by County | General Fertility Rate by Maternal Race and County | Crude Birth Rate by County | Crude Birth Rate by Infant Sex and County | Age Specific Birth Rate by County |

**General Fertility Rate: Total # of Births to Women of All Ages per 1,000 women aged 15-44 years (WA Residents only)**
Data are available in this tab for years 2011-2022 at the State and County levels. Please use the slider to select a year. The last tab titled "Download Data Table" allows you to select the data you would like to download for analysis.

**Map (Select a Year)**
2022

| Geography | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 201 |
|---|---|---|---|---|---|---|---|---|
| State Total | 53.5 | 54.7 | 54.6 | 56.7 | 58.5 | 60.6 | 63.7 | 63 |
| Adams | 79.5 | 92.0 | 84.3 | 99.6 | 100.8 | 104.0 | 100.1 | 93 |
| Asotin | 59.2 | 61.0 | 59.2 | 60.9 | 72.2 | 51.6 | 6.8 | 5 |
| Benton | 61.8 | 64.0 | 63.7 | 66.3 | 68.3 | 70.0 | 75.8 | 73 |
| Chelan | 55.9 | 57.8 | 57.9 | 64.9 | 63.4 | 64.0 | 69.5 | 71 |
| Clallam | 46.9 | 56.9 | 57.3 | 55.9 | 57.6 | 64.2 | 63.5 | 64 |
| Clark | 55.4 | 57.0 | 55.6 | 59.3 | 59.3 | 60.8 | 56.9 | 56 |
| Columbia | 61.5 | 48.4 | 53.7 | 50.2 | 58.2 | 60.3 | 65.3 | 56 |
| Cowlitz | 64.0 | 61.7 | 64.7 | 65.3 | 65.7 | 69.4 | 66.4 | 62 |
| Douglas | 65.5 | 65.3 | 61.5 | 64.5 | 66.2 | 77.1 | 71.3 | 76 |
| Ferry | 63.2 | 73.4 | 67.1 | 72.6 | 65.9 | 72.4 | 80.1 | 53 |
| Franklin | 69.1 | 70.4 | 73.8 | 78.1 | 79.4 | 84.9 | 89.3 | 90 |
| Garfield | 87.7 | 81.5 | 56.4 | 68.8 | 78.8 | 89.7 | | 33 |



NR = Not Reliable. Rates are not reliable due to counts less than 17. ** = Suppression. Rates are suppressed when counts are between 1-9.
For more information, please click on the landing page: https://doh.wa.gov/data-and-statistical-reports/washington-tracking-network-wtn/birth-outcomes-data
Citation: Washington State Department of Health, Center for Health Statistics, Birth Certificate Data, 2000–2022. Due to the current lack of Small Area Data Estimates from Office of Financial Management (OFM), the population data used to calculate rates in this dashboard come from the