The Honorable Judge John C. Coughenour

1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

8

State of Washington, et al.,

9
                                Plaintiffs,

10

11           v.

12   Donald Trump, et al.,

                                Defendants.

13

Case No. 2:25-cv-00127-JCC

**INDIVIDUAL PLAINTIFFS'**
**REPLY BRIEF IN SUPPORT OF**
**MOTION FOR PRELIMINARY**
**INJUNCTION**

Noting Date: February 4, 2025

14

15

16

17

18

19

20

21

22

23

24

INDIVIDUAL PLS.' REPLY IN SUPP. OF
MOT. FOR PRELIM. INJ.
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

## I.    INTRODUCTION

Defendants advance a remarkable claim, never endorsed by any court, that the Executive can unilaterally disregard more than a century of settled law to reinterpret the Fourteenth Amendment to strip people born in the United States of birthright citizenship. But "[t]he very nature of our free government makes it completely incongruous to have a rule of law under which a group of citizens temporarily in office can deprive another group of citizens of their citizenship." *Afroyim v. Rusk*, 387 U.S. 253, 268 (1967). Because the Fourteenth Amendment unambiguously forecloses the power Defendants assert, and because Defendants' actions would result in the deprivation of the constitutional right to citizenship, Individual Plaintiffs and proposed class members have established the need for preliminary injunctive relief with respect to the Citizenship Stripping Order (EO).

Defendants' brief plainly contradicts dispositive Supreme Court precedent. In fact, it asserts the very arguments that were made by the dissenting opinion in *Wong Kim Ark*, 169 U.S. 649 (1898), and that the majority rejected. It similarly contradicts more than a century of caselaw that follows.

Defendants' merits arguments boil down to three, all equally unavailing. First, they assert that the Fourteenth Amendment was modeled on the Civil Rights Act of 1866, whose reference to "foreign power" meant that a person must owe "no allegiance to any alien power" to be entitled to birthright citizenship. Dkt. 84 at 21 (citations omitted). But *Wong Kim Ark* squarely addressed and rejected that assertion. Second, Defendants claim that jurisdiction does not mean "subject to U.S. laws," because if it did, then Native Americans would have been citizens at the time the Fourteenth Amendment was adopted. But *Wong Kim Ark* and the legislative debates again squarely reject this argument. Finally, Defendants claim that a person must be a lawful

INDIVIDUAL PLS.' REPLY IN SUPP. OF
MOT. FOR PRELIM. INJ. - 1
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

domiciliary of the United States for their children to acquire birthright citizenship. But that claim distorts the constitutional text in an effort to add an extra requirement. In the end, Defendants' arguments about allegiance and domicile are smoke and mirrors, merely serving to distract from the fact that Defendants repeatedly ignore the statements in the congressional record from the Fourteenth Amendment debates and the reasoning in *Wong Kim Ark* that directly refute their position.

Finally, Defendants' remaining arguments are similarly untenable. Supreme Court and Ninth Circuit caselaw resoundingly holds there is a cause of action in cases like this one to remedy constitutional violations and that such violations constitute irreparable harm.

## II.   ARGUMENT

### A.   Individual Plaintiffs properly bring a constitutional claim.

Defendants' assertion that Individual Plaintiffs (hereinafter, "Plaintiffs") lack a cause of action disregards directly binding caselaw that Defendants do not even attempt to distinguish.

First, Defendants err in asserting that Plaintiffs cannot challenge the EO because the Constitution provides no way to challenge its purported reinterpretation of the Fourteenth Amendment. Dkt. 84 at 16. "Courts have long recognized the existence of an implied cause of action through which plaintiffs may seek equitable relief to remedy a constitutional violation." *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) (per curiam). This "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Consistent with this longstanding tradition, the Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief" to remedy "violations of federal law by federal officials."

INDIVIDUAL PLS.' REPLY IN SUPP. OF
MOT. FOR PRELIM. INJ. - 2
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1    *Id.* at 326–27; *see also Ziglar v. Abbasi*, 582 U.S. 120, 144 (2017) (noting that detained persons

2    "may seek injunctive relief" to challenge "large-scale policy decisions concerning the conditions

3    of confinement imposed on hundreds of prisoners").

4        Ignoring this controlling caselaw, Defendants point only to *DeVillier v. Texas*, which

5    simply remarked that a party "assert[ing] [constitutional rights] offensively" generally does so

6    "pursuant to an independent cause of action designed for that purpose." 601 U.S. 291, 291

7    (2024). But *DeVillier* was a Takings Clause case and cited for this proposition a *Bivens* case. *See*

8    *id.* (citing *Egbert v. Boule*, 596 U.S. 482, 490–91 (2022)). Thus, read in context, this statement is

9    readily understood as referring to cases seeking money or recompense for constitutional wrongs,

10   and does not reflect on the caselaw that recognizes the well-established right to sue under the

11   Constitution for injunctive relief.

12       Second, Defendants also claim that there is no statutory cause of action. Dkt. 84 at 13–15.

13   But they recognize that 8 U.S.C. § 1503 allows individuals denied the "right[s] or privilege[s]"

14   of U.S. nationality to challenge that denial in federal court. *Id.* at 14–15 (quoting 8 U.S.

15   § 1503(a)). And here, the EO instructed "department[s] [and] . . . agenc[ies]" to deny U.S.

16   citizenship to the class member children. *Compare id.* at 14 (citation omitted), *with* Dkt. 74 at 4

17   (quoting EO § 2). As a result, even if this cause of action were necessary for Plaintiffs to seek

18   preliminary relief—which it is not, because the Constitution allows them to sue—§ 1503(a)

19   would provide an independent basis for declaratory relief.

20       Finally, Plaintiffs did not move for a preliminary injunction under the Administrative

21   Procedure Act. *See* Dkt. 74, Sec. IV.A. As a result, Defendants' assertion that they have not

22   asserted a valid cause of action under the APA has no bearing on whether the Court may issue

23   the requested relief at this juncture.

24

**B.    Plaintiffs have demonstrated preliminary injunctive relief is warranted.**

**1.    Plaintiffs are likely to succeed on the merits that the EO is unconstitutional.**

a.    <u>Individuals born in the United States are "subject to the jurisdiction thereof," regardless of their parents' alienage or legal status.</u>

Defendants' first key argument is that "subject to the jurisdiction thereof" does not mean "subject to U.S. law," and instead requires exclusive allegiance to the United States. In support of this argument, they point primarily to the status of Native Americans and the Civil Rights Act of 1866. Each of these arguments is unavailing, and *Wong Kim Ark* and the legislative history of the Citizenship Clause directly rebuff them.

i.    *The historical treatment and discussion of Native Americans and tribal sovereignty confirms that "jurisdiction" in the Citizenship Clause means "subject to U.S. law."*

First, Defendants rely on the original exclusion of Native American tribal members from birthright citizenship to claim that "subject to the jurisdiction" of the United States does not mean "subject to U.S. law." This is because, according to Defendants, Congress has the power to "regulate Indian commercial activities" and "Indian property," as well as "punish Indians for crimes." Dkt. 84 at 19 (citations omitted). But this argument fails to acknowledge the sui generis nature of this issue, and how "members of the Indian tribes[] stand[] in a peculiar relation to the national government." *Wong Kim Ark*, 169 U.S. at 682.

Supreme Court precedent affirms that because of tribal sovereignty, Native American tribal members are not considered to be subject to the U.S.'s jurisdiction despite being within the country's territorial boundaries. This is because of their status as "members of separate political communities and not part of the ordinary body politic of the states or of the United States," which has "profound legal implications for the jurisdiction of state and federal governments, courts, and law-enforcement agencies." Garrett Epps, *The Citizenship Clause: A "Legislative*

INDIVIDUAL PLS.' REPLY IN SUPP. OF
MOT. FOR PRELIM. INJ. - 4
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

*History"*, 60 Am. U. L. Rev. 331, 364 (2010) (citation omitted); *see also id.* at 365 (providing

examples of Indian sovereignty). In *Elk v. Wilkins*, the Court recognized this, explaining that

"[t]he Indian tribes, being within the territorial limits of the United States, were not, strictly

speaking, foreign states; but they were alien nations, distinct political communities." 112 U.S.

94, 99 (1884). As such, the U.S. government engages with them via treaties "or through acts of

congress" expressly applying to them, for "[g]eneral acts of congress did not apply to Indians."

*Id.* at 99–100.

It was in this context that *Elk* interpreted the jurisdictional requirement of the Citizenship

Clause. In explaining why Native American tribal members were not entitled to birthright

citizenship despite being born in U.S. territory, *Elk* emphasized their "allegiance" to another

sovereign:

> Indians born within the territorial limits of the United States, members of, and
> owing immediate allegiance to, one of the Indiana tribes, (an alien though
> dependent power,) although in a geographical sense born in the United States, are
> no more "born in the United States and subject to the jurisdiction thereof," within
> the meaning of the first section of the fourteenth amendment, than the children of
> subjects of any foreign government born within the domain of that government, or
> the children born within the United States, of ambassadors or other public ministers
> of foreign nations.

*Id.* at 102. Notably, the Court did not liken Native Americans to all children of foreigners, but

instead just to those born to diplomats, i.e., those not subject to the laws of the United States.

Indeed, in *Wong Kim Ark*, the Court distinguished *Elk* by underscoring the unique, "anomalous"

nature of Native American tribes in the United States, 169 U.S. at 683, saying the decision

"concerned only members of the Indian tribes within the United States, and had no tendency to

deny citizenship to children born in the United States of foreign parents of Caucasian, African, or

Mongolian descent, not in the diplomatic service of a foreign country," *id.* at 682.

INDIVIDUAL PLS.' REPLY IN SUPP. OF
MOT. FOR PRELIM. INJ. - 5
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

The legislative history confirms the framers' understanding of why the Citizenship Clause did not cover Native Americans. During the Senate debates on the Citizenship Clause, Senator Trumbull explicitly made the point that Native American tribal members were not "subject to [U.S.] jurisdiction," explaining that the United States did not "exercise any civil or criminal jurisdiction" over "wild tribes of Indians." Cong. Globe, 39th Cong., 1st Sess. Pt. 4, at 2894 (1866). Nor did the United States "take jurisdiction of murders and robberies and other crimes committed by one Indian upon another," or "punish[] them for instituting among themselves their own tribal regulations." *Id.* at 2893; *see also id.* at 2895 (statement of Sen. Howard) (noting the U.S. did not have "power to punish an Indian who is connected with a tribe for a crime committed by him upon another member of the same tribe"). For those reasons, Senator Trumbull declared: "Are they subject to our jurisdiction in any just sense? They are not subject to our jurisdiction. . . . It is only those persons who come completely within our jurisdiction, who are subject to our laws, that we think of making citizens . . . ." *Id.* at 2893. This discussion made clear that, to the framers, "subject to the jurisdiction thereof" meant the government's ability to enforce U.S. laws against them, including in a court of law if necessary.

Notably, not once in this conversation were the children of immigrants (who had been previously discussed, *see* Dkt. 74 at 14–15) mentioned as examples of children not "subject to the jurisdiction" of the United States. *See Wong Kim Ark*, 169 U.S. at 698–99 (reviewing discussion of noncitizen children in the legislative debates). To the contrary, the debates demonstrated that they were covered. For example, Senator Cowan stated his opposition to the Clause *because* it would entitle children of Chinese immigrants and "Gypsies" to U.S. citizenship, even though, in his view, they lacked "allegiance" to the United States. Cong. Globe, 39th Cong., at 2890–91. But subsequent discussion made clear that the drafters considered such

INDIVIDUAL PLS.' REPLY IN SUPP. OF
MOT. FOR PRELIM. INJ. - 6
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

people to be covered by the clause, as no other senator brought up any alleged lack of allegiance

by those groups in the substantive discussion of "allegiance" that ensued. *See id.* at 2891

(statement of Sen. Conness); *id.* at 2893–94 (statement of Sen. Trumbull).

In sum, the debate surrounding the federal government's unique relation to Native

Americans at the time the Fourteenth Amendment was ratified demonstrated consensus that they

were not subject to U.S. law—and therefore not "subject to the jurisdiction thereof." The

children of noncitizens, however, were understood to fall within the meaning of that phrase.

> ii.   Wong Kim Ark *confirms "jurisdiction" means "subject to U.S. law"*
> *and carefully defines who is exempt from it.*

Defendants also rely on the reference to "allegiance" from *Elk* and the congressional

debates to contend that people who lack *exclusive* allegiance to the United States are not subject

to U.S. jurisdiction. *See, e.g.*, Dkt. 84 at 20–21. But the *Wong Kim Ark* Court used the term

"allegiance" in a way that is consistent with the understanding of "jurisdiction" as simply

"subject to U.S. law." For example, in its decision, the Court employed the term "allegiance" in

reference to being "under the protection and control of the crown." 169 U.S. at 658 (citation

omitted). Allegiance, the Court explained, simply required "be[ing] born within a place where

the sovereign is at the time in full possession and exercise of his power," so long as the person

"at his birth derive[s] protection from, and consequently owe[s] obedience or allegiance to, the

sovereign." *Id.* at 659 (citation omitted). Birth on the sovereign's soil "subject[s] [that person] to

the duty of allegiance which is claimed and enforced by the sovereign of his native land [by this

circumstance of his birth] and becomes reciprocally entitled to the protection of that sovereign."

*Id.* at 663 (citation omitted). The concepts of "allegiance" and "protection" were thus

intertwined. *See, e.g.*, *id.* at 679 ("Allegiance and protection are, in this connection (that is, in

relation to citizenship) reciprocal obligations." (citation omitted)). And the idea of "ow[ing] . . .

INDIVIDUAL PLS.' REPLY IN SUPP. OF
MOT. FOR PRELIM. INJ. - 7
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

allegiance" was necessarily tied to being subjected to the laws and authority of the sovereign in whose territory an individual was located, irrespective of alienage. *See, e.g.*, *id.* at 685–86.[1]

The senatorial debates on the Fourteenth Amendment reflect the same understanding of "allegiance." Senator Trumbull's statement on the topic, upon whose testimony Defendants rely, Dkt. 84 at 21–22, best exemplifies the link: "What do we mean by 'subject to the jurisdiction of the United States?' Not owing allegiance to anybody else. . . . Can you sue a Navajoe [sic] Indian in court? Are they in any sense subject to the complete jurisdiction of the United States? By no means. We make treaties with them, and therefore they are not subject to our jurisdiction." Cong. Globe, 39th Cong., at 2893.

*Wong Kim Ark* also made clear that even if some U.S.-born children owe allegiance to their parents' country of citizenship, that does not mean they do not also owe allegiance to the United States—and obtain citizenship—by virtue of their birth. 169 U.S. at 691 (quoting Secretary of State opinion that "children [may be] born to a double character" and hold dual citizenship by deriving citizenship from a foreign parent and holding it by birthright).[2] That is because "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and

---

[1]    Even the dissenting Justices in *Wong Kim Ark* acknowledged that, under common law, where a person was "born during a temporary stay of a few days [to foreign parents], the child was irretrievably a British subject. The rule was the outcome of the connection in feudalism between the individual and the soil on which he lived, and the allegiance due was that of liege men to their liege lord." 169 U.S. at 707 (Fuller, J., dissenting) (internal citation omitted). They simply objected to the majority's holding that the Citizenship Clause should be read in light of these accepted common law principles. *Id.* at 707–09.

[2]    Indeed, the *Wong Kim Ark* Court was aware that "the tendency on the continent of Europe was to make parentage, rather than birthplace, the criterion of nationality." 169 U.S. at 667. Accordingly, it acknowledged that "[t]o hold that the fourteenth amendment of the constitution excludes from citizenship the children born in the United States of citizens or subjects of other countries, would be to deny citizenship to thousands of persons of English, Scotch, Irish, German, or other European parentage, who have always been considered and treated as citizens of the United States." *Id.* at 698.

absolute." *Id.* at 683–84 (quoting *The Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch.) 116, 136 (1812)). And "no sovereignty can extend its jurisdiction beyond its own territorial limits so as to relieve those born under and subject to another jurisdiction, from their obligations or duties thereto." *Id.* at 690 (citation omitted).

Moreover, Defendants' argument that "subject to the jurisdiction thereof" requires "exclusive allegiance" is internally inconsistent. Under Defendants' interpretation, a person is not "subject to the jurisdiction" of the United States where "allegiance" is owed "to any alien power.'" Dkt. 84 at 20 (quoting *Elk*, 112 U.S. at 101–02). Yet the EO does not purport to strip birthright citizenship from children of LPRs or dual citizens, even though they owe allegiance to another country *and* the United States. Defendants' position would also naturally suggest that the federal government cannot enforce the law (including criminal, tax, and immigration law) against noncitizens because such people, in their view, are not "subject to U.S. law." *See Wong Kim Ark*, 169 U.S. at 685–86 (citation omitted) (explaining that "it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction . . . if [non-diplomat noncitizens] did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country" "in which they were found"). Of course, Defendants do not advance this position.[3]

---

[3]    Defendants also suggest that "consent" is required by the Fourteenth Amendment, pointing to *Elk* and *The Schooner Exchange*. Dkt. 84 at 20. But the reference to consent in *Elk* concerned the argument that the plaintiff, not having been born a U.S. citizen, could subsequently, "at will," become a U.S. citizen by virtue of relinquishing his tribal affiliation. As the Court explained, that process would circumvent the manner in which Congress had provided for Native Americans to become U.S. citizens: through naturalization, either by treaty, or by statute. 112 U.S. at 102–04. This case, however, concerns *birth*right citizenship. For its part, *The Schooner Exchange* discussed the concept of "consent" in the context of a sovereign's "absolute" jurisdiction over anyone in its own territory—"consent" was required for "exceptions" to that "full and complete power," 11 U.S. (7 Cranch.) at 136.

INDIVIDUAL PLS.' REPLY IN SUPP. OF
MOT. FOR PRELIM. INJ. - 9
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

Plaintiffs' interpretation does not suffer from this shortcoming. Rather, "subject to the jurisdiction thereof" does not rely on exclusive allegiance, but instead includes all those subject to U.S. law. The only exceptions are for the classes of people *Wong Kim Ark* expressly identified—those commonly understood not to be included under that phrase in the antebellum and Reconstruction era.

In outlining these exceptions, the Court relied on English common law to exclusively define the narrow categories of individuals who, despite being born in the United States, are not subject to its jurisdiction. First, the Court found that "children of foreign sovereigns or their ministers," *id.* at 693, are beyond U.S. jurisdiction pursuant to the consular immunity that common law afforded to "foreign ministers," on account of them being deemed as "in the place of the sovereign he represents, or by a political fiction . . . extra-territorial," *id.* at 685 (quoting *The Schooner Exch.*, 11 U.S. at 138). Such individuals obviously owe no allegiance to the United States. Second, for similar reasons, the Court explained that children "born on foreign public ships" are not subject to the jurisdiction of the United States, *id.* at 693, based on the understanding that a "sovereign . . . cede[s] a portion of his territorial jurisdiction . . . where he allows the troops of a foreign prince to pass through his dominions," *id.* at 684 (citation omitted). Third, *Wong Kim Ark* identified as an exception the children "of enemies within and during a hostile occupation of part of [the] territory [of the United States]." *Id.* at 693. The Court reasoned that the inhabitants of such an occupied territory would be bound to the law of the enemy, such that the "sovereignty of the United States over the territory was . . . suspended." *Id.* at 683 (citation omitted).[4] Lastly, *Wong Kim Ark* recognized an additional group, "unknown to the

---

[4]     Relying on the President's separate declaration that there is "an unprecedented flood of illegal immigration," Exec. Order No. 14159, Protecting the American People Against Invasion, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025), Defendants liken class member children to "children

INDIVIDUAL PLS.' REPLY IN SUPP. OF
MOT. FOR PRELIM. INJ. - 10
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

common law," *id.* at 682, that was not subject to the country's jurisdiction: "members of the Indian tribes owing direct allegiance to their several tribes," *id.* at 693, due to the unique laws governing tribal sovereignty, *see supra* pp. 4–6. Apart from these specific, well-recognized exceptions, "the children born within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States," are citizens by virtue of the Fourteenth Amendment. *Id.*

Subsequently, in *Plyler v. Doe*, 457 U.S. 202 (1982), the Supreme Court again confirmed that noncitizens without permanent legal status—including those unlawfully present—are "subject to the jurisdiction of" the United States.[5] *Plyler* was an Equal Protection case where all justices agreed that undocumented noncitizens were covered by the clause. *See* Dkt. 74 at 10. Defendants assert that the case nonetheless has no relevance here because the Equal Protection Clause covers all people "within the jurisdiction" of the United States, rather than those "subject to" its jurisdiction. Dkt. 84 at 37–38. However, *Wong Kim Ark* directly foreclosed this argument, declaring, "it is impossible to attribute to the words, 'subject to the jurisdiction thereof' . . . a less comprehensive meaning than to the words 'within its jurisdiction' (that is, of the state) at the end of [§ 1 of the Fourteenth Amendment]; or to hold that persons, who are indisputably 'within its

---

born of alien enemies in hostile occupation" to justify the EO. Dkt. 84 at 31. But regardless of the rhetoric, there can be no serious claim of a hostile occupation, as the United States maintains control over all of its territory. There is certainly no evidence that this purported "invasion" has resulted in an enemy power "exercis[ing] the fullest rights of sovereignty" over any part of the country, such that "the laws of the United States [are] no longer be[ing] rightfully enforced." 169 U.S. at 683 (citation omitted).

[5]    Individual Plaintiffs and proposed class members are plainly subject to the jurisdiction of the United States. As just one example, the United States requires undocumented men to register for the Selective Service. *See* 50 U.S.C. § 3802(a); *see also* Selective Service System, Immigrants and Dual Nationals, https://www.sss.gov/register/immigrants/ (last accessed Feb. 4, 2025) ("This includes, naturalized citizens, parolees, undocumented immigrants, legal permanent residents, asylum seekers, refugees, and all males with visas more than 30 days expired.").

INDIVIDUAL PLS.' REPLY IN SUPP. OF
MOT. FOR PRELIM. INJ. - 11
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1    jurisdiction' of the state, are not 'subject to the jurisdiction' of the nation." 169 U.S. at 696.

2    Accordingly, by holding in *Plyer* that unlawful entrants and those unlawfully present were

3    covered by the Equal Protection Clause, the Court again made clear that the Citizenship Clause

4    covers them too. *See* 457 U.S. at 211 & n.10.

5                         *iii.*     *The Civil Rights Act of 1866 does not suggest there is an "allegiance"*
                                     *requirement.*

6
7            Finally, Defendants also rely on the language and legislative history of the Civil Rights

8    Act of 1866 to argue the Citizenship Clause requires that children have no foreign allegiance

9    whatsoever to be subject to U.S jurisdiction. Dkt. 84 at 20–22. This argument also flounders

10   because the Supreme Court already dismissed it nearly 130 years ago. Again in *Wong Kim Ark*,

11   the Court rejected the idea that the phrase "not subject to any foreign power" in the Act would

12   "for the first time in our history . . . deny the right of citizenship to native-born children or

13   foreign white parents not in the diplomatic service of their own country, nor in hostile occupation

14   of part of our territory." 169 U.S. at 688. It also looked at the legislative history, where Senator

15   Trumbull affirmed that the children of Chinese noncitizens and "Gypsies" would benefit from

16   the Act, *id.* at 697–98, demonstrating no perceived incongruity between those children's

17   citizenship and Senator Trumbull's clarification that the Act was designed to "make citizens of

18   everybody born in the United States who owe[d] allegiance to the United States," Dkt. 84 at 21

19   (citation omitted). But, in any event, the Court pronounced that "any possible doubt in this regard

20   was removed when the negative words of the civil rights act, 'not subject to any foreign power,'

21   gave way, in the fourteenth amendment of the constitution, to the affirmative words, 'subject to

22   the jurisdiction of the United States.'" 169 U.S. at 688; *see also Wisconsin Cent. Ltd v. United*

23   *States*, 585 U.S. 274, 279 (2018) ("We usually 'presume differences in language like this convey

24

INDIVIDUAL PLS.' REPLY IN SUPP. OF          NORTHWEST IMMIGRANT RIGHTS PROJECT
MOT. FOR PRELIM. INJ. - 12                       615 Second Ave., Ste. 400
Case No. 2:25-cv-00127-JCC                     Seattle, WA  98104
                                         (206) 957-8611

1   differences in meaning.' And that presumption must bear particular strength when the same

2   Congress passed both statutes to handle much the same task." (citation omitted)).[6]

3           b.      The Citizenship Clause does not require a "lawful domicile."

4           Defendants also argue that the Citizenship Clause requires lawful domicile in the United

5   States. They contend (1) that the Clause instructs that people are also "citizens . . . of the States

6   [sic] wherein they reside," (2) the word "reside" is equivalent to "domicile," and (3) "domicile"

7   requires that someone be present in the United States on a "permanent and lawful" basis. Dkt. 84

8   at 22 (first quotation quoting U.S. Const. amend. XIV, § 1). In support, Defendants also cite

9   *Wong Kim Ark*'s occasional references to domicile. *See, e.g.*, *id.* at 23, 34–36.

10          This argument is doubly wrong. First—and most importantly—Defendants create this

11  "requirement" out of thin air. The Clause simply states that to be a citizen at birth, a person must

12  be "born . . . in the United States, and subject to the jurisdiction thereof." U.S. Const. amend.

13  XIV, § 1. Thus, there are two requirements, and *only* two requirements: (1) birth, and (2) being

14  subject to the jurisdiction of the United States. What the Clause does *not* say is that to be a U.S.

15  citizen, one must additionally be a lawful domiciliary. The clause Defendants rely on—"of the

16  States wherein they reside"—merely defines state citizenship, and nothing more.

17          Supreme Court precedent has repeatedly interpreted the Citizenship Clause in this way, a

18  fact Defendants never address. As Justice Robert Jackson explained:

19          The language of the Fourteenth Amendment declaring two kinds of citizenship is
            discriminating. It is: 'All persons born or naturalized in the United States, and
20          subject to the jurisdiction thereof, are citizens of the United States and of the State
            wherein they reside.' While it thus establishes national citizenship from the mere

21

22  [6]     Scholar Garrett Epps suggests the difference in language stems from the difference
    between legislation and constitutional amendments. The Act was "a conservative measure,
23  designed to conciliate President Johnson and gain his signature," whereas the Citizenship Clause
    was "a change to the Constitution, creating entirely new rights and providing government with
24  new powers." 60 Am. U. L. Rev. at 349, 352.

circumstance of birth within the territory and jurisdiction of the United States, birth within a state does not establish citizenship thereof. State citizenship is ephemeral.

*Edwards v. California*, 314 U.S. 160, 183 (1941) (Jackson, J., concurring) (quoting U.S. Const. amend XIV, § 1). Critically, the Court recognized this fact early on, in the decades immediately after ratification of the Amendment. In the *Slaughter-House Cases*, the Court explained that the Clause "declares that persons may be citizens of the United States without regard to their citizenship of a particular State, and it overturns the *Dred Scott* decision by making *all persons* born within the United States and subject to its jurisdiction citizens of the United States." 83 U.S. 36, 73 (1872). This statement defines national citizenship only by reference to birth and jurisdiction. The Court then went on to reinforce this point:

> [T]he distinction between citizenship of the United States and citizenship of a State is clearly recognized and established. Not only may a man be a citizen of the United States without being a citizen of a State, but an important element is necessary to convert the former into the latter. He must reside within the State to make him a citizen of it, but it is only necessary that he should be born or naturalized in the United States to be a citizen of the Union.
>
> It is quite clear, then, that there is a citizenship of the United States, and a citizenship of a State, which are distinct from each other, and which depend upon different characteristics or circumstances in the individual.

*Id.* at 73–74. This recognition—that the Clause defines two citizenships, and that national citizenship requires only birth and jurisdiction, is found repeatedly in the Court's cases. *See, e.g.*, *Rogers v. Bellei*, 401 U.S. 815, 827, 830 (1971).

Defendants ignore this controlling precedent and make much of the fact that in *Wong Kim Ark*, the Court noted that the plaintiff had domicile in the United States. Dkt. 84 at 34–36. But *Wong Kim Ark*'s reasoning and holding rely solely on the Citizenship Clause's two textual requirements: birth and jurisdiction. Specifically, drawing from the *Slaughterhouse Cases*, the Court explained that the Citizenship Clause "is declaratory of existing rights, and affirmative of

INDIVIDUAL PLS.' REPLY IN SUPP. OF
MOT. FOR PRELIM. INJ. - 14
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1   existing law, as to each of the qualifications therein expressed." 169 U.S. at 688. The Court then

2   elaborated that those "qualifications" are that a person be "subject to the jurisdiction" of the

3   United States and either "born" or "naturalized" in the country. *Id.* These requirements are

4   "everything relating to the acquisition of citizenship by facts occurring within the limits of the

5   United States." *Id.*; *see also id.* at 702 (similar). The Court then observed that the Clause's

6   language affirmed the "fundamental rule of citizenship by birth within the dominion of the

7   United States, notwithstanding alienage of parents." *Id.* at 688.

8        Defendants mischaracterize the statements cited above as just "general expressions" and

9   dicta not necessary to *Wong Kim Ark*'s conclusion, while asserting the language about domicile

10  is necessary to the holding. Dkt. 84 at 37. This argument completely inverts the Court's actual

11  reasoning. It is the Court's statements about *domicile* that are in fact "unnecessary to the

12  judgment and . . . not binding." *S. Union Co. v. United States*, 567 U.S. 343, 352 n.5 (2012).

13  What *was* necessary to the decision were the conclusions that birth and jurisdiction were all that

14  is required to determine citizenship, and what the phrase "subject to the jurisdiction" meant. The

15  entire course of the Court's reasoning in *Wong Kim Ark* leaves no doubt about this fact.

16       Second, even if a "domicile" requirement was added, it does not mean what Defendants

17  claim. Defendants cite a single footnote in an 1891 legal article to suggest that domicile requires

18  an intent to remain permanently that is lawful under the laws governing that person. *See* Dkt. 84

19  at 22. But as one of the key sources Defendants cite for this "domicile" requirement explains,

20  "governmental consent to or authority over domicile" was not a feature of domicile at the time

21  the Fourteenth Amendment was adopted. Mark Shawhan, *The Significance of Domicile in Lyman*

22  *Trumbull's Conception of Citizenship*, 119 Yale L.J. 1351, 1353 (2010). Instead, "only two

23  prerequisites for domicile . . . exist[ed]: "residence; and . . . intention of making it the home of

24

INDIVIDUAL PLS.' REPLY IN SUPP. OF
MOT. FOR PRELIM. INJ. - 15
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

the [person]." *Id.* (third and fourth alterations in original) (quoting Joseph Story, Commentaries on the Conflict of Laws §§ 41, 43, at 39–40, 42 (Boston, Hilliard, Gray, and Co., 1834)). That view of domicile "was subsequently endorsed by the U.S. Supreme Court, federal circuit courts, and state courts." *Id.* at 1354; *see also Ennis v. Smith*, 55 U.S. 400, 423 (1852) ("To constitute [domicile, there must be] actual residence in the place, with the intention that it is to be a principal and permanent residence.").

        c.    <u>The "applicable interpretive principles" Defendants cite do not apply and are directly foreclosed by binding Supreme Court precedent.</u>

Defendants seek support for their interpretation in Supreme Court statements explaining that the Executive and Congress possess significant power to regulate the admission of noncitizens. *See* Dkt. 84 at 31–32. This argument is completely inapplicable. This case has nothing to do with the *admission* of *noncitizens* to this country. Instead, it concerns the constitutional entitlement to birthright citizenship.

The difference between the principles governing immigration and citizenship are stark. While Congress and the Executive may have broad power to regulate the former, the Constitution significantly restricts their power to even define the latter, much less take it away. Defendants' argument—which asks this Court to provide the Executive with broad flexibility to reinterpret the Fourteenth Amendment—runs directly counter to controlling precedent. The Supreme Court has explicitly "h[eld] that the Fourteenth Amendment was designed to, and does, protect every citizen of this Nation against a congressional [or executive] forcible destruction of his citizenship." *Afroyim*, 387 U.S. at 268. Nothing less than democracy itself—"[t]he very nature of our free government," *id.*—depends on this principle. Notably, the Supreme Court has categorically rejected the exact "interpretive principles" Defendants now assert. Dkt. 84 at 31. As the Court observed in *Afroyim*, the "undeniable purpose of the Fourteenth Amendment to make

INDIVIDUAL PLS.' REPLY IN SUPP. OF
MOT. FOR PRELIM. INJ. - 16
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1  citizenship of Negroes permanent and secure would be frustrated by holding that the

2  Government can rob a citizen of his citizenship without his consent by simply proceeding to act

3  under an implied general power to regulate foreign affairs or some other power generally

4  granted." *Id.* at 263; *cf. Wong Kim Ark*, 169 U.S. at 704 ("[T]hat acts of congress or treaties have

5  not permitted Chinese persons born out of this country to become citizens by naturalization,

6  cannot exclude Chinese persons born in this country from the operation of the broad and clear

7  words of the constitution . . . .").

8       The other principles Defendants cite similarly make unsupported assumptions. For

9  example, they claim "the general undesirability of dual allegiances" supports their interpretation.

10 Dkt. 84 at 33 (citation omitted). As an initial matter, while that policy may have existed in 1950,

11 it no longer does today. *See* Peter J. Spiro, *Dual Nationality and the Meaning of Citizenship*, 46

12 Emory L.J. 1411, 1455 (1997) (explaining the significant relaxation of U.S. policy disfavoring

13 dual nationality). Moreover, these are policy arguments that provide neither the Executive nor

14 Congress any leeway to modify the Citizenship Clause's plain language.[7]

15 **C.    Plaintiffs have demonstrated they will suffer irreparable harm and that the public
          interest favors a classwide injunction.**

16

17      Plaintiffs and putative class members readily satisfy the remaining requirements for

18 preliminary injunctive relief. While Defendants claim that Plaintiffs will not suffer "immediate"

19 irreparable harm, Dkt. 84 at 41, all that is needed is a showing that the moving party "is likely to

20 suffer irreparable harm in the absence of preliminary relief," *Winter v. Nat. Res. Def. Council,

21 Inc.*, 555 U.S. 7, 20 (2008). Nevertheless, Plaintiffs can demonstrate immediate irreparable harm.

22

23

24 _____

[7] Defendants also claim any ambiguity should be construed in their favor, but there is no basis
for deference, and the amendment's text, as well as the cases interpreting it, are clear.

INDIVIDUAL PLS.' REPLY IN SUPP. OF                NORTHWEST IMMIGRANT RIGHTS PROJECT
MOT. FOR PRELIM. INJ. - 17                        615 Second Ave., Ste. 400
Case No. 2:25-cv-00127-JCC                        Seattle, WA  98104
                                                  (206) 957-8611

Binding precedent has repeatedly held that "an alleged constitutional infringement will often alone constitute irreparable harm." *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (citation omitted); *see also* Dkt. 74 at 18–19 (citing cases). Defendants respond by relying solely on a single unpublished district court decision to assert that not just *any* constitutional violation constitutes per se irreparable harm, and fail to address any of the Ninth Circuit caselaw cited by Plaintiffs. Dkt. 84 at 41–42. But this is not simply an abstract alleged constitutional infringement. It is a concrete violation of Plaintiffs' constitutional claim to citizenship, implicating "the total destruction of the individual's status in organized society," "a form of punishment more primitive than torture." *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion). As the Supreme Court has recognized time and again, "[c]itizenship is a most precious right," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963), whose "value and importance" is "difficult to exaggerate," *Schneiderman v. United States*, 320 U.S. 118, 122 (1943). Defendants cannot meaningfully refute this threatened irreparable harm.

Defendants also claim that there is no irreparable harm because the EO does not mandate removal and family separation after stripping expected class member children of all legal status. This argument is nonsensical: without status, those children will immediately be subject to removal under the Immigration and Nationality Act as persons present without lawful admission or parole and adequate identity documents. *See* 8 U.S.C. § 1182(a)(6)–(7). Moreover, the current Administration has acted in the past to separate families for purposes of inflicting terror and deterrence, in plain violation of families' constitutional rights. *See Ms. L. v. U.S. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018).[8]

---

[8]    Relatedly, Defendants assert that the class member children should raise their claims to citizenship in § 1503 or removal proceedings. Dkt. 84 at 45–46. But class treatment is clearly proper here, as the Court can resolve the litigation as to all class members "in one stroke." *Wal-*

Defendants also claim without support that the loss of other rights and benefits are too speculative or remote to warrant relief. Dkt. 84 at 42–43. But Plaintiffs provided voluminous citations to show that they and the expected class member children will lose rights and benefits immediately upon the children's loss of citizenship. Dkt. 74 at 20–22. Critically, Defendants do not contest that these are irreparable harms.

Finally, Defendants also make a fleeting argument that the public interest favors them because they need "'broad discretion' to manage the immigration system." Dkt. 84 at 44 (citation omitted). This argument is meritless. This case is not about the immigration system or immigrants; it is about natural-born U.S. citizens and their constitutional rights.

## III.    CONCLUSION

The Court should accordingly provisionally certify a class and grant the motion for a preliminary injunction.

Respectfully submitted this 4th day of February, 2025.

s/ Matt Adams                                    s/ Leila Kang
Matt Adams, WSBA No. 28287          Leila Kang, WSBA No. 48048
matt@nwirp.org                               leila@nwirp.org

s/ Glenda M. Aldana Madrid            s/ Aaron Korthuis
Glenda M. Aldana Madrid,               Aaron Korthuis, WSBA No. 53974
WSBA No. 46987                            aaron@nwirp.org
glenda@nwirp.org

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Suite 400
Seattle, WA 98104
(206) 957-8611

*Counsel for Individual Plaintiffs*

---

*Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Moreover, Defendants cite no requirement that Plaintiffs must be forced to litigate their injunctive relief claims via those procedures and no such requirement exists. *See supra* Sec. II.A. (explaining that a cause of action exists for Plaintiffs' claims).

**WORD COUNT CERTIFICATION**

I certify that this memorandum contains 6,394 words, in compliance with the Local Civil Rules and the Court's Minute Order, Dkt. 77.

s/ Leila Kang
Leila Kang, WSBA No. 46987
NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Suite 400
Seattle, WA 98104
(206) 957-8611
leila@nwirp.org

INDIVIDUAL PLS.' REPLY IN SUPP. OF
MOT. FOR PRELIM. INJ. - 20
Case No. 2:25-cv-00127-JCC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611