```
          FILED           ENTERED
          LODGED          RECEIVED

       FEB 04 2025    MH
              AT SEATTLE
        CLERK U.S. DISTRICT COURT
      WESTERN DISTRICT OF WASHINGTON
   BY                        DEPUTY
```

District Judge John C. Coughenour

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON et al, <br><br> Plaintiffs <br><br> vs. <br><br> DONALD TRUMP, et al <br><br> Defendants | No. 2:25-cv-00127 <br><br> **MOTION TO INTERVENE** <br><br> **NOTE ON MOTION CALENDAR FEBRUARY 4, 2025** |

## INTRODUCTION

Pursuant to Rule 24 of the Federal Rules of Civil Procedure, John Scannell (Scannell) respectfully submits this Motion to Intervene as a defendant in the above-captioned matter. Scannell seeks to present the viewpoint of ordinary working-class citizens as well as small businesspeople by presenting an alternative to the views expressed so far. He believes his argument is correct and will ensure a smooth transition as this country moves to a constitutional interpretation that removes birthright citizenship as a right under some interpretations of our constitution. Scannell also seeks to protect property interests and citizen rights that are separate and distinct from the other parties in this complaint as detailed in this motion to intervene.

## FACTUAL ALLEGATIONS OF THE PROPOSED INTERVENOR

John Scannell is an attorney who practices law from the location of his law office located in the International District of Seattle Washington. His practice is primarily in the ninth circuit, where he is licensed. In recent months, the International District (ID) has become a hub for crime

MOTION TO INTERVENE - PAGE 1

JOHN SCANNELL
501 S. JACKSON #302
SEATTLE, WASH., 98104
206-604-5924

that is separate and distinct from other areas in Seattle or in other states. Due to the policies of the City of Seattle regarding funding of police, and other issues, it has become difficult, if not impossible to conduct business there. Drug dealers have been pushed out of downtown Seattle to market their wares in the International District. Fentanyl addiction has achieved epidemic proportions. As a resident and businessperson of the International District has had to experience the following:

A) Sirens are constantly going on in the ID, typically 10 times an hour, 24 hours a day.

B) Large numbers of the homeless and drug dealers congregate throughout the district. Sometimes as many as a thousand congregate at 11th and Jackson 24 hours a day just up the street from his office. During this time, drugs are openly sold on the street including Opiates, Fentanyl, Cocaine, OxyContin, and Heroin. In addition, large numbers of homeless openly sell other stolen goods, oftentimes from the grocery carts that were used to shoplift the goods.

C) These individuals congregate throughout the ID in the doorways of the businesses that try to conduct business there. The City of Seattle will not send out police officers to investigate shoplifting under a thousand dollars so the homeless sell stolen good openly, many times from the grocery carts that were used to shoplift the goods. As a result, while many of the homeless move out of the doorways when asked, some do not. When this occurs, residents and business people become trapped in their homes and businesses for hours at a time because these individuals refuse to move and they do so with a threatening demeanor. Police do not respond when called to remove them.

D) Police say they no longer have time to respond to anything but the most serious of crimes, such as murders. This is a result of a City Council that has apparently

**MOTION TO INTERVENE - PAGE 2**

JOHN SCANNELL
501 S. JACKSON #302
SEATTLE, WASH., 98104
206-604-5924

defunded the police to the extent that there are not enough police to enforce anything but very serious crimes.

E) Scannell has had the windows of his car smashed out more than a dozen times and attempted car theft and actual theft of other materials have resulted. Scannell has now moved his automobile out of the city because he simply cannot afford the cost of replacing the glass all the time. When the police are called, Scannell has waited hours for them to show up, only to be told that the police can only furnish an incident number to give to an insurance company.

F) On one occasion, Scannell witnessed a woman who was being sexually assaulted by one of the homeless. After Scannell yelled out, the woman escaped and the homeless male appeared to leave. However, after Scannell turned his back, the homeless person returned and kicked in the side of his head, resulting in numerous fractures throughout his face for which he was hospitalized. When the police were called, they refused to investigate, saying they were too busy investigating murders and more serious assaults. They refused to contact the Bank of America who had video tapes 24 hours a day going on the street where the assault took place. Bank officials refused to supply Scannell with copies of the tape, unless they were ordered to by the police. Scannell simply does not have the resources to do the police work for them. Scannell argues standing based upon the interference with his contracts with potential clients.

G) Scannell has submitted studies in support of his motion that indicate large number of crimes are committed by both illegal aliens and aliens who enter by virtue of being related to anchor babies, that are the subject of this suit.

In addition, Scannell fears the dilution of his citizen's rights including voter power as the illegal aliens reduce the power of his vote. As time progresses, he fears that Seattle's citizenry will be more interested in maintaining Seattle's status as a sanctuary city rather than Seattle

funding its police force at a level where police can actually do their job. Granting Scannell's motion allow a viewpoint that so far has not been heard in this lawsuit. Scannell cites to studies which demonstrate that the overall level of crime will increase should the plaintiff's policy of allowing birthright citizenship be allowed to continue.

## ARGUMENT

FRCP 24(a) and (b) defines the relevant conditions under which intervention may be granted to Scannell:

> (a) Intervention of Right. On timely motion, the court must permit anyone to intervene who:
> (1) is given an unconditional right to intervene by a federal statute; or
> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.
> (b) Permissive Intervention.
> (1) In General. On timely motion, the court may permit anyone to intervene who:
> (A) is given a conditional right to intervene by a federal statute; or
> (B) has a claim or defense that shares with the main action a common question of law or fact.

1. To intervene as of right under Fed. R. Civ. P. 24(a) the applicant must claim an interest the protection of which may, as a practical matter, be impaired or impeded if the lawsuit proceeds without him. The Ninth Circuit applies a four-part test under this rule:

> (1) the motion must be timely; (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action. *Sierra Club v. United States EPA*, 995 F.2d 1478, 1481 (9th Cir.1993)

The Ninth Circuit interprets the rule broadly in favor of intervention. *Id.* First, the court looks at three criteria to determine if the motion is timely: "(1) the stage of the proceedings; (2) whether the parties would be prejudiced; and (3) the reason for any delay in moving to

intervene." *Northwest Forest Res. Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996). This is the beginning of this litigation—plaintiffs filed their motion for preliminary injunction which was granted. The parties have begun submitting their briefs to see if the injunction should be made permanent. The parties would have time to respond to this motion before the hearing. This motion is timely.

The applicant must claim a "significantly protectable interest relating to the property or transaction which is the subject of the action." "Whether an applicant for intervention demonstrates sufficient interest in an action is a practical, threshold inquiry. No specific legal or equitable interest need be established." *Greene v. United States*, 996 F.2d 973, 976 (9th Cir.1993) (citing *Portland Audubon Soc'y v. Hodel*, 866 F.2d 302 (9th Cir.), cert. denied, 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 577 (1989)). "Nevertheless, the movant must demonstrate a 'significantly protectable interest.'" *Id.* When the injunctive relief sought by plaintiffs will have direct, immediate, and harmful effects upon a third party's legally protectable interests, that party satisfies the "interest" test of Fed. R. Civ. P. 24(a)(2); he has a significantly protectable interest that relates to the property or transaction that is the subject of the action. *Forest Conservation Council v. US Forest Service*, 66 F. 3d 1489, 1494 (Court of Appeals, 9th Circuit 1995)

Here, the intervenor has a protectable interest in his valuable citizenship rights, are defined by the 14th amendment to the United States Constitution. He is entitled to have this amendment interpreted fairly, so that his rights such as voting rights, are not watered down by individuals who are not entitled to those rights. Since his citizen rights are significant and protected under the 14th amendment, Intervenor Scannell is entitled intervene as a matter of right

2. Under FRCP 24(b), permissive intervention gives a court discretion to permit intervention "when an applicant's claim or defense and the main action have a question of law or fact in common."

**MOTION TO INTERVENE - PAGE 5**

Although, at some level, both types of intervention involve discretion, permissive intervention, by definition, involves a broader discretion. *Smuck v. Hobson*, 408 F.2d 175, 178 (D.C. Cir. 1969). Because of this extra breadth, permissive intervention can sometimes take an intervenor (who would otherwise be barred) into court. For example, in an action brought by ten utilities against the Environmental Protection Agency, a court denied intervention of right to the Natural Resources Defense Council (NRDC) based on a strict reading of the interest requirement. But the court nonetheless recognized that the "views of [the] NRDC may be helpful to a proper and complete resolution of this case, ' and granted permissive intervention. *Commonwealth Edison Co. v. Train*, 71 F.R.D. 391, 392-93 (N.D. Ill. 1976).

In this case, the Trump administration is seeking an end to birthright citizenship as part of a larger initiative which seeks to reduce crime. The intervenor has an interest in this issue because his business is threatened by the ongoing increase in crime.

According to a report on crime by the Governmental Accountability Office in March 2011; the total amount of crimes committed by aliens is almost 3 million. See Exhibit 1 of Scannell declaration, page 21. While this breakdown does not distinguish between legal and illegal aliens, another study by for the year 2017 by the office of public affairs demonstrates that a disproportionate number were committed by undocumented aliens.[1]

Critics may point out that some other studies show indicate that undocumented aliens commit crimes at a lower rate[2], but all of this is irrelevant to the point Scannell makes, which is that if illegal aliens had not been let in, there would be far fewer crimes. Scannell also contends that for the purpose of this suit, whether a person is a legal alien or undocumented alien is not

---

[1] See Scannell Declaration, Exhibit 2

[2] Scannell disputes the accuracy and/or relevance of all of these studies. First of all, illegal aliens, because they are illegal, are more likely to be hiding, and therefore more difficult to catch. This could account for the lower arrest rates. Also, generally speaking, the states don't keep records of arrests of non-aliens, so most studies use unreliable indirect data to make estimates.

**MOTION TO INTERVENE - PAGE 6**

JOHN SCANNELL
501 S. JACKSON #302
SEATTLE, WASH., 98104
206-604-5924

necessarily material because none of the studies distinguish how many aliens are legally in the country because they are related to in some fashion to an anchor baby[3]. The point is the number of crimes would be far fewer, if illegal aliens and legal aliens who got in because they were related to an anchor baby.

Scannell concedes that this number is not accurately determined. Nevertheless, he would feel far safer if aliens who got in, did so by legal methods other than entering illegally or because they gained entrance because they were related to an anchor baby. He contends most other Americans would feel the same way.

If the court does not grant intervention as a matter of right, it should therefore exercise its discretion to permit Scannell to intervene by permission.

## LEGAL ANALYSIS

**1. Neither the plaintiff states nor the class action plaintiffs can establish standing.**

The United States has already given provided a strong argument as to why the *parens patriae* role assumed by the state cannot be used against the federal government and the plaintiff states have provided no authority as to why an exception should be allowed. Furthermore, the plaintiff states claim that somehow a suit can be litigated on behalf of non-persons.

In *Roe v. Wade*, 410 US 113, 156 the state of Texas argued that "the fetus is a 'person' within the language and meaning of the Fourteenth Amendment." To which Justice Harry Blackmun responded, "If this suggestion of personhood is established, the appellant's case, of course, collapses, for the fetus' right to life would then be guaranteed specifically by the Amendment." *Id*. At 156 However, Justice Blackmun then came to the conclusion "that the word 'person,' as used in the Fourteenth Amendment, does not include the unborn." While *Roe v. Wade*

---

[3] Oxford dictionaries states that this term is used to refer to a child born to a noncitizen mother in a country which has birthright citizenship, especially when viewed as providing an advantage to family members seeking to secure citizenship or legal residency

was overturned with respect to abortion, in *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022), 597 U.S. 215, *Dobbs* never reversed *Roe* with respect to its finding that a fetus is not a person with respect to the 14th amendment. The plaintiffs Washington, Oregon, Arizona and Illinois (plaintiff states) have not established that the states have the right to step in and argue on behalf of a non-person. While both the plaintiff states and the class action plaintiffs list repercussions that will befall them if the unborn are not granted citizenship, they have cited nothing that supports the idea that just because they will suffer secondary repercussions, that automatically confers them standing.

**2. Neither Trump nor Congress are forbidden by the Constitution from abolishing birthright citizenship**

It is the premise of the state plaintiffs that we are still bound by *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). That case found that we are bound by the common law principle of jus soli, (birthright citizenship) because the 14th amendment had to be interpreted taking the common law as it existed then, into account.

In *Brown v. Board of Education*, 347 US 483, 492, 493 74 S. Ct. 686, 98 L. Ed. 873 - Supreme Court, 1954 the court ruled that in determining whether segregation in schools is still allowed, the decision stated:

> In approaching this problem, we cannot turn the clock back to 1868 when the Amendment was adopted, or even to 1896 when *Plessy v. Ferguson* was written. We must consider public education in the light of its full development and its present place in American life throughout the Nation.

A similar approach was used in *Reed v. Reed* 404 U.S. 71 (1971) began a process of interpreting the 14th amendment so that it included women:

> To give a mandatory preference to members of either sex over members of the other, merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment; and whatever may be said as to

the positive values of avoiding intrafamily controversy, the choice in this context may not lawfully be mandated solely on the basis of sex.

Neither the common law principle of jus soli, nor the fourteenth amendment itself as it was originally interpreted, provided woman equal rights or the rights of African American children to attend unsegregated schools. Both of these decisions recognized that judges are bound by precedent but they cannot ignore cultural change. Of course, they ought not be bound by the weather of the day, but by the climate of the era. In this case the climate of the era dictates that the common law principles of 1776 are no longer viable.

The United Kingdom itself has rejected the principles of jus soli. Jus soli citizenship was abolished by the British Nationality Act of 1981. Since 1 January 1983 until the 2006 changes, children born out of wedlock to foreign (non-British) women were not be eligible for citizenship unless the mother was legally "settled" in the country. In 2015 the law was apply retroactively to children born prior to 2006.  Under the current law, if neither parent is British or settled, then a child born in the UK can apply for British citizenship if they have spent the first ten years of their life in the UK (see British nationality law). "The sins of the father: entitlement to citizenship for children born to unmarried parents before 1 July 2006". https://luqmanithompson.com/ Retrieved 28 January 2025.

According to one study[4] the number of countries offering birthright citizenship are in a small minority, and shrinking:

> The overwhelming majority of the world's countries do not offer automatic citizenship to everyone born within their borders. Over the past few decades, many countries that once did so — including Australia, Ireland, India, New Zealand, the United Kingdom, Malta, and the Dominican Republic — have repealed those policies. Other countries are considering changes.[5]

…

---

[4] See Exhibit 3 of Scannell declaration
[5] See Exhibit 4 of Scannell Declaration, page 1.

**MOTION TO INTERVENE - PAGE 9**

JOHN SCANNELL
501 S. JACKSON #302
SEATTLE, WASH., 98104
206-604-5924

Among the findings:

- Only 30 of the world's 194 countries grant automatic citizenship to children born to illegal aliens.

- Of advanced economies, Canada and the United States are the only countries that grant automatic citizenship to children born to illegal aliens.

- No European country grants automatic citizenship to children of illegal aliens.

- The global trend is moving away from automatic birthright citizenship as many countries that once had such policies have ended them in recent decades.

- 14th Amendment history seems to indicate that the Citizenship Clause was never intended to benefit illegal aliens nor legal foreign visitors temporarily present in the United States.

- The U.S. Supreme Court has held that the U.S.-born children of permanent resident aliens are covered by the Citizenship Clause, but the Court has never decided whether the same rule applies to the children of aliens whose presence in the United States is temporary or illegal.

- Some eminent scholars and jurists have concluded that it is within the power of Congress to define the scope of the Citizenship Clause through legislation and that birthright citizenship for the children of temporary visitors and illegal aliens could likely be abolished by statute without amending the Constitution.[6]

In addition to the above developments, Scannell points out there is a more recent concern. According to another recent study[7], allowing immigrants into the country results in an increase of four times the amount of $CO_2$ into the atmosphere than if they were not allowed to emigrate. This results in the production of 482 million tons of $CO_2$, more than the combined annual input of Great Britain and Sweden combined.

As the amici of certain members of Congress point out in their briefing, which Scannell agrees with, only Congress has the power to confer citizenship upon the children of aliens because the Fourteenth amendment doesn't do so at the present time. Since Congress has yet to

---

[6] See Exhibit 4, of Scannell Declaration
[7] See Exhibit 5 of Scannell Declaration

confer citizenship on the unborn that are the subject of this legal action, President Trump should be free to eliminate birthright citizenship by executive order.

Scannell is sympathetic to the arguments of Trump et al, and the position of certain amici that birthright citizenship has never been legal and the fact that an unconstitutional interpretation has been in effect so long doesn't make it legal. However, the unique nature and history of this particular alleged constitutional violation presents a practical problem. Whether by illegal actions of governmental officials or by lack of enforcement, the reality is that millions of immigrants may have attained a de facto right of citizenship. Rather than tie up our courts with endless litigation over who is a citizen and who is not, Scannell suggest a more practical solution is to simply proclaim that the climate of this era dictates that birthright citizenship must end.

### 3. Scannell's interests are not being represented by existing parties.

Rule 24 requires that the intervenors interests are not adequately represented by existing parties. The burden is not difficult to establish.[8]  The Supreme Court has held that the "requirement of the Rule is satisfied if the applicant shows that representation of his interest may be inadequate; and the burden of making that showing should be treated as minimal."[9] Before the 1966 amendment to Rule 24, the intervenor had the burden of showing inadequate representation. The burden has since shifted, and now the intervenor is allowed in unless the court is persuaded that representation is in fact adequate." [10]

Here, Scannell's interests are not being represented the plaintiff states because these states have decided it is more important to take up the cause of unborn fetus's and undocumented or temporary migrants rather than the issues of the proposed intervenor. The same can be said for the class action plaintiffs. For myriads of reasons the government cannot and does not adequately

---

[8] C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND CIVIL PROCEDURE (2d. ed. 1986), § 1909.
[9] Trbovich v. United Mine Workers of Am., 404 U.S. 528, 538 n.10 (1971).
[10] WRIGHT &r MILLER, supra, § 1909.

**MOTION TO INTERVENE - PAGE 11**

the class action plaintiffs. For myriads of reasons the government cannot and does not adequately enforce all laws and represent all public interests. Government agencies may fail to fully and adequately represent the public for a variety of reasons, including the possibility of influence by commercial interests due to the symbiotic relationship between regulator and regulated, an aversion to citizen participation, the fact that agencies are not confined by the safeguards of the political process, and budget constraints.[10] Donald Trump, et al, in their briefing seems to endorse the idea that if there is a remedy, it should be the individuals themselves by using remedies supplied by congress rather than relying on government entities.[11]

## CONCLUSION

For the reasons given in this memorandum the court should grant Scannell intervenor status and allow him to participate in this action.

I certify that this memorandum has 3,817 words which is in compliance with local civil rules.

Dated this 4th day of February, 2024,

John Scannell

---

[10] See Comment, Standing on the Side of the Environment: A Statutory Prescription for Citizen Participation, 1 ECOLOGY L.Q. 561564 (1971).

[11] See OPPOSITION TO PLAINTIFF STATES' MOTION FOR A TEMPORARY RESTRAINING ORDER p. 6 § 1:"Citizenship Clause claims should be litigated, if at all, by the affected individuals themselves using the process designed by Congress for such claims. 8 U.S.C. § 1503."