FILED ___ ENTERED
LODGED ___ RECEIVED

FEB 0 4 2025    MH

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                    DEPUTY

District Judge John C. Coughenour

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

STATE OF WASHINGTON et al,

Plaintiffs

vs.

DONALD TRUMP, et al

Defendants

No. 2:25-cv-00127

**DECLARATION OF JOHN SCANNELL**

## DECLARATION

Undersigned on the basis of personal knowledge, declares as follows

I am an attorney who practices law from the location of my law office located in the International District of Seattle Washington. My practice is primarily in the ninth circuit, where I am licensed. In recent months, the International District (ID) has become a hub for crime that is separate and distinct from other areas in Seattle or in other states. Due to the policies of the City of Seattle regarding funding of police, and other issues, it has become difficult, if not impossible to conduct business there. Drug dealers have been pushed out of downtown Seattle to market their wares in the International District. Fentanyl addiction has achieved epidemic proportions. As a resident and businessperson of the International District I have had to experience the following:

**DECLARATION OF JOHN SCANNELL - PAGE 1**

JOHN SCANNELL
501 S. JACKSON #302
SEATTLE, WASH., 98104
206-604-5924

A)     Sirens are constantly going on in the ID, typically 10 times an hour, 24 hours a day.

B)     Large numbers of the homeless and drug dealers congregate throughout the district. Sometimes as many as a thousand congregate at 11th and Jackson 24 hours a day just up the street from my office. During this time, drugs are openly sold on the street including Opiates, Fentanyl, Cocaine, OxyContin, and Heroin. In addition, large numbers of homeless openly sell other stolen goods, oftentimes from the grocery carts that were used to shoplift the goods.

C)     These individuals congregate throughout the ID in the doorways of the businesses that try to conduct business there. The City of Seattle will not send out police officers to investigate shoplifting under a thousand dollars so the homeless sell stolen good openly, many times from the grocery carts that were used to shoplift the goods. As a result, while many of the homeless move out of the doorways when asked, some do not. When this occurs, residents and business people become trapped in their homes and businesses for hours at a time because these individuals refuse to move and they do so with a threatening demeanor. Police do not respond when called to remove them.

D)     Police say they no longer have time to respond to anything but the most serious of crimes, such as murders. This is a result of a City Council that has apparently defunded the police to the extent that there are not enough police to enforce anything but very serious crimes.

E)     I have had the windows of my car smashed out more than a dozen times and attempted car theft and actual theft of other materials have resulted. I have now moved my automobile out of the city because I simply cannot afford the cost of replacing the glass all the time.  When the police are called, I have waited hours for them to show up, only to be told that the police can only furnish an incident number to give to an insurance company.

F)     Last September, I witnessed a woman who was being sexually assaulted by one of the homeless. After I yelled out, the woman escaped and the homeless male appeared to leave.

**DECLARATION OF JOHN SCANNELL
- PAGE 2**

JOHN SCANNELL
501 S. JACKSON #302
SEATTLE, WASH., 98104
206-604-5924

However, after I turned my back, the homeless person returned and kicked in the side of my head, resulting in numerous fractures throughout my face for which I was hospitalized. When the police were called, they refused to investigate, saying they were too busy investigating murders and more serious assaults. They refused to contact the Bank of America who had video tapes 24 hours a day going on the street where the assault took place. Bank officials refused to supply me with copies of the tape, unless they were ordered to by the police. I simply do not have the resources to do the police work for them.

     Attached as Exhibit 1 is a true and correct copy of a report on crime by the Governmental Accountability Office in March 2011.

     Attached as Exhibit 2 is a true and correct copy of data on incarcerated aliens released by the Department of Justice and Homeland Security on August 1, 2017

     Attached as Exhibit 3 is a true and correct copy of a study from the Center for Immigration Studies released in August of 2010

     Attached as Exhibit 4 is a true and correct copy of a study from the Center for Immigration Studies released in August of 2008

     I fear the dilution of my citizen's rights including voter power as the illegal aliens reduce the power of my vote. As time progresses, I fear that Seattle's citizenry will be more interested in maintaining Seattle's status as a sanctuary city rather than Seattle funding its police force at a level where police can actually do their job.

     I declare under the penalty of perjury of the State of Washington that the foregoing is true and correct.

     Dated in Seattle, Wa. this 4th day of February, 2024,

                           _John Scannell_
                           John Scannell

**DECLARATION OF JOHN SCANNELL**
**- PAGE 3**

JOHN SCANNELL
501 S. JACKSON #302
SEATTLE, WASH., 98104
206-604-5924

EXHIBIT 1

United States Government Accountability Office

# GAO

## Report to Congressional Requesters

March 2011

# CRIMINAL ALIEN STATISTICS

## Information on Incarcerations, Arrests, and Costs



G A O

Accountability ★ Integrity ★ Reliability

GAO-11-187



Highlights of GAO-11-187, a report to congressional requesters

March 2011

# CRIMINAL ALIEN STATISTICS
## Information on Incarcerations, Arrests, and Costs

## Why GAO Did This Study

The Department of Homeland Security (DHS) estimated that as of fiscal year 2009 the total alien—non-U.S.-citizen—population was about 25.3 million, including about 10.8 million aliens without lawful immigration status. Some aliens have been convicted and incarcerated (criminal aliens). The federal government bears these incarceration costs for federal prisons and reimburses states and localities for portions of their costs through the Department of Justice's (DOJ) State Criminal Alien Assistance Program (SCAAP). GAO was asked to update its April and May 2005 reports that contained information on criminal aliens. This report addresses (1) the number and nationalities of incarcerated criminal aliens; (2) the types of offenses for which criminal aliens were arrested and convicted; and (3) the costs associated with incarcerating criminal aliens and the extent to which DOJ's methodology for reimbursing states and localities for incarcerating criminal aliens is current and relevant. GAO analyzed federal and SCAAP incarceration and cost data of criminal aliens from fiscal years 2003 through 2010, and conviction and cost data from five states that account for about 70 percent of the SCAAP criminal alien population in 2008. GAO analyzed a random sample of 1,000 criminal aliens to estimate arrest information due to the large volume of arrests and offenses. GAO also estimated selected costs to incarcerate criminal aliens nationwide using DOJ data, among other sources.

View GAO-11-187 or key components. For more information, contact Charles A. Jeszeck at (202) 512-8777 or jeszeckc@gao.gov.

## What GAO Found

The number of criminal aliens in federal prisons in fiscal year 2010 was about 55,000, and the number of SCAAP criminal alien incarcerations in state prison systems and local jails was about 296,000 in fiscal year 2009 (the most recent data available), and the majority were from Mexico. The number of criminal aliens in federal prisons increased about 7 percent from about 51,000 in fiscal year 2005 while the number of SCAAP criminal alien incarcerations in state prison systems and local jails increased about 35 percent from about 220,000 in fiscal year 2003. The time period covered by these data vary because they reflect updates since GAO last reported on these issues in 2005. Specifically, in 2005, GAO reported that the percentage of criminal aliens in federal prisons was about 27 percent of the total inmate population from 2001 through 2004.

Based on our random sample, GAO estimates that the criminal aliens had an average of 7 arrests, 65 percent were arrested at least once for an immigration offense, and about 50 percent were arrested at least once for a drug offense. Immigration, drugs, and traffic violations accounted for about 50 percent of arrest offenses. About 90 percent of the criminal aliens sentenced in federal court in fiscal year 2009 (the most recently available data) were convicted of immigration and drug-related offenses. About 40 percent of individuals convicted as a result of DOJ terrorism-related investigations were aliens. SCAAP criminal aliens incarcerated in selected state prison systems in Arizona, California, Florida, New York, and Texas were convicted of various offenses in fiscal year 2008 (the most recently available data at the time of GAO's analysis). The highest percentage of convictions for criminal aliens incarcerated in four of these states was for drug-related offenses. Homicide resulted in the most primary offense convictions for SCAAP criminal aliens in the fifth state—New York—in fiscal year 2008.

GAO estimates that costs to incarcerate criminal aliens in federal prisons and SCAAP reimbursements to states and localities ranged from about $1.5 billion to $1.6 billion annually from fiscal years 2005 through 2009; DOJ plans to update its SCAAP methodology for reimbursing states and localities in 2011 to help ensure that it is current and relevant. DOJ developed its reimbursement methodology using analysis conducted by the former Immigration and Naturalization Service in 2000 that was based on 1997 data. Best practices in cost estimating and assessment of programs call for new data to be continuously collected so it is always relevant and current. During the course of its review, GAO raised questions about the relevancy of the methodology. Thus, DOJ developed plans to update its methodology in 2011 using SCAAP data from 2009 and would like to establish a 3-year update cycle to review the methodology in the future. Doing so could provide additional assurance that DOJ reimburses states and localities for such costs consistent with current trends.

In commenting on a draft of this report, DHS and DOJ had no written comments to include in the report.

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 4 |
| | Criminal Alien Incarcerations and Nationalities | 6 |
| | Criminal Alien Arrests and Convictions | 17 |
| | Estimated Costs of Criminal Alien Incarcerations | 34 |
| | Agency and Third-Party Comments | 48 |

| Appendix I | Scope and Methodology | 49 |
|---|---|---|
| | Incarcerated Criminal Alien Population in Federal and State Prison Systems and Local Jails | 49 |
| | Types of Criminal Alien Arrest Offenses and Convictions | 50 |
| | Costs Associated with Incarcerating the Criminal Alien Population | 56 |

| Appendix II | Criminal Alien Costs in Fiscal Year 2010 Dollars | 58 |
|---|---|---|

| Appendix III | SCAAP Criminal Alien Incarcerations in State Prisons and Local Jails (Corresponds to Fig. 4) | 62 |
|---|---|---|

| Appendix IV | GAO Contact and Staff Acknowledgments | 64 |
|---|---|---|

| Tables | | |
|---|---|---|
| | Table 1: Common Terms and Definitions Used in this Report | 6 |
| | Table 2: Estimated Number and Percent of Criminal Alien Arrest Offenses by Type of Offense | 21 |
| | Table 3: Immigration or Citizenship Status at the Time of Charging of Individuals Convicted as a Result of Terrorism-Related Investigations | 25 |
| | Table 4: Number of Individuals Convicted under Statutes Directly Related to Terrorism According to DOJ | 26 |
| | Table 5: Number of Individuals Convicted under Other Statutes According to DOJ | 26 |
| | Table 6: Major Offense Categories for Federal Convictions | 53 |
| | Table 7: Major Offense Categories for Arrest Offenses and State Convictions | 54 |

Table 8: Number of State Criminal Alien Assistance Program
(SCAAP) Criminal Alien Incarcerations in Each State          62

## Figures

Figure 1: Number of Criminal Aliens and U.S. Citizens Incarcerated
in Federal Prisons from Fiscal Years 2005 through 2010          7

Figure 2: Country of Citizenship for Criminal Aliens Incarcerated in
Federal Prisons as of December 2010          9

Figure 3: Number of State and Local SCAAP Criminal Alien
Incarcerations from Fiscal Year 2003 through Fiscal Year
2009          10

Figure 4: Number of SCAAP Criminal Alien Incarcerations in Each
State          12

Figure 5: Country of Birth for SCAAP Criminal Aliens in State
Prison Systems as of Fiscal Year 2009          13

Figure 6: Country of Birth for SCAAP Criminal Aliens in Local Jails
as of Fiscal Year 2009          15

Figure 7: Number of Criminal Alien Apprehensions, Removals, and
Reentries          17

Figure 8: Number of Arrests and Offenses per Criminal Alien from
August 1955 to April 2010          18

Figure 9: Percentage of Criminal Aliens Arrested At Least Once by
Offense Category          20

Figure 10: Location of Criminal Alien Arrests          22

Figure 11: Primary Convictions Related to Criminal Alien Federal
Offenders in Fiscal Year 2009          23

Figure 12: Arizona State Convictions for SCAAP Illegal Aliens in
Fiscal Year 2008 by Offense          28

Figure 13: California State Primary Convictions of SCAAP Illegal
Aliens in Fiscal Year 2008 by Offense          29

Figure 14: Florida State Convictions of SCAAP Illegal Aliens in
Fiscal Year 2008 by Offense          31

Figure 15: New York State Primary Convictions of SCAAP Illegal
Aliens for Fiscal Year 2008 by Offense          32

Figure 16: Texas State Primary Convictions of SCAAP Illegal Aliens
for Fiscal Year 2008 by Offense          33

Figure 17: Federal Prison and SCAAP Costs to Incarcerate Criminal
Aliens from Fiscal Years 2005 through 2009          35

Figure 18: SCAAP Reimbursements to States and Localities from
Fiscal Years 2003 through 2009          36

Figure 19: Estimated Operating Costs to Incarcerate SCAAP Criminal Aliens in All 50 States    38

Figure 20: Estimated Operating Costs (i.e., correctional officer salaries, medical care, food service, and utilities) per Inmate to Incarcerate SCAAP Criminal Aliens in All 50 States    39

Figure 21: Selected State Costs to Incarcerate SCAAP Criminal Aliens in Fiscal Year 2008    41

Figure 22: Selected State Costs to Incarcerate SCAAP Criminal Aliens in Fiscal Year 2009    42

Figure 23: Selected State Costs per Inmate to Incarcerate SCAAP Criminal Aliens in Fiscal Year 2009    43

Figure 24: Selected Localities' Costs and Reimbursements for Incarcerating Criminal Aliens in Fiscal Year 2008    45

Figure 25: Selected Localities' Costs and Reimbursements for Incarcerating Criminal Aliens in Fiscal Year 2009    46

Figure 26: Federal Prison and State Criminal Alien Assistance Program (SCAAP) Costs in Fiscal Year 2010 Dollars to Incarcerate Criminal Aliens from Fiscal Years 2005 through 2009    58

Figure 27: SCAAP Reimbursements to States and Localities in Fiscal Year 2010 Dollars from Fiscal Years 2003 through 2009    59

Figure 28: Estimated Operating Costs in Fiscal Year 2010 Dollars to Incarcerate SCAAP Criminal Aliens in All 50 States    60

Figure 29: Estimated Operating Costs per Inmate in Fiscal Year 2010 Dollars to Incarcerate SCAAP Criminal Aliens in All 50 States    61

**Abbreviations**

| | |
|---|---|
| BOP | Bureau of Prisons |
| BJA | Bureau of Justice Assistance |
| BJS | Bureau of Justice Statistics |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| FBI | Federal Bureau of Investigation |
| IAFIS | Integrated Automated Fingerprint Identification System |
| ICE | Immigration and Customs Enforcement |
| INS | Immigration and Naturalization Service |
| SCAAP | State Criminal Alien Assistance Program |
| USCIS | U.S. Citizenship and Immigration Services |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**G A O**

Accountability ★ Integrity ★ Reliability

**United States Government Accountability Office**
**Washington, DC 20548**

March 24, 2011

The Honorable Zoe Lofgren
Ranking Member
Subcommittee on Immigration Policy and Enforcement
Committee on the Judiciary
House of Representatives

The Honorable Steve King
House of Representatives

The Department of Homeland Security (DHS) estimated that as of fiscal year 2009 the total alien—non-U.S.-citizen—population in the United States was about 25.3 million, including about 14.5 million aliens with lawful immigration status and about 10.8 million aliens without lawful immigration status.[1] Some of the alien population have been arrested and convicted of various crimes and incarcerated in federal and state prisons and local jails. DHS refers to these individuals as criminal aliens.[2] Immigration and Customs Enforcement (ICE), one of DHS's components, is responsible for apprehending and removing those criminal aliens that do not have a legal right to remain in the United States.

The costs associated with incarcerating criminal aliens are borne by the federal government as well as state and local governments. Criminal aliens convicted in federal court and sentenced to a term of imprisonment are committed to the custody of the Department of Justice's (DOJ) Bureau of Prisons (BOP), and the federal government bears the total cost of incarcerating these individuals. The federal government also reimburses state and local government entities for portions of their incarceration costs for certain criminal alien populations through DOJ's State Criminal Alien Assistance Program (SCAAP).[3] SCAAP is intended to provide

---

[1] DHS's estimate for aliens with lawful status included lawful permanent residents, refugees, asylees, and other nonimmigrants such as temporary visitors.

[2] As we reported in April 2005, criminal aliens are noncitizens convicted of crimes while in this country legally or illegally. For more information, see GAO, *Information on Criminal Aliens Incarcerated in Federal and State Prisons and Local Jails*, GAO-05-337R (Washington, D.C.: Apr. 7, 2005).

[3] By statute, criminal aliens reimbursed under SCAAP are limited to those who entered the United States illegally, were in removal proceedings when taken into custody, or failed to maintain or comply with the conditions of their immigration status. See 8 U.S.C. § 1231(i)(3)(B).

reimbursement to states and localities for a portion of the correctional officer salary costs associated with incarcerating criminal aliens who met the following criteria: (1) had at least one felony or two misdemeanor convictions for violations of state or local law; and (2) were incarcerated for at least 4 consecutive days during the reporting period. Therefore, SCAAP is not intended to reimburse state and local governments for all of the costs associated with incarcerating all criminal aliens.

We issued two reports that contained information on criminal aliens in 2005.[4] You asked that we update and expand upon the information in those reports. Specifically, this report provides information on the following:

- The number and nationalities of criminal aliens incarcerated in federal and state prisons and local jails and the number of criminal alien (1) apprehensions, (2) removals, and (3) apprehensions for illegal reentry into the United States after removal.

- The types of offenses for which criminal aliens were arrested and convicted.

- The costs associated with incarcerating criminal aliens and the extent to which DOJ's methodology for reimbursing states and localities for incarcerating certain criminal aliens is relevant and current.

To determine the number and nationalities of criminal aliens incarcerated, we analyzed BOP data on criminal aliens incarcerated in federal prisons from fiscal years 2005 through 2010 and SCAAP data on criminal aliens incarcerated in state prisons and local jails from fiscal years 2003 thorough 2009. There are no reliable population data on criminal aliens incarcerated in all state prison systems and local jails. The data we obtained represent a portion of the total population of criminal aliens who may be incarcerated at the state and local levels, since by statute SCAAP does not reimburse states and localities for certain criminal aliens, such as aliens with lawful immigration status, and not all jurisdictions may apply for reimbursement. To determine the number of criminal alien apprehensions, removals, and

---

[4]GAO, *Information on Criminal Aliens Incarcerated in Federal and State Prisons and Local Jails*, GAO-05-337R (Washington, D.C.: Apr. 7, 2005) and *Information on Certain Illegal Aliens Arrested in the United States*, GAO-05-646R (Washington, D.C.: May 9, 2005).

apprehensions for reentering the country illegally after a prior removal, we analyzed ICE data from fiscal years 2007 through 2010.[5]

To determine the types of offenses for which criminal aliens were arrested, we obtained the Federal Bureau of Investigation (FBI) arrest histories of about 203,000 criminal aliens incarcerated in state prisons and local jails from July 1, 2004, through June 30, 2008, and 48,000 criminal aliens incarcerated in federal prisons as of December 27, 2008, for a total of 251,000 criminal aliens. Due to the large volume of arrests and offenses, we selected a random sample of 1,000 criminal aliens and analyzed their arrest records to estimate the number and types of offenses in our study population of approximately 249,000.[6] There were nearly 1.7 million arrest records relating to nearly 3 million offenses for these 249,000 criminal aliens. To determine the type of offenses for which criminal aliens were convicted, we analyzed data from the U.S. Sentencing Commission on federal convictions of criminal aliens from fiscal years 2003 through 2009 and conviction data from five states—Arizona, California, Florida, New York, and Texas—from fiscal years 2005 through 2008. We selected these five states based on the number of SCAAP criminal aliens. Collectively, these states accounted for about 70 percent of the SCAAP criminal alien population in fiscal year 2008.

To determine the costs associated with incarcerating criminal aliens in federal prisons, we analyzed BOP inmate and cost data. To determine the costs of incarcerating criminal aliens in state prison systems, we used a DOJ Bureau of Justice Statistics (BJS) study that estimated selected costs of incarcerating inmates (i.e., correctional officer salary, medical care, food service, and utilities) for all 50 state prison systems in 2001.[7] Applying relevant inflation factors and SCAAP reimbursement data, we calculated these selected operating costs for incarcerating criminal aliens for state

---

[5]The periods of time covered by these data vary because they reflect updates since we last reported on these issues in 2005 (see GAO-05-337R and GAO-05-646R). Moreover, they reflect the most recent data available at the time of our analysis.

[6]We found that five of the criminal aliens from our random sample of 1,000 were out of scope because their records did not reflect actual arrests but rather administrative actions (e.g., being booked into a prison or transferred from one correctional facility to another). As such, our analysis is of 995 criminal aliens and our estimated study population is about 249,000. See appendix I for details on the margin of error for sample estimates presented in this report.

[7]BJS, *State Prison Expenditures, 2001* (Washington, D.C.: June 2004). See appendix II for criminal alien costs in fiscal year 2010 dollars.

prisons systems that sought SCAAP reimbursement from fiscal years 2003 through 2009. Since our nationwide estimate only includes selected costs, to estimate the total cost of incarcerating criminal aliens, we analyzed cost and SCAAP data for 5 state prisons systems—Arizona, California, Florida, New York, and Texas—and 5 local jails—New York City, New York; Los Angeles County, California; Orange County, California; Maricopa County, Arizona; and Harris County, Texas. We selected these state prison systems and local jails because they are the same prison systems and local jails that we used in our April 2005 report.[8] To determine the extent to which DOJ's SCAAP reimbursement methodology was relevant and current, we analyzed agency documentation, such as current SCAAP guidelines, and spoke with DOJ officials regarding the methodology. We evaluated this methodology using best practices in cost estimating.[9] For more details on our scope and methodology, see appendix I.

We determined that the data in our study were sufficiently reliable for the purposes of this report by analyzing available documentation, such as related data dictionaries, conducting tests to identify missing data or anomalies, and following up with agency officials knowledgeable about the data to address any questions about the data. We conducted this performance audit from October 2009 through March 2011 in accordance with generally accepted government auditing standards.[10] Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

As of fiscal year 2009, DHS estimated that the total alien population in the United States was about 25.3 million. Some of the alien population have been arrested and incarcerated in federal and state prisons and local jails, adding to already overcrowded prisons and jails. The federal government

---

[8] See GAO-05-337R.

[9] See GAO, *GAO Cost Estimating and Assessment Guide: Best Practices for Developing and Managing Capital Program Costs*, GAO-09-3SP (Washington, D.C.: March 2009).

[10] As part of this review, we briefed the reporting subcommittee on our preliminary results. In addition, the length of this review reflects delays we encountered in obtaining conviction data on SCAAP illegal aliens and cost data from states due to unforeseen circumstances caused by state furloughs.

bears the total cost of incarcerating all criminal aliens in federal prisons and reimburses state and local governments for portions of their incarceration costs for certain criminal alien populations through SCAAP. Any costs related to incarcerating criminal aliens not reimbursed by the federal government are borne by state and local governments.

## Arrest Histories

In general, individuals arrested by federal, state, and local law enforcement authorities are fingerprinted and their prints are sent to the FBI. For each individual submitted, the FBI creates a unique identification number allowing, among other things, law enforcement to determine an individual's arrest history. The fingerprints are stored in the FBI's Integrated Automated Fingerprint Identification System (IAFIS).

## SCAAP Reimbursement

State and local entities wishing to get reimbursed for incarcerating eligible criminal aliens submit identification data each year, such as the individual alien's name, and date and country of birth to DOJ by means of a web-based system. DOJ then sends this data to ICE, which researches DHS databases to try to determine the individual's immigration or citizenship status. For each individual name submitted, ICE reports to DOJ that it (1) verified the individual was illegally in the United States at the time of incarceration (called SCAAP illegal aliens), (2) lacked documentation to confirm an individual's immigration status (called SCAAP unknown aliens), or (3) verified that the individual was an alien legally in the United States or a United States citizen and therefore not eligible for reimbursement under SCAAP. According to ICE officials, some of the unknown aliens may be in the United States illegally but have not come into contact with DHS authorities, which is why ICE could not verify their immigration status. Table 1 summarizes the terms and definitions used in this report.

## General Terms and Definitions

**Table 1: Common Terms and Definitions Used in this Report**

| Term | Definition |
|------|------------|
| Alien | Any person who is not a citizen of the United States. |
| Criminal aliens | Noncitizens who are residing in the United States legally or illegally and are convicted of a crime. |
| Primary conviction | When convicted of multiple offenses, the primary conviction is the offense with the longest maximum sentence. |
| **SCAAP criminal aliens—divided into two subgroups[a]** | |
| SCAAP illegal aliens | Noncitizens whom ICE verified were illegally in the United States at the time of incarceration and for whom state and local jurisdictions received federal reimbursement through SCAAP. |
| SCAAP unknown aliens | Individuals whom states and local jurisdictions believe to be illegally in the United States. However, ICE lacks documentation to confirm their immigration status. States and local jurisdictions received partial federal reimbursement through SCAAP. |

Source: GAO.

[a]SCAAP criminal aliens are a subset of all criminal aliens because criminal aliens with lawful immigration status do not meet the statutory criteria for SCAAP reimbursement. SCAAP data do not represent the number of unique individuals since these individuals could be incarcerated in multiple SCAAP jurisdictions during the reporting period.

## Criminal Alien Incarcerations and Nationalities

## Proportion of Criminal Aliens Incarcerated in Federal Prisons Remained Consistent from Fiscal Years 2005 through 2010

As shown in figure 1, the number of criminal aliens incarcerated in federal prisons increased about 7 percent from about 51,000 in fiscal year 2005 to about 55,000 in fiscal year 2010. The number of total inmates incarcerated in federal prisons increased about 14 percent from about 189,000 in fiscal year 2005 to about 215,000 in fiscal year 2010.[11]

**Figure 1: Number of Criminal Aliens and U.S. Citizens Incarcerated in Federal Prisons from Fiscal Years 2005 through 2010**



Number of inmates

Source: GAO analysis of BOP data.

Further, the criminal alien population as a percentage of the total federal inmate population has remained relatively constant since 2001. In 2005, we reported that the overall percentage of the criminal alien population incarcerated in federal prisons remained consistently around 27 percent of the total inmate population from 2001 though 2004.[12] In fiscal year 2005,

---

[11]BOP incarceration data are based on an average of the 12 monthly population snapshots for each type of BOP institution, such as minimum security, within the fiscal year. These data do not include inmates for which citizenship is unknown.

[12]See GAO-05-337R.  In 2005, we reported federal incarceration data as of the end of the calendar year.

GAO-11-187  Criminal Alien Statistics

the criminal alien population in federal prisons was around 27 percent of the total inmate population, and from fiscal years 2006 through 2010 remained consistently around 25 percent.

## Mexico Represents the Country of Citizenship for Most Criminal Aliens Incarcerated in Federal Prisons as of December 2010

As shown in figure 2, about 68 percent of the approximately 51,000 criminal aliens incarcerated in federal prison at the end of December 2010 were citizens of Mexico, and almost 90 percent were citizens of one of eight countries, including Mexico.[13]

[13]BOP's data were as of December 25, 2010.  These data do not include criminal alien inmates for which BOP does not have country of citizenship.  BOP obtains country of citizenship data from presentence investigation reports, which may be based on documentation such as a birth certificate or immigration documents, or be self-reported.

**Figure 2: Country of Citizenship for Criminal Aliens Incarcerated in Federal Prisons as of December 2010**



1%
Guatemala

2%
Honduras

2%
El Salvador

2%
Jamaica

3%
Cuba

5% Dominican Republic

5% Colombia

10% Remaining 172 countries

68%

Mexico

Source: GAO analysis of BOP data.

Note: Percentages do not add to 100 due to rounding.

These data are similar to what we reported in 2005.[14] Specifically, in 2005, we reported that about 63 percent of the approximately 49,000 criminal aliens incarcerated in federal prison at year-end 2004 were citizens of Mexico and about 90 percent were citizens of the same eight countries in figure 2.

---

[14]See GAO-05-337R.

## Number of State and Local SCAAP Criminal Alien Incarcerations Increased from Fiscal Years 2003 through 2009

From fiscal years 2003 through 2009, the number of SCAAP criminal alien incarcerations in state prison systems and local jails increased from about 220,000 in fiscal year 2003 to about 296,000 in fiscal year 2009. Specifically, the number of SCAAP criminal alien incarcerations in state prison systems increased by about 25 percent and the number of SCAAP criminal alien incarcerations in local jails increased by about 40 percent, as shown in Figure 3.[15]

**Figure 3: Number of State and Local SCAAP Criminal Alien Incarcerations from Fiscal Year 2003 through Fiscal Year 2009**



Number of Incarcerations

Source: GAO analysis of DOJ Bureau of Justice Assistance data.

Note: These fiscal years represent data on SCAAP criminal alien incarcerations from July 1 through June 30 for the respective fiscal year. For example, fiscal year 2009 includes incarcerations from July 1, 2008, through June 30, 2009. Fiscal year 2009 data are the most recent data available from DOJ.

---

[15]The following state prison systems did not apply for SCAAP reimbursement: Illinois, Montana, and Oregon in fiscal year 2003; Montana in fiscal year 2004; Alaska in fiscal year 2005; Virginia and West Virginia in fiscal year 2006; and West Virginia in fiscal years 2007, 2008, and 2009. SCAAP data do not represent the number of unique individuals since these individuals could be incarcerated in multiple SCAAP jurisdictions during the reporting period.

In addition, 49 state prison systems and the District of Columbia received reimbursement in fiscal year 2009 compared to 47 state prison systems and the District of Columbia for fiscal year 2003. Of the total number of inmate days spent by all inmates in state prisons that received SCAAP reimbursements, SCAAP criminal aliens accounted for about 5 percent of all days in fiscal year 2009 and about 4 percent in fiscal year 2003. The number of local jurisdictions receiving reimbursement under SCAAP increased about 16 percent from about 700 local jails in fiscal year 2003 to about 810 local jails in fiscal year 2009. In fiscal year 2009, SCAAP criminal aliens accounted for about 6 percent of the total number of days spent by all inmates in these 810 local jails compared to about 5 percent in fiscal year 2003.

## About 70 Percent of SCAAP Criminal Alien Incarcerations in State Prison Systems and Local Jails Were in Six States— California, Texas, Arizona, Florida, New York, and Illinois—in Fiscal Year 2009

Six states—California, Texas, Arizona, Florida, New York, and Illinois—incarcerated 66 percent of the nearly 296,000 SCAAP criminal alien incarcerations nationwide in fiscal year 2009, as shown in figure 4.[16] See appendix III for additional information on figure 4.

---

[16]Other studies have researched criminal alien populations in certain states. For examples, see Public Policy Institute of California, *Crime, Corrections, and California: What Does Immigration Have to Do with It?* (San Francisco, California: February 2008) and State of New York, *The Impact of Foreign Born Inmates on the New York State Department of Correctional Services* (Albany, New York: July 2008).

**Figure 4: Number of SCAAP Criminal Alien Incarcerations in Each State**



Source: GAO analysis of BJA SCAAP data; Map Resources.

**Mexico Represents the Country of Birth for Most SCAAP Criminal Aliens in State Prison Systems as of Fiscal Year 2009**

As shown in figure 5, about 66 percent of the SCAAP criminal aliens incarcerated in state prison systems from July 1, 2008, through June 30, 2009, were born in Mexico and about 85 percent were born in one of nine countries, including Mexico.[17]

**Figure 5: Country of Birth for SCAAP Criminal Aliens in State Prison Systems as of Fiscal Year 2009**



Source: GAO analysis of DOJ Bureau of Justice Assistance data.

Note: Percentages do not add to 100 due to rounding.

---

[17]Of the inmates we analyzed, about 63,000 were SCAAP illegal aliens and about 28,000 were SCAAP unknown aliens. We did not include about 1,300 inmates of unknown country of birth. SCAAP country of birth data are provided to DOJ by jurisdictions. According to DOJ, these data may be provided directly from inmates, the jurisdiction's database, or ICE. SCAAP criminal aliens from the District of Columbia were included in our analysis of SCAAP criminal aliens in state prison systems.

Similarly, we reported in 2005 that about 58 percent of approximately 52,000 SCAAP criminal aliens incarcerated in five state prison systems with the most criminal aliens—Arizona, California, Florida, New York, and Texas—as of mid-year 2004 were born in Mexico.[18] At that time, about 80 percent of these SCAAP criminal aliens were born in one of six countries—Mexico, the Dominican Republic, Cuba, El Salvador, Jamaica, and Vietnam.

## Mexico Represents the Country of Birth for Most SCAAP Criminal Aliens in Local Jails as of Fiscal Year 2009

As shown in figure 6, about 70 percent of the SCAAP criminal aliens incarcerated in local jails from July 1, 2008, through June 30, 2009, were born in Mexico and about 85 percent were born in one of seven countries, including Mexico.[19]

---

[18]See GAO-05-337R.

[19]Of the inmates we analyzed, about 60,000 were SCAAP illegal aliens and about 144,000 were SCAAP unknown aliens. We did not include about 1,000 inmates of unknown country of birth. SCAAP country of birth data are provided to DOJ by jurisdictions. According to DOJ, these data may be provided directly from inmates, the jurisdiction's database, or ICE.

**Figure 6: Country of Birth for SCAAP Criminal Aliens in Local Jails as of Fiscal Year 2009**



**1%**
Cuba

**1%**
Dominican Republic

**2%**
Germany

**3%**
Honduras

**4%**
Guatemala

4%    El Salvador

14%    Remaining 213 countries

70%

Mexico

Source: GAO analysis of DOJ Bureau of Justice Assistance data.

Note: Percentages do not add to 100 due to rounding.

Similarly, we reported in 2005 that about 65 percent of the approximately 170,000 SCAAP criminal aliens in five local jurisdictions—New York City, New York; Los Angeles County, California; Orange County, California; Maricopa County, Arizona; and Harris County, Texas—in fiscal year 2003 were born in Mexico. At that time, about 80 percent of these SCAAP criminal aliens were born in one of eight countries—Mexico, El Salvador, Guatemala, Honduras, South Korea, Vietnam, the Dominican Republic, and the Philippines.[20]

---

[20]See GAO-05-337R.

**Number of Criminal Alien Apprehensions and Removals Increased from Calendar Years 2007 through 2010**

As shown in figure 7, the number of criminal alien apprehensions by ICE, removal proceedings, and removals ordered[21] increased significantly from calendar years 2007 through 2010.[22] The number of criminal alien

- apprehensions increased by about 85 percent,
- removal proceedings increased by 71 percent, and
- removals ordered increased more than seven fold from about 9,000 in 2007 to about 79,000 in 2010.

The number of criminal alien removals from the United States in which ICE later recorded an individual was apprehended for reentering the country illegally increased about 42 percent (about 8,000) from calendar years 2007 through 2009, but declined 35 percent (about 10,000) from 2009 to 2010.

[21]Removal proceedings are administrative hearings before an immigration judge for the purpose of determining the inadmissibility or deportability of aliens. Aliens ordered removed are those who have received an order of removal that is administratively final, or, if the order was judicially reviewed in federal court and the court ordered a stay of removal, those who have received a final order from the court affirming the administrative order of removal.

[22]These data do not represent unique individuals since an individual could be apprehended multiple times in the same year. Also, aliens apprehended in one year may be placed in removal proceedings or removed in a later year. Similarly, aliens placed in removal proceedings in one year may be removed in a later year.



**Figure 7: Number of Criminal Alien Apprehensions, Removals, and Reentries**

Source: GAO analysis of ICE data.

## Criminal Alien Arrests and Convictions

**The Majority of Criminal Aliens in Our Study Population Had from 1 to 5 Arrests and from 1 to 10 Offenses**

Based on our random sample of 1,000 criminal aliens, we estimate that our study population of about 249,000 criminal aliens were arrested about 1.7 million times, averaging about 7 arrests per criminal alien, slightly lower than the 8 arrests per criminal alien we reported in 2005.[23] They were arrested for a total of about 2.9 million offenses, averaging about 12

[23]See GAO-05-646R. See app. I for information on the margin of error for these estimates.

offenses per criminal alien, slightly lower than the 13 offenses per criminal alien we reported in 2005.[24]

As shown in figure 8, 54 percent of the criminal aliens in our study population had from one to five arrests in their arrest history record. About 9 percent of the criminal aliens in our study population (about 23,000) had one arrest. About 60 percent of the criminal aliens in our study population had from 1 to 10 offenses in their arrest history record. Our analysis includes criminal aliens with arrests dating from August 1955 to April 2010. About 90 percent of the arrests in our study population occurred after 1990.

**Figure 8: Number of Arrests and Offenses per Criminal Alien from August 1955 to April 2010**



Source: GAO analysis of IAFIS data.

Note: For information on the margin of error, see app. I.

---

[24]A single arrest can be for multiple offenses, if the arrest for each of those offenses occurred within the same jurisdiction on the same date. An arrest does not necessarily result in prosecution or a conviction.

## 65 Percent of the Criminal Aliens in Our Study Population Were Arrested at Least Once for an Immigration Offense

Sixty-five percent of the 249,000 criminal aliens in our study population were arrested at least once for either a civil or criminal immigration violation. The two types of arrests typically lead to different outcomes: arrests for civil immigration violations are for the purpose of placing individuals into removal proceedings, whereas arrests for criminal violations can lead to criminal prosecution. About 50 percent of the criminal aliens in our study population were arrested at least once for either assault, homicide, robbery, a sex offense, or kidnapping. About half of the criminal aliens were arrested at least once for a drug violation. Figure 9 shows the percentage of criminal aliens arrested at least once by offense category.



**Figure 9: Percentage of Criminal Aliens Arrested At Least Once by Offense Category**

Source: GAO analysis of FBI IAFIS data.

Note: For information on the margin of error, see app. I.

**Immigration, Drugs, and Traffic Violations Accounted for about 50 Percent of Offenses in Our Study Population**

Of the nearly 3 million arrest offenses in our study population, we estimate that about 50 percent were related to immigration, drugs, or traffic violations, as shown below in table 2.

**Table 2: Estimated Number and Percent of Criminal Alien Arrest Offenses by Type of Offense**

| Arrest offense | Number | Percent |
|---|---|---|
| Immigration[a] | 529,859 | 18 |
| Drugs | 504,043 | 17 |
| Traffic violations | 404,788 | 14 |
| Obstruction of justice | 252,899 | 9 |
| Assault | 213,047 | 7 |
| Larceny/theft | 125,322 | 4 |
| Fraud, forgery, and counterfeiting | 120,810 | 4 |
| Burglary | 115,045 | 4 |
| Weapons violations | 94,492 | 3 |
| Motor vehicle theft | 81,710 | 3 |
| Sex offenses | 69,929 | 2 |
| Disorderly conduct | 52,384 | 2 |
| Stolen property | 49,126 | 2 |
| Property damage | 42,609 | 1 |
| Robbery | 42,609 | 1 |
| Homicide | 25,064 | 1 |
| Kidnapping | 14,788 | 1 |
| Arson | 2,005 | <1 |
| Other | 151,138 | 5 |
| **Total** | **2,891,668** | **100[b]** |

Source: GAO analysis of FBI IAFIS data.

Note: For information on the margin of error, see app. I.

[a]Offenses included in our immigration category included both criminal offenses (63,914) and civil immigration violations—those that lead to removal proceedings (305,784). For 160,161 immigration offenses, we were unable to distinguish whether the offense was criminal or civil. See app. I for information on the margin of error.

[b]Percentages may not add to 100 due to rounding.

The Majority of Criminal Aliens in Our Study Population Were Arrested in California, Texas, or Arizona

As shown in figure 10, about 75 percent of criminal aliens in our study population were arrested in one of three states—California, Texas, and Arizona.[25]

**Figure 10: Location of Criminal Alien Arrests**



1% Oregon

1% Georgia

1% Colorado

1% Virginia

2% Florida

2% Illinois

3% New York

3% Washington

9% Arizona

10% Remaining 36 states, District of Columbia and U.S. territories

10% Texas

54% California

Source: GAO analysis of FBI's IAFIS data.

Note: For information on the margin of error, see app. I. Percentages do not add to 100 due to rounding.

[25] Arrests were made by federal, state, and local authorities. In two arrest histories in our sample, there were arrests made in countries other than the United States.

**Almost 90 Percent of Primary Federal Convictions Related to Criminal Alien Offenders in Fiscal Year 2009 Were for Immigration or Drug-Related Offenses**

In fiscal year 2009, immigration and drug offenses accounted for nearly 90 percent of federal primary convictions for criminal aliens based upon U.S. Sentencing Commission data, as shown in figure 11.[26]

**Figure 11: Primary Convictions Related to Criminal Alien Federal Offenders in Fiscal Year 2009**



1%
Money Laundering/Racketeering/Extortion

2%
Other$^a$

2%
Firearms

Economic Crimes

7%

20% — Drugs

68%

Immigration

Source: GAO analysis of U.S. Sentencing Commission data.

$^a$"Other" offenses include homicide, kidnapping, sex offenses, assault, arson, burglary, and auto theft.

Moreover, the number of criminal aliens convicted of immigration violations has increased while the number convicted of drug violations has remained stable. In fiscal year 2004, immigration offenses accounted for about 13,000 primary federal convictions of criminal aliens compared to 24,000 (an 85 percent increase) in fiscal year 2009. In fiscal year 2004, drug

---

[26]An offender may be convicted of multiple offenses. For each offender, the U.S. Sentencing Commission tracks the offense that carries the greatest sentence, called the primary conviction. Since these data are of federal convictions, they include offenders who were sentenced to a period of incarceration and those who were not.

offenses accounted for about 7,000 primary convictions compared to the same number in 2009.

## Forty-Three Percent of Individuals Convicted as a Result of Terrorism-Related Investigations Were Aliens

In March 2010, DOJ's National Security Division reported information on convictions resulting from international terrorism investigations conducted since September 11, 2001. According to DOJ, the convictions represent cases where defendants were directly linked to international terrorism as well as those who at the time of charging appeared to have a connection to international terrorism.[27] To determine if any of the individuals convicted in these terrorism-related cases were aliens, we requested that U.S. Citizenship and Immigration Services (USCIS) provide us the immigration or citizenship status, if known, of these individuals.

Based on USCIS information, 173 (43 percent) of the 399 individuals included in DOJ's list of convictions resulting from international terrorism-related investigations were, at the time of charging, aliens with or without legal immigration status. The remaining 226 individuals (57 percent) were either U.S. citizens[28], naturalized U.S. citizens, aliens brought into the United States for prosecution, or unknown. Of the 105 aliens with legal immigration status, 68 (65 percent) were lawful permanent residents. Table 3 shows the immigration or citizenship status related to these individuals.

[27]See DOJ, *Introduction to National Security Division Statistics on Unsealed International Terrorism and Terrorism-Related Convictions* (Washington, D.C. March 2010). DOJ included individuals identified and detained in the course of a nationwide investigation conducted after September 11, 2001, and subsequently charged with a criminal offense, as well as additional defendants who, at the time of charging, appeared to have a connection to international terrorism even if they were not charged with a terrorism-related offense. We did not verify these individuals' connections to terrorism.

[28]This category includes U.S. citizens who were born in the United States (52 individuals) or derived U.S. citizenship (2 individuals). For 5 of the individuals included in this category, the source of their U.S. citizenship could not be determined. For this analysis, we treated naturalized U.S. citizens as a separate category.

**Table 3: Immigration or Citizenship Status at the Time of Charging of Individuals Convicted as a Result of Terrorism-Related Investigations**

| Immigration or citizenship status | Number of individuals | Percent |
|---|---|---|
| Aliens with legal immigration status | 105 | 26 |
| Naturalized U.S. citizens | 83 | 21 |
| Aliens without legal immigration status | 68 | 17 |
| U.S. citizens[a] | 59 | 15 |
| Aliens brought into the United States for prosecution | 50 | 13 |
| Unknown[b] | 34 | 9 |
| **Total**[c] | **399** | **100** |

Source: GAO Analysis of DOJ and USCIS data.

[a]This category includes U.S. citizens who were born in the United States (52 individuals) or derived U.S. citizenship (2 individuals). For 5 of the individuals included in this category, the source of their U.S. citizenship could not be determined. For this analysis, we treated naturalized U.S. citizens as a separate category.

[b]The immigration/citizenship status of some individuals is unknown because of a lack of identifying information needed to determine their status.

[c]Percentages may not add to 100 due to rounding.

**About 20 Percent of Individuals Convicted under Statutes Directly Related to Terrorism Were Aliens**

According to DOJ, some of the defendants on the DOJ list were charged with violations of federal statutes that are directly related to international terrorism, such as hostage taking and bombings of places of public use. Twenty-two individuals (21 percent) of the 107 individuals convicted of statutes identified by DOJ as directly related to terrorism were aliens with or without legal immigration status, as shown in table 4. The remaining 85 individuals (79 percent) were either U.S. citizens, naturalized U.S. citizens, aliens brought into the United States for prosecution, or unknown. Of the 107 individuals, 62 individuals were also convicted under other statutes not directly related to terrorism.

**Table 4: Number of Individuals Convicted under Statutes Directly Related to Terrorism According to DOJ**

| Immigration or citizenship status | Number of convicted individuals | Percent |
|---|---|---|
| U.S. citizens | 30 | 28 |
| Aliens brought into the United States for prosecution | 30 | 28 |
| Naturalized U.S. citizens | 16 | 15 |
| Aliens with legal immigration status | 13 | 12 |
| Aliens without legal immigration status | 9 | 8 |
| Unknown | 9 | 8 |
| **Total**[a] | **107** | **100** |

Source: GAO Analysis of DOJ and USCIS data.

[a]Percentages may not add to 100 due to rounding.

**About 50 Percent of Individuals Convicted under Other Statutes Were Aliens**

DOJ also included on its list defendants where the investigation involved an identified link to international terrorism but they were charged with violating other statutes, including fraud, immigration, drugs, false statements, and general conspiracy charges. Of the 292 individuals convicted under other statutes, 151 individuals (52 percent) were aliens with or without legal immigration status. The remaining 141 individuals (48 percent) were either U.S. citizens, naturalized U.S. citizens, aliens brought into the United States for prosecution, or unknown, as shown in table 5.

**Table 5: Number of Individuals Convicted under Other Statutes According to DOJ**

| Immigration or citizenship status | Number of convicted individuals | Percent |
|---|---|---|
| Aliens with legal immigration status | 92 | 32 |
| Naturalized U.S. citizens | 67 | 23 |
| Aliens without legal immigration status | 59 | 20 |
| U.S. citizens | 29 | 10 |
| Aliens brought into the United States for prosecution | 20 | 7 |
| Unknown | 25 | 9 |
| **Total**[a] | **292** | **100** |

Source: GAO Analysis of DOJ and USCIS data.

[a]Percentages may not add to 100 due to rounding.

Three of the Individuals on DOJ's List Received U.S. Citizenship after Their Conviction

An individual applying for naturalization must demonstrate good moral character for a statutory period of time—from 5 years preceding the application up to admission to citizenship. This includes not having been convicted of crimes, such as murder, rape, drug trafficking, or other aggravated felonies prior to or during that period, as well as not having been convicted of other crimes during that period, such as certain drug offenses or convictions that led to 180 days or more of prison time.

Based upon our analysis of USCIS and DOJ data, three of the individuals on the DOJ list received U.S. citizenship after their convictions. Two were convicted of unlawful production of an identity document and one was convicted of transferring funds out of the country in violation of U.S. sanctions.

According to USCIS documentation, in all three cases

- the convictions were outside of the statutory period, were not aggravated felonies, and resulted in no prison time for the defendants;
- all required background checks were conducted and resolved with appropriate law enforcement agencies; and
- no national security, public safety, or other grounds of ineligibility existed.

As a result, USCIS determined that each of these individuals were able to demonstrate good moral character within the required period of time and met all other requirements for naturalization.

**About 50 Percent of All Arizona State Convictions of SCAAP Illegal Alien Inmates in Fiscal Year 2008 Were Related to Drugs, Traffic Violations, and Assault**

As shown in figure 12, about 50 percent of all convictions for Arizona's SCAAP illegal alien incarcerations in fiscal year 2008 were related to three offenses: drugs, traffic violations, and assault.[29]

**Figure 12: Arizona State Convictions for SCAAP Illegal Aliens in Fiscal Year 2008 by Offense**



Source: GAO analysis of Arizona Department of Corrections data.

a"Other" offenses include obstruction of justice, property damage, disorderly conduct, immigration, stolen property, and arson.

Additionally, the total number of SCAAP illegal aliens incarcerated in Arizona state prisons in fiscal year 2008 was about 6,000, which accounted for about 11 percent of all inmate days. From fiscal years 2005 through

---

[29]We were not able to distinguish the primary offenses for Arizona convictions, and instead presented our analysis of all offenses provided per inmate (approximately 10,000 convictions). Our analysis of state conviction data was based on convictions related to SCAAP illegal alien incarcerations in fiscal year 2008 (incarcerations from July 1, 2007, through June 30, 2008), which were the most recent SCAAP data available at the time of our analysis.

2008, drug-related offenses led to more convictions than other offenses, increasing about 6 percent.

**About 50 Percent of California State Primary Convictions of SCAAP Illegal Alien Inmates in Fiscal Year 2008 Were Related to Drugs, Assault, and Sex Offenses**

As shown in figure 13, about 50 percent of California's primary convictions related to SCAAP illegal aliens were for drugs, assault, and sex offenses.[30]

**Figure 13: California State Primary Convictions of SCAAP Illegal Aliens in Fiscal Year 2008 by Offense**



Source: GAO analysis of California Department of Corrections and Rehabilitation data.

a"Other" offenses include stolen property, fraud, forgery, counterfeiting, kidnapping, property damage, arson, and obstruction of justice.

---

[30]Our analysis is of the primary offense provided per case (some inmates have more than one case associated with them, and as a result the 2008 analysis is of about 34,000 primary offenses related to about 27,000 inmates). Our analysis of state conviction data was based on convictions related to SCAAP illegal alien incarcerations in fiscal year 2008 (incarcerations from July 1, 2007, through June 30, 2008), which were the most recent SCAAP data available at the time of our analysis.

Further, the total number of SCAAP illegal aliens incarcerated in California state prisons in fiscal year 2008 was about 27,000, which accounted for about 10 percent of all inmate days. From fiscal years 2005 through 2008, drug-related convictions decreased by about 4 percent. Moreover, in fiscal year 2008, drug-related convictions accounted for about 27 percent of primary convictions for SCAAP illegal aliens in California.

## About 50 Percent of All Florida State Convictions of SCAAP Illegal Alien Inmates in Fiscal Year 2008 Were Related to Drugs, Sex Offenses, Burglary, and Robbery

As shown in figure 14, about 50 percent of all Florida state convictions of SCAAP illegal alien inmates were for drugs, sex offenses, burglary and robbery in fiscal year 2008.[31]

---

[31]We were not able to distinguish the primary offenses for Florida convictions, and instead presented our analysis of all offenses provided per inmate (approximately 25,000 convictions). Our analysis of state conviction data was based on convictions related to SCAAP illegal alien incarcerations in fiscal year 2008 (incarcerations from July 1, 2007, through June 30, 2008), which were the most recent SCAAP data available at the time of our analysis.

**Figure 14: Florida State Convictions of SCAAP Illegal Aliens in Fiscal Year 2008 by Offense**



Source: GAO analysis of Florida Department of Corrections data.

Note: Percentages do not add to 100 due to rounding.

ᵃ"Other" offenses include motor vehicle theft, weapons violations, obstruction of justice, stolen property, property damage, arson, and disorderly conduct.

Also, the total number of SCAAP illegal aliens incarcerated in Florida state prisons in fiscal year 2008 was about 6,000, which accounted for about 5 percent of all inmate days. From fiscal years 2005 through 2008, drug-related offenses led to more convictions in Florida than other offenses.

**50 Percent of New York State Primary Convictions of SCAAP Illegal Alien Inmates in Fiscal Year 2008 Were Related to Homicide and Drugs**

As shown in figure 15, 50 percent of primary convictions related to SCAAP illegal aliens in New York state prison for fiscal year 2008 were for homicide and drugs.[32]

**Figure 15: New York State Primary Convictions of SCAAP Illegal Aliens for Fiscal Year 2008 by Offense**



Source: GAO analysis of New York State Department of Correctional Services data.

Note: Percentages do not add to 100 due to rounding.

a"Other" offenses include fraud, forgery, counterfeiting, traffic violations, obstruction of justice, arson, stolen property, motor vehicle theft, and property damage.

Additionally, the total number of SCAAP illegal aliens incarcerated in New York state prisons in fiscal year 2008 was about 5,000, which accounted for about 5 percent of all inmate days. From fiscal years 2005 through 2006, drugs led to more primary convictions than any other offense. However,

---

[32]Our analysis is of the primary offense provided per inmate. Our analysis of state conviction data was based on convictions related to SCAAP illegal alien incarcerations in fiscal year 2008 (incarcerations from July 1, 2007, through June 30, 2008), which were the most recent SCAAP data available at the time of our analysis.

beginning in fiscal year 2007, homicide primary convictions surpassed drug primary convictions as the primary offense resulting in the most convictions in New York.

## 50 Percent of Texas State Primary Convictions of SCAAP Illegal Alien Inmates in Fiscal Year 2008 Were Related to Drugs, Sex Offenses, and Assault

As shown in figure 16, 50 percent of primary convictions related to SCAAP illegal alien inmates in Texas state prisons in fiscal year 2008 were for drugs, sex offenses, and assault.[33]

**Figure 16: Texas State Primary Convictions of SCAAP Illegal Aliens for Fiscal Year 2008 by Offense**



Drugs

**3%**
Obstruction of Justice

Other[a]

8%

20%

8% Burglary

9% Homicide

18%

10% Robbery

12% 11%

Traffic Violations

Assault

Sex Offenses

Source: GAO analysis of Texas Department of Criminal Justice data.

Note: Percentages do not add to 100 due to rounding.

[a]"Other" offenses include larceny/theft, kidnapping, motor vehicle theft, weapons violations, fraud, forgery, counterfeiting, arson, property damage, and stolen property.

Further, the total number of SCAAP illegal aliens incarcerated in Texas state prisons in fiscal year 2008 was about 10,000, which accounted for

---

[33]Our analysis is of the primary offense provided per inmate. Our analysis of state conviction data was based on convictions related to SCAAP illegal alien incarcerations in fiscal year 2008 (incarcerations from July 1, 2007, through June 30, 2008), which were the most recent SCAAP data available at the time of our analysis.

about 4 percent of all inmate days. From fiscal years 2005 through 2008, drugs, sex offenses, and assault remained the top three offenses for SCAAP illegal alien incarcerations.

# Estimated Costs of Criminal Alien Incarcerations

## Federal Prison and SCAAP Costs to Incarcerate Criminal Aliens Increased from Fiscal Years 2005 through 2009

The estimated annual cost to incarcerate criminal aliens in BOP facilities plus SCAAP reimbursements ranged from about $1.5 billion in fiscal year 2005 to $1.6 billion in fiscal year 2009, as shown in figure 17. About 77 percent of these costs were associated with incarcerating criminal aliens in BOP facilities. In 2005, we estimated that the costs to incarcerate criminal aliens in BOP facilities along with SCAAP reimbursements ranged from about $1.5 billion in fiscal year 2001 to about $1.4 billion in fiscal year 2004.[34] For data in fiscal year 2010 dollars, see appendix II. The cost to incarcerate criminal aliens in BOP facilities increased by about 15 percent from about $1.1 billion in fiscal year 2005 to about $1.3 billion in fiscal year 2009 due to increases in both the criminal alien population incarcerated and costs to incarcerate inmates in BOP facilities. SCAAP reimbursements to states and localities increased by about 5 percent from fiscal years 2005 to 2008.

[34]See GAO-05-337R.

**Figure 17: Federal Prison and SCAAP Costs to Incarcerate Criminal Aliens from Fiscal Years 2005 through 2009**



**Dollars** (in millions)

Source: GAO analysis of BOP and BJA SCAAP data.

Note: Forty-nine states and the District of Columbia received SCAAP reimbursement in both fiscal years 2005 and 2009. About 810 local jurisdictions received reimbursement in fiscal year 2009 compared to about 730 local jurisdictions in fiscal year 2005.

**SCAAP Reimbursements to States and Local Jurisdictions Increased from Fiscal Years 2003 through 2008 but Declined in Fiscal Year 2009**

As shown in figure 18, SCAAP reimbursements to states and localities increased by about 40 percent from fiscal years 2003 to 2008. SCAAP reimbursements for fiscal year 2009 decreased about 18 percent from fiscal year 2008 due to lower appropriations.[35] For data in fiscal year 2010 dollars, see appendix II.

**Figure 18: SCAAP Reimbursements to States and Localities from Fiscal Years 2003 through 2009**



SCAAP reimbursements (dollars in millions)

Source: GAO analysis of DOJ Bureau of Justice Assistance data.

Legend:
- Local
- States plus District of Columbia

---

[35]For the purposes of our analysis, territories that received SCAAP reimbursement during fiscal years 2003 through 2009 are not included. Figures may not be exact due to rounding. The following state prison systems did not apply for SCAAP reimbursement: Illinois, Montana, and Oregon in fiscal year 2003; Montana in fiscal year 2004; Alaska in fiscal year 2005; Virginia and West Virginia in fiscal year 2006; and West Virginia in fiscal years 2007, 2008, and 2009.

**Estimated Selected Operating Costs to Incarcerate SCAAP Criminal Aliens in Prisons Nationwide Increased about 56 Percent from Fiscal Years 2003 through 2009**

We estimated that selected operating costs (i.e., correctional officer salaries, medical care, food service, and utilities) associated with incarcerating criminal aliens in our nation's state prison systems totaled $7 billion from fiscal year 2003 through fiscal year 2009. These costs ranged from about $736 million in 2003 to $1.1 billion in 2009, about a 56 percent increase, as illustrated by the white bars in figure 19. For data in fiscal year 2010 dollars, see appendix II. In the aggregate, states were eligible for reimbursement of about $4.5 billion in correctional officer salary costs of the estimated $7 billion, as illustrated by the light blue bars in figure 19.[36] Based on available appropriations, states were reimbursed for about $1.6 billion of the $7 billion, about 23 percent, as illustrated by the dark blue bars in figure 19.[37]

---

[36]SCAAP is intended to provide reimbursement to states and localities for a portion of the correctional officer salary costs associated with incarcerating criminal aliens who met the following criteria: (1) had at least one felony or two misdemeanor convictions for violations of state or local law; and (2) were incarcerated for at least 4 consecutive days during the reporting period.

[37]These selected operating costs include correctional officer salaries, medical care, food service, and utilities.

GAO-11-187  Criminal Alien Statistics

**Figure 19: Estimated Operating Costs to Incarcerate SCAAP Criminal Aliens in All 50 States**



Sources: GAO analysis of DOJ Bureau of Justice Statistics and Bureau of Justice Assistance data.

Note: SCAAP reimbursement figures may not equal appropriation due to rounding. Our analysis includes those states that received SCAAP reimbursement in the associated fiscal year. As a result, not all 50 states may be included in each fiscal year. Our analysis also includes the District of Columbia.

**Estimated Operating Costs per Inmate to Incarcerate SCAAP Criminal Aliens in Prisons in All 50 States Ranged from about $10,000 to $12,500**

We estimated that selected operating costs (i.e., correctional officer salaries, medical care, food service, and utilities) per inmate associated with incarcerating criminal aliens in state prisons ranged from about $10,000 in fiscal year 2003 to about $12,500 in fiscal year 2009, as shown in figure 20. We found that, on average, SCAAP reimbursed states about $2,400 per inmate (about 24 percent) in fiscal year 2003 and about $2,200 per inmate (about 17 percent) in fiscal year 2009. For data in fiscal year 2010 dollars, see appendix II.

**Figure 20: Estimated Operating Costs (i.e., correctional officer salaries, medical care, food service, and utilities) per Inmate to Incarcerate SCAAP Criminal Aliens in All 50 States**



State cost in dollars

Total per inmate costs
SCAAP reimbursement per inmate

Sources: GAO analysis of DOJ Bureau of Justice Statistics and Bureau of Justice Assistance data.

**California Accounted for about 70 Percent of Total Costs for Selected States to Incarcerate SCAAP Criminal Aliens in Fiscal Year 2008**

We estimated that California's total cost to incarcerate SCAAP criminal aliens in fiscal year 2008 was about $1.1 billion. This represents about 70 percent of the $1.6 billion total estimated costs for the five states we reviewed, as shown in figure 21.[38] California's estimated cost is higher than the other four states due to higher per inmate incarceration costs and the larger number of SCAAP criminal aliens. In 2005, we estimated that California's total cost to incarcerate SCAAP criminal aliens was about $510 million in fiscal year 2002 and $635 million in fiscal year 2003.[39]

---

[38]We selected the five states based on the number of SCAAP criminal aliens.  Collectively, these states accounted for about 70 percent of the SCAAP criminal alien population in fiscal year 2008.  We also selected these state prison systems and local jails because they were the same prison systems and local jails that we used in our April 2005 report.

[39]See GAO-05-337R.

**GAO-11-187 Criminal Alien Statistics**



**Figure 21: Selected State Costs to Incarcerate SCAAP Criminal Aliens in Fiscal Year 2008**

Source: GAO analysis of BJA SCAAP data and Arizona Department of Corrections, California Department of Corrections and Rehabilitation, Florida Department of Corrections, New York State Department of Correctional Services, and Texas Department of Criminal Justice data.

Note: SCAAP reimbursement figures may not equal appropriation due to rounding.

## California Accounted for about 70 Percent of Total Costs for Selected States to Incarcerate SCAAP Criminal Aliens in Fiscal Year 2009

We estimated that California's total cost to incarcerate SCAAP criminal aliens in fiscal year 2009 was about $1.1 billion. This represents about 70 percent of the about $1.6 billion total estimated costs for the five states we reviewed, as shown in figure 22. California's estimated cost is higher than the other four states due to higher incarceration costs and the larger number of SCAAP criminal aliens.

**Figure 22: Selected State Costs to Incarcerate SCAAP Criminal Aliens in Fiscal Year 2009**



Source: GAO analysis of BJA SCAAP data and Arizona Department of Corrections, California Department of Corrections and Rehabilitation, Florida Department of Corrections, New York State Department of Correctional Services, and Texas Department of Criminal Justice data.

Note: SCAAP reimbursement figures may not equal appropriation due to rounding.

**Selected Total State Costs per Inmate to Incarcerate SCAAP Criminal Aliens in Fiscal Year 2009 Ranged from about $12,000 to about $34,000**

We estimated that total costs per inmate to incarcerate SCAAP criminal aliens in fiscal year 2009 in five selected states ranged from about $12,000 for Texas to about $34,000 for California, as shown in figure 23. SCAAP reimbursements per inmate ranged from about $1,400 for Texas (about 11 percent) to about $4,500 for New York (about 15 percent).



**Figure 23: Selected State Costs per Inmate to Incarcerate SCAAP Criminal Aliens in Fiscal Year 2009**

Source: GAO analysis of BJA SCAAP data and Arizona Department of Corrections, California Department of Corrections and Rehabilitation, Florida Department of Corrections, New York State Department of Correctional Services, and Texas Department of Criminal Justice data.

**Selected Localities' Costs to Incarcerate SCAAP Criminal Aliens Ranged from $21 Million to $86 Million in Fiscal Year 2008**

In fiscal year 2008, the total estimated costs to incarcerate criminal aliens in the localities we reviewed ranged from $21 million in Harris County, Texas, to $86 million in New York City, New York, as shown in figure 24.[40] In 2005, we reported that the total estimated costs to incarcerate criminal aliens in the same localities in fiscal year 2003 ranged from $15 million in Maricopa County, Arizona, to $95 million in New York City, New York.[41] SCAAP reimbursements ranged from $3 million to $15 million in these localities or between about 9 percent (Maricopa County, Arizona) and about 19 percent (Los Angeles County, California) of the localities' total estimated costs, as shown in figure 24.

---

[40]Fiscal year 2008 includes the period from July 1, 2007, through June 30, 2008.

[41]See GAO-05-337R.

**Figure 24: Selected Localities' Costs and Reimbursements for Incarcerating Criminal Aliens in Fiscal Year 2008**



Source: GAO analysis of BJA SCAAP data, and Los Angeles County, California, Sheriff's Department; Maricopa County, Arizona Sheriff's Office; Orange County, California Sheriff's Department; New York City Department of Corrections; and Harris County, Texas Sheriff's Office data.

Note: SCAAP reimbursement figures may not equal appropriation due to rounding.

**Selected Localities' Costs to Incarcerate SCAAP Criminal Aliens Ranged from $30 Million to $139 Million in Fiscal Year 2009**

In fiscal year 2009, the total estimated costs to incarcerate criminal aliens in the localities we reviewed ranged from $30 million in Harris County, Texas, to $139 million in Los Angeles County, California, as shown in Figure 25. SCAAP reimbursements ranged from $3 million to $14 million in these localities or between about 7 percent (Orange County, California) and about 15 percent (New York City, New York) of the total estimated costs.

**Figure 25: Selected Localities' Costs and Reimbursements for Incarcerating Criminal Aliens in Fiscal Year 2009**



Source: GAO analysis of BJA SCAAP data, and Los Angeles County, California, Sheriff's Department; Orange County, California Sheriff's Office; Orange County, California Sheriff's Department; New York City Department of Corrections; and Harris County, Texas Sheriff's Office data.

Note: SCAAP reimbursement figures may not equal appropriation due to rounding.

## DOJ Plans to Update Its SCAAP Reimbursement Methodology Consistent with Best Practices

The amount DOJ awards states, counties, and cities (localities) in SCAAP reimbursements depends on, among other things, the extent to which DHS can verify the alien's immigration status at the time of incarceration. States and localities receive the maximum reimbursable amount for criminal aliens for whom DHS can verify their lack of legal status (SCAAP illegal aliens). States and localities also receive partial reimbursement for criminal aliens for whom DHS is unable to verify their immigration status (SCAAP aliens of unknown immigration status). DOJ is to reimburse states for 65 percent, cities for 60 percent, and counties for 80 percent of correctional officer salary costs associated with unknown aliens. According to DOJ officials, this methodology was developed based on analysis that the former Immigration and Naturalization Service (INS) conducted in 2000 where it analyzed the records of aliens submitted for SCAAP reimbursement in 1997 whose immigration status was at that time unknown. Based upon this analysis, INS determined that 65 percent of those unknown aliens submitted for reimbursement by states did not have legal status, 60 percent submitted for reimbursement by cities did not have legal status, and 80 percent submitted for reimbursement by counties did not have legal status.

Best practices in cost estimating and assessment of programs call for new data to be continuously collected so it is always relevant and current. Most programs do not remain static; they tend to change in the natural evolution of the program.[42] During the course of our review, we discussed with DOJ officials the relevancy of the current SCAAP reimbursement methodology since it is based on 1997 data. Thus, in January 2011, DOJ officials said that they had developed plans to update DOJ's SCAAP methodology, as appropriate, using SCAAP data from 2009 to help ensure that this methodology for reimbursing states and localities for unknown aliens is relevant and current. DOJ plans to use this data along with other factors to determine how to update its methodology for its next reimbursement cycle in 2011. DOJ stated that it would like to work with DHS to establish a 3-year update cycle to review the methodology in the future. Updating the SCAAP methodology would provide additional assurance that DOJ reimburses states and localities for such costs consistent with current trends.

---

[42]See GAO-09-3SP.

**GAO-11-187  Criminal Alien Statistics**

## Agency and Third-Party Comments

We requested comments on a draft of this report from DHS and DOJ. We also provided relevant portions of a draft of this report to the U.S. Sentencing Commission, Arizona Department of Corrections, California Department of Corrections and Rehabilitation, Florida Department of Corrections, New York State Department of Correctional Services, and Texas Department of Criminal Justice for review and comment. DHS, DOJ, and the U.S. Sentencing Commission notified us through e-mails received on March 15, 17, and 16, 2011, respectively, that they had no written comments to include in our report. In addition to these responses, USCIS and DOJ each provided technical comments, which have been incorporated into the report, as appropriate. The five state departments did not provide comments.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until up to 30 days from the report date. At that time, we will send copies of this report to the Attorney General, Secretary of Homeland Security, and other interested congressional committees.

In addition, this report will be available at no charge on GAO's Web site at http://www.gao.gov. If you or your staff have questions concerning this report or wish to discuss the matter further, please contact me at (202) 512-8777 or jeszeckc@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. Key contributors to this report are acknowledged in appendix IV.

Charles A. Jeszeck
Acting Director, Homeland Security and Justice Issues

# Appendix I: Scope and Methodology

This appendix provides additional details on the scope and methodology used to update our 2005 reports.[1] Specifically, our work provides information on the following:

1. The number and nationalities of criminal aliens incarcerated in federal and state prisons and local jails and the number of criminal alien (1) apprehensions, (2) removals, and (3) apprehensions for illegal reentry into the United States after removal.

2. The types of offenses for which criminal aliens were arrested and convicted.

3. The costs associated with incarcerating the criminal alien population and the extent to which the Department of Justice's (DOJ) methodology for reimbursing states and localities for the incarceration of certain criminal aliens is relevant and current.

## Incarcerated Criminal Alien Population in Federal and State Prison Systems and Local Jails

To determine the number and nationalities of criminal aliens incarcerated in federal and state prison systems and local jails, we analyzed DOJ's Bureau of Prisons (BOP) federal incarceration data on criminal aliens incarcerated in federal prisons from fiscal years 2005 through 2010 and DOJ's State Criminal Alien Assistance Program (SCAAP) incarceration data on criminal aliens incarcerated in state prison systems and local jails from fiscal years 2003 through 2009.[2] BOP incarceration data are based on an average of the 12 monthly population snapshots for each type of BOP institution, such as minimum security, within the fiscal year. These data do not include inmates for whom citizenship is unknown. There are no reliable population data on criminal aliens incarcerated in all state prison systems and local jails. The data we obtained represent a portion of the total population of criminal aliens who may be incarcerated at the state and local levels, since by statute SCAAP does not reimburse states and localities for certain criminal aliens, such as aliens with lawful immigration status, and not all jurisdictions may apply for

---

[1]GAO, *Information on Criminal Aliens Incarcerated in Federal and State Prisons and Local Jails*, GAO-05-337R (Washington, D.C.: Apr. 7, 2005) and *Information on Certain Illegal Aliens Arrested in the United States*, GAO-05-646R (Washington, D.C.: May 9, 2005).

[2]The period of time covered by these data vary because they reflect updates since we last reported on these issues in 2005 (see GAO-05-337R and GAO-05-646R). Moreover, they reflect the most recent data available at the time of our analysis. For more information on our prior work, see GAO-05-337R and GAO-05-646R.

Appendix I: Scope and Methodology

reimbursement.[3] To determine the nationalities of criminal aliens incarcerated in federal and state prison systems and local jails, we analyzed BOP country of citizenship data as of December 2010 for federal prisons, and SCAAP country of birth data from fiscal year 2009 for state prisons and local jails.[4] These data were the most recent as of the time of our analysis. BOP country of citizenship data do not include criminal alien inmates for whom BOP does not have country of citizenship. BOP obtains country of citizenship data from presentence investigation reports, which may be based on documentation such as a birth certificate or immigration documents, or be self-reported. SCAAP country of birth data are provided to DOJ by jurisdictions. According to DOJ, these data may be provided directly from inmates, the jurisdiction's database, or U.S. Immigration and Customs Enforcement (ICE). To determine the number of criminal alien apprehensions, removals, and apprehensions for reentering the country illegally after a prior removal, we analyzed ICE data from fiscal years 2007 through 2010.

## Types of Criminal Alien Arrest Offenses and Convictions

To determine the types of offenses criminal aliens incarcerated in federal and state prison systems and local jails were arrested for, we selected a random sample of aliens. Specifically, we obtained data from BOP on the population of aliens incarcerated in federal prisons as of December 27, 2008 (approximately 49,000 inmates). We added to this the population of convicted criminal aliens incarcerated in state prison systems and local jails from July 1, 2004, through June 30, 2008, for whom state and local governments sought reimbursement under SCAAP (approximately 460,000 inmates) for a total of about 509,000. These two populations were chosen because they were the most recent population data available when we began our analysis. In order to obtain an alien's arrest history, we needed to first determine which criminal aliens had a Federal Bureau of Investigation (FBI) identification number. The FBI identification number

---

[3]SCAAP is intended to provide reimbursement to states and localities for a portion of the correctional officer salary costs associated with incarcerating criminal aliens who met the following criteria: (1) had at least one felony or two misdemeanor convictions for violations of state or local law; and (2) were incarcerated for at least 4 consecutive days during the reporting period. The program is not intended to reimburse for all costs associated with criminal alien incarcerations.

[4]For the purposes of our report, data on SCAAP criminal alien incarcerations cover the period from July 1 through June 30 for the respective fiscal year. For example, SCAAP fiscal year 2008 data represents the time frame from July 1, 2007, through June 30, 2008. BOP maintains its nationality data based on country of citizenship and SCAAP maintains its data based on country of birth.

is a unique identifier the FBI assigns to a set of fingerprints that allows the linking of relevant arrest records and any subsequent activity within the criminal justice system. The arrest histories are stored in the FBI's Integrated Automated Fingerprint Identification System (IAFIS). About 251,000 (about 48,000 BOP inmates and 203,000 SCAAP inmates) of the 509,000 criminal aliens had a valid FBI identification number in the data records we obtained.[5] We provided the FBI number and other identifying information to the FBI and requested the arrest history for these 251,000 criminal aliens. The arrest history record for each criminal alien with a unique FBI identification number contained the dates of arrest, the arresting agency, location of the arrest, and a description of each offense that resulted in the arrest, such as drug possession, burglary, and robbery. We used data available in IAFIS as of May 2010 to determine the arrest history for each alien.

The arrest history records for the 251,000 contained several hundred thousand different descriptions of arrest offenses. From these 251,000 criminal aliens, we selected a simple random sample of 1,000 criminal aliens to analyze. We found that 5 of the criminal aliens from our sample were out of scope because their records did not reflect actual arrests but rather administrative actions (e.g., being booked into a prison or transferred between facilities). As such, our analysis is of 995 criminal aliens, and our estimated study population is about 249,000. Based on this analysis, we determined the estimated numbers of criminal alien arrests and offenses in our study population. We categorized the arrest history records for this sample into 1 of 19 major offense categories, such as immigration, using FBI's *Reference Guide to Aid in Understanding Arrest Abbreviations* on how to categorize different types of crimes (see table 7 below). Because the time period for the federal population of aliens is a single point in time, whereas the time periods for the state prison and local jail population are over four SCAAP years, our combined population understates the federal population of aliens since it does not account for federal prisoners that flowed in and out of BOP facilities. Given this difference in time period for these populations, we are not reporting comparisons between federal and state and local prisons, except in cases where we note that the subpopulations may differ as a result of the time difference rather than as a result of a difference between the two subpopulations. For the study population, the analysis includes criminal

---

[5]States and localities applying for SCAAP reimbursement are not required to submit an individual's FBI identification number to verify the individual's immigration status.

Appendix I: Scope and Methodology

aliens with arrests submitted to the FBI dating from August 1955 to April 2010.

Because our estimates regarding criminal alien arrests and offenses are based on a probability sample, each estimate we report has a measurable margin of error due to sampling. The margin of error surrounding an estimate is expressed as (1) a number of percentage points higher or lower than the percentage estimate, (2) a percent higher or lower than the estimated number, or (3) the entire range the margin of error covers, which is referred to as a confidence interval. Margins of error are calculated based on a certain confidence level, which for estimates in this report are 95 percent. For the estimated number of criminal aliens in our study population, total arrests, total offenses, and the average number of arrests and offenses per criminal alien, the margin of error is no more than +/-6 percent. For estimates of the number of arrests and offenses per criminal alien (see figure 8 of this report), the margin of error for percentage estimates is no more than +/-3 percentage points and the margin of error for the estimated numbers of criminal aliens is no more than +/-30 percent of the estimate unless otherwise noted.[6] For estimated percentages of criminal aliens with at least 1 arrest per offense category (see figure 9 of this report), the margin of error is no more than +/-3 percentage points. For estimated offenses by arrest offense categories (see table 2 of this report), the margin of error for percentage estimates is no more than +/-2 percentage points, and the margin of error for the estimated numbers of arrest offenses is no more than +/-20 percent of the estimated number unless otherwise noted.[7] For estimates related to arrest locations (see figure 10 of this report), the margin of error for the percentage estimates is no more than +/-1 percentage point.

To determine offenses for which criminal aliens were convicted, we analyzed federal data from the U.S. Sentencing Commission on federal court convictions from fiscal years 2003 through 2009; and data from five states—Arizona, California, Florida, New York, and Texas—on state

---

[6] For our 21 to 25 arrest category in fig. 8 of this report, the confidence interval is from 2,642 through 6,882 criminal aliens.  For our 26 or greater arrest category in fig. 8 of this report, the confidence interval is from 1,499 through 5,018 criminal aliens.

[7] For our kidnapping category in table 2 of this report, the confidence interval is from 11,112 through 18,464 offenses.  For our arson category in table 2 of this report, the confidence interval is from 648 through 3,362.

convictions from fiscal years 2005 through 2008.[8] We selected these five states because they are the states with the largest number of SCAAP criminal aliens. Collectively, these states accounted for about 70 percent of the SCAAP criminal alien population in fiscal year 2008. Criminal aliens may be convicted of multiple offenses. For federal court convictions, we analyzed data on the primary offense per offender—the offense with the longest maximum sentence when an individual is convicted of multiple offenses. Table 6 describes the multiple offense categories for federal court convictions.

**Table 6: Major Offense Categories for Federal Convictions**

| Major offense category | Category includes |
|---|---|
| Immigration | Alien smuggling; trafficking in documents needed for entry into the United States, such as U.S. passports; fraudulently acquiring entry documents; unlawfully entering the United States. |
| Drugs | Drug distribution, manufacture, possession. |
| Economic crimes | Larceny, fraud, embezzlement, forgery/counterfeiting, tax offenses, and antitrust (i.e., price fixing). |
| Firearms | Unlawful possession/transportation of firearms or ammunition, use of firearms or ammunition to commit crime. |
| Money Laundering/Racketeering/Extortion | Monetary transaction from unlawful activity, failure to report monetary transactions, violent crimes in aid of racketeering, blackmail, extortion by force or threat. |

Source: GAO analysis of U.S. Sentencing Commission data.

Our analysis of state conviction data was based on convictions related to SCAAP illegal alien incarcerations from fiscal years 2005 through 2008 (incarcerations from July 1, 2004, through June 30, 2008), which were the most recent SCAAP data available at the time of our analysis. The data provided by Arizona and Florida did not distinguish primary convictions, thus we presented our analysis of all offenses provided per inmate. For California, New York, and Texas, we analyzed the primary conviction

---

[8]We analyzed federal data from fiscal years 2003 through 2009 to determine trends in federal convictions, if any, since our past work. We analyzed state data from fiscal years 2005 through 2008 to determine trends in selected state convictions, if any, using the 4 most recent fiscal years at the time of our analysis.

Appendix I: Scope and Methodology

provided per inmate. Table 7 describes the multiple offense categories for state convictions.

**Table 7: Major Offense Categories for Arrest Offenses and State Convictions**

| Major offense category | Category includes |
|---|---|
| Arson | Arson, reckless burning, and possession of arson materials |
| Assault | Assault, battery, assault with a deadly weapon, endangerment, and threats |
| Burglary | Breaking and entering, burglary, and possession of burglary tools |
| Disorderly conduct | Disturbing the peace, fighting, intoxication, public nuisance, and disorderly conduct |
| Drugs | Use/under the influence, possession, possession with intent to distribute, sales, manufacturing, transporting, and possession of drug paraphernalia |
| Fraud, forgery, and counterfeiting | Deceptive practices or identification, fraud, giving false information, altering or forging documents, and counterfeiting or possession of counterfeit materials or tools |
| Homicide | Murder, manslaughter, and homicide |
| Immigration | Illegal entry, illegal reentry, false claim to U.S. citizenship, alien smuggling, and removal proceedings |
| Kidnapping | False imprisonment, kidnapping, and taking hostages |
| Larceny/theft | Grand and petty larceny and theft, shoplifting, embezzlement, and money laundering |
| Motor vehicle theft | Auto theft, carjacking, and taking a vehicle without consent |
| Obstruction of justice | Escaping, evading, being a fugitive of justice, failing to appear, failing to register as a sex offender, resisting arrest, and interfering with or obstructing an officer or justice proceedings |
| Property damage | Destruction of property, vandalism, and criminal or malicious mischief |
| Robbery | Armed robbery, robbery of a dwelling, robbery of a bank, and unarmed robbery |
| Sex offenses | Lewd and lascivious acts, rape, sexual assault, indecent exposure, prostitution, and molestation |
| Stolen property | Buying, selling, receiving, or possessing stolen property |
| Traffic violations | Driving under the influence, hit and run, no proof of insurance, no driver's license, and moving violations such as speeding and failure to stop |
| Weapons violations | Possession of a weapon, discharging a weapon, altering a weapon, and carrying a concealed weapon |

| Major offense category | Category includes |
|---|---|
| Other | Includes trespassing, gang participation, littering, child cruelty, racketeering, and illegal waste dumping |

Source: GAO analysis of FBI data.

Note: All offenses include any attempt or conspiracy to commit the respective offense. We developed the criminal offense categories using the FBI's classification for offense codes as our guidance.

To determine the immigration or citizenship status of individuals identified by DOJ as having been convicted as a result of international terrorism investigations, we obtained unique identifiers (alien identification number or U.S. Marshals identification number) for these individuals, as available, from the U.S. Sentencing Commission and BOP.[9] An alien identification number is a unique number assigned to an alien who has come into contact with immigration authorities. The U.S. Marshals identification number is a unique number assigned to individuals who have been processed into the federal prison system. Based on the identifying information, the U.S. Citizenship and Immigration Services (USCIS) provided information on the immigration or citizenship status of these individuals. We analyzed this information to determine the immigration status of these individuals at the time charges were filed against them as a result of an international terrorism investigation. We also analyzed additional information provided by USCIS on three individuals who were naturalized after their conviction dates, including the offenses of conviction, sentence imposed, and steps taken to vet these individuals prior to their naturalization. We interviewed USCIS officials on the immigration and citizenship status information provided for all individuals on the DOJ list and the actions taken to vet the three individuals who were naturalized. We did not independently verify these individuals' links to terrorism.

---

[9]We analyzed information including the individuals' names, charges, conviction charges, date of conviction and sentence, and sentence description from DOJ, *Introduction to National Security Division Statistics on Unsealed International Terrorism and Terrorism-Related Convictions* (Washington, D.C.: March 2010).

## Costs Associated with Incarcerating the Criminal Alien Population

To determine the costs associated with incarcerating the criminal alien population, we obtained and analyzed cost and inmate data from BOP, data on SCAAP reimbursements to states for incarcerating criminal aliens, and cost and inmate data from five states (Arizona, California, Florida, New York, and Texas) and five localities (Maricopa County, Arizona; Orange County, California; Los Angeles County, California; New York City, New York; Harris County, Texas). We selected these five states based on the number of SCAAP criminal aliens. Collectively, these states accounted for about 70 percent of the SCAAP criminal alien population in fiscal year 2008. We selected the five localities based on the localities with the largest criminal alien populations in SCAAP for fiscal year 2003, which allowed us to compare our current analysis to our work conducted in 2005. We also selected these state prison systems and local jails because they are the same prison systems and local jails that we used in our April 2005 report.[10] To estimate the total costs for incarcerating criminal aliens in these selected states and localities, we used the average daily cost data provided by the states and localities and the number of SCAAP illegal alien and unknown inmate days submitted by these states and localities for reimbursement. While our analysis provides insight into the costs associated with incarcerating criminal aliens in these states and localities, the results of this analysis are not generalizable to other states and localities. In addition, we did not independently evaluate the accuracy of the cost data provided by these states and localities.

To calculate the total BOP and SCAAP costs, we added the BOP and SCAAP data for each year. For all 50 states, we estimated selected operating costs associated with incarcerating criminal aliens from fiscal years 2003 through 2009 using Bureau of Justice Statistics (BJS) and SCAAP reimbursement data as well as inflation factors.[11] These selected operating costs include correctional officer salaries, medical care, food service, and utilities. The salaries for correctional officers were obtained for each year from SCAAP data. The other three categories were calculated using BJS data and HIS Global Insight price deflators for the corresponding categories. Our estimation may not include all related costs and therefore may not reflect actual costs but rather a lower-bound cost estimation that is consistent across the reporting time frame. Our analysis includes those states that received SCAAP reimbursement in the associated fiscal year. As a result, not all 50 states may be included in each

[10]See GAO-05-337R.

[11]BJS, *State Prison Expenditures, 2001* (Washington, D.C.: June 2004).

fiscal year. Our analysis also includes the District of Columbia. The following state prison systems did not apply for SCAAP reimbursement: Illinois, Montana, and Oregon in fiscal year 2003; Montana in fiscal year 2004; Alaska in fiscal year 2005; Virginia and West Virginia in fiscal year 2006; and West Virginia in fiscal years 2007, 2008, and 2009. We used federal inflation factors to present criminal alien costs in fiscal year 2010 dollars. To determine estimated operating costs and total state costs per inmate, we divided the total estimated operating costs and total state costs by the number of related SCAAP illegal and unknown inmates. To determine the extent to which DOJ's SCAAP reimbursement methodology was relevant and current, we analyzed agency documentation and spoke with DOJ officials regarding the methodology. We evaluated this methodology using best practices in cost estimating.[12]

We determined that the data used in our study were sufficiently reliable for the purposes of this report by analyzing available documentation, such as related data dictionaries, interviewing officials knowledgeable about the data, conducting electronic tests to identify missing data and anomalies, and following up with officials, as appropriate, to address any questions.

We conducted this performance audit from October 2009 through March 2011 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[12]See GAO, *GAO Cost Estimating and Assessment Guide:  Best Practices for Developing and Managing Capital Program Costs*, GAO-09-3SP (Washington, D.C.: March 2009).

# Appendix II: Criminal Alien Costs in Fiscal Year 2010 Dollars

**Figure 26: Federal Prison and State Criminal Alien Assistance Program (SCAAP) Costs in Fiscal Year 2010 Dollars to Incarcerate Criminal Aliens from Fiscal Years 2005 through 2009**



Source: GAO analysis of BOP and BJA SCAAP data.

Note: Forty-nine states and the District of Columbia received SCAAP reimbursement in both fiscal years 2005 and 2009. About 810 local jurisdictions received reimbursement in fiscal year 2009 compared to about 730 local jurisdictions in fiscal year 2005. Numbers may not be exact due to rounding.

Appendix II: Criminal Alien Costs in Fiscal
Year 2010 Dollars

**Figure 27: SCAAP Reimbursements to States and Localities in Fiscal Year 2010 Dollars from Fiscal Years 2003 through 2009**



SCAAP reimbursements (dollars in millions)

☐ Local
▨ States plus District of Columbia

Source: GAO analysis of DOJ Bureau of Justice Assistance data.

Note: Numbers may not be exact due to rounding.

Appendix II: Criminal Alien Costs in Fiscal
Year 2010 Dollars

**Figure 28: Estimated Operating Costs in Fiscal Year 2010 Dollars to Incarcerate SCAAP Criminal Aliens in All 50 States**



Dollars (in millions)

Legend:
- Total estimated SCAAP illegal alien cost
- Total estimated SCAAP unknown alien cost
- SCAAP eligible illegal inmate costs
- SCAAP eligible unknown inmate costs
- SCAAP reimbursement for illegal inmates
- SCAAP reimbursement for unknown inmates

Sources: GAO analysis of DOJ Bureau of Justice Statistics and Bureau of Justice Assistance data.

Note: Our analysis includes those states that received SCAAP reimbursement in the associated fiscal year. As a result, not all 50 states may be included in each fiscal year. Our analysis also includes the District of Columbia. Numbers may not be exact due to rounding. SCAAP illegal aliens are noncitizens whom Immigration and Customs Enforcement (ICE) verified were illegally in the United States at the time of incarceration and for whom state and local jurisdictions received federal reimbursement through SCAAP. SCAAP unknown aliens are individuals whom states and local jurisdictions believe to be illegally in the United States. However, ICE lacks documentation to confirm their immigration status.

Appendix II: Criminal Alien Costs in Fiscal
Year 2010 Dollars

**Figure 29: Estimated Operating Costs per Inmate in Fiscal Year 2010 Dollars to Incarcerate SCAAP Criminal Aliens in All 50 States**



Sources: GAO analysis of DOJ Bureau of Justice Statistics and Bureau of Justice Assistance data.

Note: Our analysis includes those states that received SCAAP reimbursement in the associated fiscal year. The following state prison systems did not apply for SCAAP reimbursement: Illinois, Montana, and Oregon in fiscal year 2003; Montana in fiscal year 2004; Alaska in fiscal year 2005; Virginia and West Virginia in fiscal year 2006; and West Virginia in fiscal years 2007, 2008, and 2009.

# Appendix III: SCAAP Criminal Alien Incarcerations in State Prisons and Local Jails (Corresponds to Fig. 4)

This appendix provides additional details on figure 4: Number of SCAAP Criminal Alien Incarcerations in Each State.

**Table 8: Number of State Criminal Alien Assistance Program (SCAAP) Criminal Alien Incarcerations in Each State**

| State | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| Alaska | 77 | 87 | - | 93 | 107 | 101 | 87 |
| Alabama | 98 | 113 | 102 | 214 | 259 | 295 | 313 |
| Arkansas | 493 | 488 | 486 | 788 | 1,007 | 1,353 | 1,342 |
| Arizona | 10,941 | 11,985 | 12,200 | 13,268 | 14,613 | 18,357 | 17,488 |
| California | 85,210 | 91,614 | 89,381 | 93,048 | 99,189 | 102,121 | 102,795 |
| Colorado | 5,761 | 5,857 | 6,968 | 6,487 | 7,174 | 7,340 | 7,574 |
| Connecticut | 409 | 422 | 432 | 476 | 469 | 481 | 517 |
| District of Columbia | 48 | 107 | 33 | 96 | 168 | 251 | 432 |
| Delaware | 40 | 49 | 99 | 57 | 44 | 38 | 36 |
| Florida | 10,383 | 11,473 | 12,416 | 16,203 | 15,186 | 16,935 | 17,229 |
| Georgia | 2,319 | 2,889 | 3,075 | 3,449 | 4,361 | 6,062 | 7,371 |
| Hawaii | 101 | 171 | 179 | 174 | 198 | 253 | 286 |
| Iowa | 659 | 591 | 492 | 523 | 691 | 543 | 501 |
| Idaho | 1,238 | 1,214 | 1,315 | 1,250 | 1,262 | 1,134 | 1,271 |
| Illinois | 4,967 | 7,271 | 7,528 | 7,499 | 8,335 | 11,114 | 10,677 |
| Indiana | 553 | 953 | 1,138 | 1,410 | 1,534 | 1,684 | 1,793 |
| Kansas | 973 | 1,090 | 841 | 1,048 | 1,043 | 1,252 | 1,328 |
| Kentucky | 681 | 652 | 692 | 626 | 623 | 1,139 | 1,343 |
| Louisiana | 236 | 213 | 174 | 172 | 228 | 204 | 246 |
| Massachusetts | 1,897 | 2,509 | 2,789 | 2,778 | 2,639 | 2,731 | 2,523 |
| Maryland | 1,730 | 1,488 | 1,644 | 1,635 | 1,971 | 2,369 | 2,710 |
| Maine | 35 | 53 | 60 | 119 | 103 | 100 | 406 |
| Michigan | 1,723 | 1,523 | 1,736 | 1,831 | 1,829 | 1,850 | 1,700 |
| Minnesota | 1,594 | 1,418 | 1,049 | 1,472 | 1,866 | 2,193 | 2,140 |
| Missouri | 725 | 786 | 607 | 661 | 707 | 805 | 723 |
| Mississippi | 72 | 66 | 100 | 78 | 78 | 183 | 342 |
| Montana | 19 | 41 | 50 | 42 | 54 | 39 | 24 |
| North Carolina | 4,084 | 4,753 | 6,126 | 6,297 | 7,439 | 8,150 | 8,948 |
| North Dakota | 29 | 28 | 41 | 37 | 55 | 43 | 46 |
| Nebraska | 1,082 | 1,064 | 1,142 | 737 | 1,328 | 1,424 | 1,754 |
| New Hampshire | 167 | 164 | 116 | 106 | 103 | 104 | 185 |
| New Jersey | 5,455 | 5,085 | 6,006 | 6,305 | 8,434 | 9,693 | 9,971 |
| New Mexico | 1,732 | 2,220 | 2,507 | 2,067 | 2,021 | 2,675 | 2,112 |

**Appendix III: SCAAP Criminal Alien
Incarcerations in State Prisons and Local
Jails (Corresponds to Fig. 4)**

| State | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| Nevada | 4,957 | 4,923 | 5,623 | 5,369 | 6,605 | 6,148 | 6,918 |
| New York | 16,130 | 14,536 | 14,286 | 12,962 | 12,138 | 13,192 | 11,096 |
| Ohio | 756 | 792 | 901 | 924 | 1,240 | 1,777 | 3,879 |
| Oklahoma | 1,751 | 1,429 | 1,397 | 1,993 | 2,471 | 4,128 | 1,666 |
| Oregon | 2,056 | 3,464 | 3,892 | 4,307 | 4,755 | 5,158 | 3,609 |
| Pennsylvania | 1,414 | 1,162 | 1,232 | 1,516 | 1,615 | 2,054 | 2,169 |
| Rhode Island | 663 | 400 | 352 | 402 | 429 | 359 | 421 |
| South Carolina | 925 | 1,117 | 1,472 | 1,721 | 2,649 | 2,051 | 3,750 |
| South Dakota | 292 | 267 | 317 | 352 | 486 | 547 | 93 |
| Tennessee | 764 | 1,148 | 1,196 | 1,409 | 1,630 | 2,499 | 1,993 |
| Texas | 32,127 | 31,047 | 27,980 | 30,689 | 33,221 | 36,065 | 37,021 |
| Utah | 2,338 | 2,574 | 2,316 | 2,395 | 2,648 | 2,018 | 3,438 |
| Virginia | 2,432 | 2,882 | 3,743 | 3,298 | 4,554 | 5,819 | 4,968 |
| Vermont | 20 | 24 | 25 | 17 | 20 | 28 | 13 |
| Washington | 5,668 | 5,375 | 4,891 | 5,164 | 6,050 | 6,384 | 5,976 |
| Wisconsin | 2,174 | 2,362 | 2,592 | 2,724 | 2,756 | 2,882 | 2,690 |
| West Virginia | 5 | 6 | 8 | - | - | 22 | 5 |
| Wyoming | 75 | 63 | 56 | 49 | 59 | 71 | 65 |

Source: GAO analysis of Bureau of Justice Assistance (BJA) SCAAP data.

Note: This is not an exhaustive list of all state prison systems and local jails, nor does it capture all
criminal aliens incarcerated in the United States. Submission to the SCAAP program for
reimbursement is voluntary, and as such, not all state prison systems and local jails will be included.

**GAO-11-187  Criminal Alien Statistics**

# Appendix IV: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Charles A. Jeszeck, (202) 512-8777 or jeszeckc@gao.gov |
| **Staff Acknowledgments** | In addition to the contact named above, Michael Dino, Assistant Director, and Ryan Consaul managed this assignment. Michelle R. Su made significant contributions to the work. Hiwotte Amare, Virginia Chanley, Ruben Montes de Oca, and Karen O'Conor assisted with the design, methodology, and data analysis. Pedro Almoguera assisted with issues related to costs. Frances Cook provided legal support. Lara Miklozek provided assistance in report preparation. |

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| Congressional Relations | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, DC 20548 |



EXHIBIT 2



**PRESS RELEASE**

# Pursuant to Executive Order on Public Safety, Departments of Justice and Homeland Security Release Data on Incarcerated Aliens

Tuesday, August 1, 2017

**For Immediate Release**

Office of Public Affairs

President Trump's Executive Order on Public Safety in the Interior of the United States requires the Department of Justice and Department of Homeland Security to collect relevant data and provide quarterly reports on data collection efforts. The data in this release shows a significant prison population of incarcerated aliens.

Below is a summary of data collected under Section 16 of the Order, which directs "the Secretary [of Homeland Security] and the Attorney General . . . to collect relevant data and provide quarterly reports" regarding the following subjects: (a) the immigration status of all aliens incarcerated under the supervision of the Bureau of Prisons; (b) the immigration status of all aliens incarcerated as federal pretrial detainees; and (c) the immigration status of all convicted aliens in state prisons and local detention centers throughout the United States.

## Information Regarding Immigration Status of Aliens Incarcerated Under the Supervision of the Federal Bureau of Prisons

The Department of Justice's Bureau of Prisons (BOP) has an operational process for maintaining data regarding foreign-born inmates in its custody. On a daily basis, BOP supplies this

information to U.S. Immigration and Customs Enforcement (ICE). ICE, in turn, analyzes that information to determine the immigration status of each inmate and provides that information back to BOP.

As a part of satisfying the Justice Department's second quarterly report of this information, below is information regarding aliens currently incarcerated under the supervision of BOP.[1] This information is current as of June 24:

Out of the 187,855 inmates in BOP custody, 42,034 are foreign-born. The breakdown of the 42,034 aliens is as follows:

- 19,749 (46.9%) are aliens who have received final orders of removal;

- 21,121 (50.2%) are aliens who are under ICE investigation for possible removal;

- 1,157 (2.8%) are aliens whose cases are pending adjudication before an Immigration Judge in the Executive Office of Immigration Review (EOIR); and

- Seven (.0002%) are aliens who have been granted relief.

### Information Regarding the Immigration Status of Aliens Incarcerated as Federal Pretrial Detainees

The U.S. Marshal Service (USMS), the Department of Justice's component charged with the housing and care of federal pretrial detainees, recently instituted a program to capture data regarding the immigration status of these detainees.

Based upon records current as June 14, USMS identified 12,005 "self-reporting" foreign-born prisoners (aliens) out of 50,135 arrested and detained at USMS facilities. Further details follow for the 12,005 detained aliens:

- 9,857 (82.1%) are aliens who have received final orders of removal;

- 2,047 (17.1%) are aliens whose cases are still pending adjudication before an Immigration Judge in the EOIR; and

- 101 (.8%) are aliens still pending adjudication (ICE has charged these aliens as removal cases, but a final disposition has not yet been reached.)

### Immigration Status of All Convicted Aliens Incarcerated in State Prisons and Local Detention Centers throughout the United States

The Department continues to progress towards establishing data collection of the immigration status of convicted aliens incarcerated in state prisons and local detention centers through its Office of Justice Programs (OJP), Bureau of Justice Statistics (BJS).

[1] The previous report is available at: https://www.justice.gov/opa/pr/pursuant-executive-order-public-safety-department-justice-releases-data-incarcerated-aliens-0

*Updated August 7, 2017*

**Component**

Office of the Attorney General

Press Release Number: 17-853

# Related Content

PRESS RELEASE

### Attorney General Merrick B. Garland Honors Justice Department Employees and Partners for the 72nd Annual Attorney General's Awards

Attorney General Merrick B. Garland announced the recipients of the 72nd Annual Attorney General's Awards, honoring Justice Department employees and others for extraordinary contributions to the enforcement of our nation's...

January 17, 2025

SPEECH

### Attorney General Merrick B. Garland Delivers Farewell Address

Washington

Thank you, Lisa. There is no one I would rather have worked with day in and day out to lead this Department. The American people could not have asked for...

January 16, 2025

**SPEECH**

## Attorney General Garland Delivers Remarks at the 72nd Annual Attorney General's Awards

Washington

Thank you, Deputy Attorney General Monaco. And hello, everyone.

It is a pleasure to welcome you to the 72nd Annual Attorney General's Awards Ceremony.

January 15, 2025



**Office of Public Affairs**

U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington DC 20530

Office of Public Affairs Direct Line
202-514-2007

Department of Justice Main Switchboard
202-514-2000

EXHIBIT 3

# Backgrounder

August 2010



**Center for Immigration Studies**

# Birthright Citizenship in the United States
## A Global Comparison

### By Jon Feere

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside."

-- U.S. CONST. amend. XIV, § 1

## Introduction

Every year, 300,000 to 400,000 children are born to illegal immigrants in the United States. Despite the foreign citizenship and illegal status of the parent, the executive branch of the U.S. government automatically recognizes these children as U.S. citizens upon birth. The same is true of children born to tourists and other aliens who are present in the United States in a legal but temporary status. Since large-scale tourism and mass illegal immigration are relatively recent phenomena, it is unclear for how long the U.S. government has followed this practice of automatic "birthright citizenship" without regard to the duration or legality of the mother's presence.

Eminent legal scholars and jurists, including Professor Peter Schuck of Yale Law School and U.S. Court of Appeals Judge Richard Posner, have questioned whether the 14th Amendment should be read to mandate such a permissive citizenship policy. Nevertheless, the practice has become the de facto law of the land without any input from Congress or the American public.

Advocates of maintaining this citizenship policy argue that the plain language of the Citizenship Clause of the 14th Amendment protects automatic birthright citizenship for all children born to illegal and temporary aliens. However, several legal scholars and political scientists who have delved into the history of the 14th Amendment have concluded that "subject to the jurisdiction thereof" has no plain meaning and that the executive branch's current, broad application of the Citizenship Clause may not be warranted.

The overwhelming majority of the world's countries do not offer automatic citizenship to everyone born within their borders. Over the past few decades, many countries that once did so — including Australia, Ireland, India, New Zealand, the United Kingdom, Malta, and the Dominican Republic — have repealed those policies. Other countries are considering changes.

In the United States, both Democrats and Republicans have introduced legislation aimed at narrowing the application of the Citizenship Clause. In 1993, Sen. Harry Reid (D-Nev.) introduced legislation that would limit birthright citizenship to the children of U.S. citizens and legally resident aliens, and similar bills have been introduced by other legislators in every Congress since. The current Congress saw the introduction by Rep. Nathan Deal (R-Ga.) of the "Birthright Citizenship Act of 2009," which so far has gathered nearly 100 sponsors.[1]

This *Backgrounder* briefly explains some policy concerns that result from an expansive application of the Citizenship Clause, highlights recent legislative efforts to change the policy, provides a historical overview of the development of the 14th Amendment's Citizenship Clause, and includes a discussion of how other countries approach birthright citizenship. The paper concludes that Congress should clarify the scope of the Citizenship Clause and promote a serious discussion on whether the United States should automatically confer the benefits and burdens of U.S. citizenship on the children of aliens whose presence is temporary or illegal.

*Jon Feere is the Legal Policy Analyst at the Center for Immigration Studies.*

Among the findings:

- Only 30 of the world's 194 countries grant automatic citizenship to children born to illegal aliens.

- Of advanced economies, Canada and the United States are the only countries that grant automatic citizenship to children born to illegal aliens.

- No European country grants automatic citizenship to children of illegal aliens.

- The global trend is moving away from automatic birthright citizenship as many countries that once had such policies have ended them in recent decades.

- 14th Amendment history seems to indicate that the Citizenship Clause was never intended to benefit illegal aliens nor legal foreign visitors temporarily present in the United States.

- The U.S. Supreme Court has held that the U.S.-born children of permanent resident aliens are covered by the Citizenship Clause, but the Court has never decided whether the same rule applies to the children of aliens whose presence in the United States is temporary or illegal.

- Some eminent scholars and jurists have concluded that it is within the power of Congress to define the scope of the Citizenship Clause through legislation and that birthright citizenship for the children of temporary visitors and illegal aliens could likely be abolished by statute without amending the Constitution.

The international findings in this report are the result of direct communication with foreign government officials and analysis of relevant foreign law. It is the most current research on global birthright citizenship data.

## The Impact of Birthright Citizenship

Between 300,000 and 400,000 children are born to illegal immigrants in the United States every year. Put another way, as many as one out of 10 births in the United States is to an illegal immigrant mother.[2] All of these children are considered by the executive branch of the U.S. government to be U.S. citizens who enjoy the same rights and are entitled to the same benefits as the children of U.S. citizens.

The population of U.S.-born children with illegal alien parents has expanded rapidly in recent years from 2.3 million in 2003 to 4 million in 2008; since these figures do not include children who are 18 years of age or older nor those who are married, the actual figure is somewhat larger.[3]

The two citizenship benefits that have drawn the most attention in the birthright citizenship debate are, first, food assistance and other welfare benefits to which a family of illegal aliens would not otherwise have access, and second, the ability of the child when he grows up to legalize his parents, and also to bring into the United States his foreign-born spouse and any foreign-born siblings. The sponsored spouse can, in turn, sponsor her own foreign-born parents and siblings, and the siblings can, in turn, sponsor their own foreign-born spouses, and so on, generating a virtually never-ending and always-expanding migration chain.

Because having a child on U.S. soil can cement an immigrant's presence in the United States, provide access to welfare benefits, and ultimately initiate chain migration of the child's extended family and in-laws, children born to illegal aliens and legal temporary visitors are sometimes referred to as "anchor babies." These benefits have contributed to the growth of a "birth tourism" industry.

The voices calling for a change to the current application of the Citizenship Clause of the 14th Amendment are quite diverse and are not limited to activists and policymakers. The influential Circuit Court Judge Richard Posner held in a recent court decision that the policy of granting automatic birthright citizenship for children of illegal and temporary aliens is one that "Congress should rethink" and that the United States "should not be encouraging foreigners to come to the United States solely to enable them to confer U.S. citizenship on their future children."[4]

**Benefits.** Most benefits Americans would regard as "welfare" are not accessible to illegal immigrants. However, illegal immigrants can obtain welfare benefits such as Medicaid and food stamps on behalf of their U.S.-born children. Many of the welfare costs associated with illegal immigration, therefore, are due to the current birthright citizenship policy. Put another way, greater efforts at barring illegal aliens from federal welfare programs will not significantly reduce costs because their citizen children can continue to access the benefits. Nationwide, 40 percent of illegal alien-headed households receive some type of welfare. In some states, the rate is higher: in New York, 49 percent receive welfare; in California, the rate is 48 percent; in Texas, it is 44 per-

Center for Immigration Studies

cent; and in Georgia, 42 percent of illegal alien-headed households receive welfare.[5] Only 19 percent of households headed by native-born citizens make use of a major welfare program.

Of course, states offer additional welfare benefits as well. Los Angeles County Supervisor Michael D. Antonovich recently released data from the Los Angeles County Department of Public Social Services indicating that children of illegal aliens in Los Angeles Country received $50 million in welfare benefits during the month of February 2010 alone. The report estimates that 23 percent of all CALWORKS and food stamp issuances in Los Angeles County are to illegal immigrant parents who collect on their U.S.-born children's behalf. The supervisor estimates that illegal immigration and birthright citizenship cost taxpayers in Los Angeles County over $1 billion annually, not including education costs.[6]

Despite taxpayers' assistance, approximately 59 percent of illegal aliens and their U.S.-born children live in or near poverty. In total, 21.5 million immigrants (legal and illegal) and their young children live in or near poverty. In California, Arizona, Texas, and Colorado illegal aliens and their U.S.-born children account for roughly a fifth of the those in poverty.[7] Ultimately, treating the U.S.-born children of illegal aliens as citizens has the statistical effect of increasing the percentage of U.S. citizens living in poverty.

It is important to remember that births to illegal aliens are not spread evenly throughout the United States. Some states, particularly those closer to the southern border, carry a much larger burden. According to the Texas Health and Human Services Commission, between 60,000 to 65,000 babies are born to illegal aliens in Texas every year, representing about 16 percent of total births statewide. The report estimates that between 2001 and 2009, births to illegal immigrant women totaled 542,152 in Texas alone.[8]

**Chain Migration.** A child born to illegal aliens in the United States can initiate a chain of immigration when he reaches the age of 18 and can sponsor an overseas spouse and unmarried children of his own. When he turns 21, he can also sponsor his parents and any brothers and sisters.[9]

Family-sponsored immigration accounts for most of the nation's growth in immigration levels. Of the 1,130,818 immigrants who were granted legal permanent residency in 2009, a total of 747,413 (or, 66.1 percent) were family-sponsored immigrants. A change to U.S. immigration laws in the late 1950s — one that allowed for the admission of extended family members outside the nuclear family — resulted in the average an-

nual flow increasing from 250,000 then, to over 1 million today. This number continues to rise every year because of the ever-expanding migration chains that operate independently of any economic downturns or labor needs.[10] Although automatic and universal birthright citizenship is not the only contributor to chain migration, ending it would prevent some of this explosive growth.

The issue of birthright citizenship for the children of aliens who have not been admitted for permanent residence cannot be resolved in isolation from other immigration issues. For example, politicians on both sides of the aisle regularly call for an increase in temporary workers, but the economic and social impact of children born to these workers while they are in the United States is never part of the discussion. Under any large-scale guestworker program, it is likely that tens of thousands of children would be born on U.S. soil. If the guestworker does not depart when his work visa expires, he becomes an illegal alien and is subject to deportation. But immigration authorities cannot deport the guestworker's citizen child along with the overstaying guestworker. The result is that the guestworker makes the case for indefinite stay based on the principle of "keeping families together" — an argument that is often successful at stopping an alien's deportation. Because of birthright citizenship, what started as a policy to bring in laborers on a temporary basis can become yet another channel for permanent immigration. This is one of the reasons why some have said that "there is often nothing more permanent than a temporary worker."[11]

**Birth Tourism.** The significant benefits of U.S. citizenship and the executive branch's permissive birthright citizenship policies have become a magnet for those seeking to add a U.S. passport holder to their family. An entire industry of "birth tourism" has been created and the phenomenon of pregnant women traveling (legally) to the United States specifically for the purpose of giving birth on U.S. soil has grown largely without any debate in Congress or the consent of the public.

"It's easy. If you register the birth, it's automatic that your baby can get an American passport," said Kim Jeong Yeon, a Korean woman who traveled to the United States on a tourist visa while six months pregnant.[12] Like many other women, Kim spent thousands of dollars to have a company arrange the travel. "If they could afford it, all my friends would go to the United States to have their babies," she said.

According to Selin Burcuoglu, a Turkish woman who traveled to the United States to give birth last year, the process was easy: "We found a company on the Internet and decided to go to Austin for our child's

birth. It was incredibly professional. They organized everything for me. I had no problem adjusting and I had an excellent birth. I don't want her to deal with visa issues — American citizenship has so many advantages."[13]

Birth tourism can be a lucrative business for immigrants who facilitate the travel and birthing process for their former countrymen. Turkish doctors, hotel owners, and immigrant families in the United States have assembled what amounts to a birth-tourism assembly line, reportedly arranging the U.S. birth of 12,000 Turkish children since 2003. The Turkish-owned Marmara Hotel group offers a "birth tourism package" that includes accommodations at their Manhattan branch. "We hosted 15 families last year," said Nur Ercan Mağden, head manager of The Marmara Manhattan, adding that the cost was $45,000 each.[14]

Similarly, the Tucson Medical Center (TMC) in Arizona offers a "birth package" to expectant mothers and actively recruits in Mexico. Expectant mothers can schedule a Caesarean or simply arrive a few weeks before their due date. The cost reportedly ranges from $2,300 to $4,600 and includes a hospital stay, exams, and a massage. Additional children trigger a surcharge of $500. "These are families with a lot of money, and some arrive on private jets and are picked up by an ambulance and brought here," said Shawn Page, TMC's administrator of international services and relations.[15]

In California, three Chinese-owned "baby care centers" offer expectant mothers a place to give birth to an American citizen for a fee of $14,750, which includes shopping and sightseeing trips. For a $35 daily fee, television, internet, and three meals are provided. "We don't encourage moms to break the law — just to take advantage of it," explains Robert Zhou, the agency's owner. Zhou says that he and his wife have helped up to 600 women give birth in the United States within the last five years. In fact, they started the business after traveling to the United States to have a child of their own. Zhou explains that the number of agencies like his has soared in the past five years.[16]

Zhou believes that a cheaper education is often a motivating factor and his pitch to prospective clients includes the notion that public education in the United States is "free." One of his clients, Christina Chuo, explains that her parents "paid a huge amount of money for their education" in the United States because they were foreign students; having an American citizen child permits her child to acquire the same education at a lower tuition. She also noted that she and her husband were not interested in permanently immigrating to the United States, "except, perhaps, when they retire."[17]

As discussion about limiting birthright citizenship heats up in the United States, some foreign countries are concerned about possible changes. The Nigerian media, for example, recently published an article titled, "American Agitations Threaten a Nigerian Practice." The practice referred to is that of Nigerians traveling to the United States to have a child — a practice that, according to the newspaper, is "spreading so fast that it is close to becoming an obsession."[18]

The U.S. State Department is not permitted to deny a woman a temporary visitor visa simply because she is pregnant and the legal document she obtains means she is not likely to be stopped at the border.[19] Consequently, the practice of granting automatic birthright citizenship allows a seemingly temporary admission of one foreign visitor to result in a permanent increase in immigration and grants of citizenship that were not necessarily contemplated or welcomed by the American public. Add to this the fact that immigration authorities are less likely to deport a visitor who overstays their permitted time if they have a U.S. citizen child, and one ends up with an immigration policy quite different from that which was originally intended.

The birth tourism industry illustrates how the executive branch's permissive birthright citizenship policies can have the effect of transferring control over the nation's immigration policy from the American people to foreigners.

## Congress Considers Changes

Over the last few decades, many of those few countries with automatic birthright citizenship policies have changed their law as a means of discouraging illegal immigration and to give citizens more control over the future of their societies. The countries that have ended the practice in recent years include the United Kingdom, Australia, Ireland, India, Malta, New Zealand, and the Dominican Republic. Barbados and Antigua & Barbuda may also be ending the practice as the nations look for ways to cope with illegal immigration.

In the United States, birthright citizenship has been the subject of congressional hearings and proposed legislation for at least the past two decades.

The effort to end automatic birthright citizenship in the United States has come from across the political spectrum. Sen. Harry Reid (D-Nev.) introduced legislation to end automatic birthright citizenship in 1993, the Republican Party made the end of automatic birthright citizenship part of its 1996 platform, and the current Congress saw the introduction of the "Birthright Citizenship Act of 2009" by Rep. Nathan Deal (R-Ga.).

Center for Immigration Studies

The current bill has attracted nearly 100 co-sponsors.[20] Since 1993, legislation to end birthright citizenship has been introduced in each Congress.[21]

The latest legislation would limit birthright citizenship to persons born in the United States to at least one parent who is either (1) a citizen or national of the United States, (2) an alien lawfully admitted for permanent residence in the United States whose residence is in the United States; or (3) an alien performing active service in the armed forces. It is an effort to define who is "subject to the jurisdiction" of the United States, a clause found in the 14th Amendment of the U.S. Constitution that dictates the scope of birthright citizenship, as discussed later.

**What Law Requires Birthright Citizenship?** Is automatic birthright citizenship for children of all legal and illegal aliens expressly required by the U.S. Constitution? On its face, the answer is "no." No language in the Constitution specifically addresses how the children of foreigners must be dealt with in regards to citizenship. The 14th Amendment confers citizenship through "naturalization" or by birth to persons "subject to the jurisdiction" of the United States, but provides no guidance on when an alien is to be regarded as subject to U.S. jurisdiction. The next question, then, is whether any statute enacted by Congress specifically directs the granting of citizenship to children born in the United States to illegal aliens. Again, the answer is "no." The executive branch's birthright citizenship policy is not based on any federal regulation. One might say that the practice has become policy without becoming law.

Because the current policy has not been taken through the standard legislative or regulatory processes, it has become official practice without any input from the American public or their elected representatives. A recent survey found that only 33 percent of Americans support the practice of granting automatic citizenship to children born to illegal aliens.[22]

**Jus Sanguinis and Jus Soli.** Countries generally adopt one of two systems for granting citizenship to children — jus sanguinis or jus soli. Most countries practice jus sanguinis, also known as citizenship by descent, or citizenship by "right of blood." Under this system, a child acquires the parent's citizenship upon birth. This threshold varies from country to country; for example, some countries will determine the child's citizenship based on the father's citizenship, while others will look to the mother's citizenship. Countries practicing jus sanguinis will not automatically grant citizenship to a child born within their borders if that child is born to parents who

are foreigners. This would be true of immigrants who have entered both legally and illegally. The child maintains the parent's foreign citizenship.

A small number of countries practice jus soli, or citizenship by "right of soil." Under this system, a child automatically acquires the citizenship of the country in which the birth takes place. This citizenship is generally granted without conditions, and the citizenship and immigration status of the parents is inconsequential. Only 30 of the world's 194 countries practice jus soli. The United States is one of the few countries with this system.

Although the United States is practicing jus soli when it grants automatic citizenship to children born to illegal immigrants, historians generally agree that the two citizenship principles that have vied for supremacy in Anglo-American law are that of ascription and consent — whether citizenship is ascribed to a person based on circumstances outside his control or whether there must be some form of consent by the individual and the state.[23] Some scholars have written that the United States has adopted elements of both ascription and consent, without ever adequately reconciling them into a practical, unified, or effective policy — something that must occur if the United States wishes to successfully address complex issues involving immigration and citizenship.

**From Subjectship to Citizenship.** Political historians note that the founders the United States sought a citizenship policy different from that found in British common law. The phrase "birthright citizenship" is derived from "birthright subjectship," a phrase that described the perpetual allegiance to the King of England owed in medieval times by anyone born within his realm. According to Professor Edward J. Erler, Professor of Political Science at California State University:

> "The framers of the Constitution were, of course, well-versed in the British common law, having learned its essential principles from William Blackstone's *Commentaries on the Laws of England*. As such, they knew that the very concept of citizenship was unknown in British common law. Blackstone speaks only of 'birthright subjectship' or 'birthright allegiance,' never using the terms citizen or citizenship. The idea of birthright *subjectship* is derived from feudal law. It is the relation of master and servant; all who are born within the protection of the king owe perpetual allegiance as a 'debt of gratitude.' According to Blackstone, this debt is 'intrinsic' and 'cannot be forfeited, cancelled, or altered.'

5

Center for Immigration Studies

Birthright subjectship under the common law is thus the doctrine of perpetual allegiance."[24]

Like other historians, Erler notes that in the Declaration of Independence and the Constitution the Founders rejected the medieval concept of ascriptive "subjectship" in favor of a modern "citizenship" based on the consent of the governed.[25] The liberty sought by the Founders required citizenship, rather than subjectship, as only the former allowed the individual to leave his nation at any time of his choosing — a freedom not possible under British common law. As Blackstone explained, the "natural-born subject of one prince cannot by any act of his own, no, not by swearing allegiance to another, put off or discharge his natural allegiance to the former... and it is unreasonable that, by such voluntary act of his own, he should be able at pleasure to unloose those bands, by which he is connected to his natural prince."[26] It was this very type of subjugation that the Founders did not want to bring to the new government.[27]

The movement from medieval ascription to modern consent was explained by Peter H. Schuck and Rogers M. Smith in their influential book *Citizenship Without Consent*:

"[B]irthright citizenship originated as a distinctively feudal status intimately linked to medieval notions of sovereignty, legal personality, and allegiance. At a conceptual level, then, it was fundamentally opposed to the consensual assumptions that guided the political handiwork of 1776 and 1787. In a polity whose chief organizing principle was and is the liberal, individualistic idea of consent, mere birth within a nation's border seems to be an anomalous, inadequate measure or expression of an individual's consent to its rule and a decidedly crude indicator of the nation's consent to the individual's admission to political membership."[28]

Schuck and Smith argue that a constitutional commitment to "citizenship based on mutual consent" is not only in line with the historical development of the United States but that it is also "constitutionally permissible and democratically legitimate."[29]

Still, the exact perimeters of U.S. citizenship were never fully defined during the early years of the nation's founding and consensualism was never fully embraced, in part because a complete resolution of the issue would have raised sensitive questions about whether state or national citizenship was primary, whether states

had to recognize citizenship granted by other states, and the issue of state and federal authority, generally.[30]

At the most basic level, Americans were quite obviously committed to the principles of a consensual government and also the right of expatriation — particularly since the British continued to demand the allegiance of their former subjects well into the nineteenth century. The ascriptive approach to citizenship simply did not comport with the purpose behind the American Revolution.[31]

Nevertheless, it was not until the American Civil War that the concept of citizenship acquired some much-needed clarification.

# The Citizenship Clause Of the 14th Amendment

Before the 14th Amendment, citizenship was granted by states, and subsequently recognized by the federal government. Although the 13th Amendment officially ended slavery in 1865, it was not sufficient for the purpose of making freed slaves citizens of the United States. In the 1857 case *Dred Scott v. Sandford*, the Supreme Court held that blacks, even those freed from slavery, were not citizens of the United States.[32] In the aftermath of the Civil War, some states were preventing freed slaves form gaining federal citizenship by denying state citizenship. "Black Codes" passed into law by some states denied many other civil rights.

These injustices led to the Civil Rights Act of 1866, which was aimed, in part, at overruling the *Dred Scott* decision and which laid the groundwork for enactment of the 14th Amendment two years later. The Act declared, among other things:

"That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States;"[33]

Two years later in 1868, the Citizenship Clause of the 14th Amendment would be closely patterned on the citizenship declaration of the 1866 Act. Both intended to exclude from birthright citizenship at least some U.S.-born persons where a competing claim of subjectship or citizenship existed. The 1866 Act drew the line by excluding persons "subject to any foreign power," while the 14th Amendment included only persons "subject to the jurisdiction" of the United States.[34] In either case what was being weighed was competing claims to the future allegiance of the child.[35]

**"Subject to the Jurisdiction Thereof."** The first sentence of Section 1 of the 14th Amendment of the U.S. Constitution, also known as the Citizenship Clause, reads as follows:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside."[36]

This clause contains two requirements for obtaining U.S. citizenship by birth: (1) the birth must have occurred within the United States; and (2) the person born must be subject to the jurisdiction of the United States. The second requirement imposes a consensual qualification to birthright citizenship.[37] Advocates of granting automatic citizenship to children of illegal aliens almost always focus only on the first requirement, arguing birth on U.S. soil, alone, guarantees U.S. citizenship.[38] These advocates also argue that "subject to the jurisdiction" simply means being susceptible to police authority (i.e. being required to follow laws and pay fines for violations). But such an interpretation creates a redundancy in the 14th Amendment, as all people born in the United States are subject to the laws of the land. Accepting the premise that "subject to the jurisdiction thereof" simply means being "subject to police power" turns a critical and carefully-written portion of the Citizenship Clause into a redundancy. Unquestionably, basic statutory interpretation requires one to view each clause as a distinct and separate requirement, and no honest jurist would read a redundancy into a statute, much less a constitutional amendment.[39]

The inquiry, then, is focused on the intent of those who wrote the clause and whether a child born in the United States to an illegal alien is a person who is "subject to the jurisdiction" of the United States, and consequently an automatic citizen of the country. No one doubts that the main purpose of the 14th Amendment was to ensure that freed slaves would be recognized as U.S. citizens. Nevertheless, some argue that children of illegal aliens should enjoy the same privilege. But when the 14th Amendment was enacted, there were few limits on immigration and very few persons in the United States would have been residing here illegally. Moreover, given the costs and risks of long-distance transportation, tourists and other temporary visitors were limited in numbers. There is simply no direct evidence that Congress wished to confer citizenship on the children of temporary or illegal visitors, but there is some evidence that they did not.

The most informative source on the intent of Congress is the *Congressional Globe*, the earlier version of today's *Congressional Record*. The development of the language that made it into the 14th Amendment is revealing. At the outset, the authors of the 1866 Act and the 14th Amendment understood that a certain amount of respect or allegiance to the United States was expected of all persons who found themselves within our borders, even from foreigners visiting temporarily, and that this alone would not justify a grant of citizenship. During debate on the 1866 Act, Sen. Lyman Trumbull (R-Ill.) explained that his goal was "to make citizens of everybody born in the United States who owe allegiance to the United States," but noted a lack of clarity in such a phrasing, explaining:

"I thought that might perhaps be the best form in which to put the amendment at one time, 'That all persons born in the United States and owing allegiance thereto are hereby declared to be citizens;' but upon investigation it was found that a sort of allegiance was due to the country from persons temporarily resident in it whom we would have no right to make citizens, and that that form would not answer."[40]

The "sort of allegiance" owed by an alien "temporarily resident" in the United States, legally or illegally, would seem to include a duty to follow basic laws, but not the duty of loyalty demanded of a citizen. While advocates for the rights of illegal aliens argue that this duty to obey our laws (and an alien's susceptibility to being arrested for a violation of our laws) makes an alien "subject to the jurisdiction" of the United States, that was not the view of those who framed the Citizenship Clause. In the 1866 Act, any such interpretation was precluded by using the phrase "not subject to any foreign power."

Soon thereafter, the phrase "not subject to any foreign power" would reappear as "subject to the jurisdiction thereof" in the 14th Amendment. Thus, while the language of the 1866 Act distinguished aliens on the basis of their continuing obligation of allegiance to a foreign power, the 14th Amendment focused mainly on the alien's degree of allegiance to the United States. However, in both cases, the purpose was to avoid the granting of citizenship to people with only a temporary sort of allegiance. Opposition to granting citizenship to individuals subject to a foreign power was strong throughout the Senate.[41] It does seem that the framers of the Citizenship Clause had no intention of establishing a universal rule of automatic birthright citizenship.[42]

Center for Immigration Studies

On May 30, 1866, Sen. Jacob Howard (R-Mich.) initiated debate on a resolution that would become the Citizenship Clause of the 14th Amendment. In defining citizenship by birth, Sen. Howard explained:

> "This will not, of course, include persons born in the United States who are foreigners, aliens, who belong to the families of ambassadors or foreign ministers accredited to the Government of the United States, but will include every other class of persons. It settles the great question of citizenship and removes all doubt as to what persons are or are not citizens of the United States."[43]

Whether Sen. Howard thought that the "jurisdiction" clause would exclude only the children of diplomats or some larger category of "foreigners" has been much debated. In fact neither side of the debate can rely exclusively on Sen. Howard's statement since the statement (or the reporting of the statement) is grammatically incomplete, and one's interpretation depends on how one chooses to complete the grammar. When the senator said…

> "This will not, of course, include persons born in the United States who are foreigners, aliens, who belong to the families of ambassadors or foreign ministers…"

…he may have meant either:

(1) "This will not, of course, include persons born in the United States who are foreigners, aliens, [or those] who belong to the families of ambassadors or foreign ministers…"

…or:

(2) "This will not, of course, include persons born in the United States who are foreigners [or] aliens who belong to the families of ambassadors or foreign ministers…"

The former interpretation would support the narrative that children born to illegal aliens are not considered citizens, while the latter would deny U.S. citizenship to only those born to family of visiting government officials. Since we cannot know for sure what Sen. Howard meant to say, the most one can conclude is that he did not expect that every U.S.-born child of an alien would automatically be made a citizen by the 14th Amendment. Interestingly, as noted below, the Supreme Court, even when expanding the scope of birthright citizenship, has assumed the first and more exclusive reading.

There is a better record of how the sponsors expected the 14th Amendment to apply to tribal Indians. Sen. Trumbull, sponsor of the 1866 Act, offered his definition of "subject to the jurisdiction:"

> "What do we mean by 'subject to the jurisdiction of the United States?' Not owing allegiance to anybody else. That is what it means."[44]

Sen. Trumbull went on to explain how this clause might apply to American Indians:

> "It cannot be said of any Indian who owes allegiance, partial allegiance if you please, to some other Government that he is 'subject to the jurisdiction of the United States.'"[45]

Sen. Trumbull's explanation hearkens back to the 1866 Act and its exclusion of persons "subject to any foreign power." Today, it cannot be denied that an illegal alien is, under law, a citizen of a foreign country and therefore subject to that country's jurisdiction. An illegal alien owes at least some amount of allegiance to their home country, if not complete allegiance. They are not under any sense of the law a citizen of the United States. As explained by Thomas Jefferson: "Aliens are the subjects of a foreign power."[46] Although, as a result of federal statutory law, all native-born Indians are regarded as citizens today, at the time of the 14th Amendment Indian tribes were treated as foreign powers, and members of the tribe were presumed to owe their first allegiance to the tribe. There was no need to refer specifically to Indian tribes in the Amendment because it simply stood to reason that, for an Indian, mere presence in the United States could not be treated as a transfer of allegiance from his tribe to the United States. Query whether, in the 21st century, it stands to reason that a French tourist who gives premature birth to a child during a two-week visit to Disney World should, by virtue of her presence in Orlando, be regarded as having forsaken her allegiance to France.

If the question of "jurisdiction" boils down to one of allegiance, and under U.S. jurisprudence allegiance is a voluntary association, on what basis can a newborn child be found to have chosen an allegiance to his parent's country over allegiance to the United States, or vice versa? It was understood by the authors of the 14th Amendment that jurisdiction as to the child would

8

be imputed from the status of the parents. Sen. Reverdy Johnson (D-Md.) explained that parents must be "subject to the authority" of the United States if their children born here are to be classified as having acquired the status of U.S. citizen:

> "Now, all that this amendment provides is, that all persons born in the United States and not subject to some foreign Power…shall be considered as citizens of the United States. … [T]he amendment says that citizenship may depend on birth, and I know of no better way to give rise to citizenship than the fact of birth within the territory of the United States, *born of parents who at the time were subject to the authority of the United States.*"[47] (emphasis added)

Are illegal aliens subject to the authority of the United States? Not in the way contemplated by authors of the 14th Amendment. As explained earlier, the authors of the 14th Amendment explained that being subject to the jurisdiction of the United States means not owing allegiance to anybody else.

Without asking immigrants themselves, we cannot know where their allegiances lie, but in the case of Mexican immigrants, who constitute nearly 60 percent of the illegal alien population in the United States,[48] we do know what their government thinks. It appears these individuals owe at least partial, if not complete allegiance to the government of Mexico.

For example, in its recent amicus brief to the U.S. District Court overseeing the injunction hearing on Arizona's anti-illegal immigration bill S.B. 1070, the government of Mexico refers to Mexican illegal aliens as "its people" and "its citizens."[49] This is not a new perspective.

Former Mexican President Vicente Fox appointed one Juan Hernandez to head a governmental agency called the Institute for Mexicans Abroad. According to Mr. Hernandez's own website, the agency's principal objective is to "serve and dignify the 24 million whom President Fox has called heroes — the countrymen who live in foreign lands."[50] Mr. Hernandez explains: "We are betting on that the Mexican-American population in the United States…will think 'Mexico first' … But now I want the third generation, the seventh generation, I want them all to think 'Mexico first.'"[51]

Ultimately, in assessing the statements found in the *Congressional Globe*, it is important to remember that floor statements said during debate in the House or Senate are not law; it is only the language of the law itself upon which Congress has agreed. Because the "subject to the jurisdiction" language can be, and has been, susceptible to so many interpretations, it may be prudent for the current Congress to clarify, by statute, the full scope of the 14th Amendment's Citizenship Clause.

If Congress does not act first, there is a chance that someday the courts, with nothing more than these floor statements to guide them, will be forced to clarify what is now uncertain. It is arguably better for Congress to determine the proper scope of the 14th Amendment based on careful deliberations, rather than having so important a decision rendered by the judiciary based on a handful of 19th century floor statements.

# The Supreme Court Weighs In

The U.S. Supreme Court has shed some light on the meaning of "subject to the jurisdiction thereof" in the years that followed the passage of the 14th Amendment. The first definition from the Supreme Court appeared in 1873 in the *Slaughter-House Cases*, a series of cases not dealing specifically with birthright citizenship. Here, the Court explained:

> "The phrase, 'subject to its jurisdiction' was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign States born within the United States."[52]

This interpretation is consistent with Sen. Howard's floor statement on the scope of jurisdiction, discussed above, as not including foreigners, *or* aliens, *or* children born to foreign government officials. Even the dissenting justices agreed with this restrictive interpretation.

The Supreme Court addressed "subject to the jurisdiction" again in 1884 in *Elk v. Wilkins*, a case that focused on the citizenship of an American Indian who had been born into a tribe but had later severed his tribal ties. Here, the Court emphasized that a person not born into U.S. citizenship could not make himself "subject to the jurisdiction" of the United States without the consent of the United States. According to the Court: "no one can become a citizen of a nation without its consent."[53] Specifically, the Court held that although the plaintiff was born in the United States, he was not granted U.S. citizenship through any treaty or statute and was consequently not subject to the jurisdiction of the United States under the 14th Amendment. The Court defined the jurisdictional requirement of the Citizenship Clause as requiring a person to be:

"...not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance."[54]

The Court also explained that Indians born in tribes geographically located within the United States are "no more 'born in the United States and subject to the jurisdiction thereof'...than the children of subjects of any foreign government born within" the United States "or the children born within the United States, of ambassadors or other public ministers of foreign nations."[55]

This holding is clearly damaging to those who argue the 14th Amendment grants citizenship to children born to illegal aliens because an illegal alien is certainly a subject of a foreign government. A child born to such an individual is not, according to the *Elk* Court, subject to the jurisdiction of the United States. Additionally, this holding is consistent with the interpretation of Sen. Howard's floor statement that the 14th Amendment denies citizenship not only to children born to parents who are visiting foreign diplomats, but also to children born to foreigners, generally.

Another Supreme Court holding that is often cited is the 1898 case *United States v. Wong Kim Ark* which held that Wong Kim Ark, a child born in the United States to legal resident Chinese immigrants, was a birthright U.S. citizen under the 14th Amendment. According to the Court:

"[A] child born in the United States, of parents of Chinese descent, who at the time of his birth, are subjects of the emperor of China, *but have a permanent domicile and residence in the United States*, and... are not employed in any diplomatic or official capacity under the Emperor of China, becomes at the time of his birth a citizen of the United States."[56] (emphasis added)

The Court gave little weight to the consensualist attitudes shown in the *Congressional Globe* floor statements and based its decision instead on a theory that the 14th Amendment was simply a codification of English common law, citing the English jurists William Blackstone and Edward Coke. Given the *Wong Kim Ark* Court's reliance on English common law, it is worth observing that Justice Story, who years earlier held that U.S. citizenship law derives from English common law, wrote the following in his famous *Conflict of Laws* treatise:

"A reasonable qualification of the [English birthright citizenship] rule would seem to be that it should not apply to children of parents who were *in itinere* in the country, or who were abiding there for temporary purposes, as for health or curiosity, or occasional business."[57]

In concluding that "subject to the jurisdiction thereof" in the Citizenship Clause should be very broadly construed, the Court in *Wong Kim Ark* held that it simply means the same thing as "within the jurisdiction," a phrase found in the Equal Protection Clause of the 14th Amendment:

"It is impossible to construe the words 'subject to the jurisdiction thereof,' in the opening sentence [of the 14th Amendment], as less comprehensive than the words 'within its jurisdiction,' in the concluding sentence of the same section; or to hold that persons 'within the jurisdiction' of one of the States of the Union are not 'subject to the jurisdiction of the United States.'"[58]

Setting aside some of its own earlier commentary, the Court surmised that the "real object" of the Citizenship Clause "would appear to have been to exclude, by the fewest and fittest words... two classes of cases — children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign State."[59]

The strongly worded dissent reiterated much of the earlier precedent, explaining:

"To be 'completely subject' to the political jurisdiction of the United States is to be in no respect or degree subject to the political jurisdiction of any other government.

"Now I take it that the children of aliens, whose parents have not only not renounced their allegiance to their native country, but are forbidden by its system of government, as well as by its positive laws, from doing so, and are not permitted to acquire another citizenship by the laws of the country into which they come, must necessarily remain themselves subject to the same sovereignty as their parents, and cannot, in the nature of things, be, any more than their parents, completely subject to the jurisdiction of such other country. ... The Fourteenth Amendment was not designed to accord citizenship to persons so situated and to cut off

Center for Immigration Studies

the legislative power from dealing with the subject. ... It is not to be admitted that the children of persons so situated become citizens by the accident of birth."[60]

Some scholars argue that the dissent is more aligned with the established precedent and that the allegiance of the child in this case should have followed that of his parents, as was held to be the rule in *Elk*.[61] Other scholars feel that Congress probably did intend to extend citizenship to individuals like Wong Kim Ark but only with the expectation that the actual effect of such an application would be trivial.[62]

The only 20th century case that touches on the 14th Amendment's application to illegal aliens is the 1982 case *Plyler v. Doe*, which held that the denying of public-school admission to illegal-alien children would violate the Equal Protection Clause of the 14th Amendment. Although the case did not require the Court to decide the scope of birthright citizenship, Justice William Brennan, writing for a split 5-4 Court, added an endnote that cited language from *Wong Kim Ark* and added the following language:

"[N]o plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful."[63]

Of course, policymakers have made plenty of distinctions as between the two groups. According to University of Texas law professor Lino A. Graglia, Justice Brennan seems to have based his reasoning on the mistaken premise that *Wong Kim Ark* decided the case of illegal aliens.[64] Ultimately, this dictum hardly represents an investigation into the appropriate scope of the 14th Amendment's Citizenship Clause and it does not bind any subsequent court. As Yale Law professor Peter Schuck has written: "no court has ever squarely decided the question of the status under the Citizenship Clause of the native-born children of illegal and nonimmigrant aliens."[65]

While the *Slaughter-House Cases*, *Elk v. Wilkins*, *Wong Kim Ark*, and *Plyler v. Doe* provide food for thought and fodder for debate, it remains to be seen whether a 21st century court will be more inclined to follow the reasoning of *Elk* or the reasoning of *Wong Kim Ark* if and when faced with having to make an unprecedented decision about whether the U.S. Constitution imposes U.S. citizenship on the U.S.-born children of aliens who

have been admitted only for "temporary purposes" or who have not been admitted at all.

## What About the Plenary Power Doctrine?

If Congress were to declare an end to birthright citizenship for the U.S.-born children of aliens not admitted to permanent residence, the law would certainly be challenged in court, likely forcing the Supreme Court to render a final decision. In addition to weighing its own 14th Amendment jurisprudence, the Court would have to address the plenary power doctrine that holds that the political branches — the legislative and the executive, rather than the judicial — have sole power to regulate immigration as a basic attribute of sovereignty.[66]

As Justice Felix Frankfurter, an immigrant himself, once held in the defense of the plenary power doctrine:

"Though as a matter of political outlook and economic need this country has traditionally welcomed aliens to come to its shores, it has done so exclusively as a matter of political outlook and national self-interest. This policy has been a political policy, belonging to the political branch of the Government wholly outside the concern and the competence of the Judiciary... In recognizing this power and this responsibility of Congress, one does not in the remotest degree align oneself with fears unworthy of the American spirit or with hostility to the bracing air of the free spirit. One merely recognizes that the place to resist unwise or cruel legislation touching aliens is the Congress, not this Court."[67]

Advocates of maintaining automatic birthright citizenship for illegal aliens argue that a constitutional amendment is necessary to change the current policy. However, the ambiguities surrounding the phrase "subject to the jurisdiction thereof" and the scope of Congress's plenary power to regulate immigration have caused historians and legal scholars to conclude that Congress itself has the power to interpret the phrase and to impose reasonable limits on its application. As explained by Professor Erler:

"We have seen that the framers of the Fourteenth Amendment unanimously agreed that Indians were not 'subject to the jurisdiction' of

11

Countries that Recognize Automatic Birthright Citizenship





the U.S. Beginning in 1870, however, Congress began to pass legislation offering citizenship to Indians on a tribe by tribe basis. Finally, in 1923, there was a universal offer to all tribes. Any Indian who consented could become an American citizen. This citizenship was based on reciprocal consent: an offer on the part of the U.S. and acceptance on the part of an individual. Thus Congress used its legislative powers under the Fourteenth Amendment to determine who was within the jurisdiction of the U.S. It could make a similar determination today, based on this legislative precedent, that children born in the U.S. to illegal aliens are not subject to American jurisdiction. A constitutional amendment is no more required now than it was in 1923."[68]

This sentiment is shared by the influential Judge Posner, who held in a recent decision that "A constitutional amendment may be required to change the rule whereby birth in this country automatically confers U.S. citizenship, but I doubt it."[69] Posner concluded: "Congress would not be flouting the Constitution if it amended the Immigration and Nationality Act to put an end to the nonsense."[70]

## An International Comparison

The United States is one of the few countries on the globe to recognize universal and automatic citizenship for children born to illegal and temporary immigrants. The overwhelming majority of the world's countries do not have such a birthright policy. Out of the world's 194 countries, the Center for Immigration Studies can confirm that only 30 countries grant automatic birthright citizenship. This research has been the result of direct communication with foreign government officials and analysis of relevant foreign law including statutory and constitutional law.[71]

The map on pages 12 and 13 illustrates which countries have automatic birthright citizenship, those that do not, and the remaining few countries which we could not confirm. Table 1 lists each country by name.

Developed countries generally do not grant automatic birthright citizenship to children of illegal aliens. There are 31 countries on the International Monetary Fund's list of advanced economies as listed in Table 2 (page 16). The United States and Canada are the only advanced economies in the world which grant automatic birthright citizenship to children of illegal and temporary aliens. Similarly, the United Nation's list of countries with "very high human development" includes only three countries recognizing universal birthright citizenship: Canada, the United States, and Barbados, as listed in Table 3 (page 16). As noted below, the government of Barbados may be on the verge of ending birthright citizenship for children of illegal aliens.

In recent years, the international trend has been to end universal birthright citizenship. Countries that have ended universal birthright citizenship include the United Kingdom, which ended the practice in 1983, Australia (1986), India (1987), Malta (1989), Ireland, which ended the practice through a national referendum in 2004, New Zealand (2006), and the Dominican Republic, which ended the practice in January 2010. The reasons countries have ended automatic birthright citizenship are diverse, but have resulted from concerns not all that different from the concerns of many in the United States. Increased illegal immigration is the main motivating factor in most countries. Birth tourism was one of the reasons Ireland ended automatic birthright citizenship in 2004.[72] If the United States were to stop granting automatic citizenship to children of illegal immigrants, it would be following an international trend.

Some countries which currently recognize automatic birthright citizenship are considering changing the policy. For example, Barbados is struggling with large amounts of immigration (relative to its size), both legal and illegal, and is contemplating ending birthright citizenship for children of illegal aliens. The country initiated an illegal alien amnesty last summer which gave illegal aliens six months to legalize their status. Anyone still in the country illegally after December 1, 2009, faces deportation. The amnesty had a number of conditions, and any illegal alien with three or more dependents could not automatically qualify. Consequently, the question of what to do with children born to illegal aliens became central to political debate. A series of changes have been recommended by the nation's immigration department, and one proposed change is the end of birthright citizenship.[73]

Not too far from Barbados, a similar discussion has been taking place. Antigua and Barbuda, one of the few nations that currently grant automatic birthright citizenship to children of illegal aliens, just this year outlined a series of enforcement-minded recommendations aimed at tightening their citizenship, immigration, and work permit policies.[74] In a government report, the authors note that "the so called 'open door' policy relative to immigration should be discontinued as there is a significant risk of Antigua and Barbuda nationals being displaced in the job market by 'non-nationals' whose willingness to work hard for low wages makes them attractive to prospective employers."[75] The authors also

Center for Immigration Studies

## Table 1. Which Countries Recognize Automatic Birthright Citizenship?

| No Automatic Birthright Citizenship | | | Birthright Citizenship | Unable to Confirm |
|---|---|---|---|---|
| Afghanistan | Hungary | Pakistan | Antigua and Barbuda | Azerbaijan |
| Albania | Iceland | Palau | Argentina | Botswana |
| Algeria | India | Papua New Guinea | Barbados | Cape Verde |
| Andorra | Indonesia | Philippines | Belize | Central African Rep. |
| Angola | Iran | Poland | Bolivia | Congo (Rep. of) |
| Armenia | Iraq | Portugal | Brazil | Equatorial Guinea |
| Australia | Ireland | Qatar | Canada | Eritrea |
| Austria | Israel | Romania | Chile | Guinea |
| Bahamas | Italy | Russia | Colombia | Guinea-Bissau |
| Bahrain | Japan | Samoa | Dominica | Lesotho |
| Bangladesh | Jordan | San Marino | Ecuador | Mali |
| Belarus | Kazakhstan | Sao Tome and Principe | El Salvador | Mozambique |
| Belgium | Kenya | Saudi Arabia | Fiji | Nauru |
| Benin | Kiribati | Senegal | Grenada | Niger |
| Bhutan | Korea, North | Serbia | Guatemala | Rwanda |
| Bosnia and Herzegovina | Korea, South | Seychelles | Guyana | Sierra Leone |
| Brunei | Kosovo | Singapore | Honduras | Tanzania |
| Bulgaria | Kuwait | Slovakia | Jamaica | Tuvalu |
| Burkina Faso | Kyrgyzstan | Slovenia | Mexico* | Zambia |
| Burma/Myanmar | Laos | Solomon Islands | Nicaragua | |
| Burundi | Latvia | Somalia | Panama | |
| Cambodia | Lebanon | South Africa | Paraguay | |
| Cameroon | Liberia | Spain | Peru | |
| Chad | Libya | Sri Lanka | Saint Kitts and Nevis | |
| China | Liechtenstein | Sudan | Saint Lucia | |
| Comoros | Lithuania | Suriname | Saint Vincent and the Grenadines | |
| Congo (Dem. Rep.) | Luxembourg | Swaziland | Trinidad and Tobago | |
| Costa Rica | Macedonia | Sweden | United States | |
| Côte d'Ivoire | Madagascar | Switzerland | Uruguay | |
| Croatia | Malawi | Syria | Venezuela | |
| Cuba | Malaysia | Tajikistan | | |
| Cyprus | Maldives | Thailand | | |
| Czech Rep. | Malta | Timor-Leste | | |
| Denmark | Marshall Islands | Togo | | |
| Djibouti | Mauritania | Tonga | | |
| Dominican Rep. | Mauritius | Tunisia | | |
| Egypt | Micronesia | Turkey | | |
| Estonia | Moldova | Turkmenistan | | |
| Ethiopia | Monaco | Uganda | | |
| Finland | Mongolia | Ukraine | | |
| France | Montenegro | United Arab Emirates | | |
| Gabon | Morocco | United Kingdom | | |
| Gambia | Namibia | Uzbekistan | | |
| Georgia | Nepal | Vanuatu | | |
| Germany | Netherlands | Vietnam | | |
| Ghana | New Zealand | Yemen | | |
| Greece | Nigeria | Zimbabwe | | |
| Haiti | Norway | | | |
| Holy See, Vatican City | Oman | | | |

* Mexico has "automatic nationality" at birth, which is counted as birthright citizenship here.

Center for Immigration Studies

note that work visa issuance should "have as priority the 'importing' of skills needed in Antigua and Barbuda for the growth of the economy."[76] Although the report does not call for a change to birthright citizenship policies, it does note that "citizenship of Antigua and Barbuda should be treated as a thing of value and worth."[77] Interestingly, when asked about Antigua and Barbuda ending birthright citizenship for illegal aliens, the consular

officer with whom I spoke stated, "probably they might look at it down the road."[78]

There are varying approaches to citizenship throughout the world. Many countries require at least one parent to be a citizen of the country in order for their child to acquire the country's citizenship. Some countries make a distinction between whether that citizen parent is the mother or father. There are other variations as well. In Australia, a country that does not recognize automatic birthright citizenship, a child born to illegal immigrant parents may obtain Australian citizenship at age 10 if he was born after 1986 and has lived in Australia for the entire 10 years.[79] An Australian official explained that the child must still petition the immigration minister, who conducts fact-finding to verify the claim. The official also added that it would be "extremely unlikely" that illegal immigrants would be able to remain in Australia for the necessary ten-year period, meaning that the grant of citizenship rarely happens.[80]

It is important to remember that while a country may officially recognize birthright citizenship, it does not mean that the country is necessarily easy on illegal immigration. Paraguay, for example, has a birthright citizenship policy, but it has serious laws against illegal immigration which not only bar the employment of illegal aliens, but also prohibit owners of hotels and guesthouses from providing illegal aliens with accommodations.[81]

Mexico has a unique citizenship policy in that the country's constitution grants automatic nationality to anyone born in Mexico, but not automatic citizenship. This is true even of children born to Mexican citizens. When a Mexican reaches the age of 18, they then acquire citizenship. Mexican government officials with whom I spoke were uncertain how often their country grants nationality or citizenship to children born to illegal immigrants. The effort Mexico makes to discourage immigration indicates that this may be a rare occurrence. For example, the Mexican Constitution, among other things, allows the government to expel any immigrant for any reason without due process.[82] When combined with the protected constitutional right of making a citizen's arrest, which allows "any person" to detain a suspected criminal and his accomplices who are caught violating a law, it is clear living in Mexico illegally is not easy.[83] The constitution also severely limits the property rights of immigrants and requires immigrants to get permission from the government to own land; even if permission is granted, the immigrant can never own land within 100 kilometers of land borders nor

### Table 2. Of Advanced Economies, Only Canada and the United States Recognize Automatic Birthright Citizenship

| | | |
|---|---|---|
| Australia | Iceland | Portugal |
| Austria | Ireland | Singapore |
| Belgium | Israel | Slovak Republic |
| **Canada** | Italy | Slovenia |
| Cyprus | Japan | Spain |
| Czech Republic | Korea | Sweden |
| Denmark | Luxembourg | Switzerland |
| Finland | Malta | United Kingdom |
| France | Netherlands | **United States** |
| Germany | New Zealand | |
| Greece | Norway | |

**Source:** International Monetary Fund, World Economic Outlook Database—WEO Groups and Aggregates Information, October 2009, at www.imf.org/external/pubs/ft/weo/2009/02/weodata/groups.htm#ae

### Table 3. Only Three Countries with "Very High Human Development" Recognize Automatic Birthright Citizenship

| | | |
|---|---|---|
| Norway | Austria | Andorra |
| Australia | Spain | Slovenia |
| Iceland | Denmark | Brunei |
| **Canada** | Belgium | Kuwait |
| Ireland | Italy | Cyprus |
| Netherlands | Liechtenstein | Qatar |
| Sweden | New Zealand | Portugal |
| France | United Kingdom | United Arab |
| Switzerland | Germany | Emirates |
| Japan | Singapore | Czech Republic |
| Luxembourg | Greece | **Barbados** |
| Finland | Korea (Rep. of) | Malta |
| **United States** | Israel | |

**Source:** "List of Countries with 'Very High Human Development.'" Overcoming barriers: Human mobility and development. Human Development Report 2009. United Nations Development Programme.

Center for Immigration Studies

land within 50 kilometers of the coasts.[84] An immigrant wishing to change these rules will have difficulty as the Mexican Constitution states that only citizens are entitled to participate in Mexico's political affairs.[85] Even with Mexico's form of birthright citizenship, any child born to illegal immigrants or even legal immigrants in Mexico is barred from becoming president of Mexico; not only must the Mexican president be born in Mexico, but so must at least one of his parents.[86] While Mexico may grant citizenship to children born to aliens, the nation's constitution clearly imputes a second-class status on children of immigrants.

Additionally, many countries which do recognize birthright citizenship are not necessarily quick to grant citizenship to all people within their jurisdiction. Some countries are the focus of human rights groups because they do not grant citizenship to indigenous people. For example, Peru, a country with a birthright citizenship policy, has an indigenous population that makes up approximately 45 percent of the nation's total population, but the indigenous do not have access to Peruvian citizenship. Unlike the United States, some countries' birthright citizenship policies come with exceptions.

It is also important to remember that some of the countries which do automatically grant citizenship to children of illegal immigrants may not have much illegal immigration at all. For this reason, comparing countries like Fiji to the United States, for example, may be somewhat disingenuous; Fiji has an estimated illegal immigrant population of 2,000 people, while the United States has an estimated illegal immigrant population of up to 12 million.[87]

Moreover, not all countries which recognize birthright citizenship allow the child to initiate chain migration by petitioning to have additional family members enter. Consequently, some countries are able to avoid some of the problems associated with birthright citizenship experienced in the United States.

Perhaps most instructive is the clarity with which most other nations have authored their respective citizenship laws. Most countries' citizenship laws contain very little ambiguity and do not require one to conduct a historical analysis or seek judicial clarification for the purpose of determining intent. For example, Brazil's constitution confers citizenship on "those born in the Federative Republic of Brazil, even if of foreign parents," Australia's statutory law declares a person born in Australia an automatic Australian citizen "if and only if a parent of the person is an Australian citizen, or a permanent resident, at the time the person is born," while the Dominican Republic's new constitution denies

birthright citizenship to "foreigners who are in transit or who reside illegally in Dominican territory."[88]

To the extent there remains any debate over U.S. citizenship, it may be helpful for the U.S. Congress to clarify the scope of the Citizenship Clause of the 14th Amendment.

## Conclusion

Extending 14th Amendment birthright citizenship to any class of persons is a momentous matter because it confers very valuable benefits and imposes very serious obligations on children who have no say in the matter and it also has long-lasting and important effects on the size and composition of the U.S. population. The executive branch's current practice of extending birthright citizenship to nonresident aliens has never been authorized by any statute or any court decision. The legislative record left by drafters of the 14th Amendment shows that they were primarily concerned about conferring citizenship on freed slaves. While the Supreme Court has settled the matter as it applies to permanent resident aliens, it has yet to decide the matter as it applies to aliens whose presence in the United States is temporary or unlawful. As a result, Americans are justifiably upset with a policy that has become standard practice without their approval.

Because the legislative history is not decisive and there is no Supreme Court precedent, serious legal scholars and eminent jurists have argued that Congress should use its inherent authority to define the scope of birthright citizenship. Congress can use the hearing process to promote a calm, informed, and serious discussion on the wisdom and legality of granting automatic U.S. citizenship to the children of "birth tourists," illegal aliens, and other categories of foreign visitors who are taking advantage of a clause in the 14th Amendment that was primarily aimed at helping an entirely different class of persons.

Whatever the outcome of such a debate, and whatever form resulting legislation might take, Americans could then at least feel confident that their country's citizenship policy had become law through the political process and that the public had a say in determining the nation's future. Should the United States end the practice of granting automatic and universal citizenship to anyone born on U.S. soil, the nation would be following a global trend already embraced by most of the world's democracies.

17

Center for Immigration Studies

# End Notes

1 Birthright Citizenship Act of 2009, H.R.1868, 111th Cong. (2009). *See also* Jerry Seper, *Senate bill would slash U.S. immigration quota*, WASH. TIMES, Aug. 16, 1993, at A4 (noting that Sen. Harry Reid's legislation, the Immigration Stabilization Act of 1993 (S.1351), would, among other things, "Change existing law to ensure that a person born in the United States to an alien mother who is not a lawful resident would not automatically become a U.S. citizen," and quoting Sen. Reid as saying, "Our borders have overflowed with illegal immigrants placing tremendous burdens on our criminal justice system, schools and social programs… The Immigration and Naturalization Service needs the ability to step up enforcement… Our federal wallet is stretched to the limit by illegal aliens getting welfare, food stamps, medical care and other benefits, often without paying taxes… Safeguards like welfare and free medical care are in place to boost Americans in need of short-term assistance… These programs were not meant to entice freeloaders and scam artists from around the world… Even worse, Americans have seen heinous crimes committed by individuals who are here illegally.")

2 Steven Camarota, *Births to Immigrants in America, 1970 to 2002*, Center for Immigration Studies, July 2005, www.cis.org/ImmigrantsBirths-1970-2002, estimated 383,000 births to illegal-immigrant mothers in 2002. The Pew Hispanic Center has estimated 340,000 births with at least one illegal-immigrant parent in 2008; Jeffrey S. Passel and Paul Taylor, *Unauthorized Immigrants and Their U.S.-Born Children*, Aug. 11, 2010, http://pewhispanic.org/files/reports/125.pdf.

3 Jeffrey S. Passel and D'Vera Cohn, *A Portrait of Unauthorized Immigrants in the United States*, Pew Hispanic Center, Apr. 14, 2009, www.pewhispanic.org/files/reports/107.pdf.

4 Oforji v. Ashcroft, 354 F.3d 609, 620-1 (2003).

5 Steven Camarota, *Immigrants in the United States, 2007: A Profile of America's Foreign-Born Population*, Center for Immigration Studies, Nov. 2007, www.cis.org/immigrants_profile_2007. For other states, see Table 25, "Welfare Use for Illegal Alien-Headed Households."

6 Press Release, Tony Bell, Communications Deputy for the Office of Los Angeles County Supervisor Michael D. Antonovich, *Welfare Costs for Children of Illegal Aliens Exceeds $50 Million*, Apr. 19, 2010, antonovich.lacounty.gov/Pages/Press%20Releases/10/April/Illegal%20Immigration%2041910.html.

7 Camarota, *supra* note 5.

8 Sherry Jacobson, *Across Texas, 60,000 Babies of Noncitizens Get U.S. Birthright*, DALLAS MORNING NEWS, Aug. 8, 2010, http://www.dallasnews.com/sharedcontent/dws/dn/latestnews/stories/080810dnmetbabies.2be9a7e.html.

9 *Family Based Immigrants*, U.S. Dept. of State, travel.state.gov/visa/immigrants/types/types_1306.html.

10 Randall Monger, *Annual Flow Report: U.S. Legal Permanent Residents: 2009*, Office of Immigration Statistics, Dept. of Homeland Security, Apr. 2010, www.dhs.gov/xlibrary/assets/statistics/publications/lpr_fr_2009.pdf.
*See also* Chain Migration Chart, NumbersUSA, www.numbersusa.com/content/learn/issues/chain-migration/chain-migration-chart.html.

11 Philip Martin, *There Is Nothing More Permanent Than Temporary Foreign Workers*, Center for Immigration Studies, Apr. 2001, www.cis.org/articles/2001/back501.html.

12 Barbara Demick, *Korean Moms Want 'Born in USA' Babies*, L.A. TIMES, May 2002, www.fileus.org/dept/citizenship/02-05-26-latimes-birth_tourism_asia.html.

13 Işıl Eğrikavuk, *Birth Tourism in US on the Rise for Turkish Parents*, HÜRRIYET DAILY NEWS, Mar. 12, 2010, www.hurriyetdailynews.com/n.php?n=birth-tourism-to-the-usa-explodes-2010-03-12.

14 *Id.*

15 Mariana Alvarado, *Hospital Lures Mexican Moms; Tucson Medical Center 'Birth Package' Raises Questions*, ARIZ. DAILY STAR, June 28, 2009, www.wincoast.com/forum/archive/index.php/t-90605.html.

16 Keith B. Richburg, *For Many Pregnant Chinese, a U.S. Passport For Baby Remains a Powerful Lure*, WASH. POST, July 18, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/07/17/AR2010071701402.html.

17 *Id.*

18 Davidson Iriekpen, *Citizenship Rights: American Agitations Threaten a Nigerian Practice*, THIS DAY (Nigeria), Aug. 16, 2010, http://www.thisdayonline.com/nview.php?id=180829

19 This is not a new phenomenon. *See, e.g.*, Wayne King, *Mexican Women Cross Border so Babies Can Be U.S. Citizens*, N.Y. TIMES, Nov. 21, 1982 ("If she has a document for entry and there is no reason to deny that entry, she can come in," said Berl Williams, acting agent in charge of the Immigration and Naturalization Service at Brownsville. "The local crossing card is good for 72 hours. We don't stop pregnant women at the border.").

20 Birthright Citizenship Act of 2009, H.R.1868, 111th Cong. (2009).

21 Roy Beck, *Retiring Rep. Deal Leaves 17-Year Record of Trying to End Birthright Citizenship*, Mar. 1, 2010, www.numbersusa.com/content/nusablog/beckr/march-1-2010/retiring-rep-deal-leaves-17-year-record-trying-end-birthright-citizenshi.

22 Press Release, Rasmussen Reports, "58% Say No to Citizenship for Children of Illegal Immigrants," June 3, 2010, http://www.rasmussenreports.com/public_content/politics/current_events/immigration/58_say_no_to_citizenship_for_children_of_illegal_immigrants.

23 PETER H. SCHUCK & ROGERS M. SMITH, CITIZENSHIP WITHOUT CONSENT: ILLEGAL ALIENS IN THE AMERICAN POLITY 9-42 (Yale Univ. Press 1985) (1985).

24 Edward J. Erler, *Birthright Citizenship and Dual Citizenship: Harbingers of Administrative Tyranny*, California State University, San Bernardino, July 2008, www.hillsdale.edu/news/imprimis/archive/issue.asp?year=2008&month=07. *See also* John Eastman, *From Feudalism to Consent: Rethinking Birthright Citizenship*, Heritage Foundation, Mar. 30, 2006, www.heritage.org/Research/Reports/2006/03/From-Feudalism-to-Consent-Rethinking-Birthright-Citizenship.

25 *Id.*

26 William Blackstone, *Commentaries on the Laws of England, A*

*Facsimile of the First Edition of 1765–1769.* Chicago: University of Chicago Press, 1979, avalon.law.yale.edu/18th_century/blackstone_bk1ch10.asp.

[27]  This sentiment against the ascriptive approach was reiterated by Congress in the Expatriation Act of 1868, a law passed within days of passage of the 14th Amendment. The Act read, in part: "Be it enacted… That any declaration, instruction, opinion, order, or decision of any officers of this government which denies, restricts, impairs, or questions the right of expatriation, is hereby declared inconsistent with the fundamental principles of this government." Expatriation Act of 1868, 15 Stat. 223, 40th Cong. (2d Sess. 1868).

[28]  SCHUCK , *supra* note 23, at 2.

[29]  *Id.* at 6.

[30]  *Id.* at 53.

[31]  *Id.* at 54.

[32]  Scott v. Sandford, 60 U.S. 393 (1857).

[33]  An Act to protect all Persons in the United States in their Civil Rights, and furnish the Means of their Vindication (the Civil Rights Act of 1866), 14 Stat. 27 (1866).

[34]  SCHUCK, *supra* note 23, at 74 ("Although the Citizenship Clause was derived from the 1866 act, it was by no means identical. There were four textual differences… The legal scholar is sorely tempted to ascribe significance to these intriguing differences in language, especially when they appear in two documents adopted by the same body within a period of weeks. Unfortunately, neither the Congressional debates nor subsequent judicial exegesis provides much insight into the origins or meaning of these textual disparities.").

[35]  Lino A. Graglia, *Birthright Citizenship for Children of Illegal Aliens: An Irrational Public Policy*, Tex. Review of Law & Politics, Vol. 14, No. 1 (2009), www.trolp.org/main_pgs/issues/v14n1/Graglia.pdf.

[36]  U.S. CONST. amend. XIV, § 1.

[37]  SCHUCK, *supra* note 23, at 76.

[38]  *See, e.g., Ending Birthright Citizenship Would Not Stop Illegal Immigration,* Immigration Policy Center, June 15, 2010 (stating, without any discussion of the "subject to the jurisdiction" language: "Birthright citizenship, or the principle of *jus soli,* means that any person born within the territory of the U.S is a citizen, regardless of the citizenship of one's parents;" and "The legislative history clearly shows that Congress clearly intended to bestow birthright citizenship on the U.S.-born children of immigrants."), www.immigrationpolicy.org/just-facts/ending-birthright-citizenship-would-not-stop-illegal-immigration; *see, e.g.,* Michael Gerson, *On immigration, Lindsey Graham abandons principle,* WASH. POST, July 30, 2010 (noting, "The authors of the Fourteenth Amendment guaranteed citizenship to all people 'born or naturalized in the United States' for a reason."), http://voices.washingtonpost.com/postpartisan/2010/07/on_immigration_lindsey_graham.html.

[39]  *See, e.g.,* Yule Kim, *Statutory Interpretation: General Principles and Recent Trends,* Congressional Research Service, Aug. 31, 2008 (citing various court holdings: "Ordinarily, as in everyday English, use of the conjunctive 'and' in a list means that all of the listed requirements must be satisfied, while use of the disjunctive 'or' means that only one of the listed require-

ments need be satisfied;" and, "A basic principle of statutory interpretation is that courts should 'give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed.' The modern variant is that statutes should be construed 'so as to avoid rendering superfluous' any statutory language."), www.fas.org/sgp/crs/misc/97-589.pdf.

[40]  *Congressional Globe,* Senate, 39th Congress, 1st Session, Feb. 1, 1866, Pg. 572 (statement of Sen. Trumbull).

[41]  *Congressional Globe,* Senate, 39th Congress, 1st Session, Feb. 1, 1866. (See, e.g., statements of Sen. John B. Henderson, Pgs. 571-572; Sen. Trumbull, Pg. 572; Sen. Johnson, Pg. 573).

[42]  SCHUCK, *supra* note 23, at 96. *See also Congressional Globe,* Senate, 39th Congress, 1st Session, May 30, 1866. Pg. 2891 (statement of Sen. Cowan). Interestingly, there is some evidence that the 14th Amendment's framers would not have supported a permissive interpretation of the Citizenship Clause that encourages mass immigration in the way it does today. Sen. Edgar Cowan (R-Penn.) was concerned about giving the federal government too much control over the granting of citizenship and asked whether immigrants "…have the free right to locate [to California] and settle among [Californians], and if they have an opportunity of pouring in such an immigration as in a short time will double or treble the population of California, I ask, are the people of California powerless to protect themselves? I do not know that the contingency will ever happen, but it may be well to consider it while we are on this point." The contingency certainly happened. California's population at the time of this debate in 1866 was approximately 488,000. California's population more than doubled by 1890 (at 1,213,398) and more than tripled by 1900 (at 1,485,053). Today, California's population is over 37 million, or approximately 76 times larger than it was when Sen. Cowan voiced his concern. Considering Sen. Cowan was concerned about a doubling of California's population, it is difficult to argue that he would have agreed to language that he thought would allow for a liberal and universal birthright citizenship policy.

[43]  *Congressional Globe,* Senate, 39th Congress, 1st Session, Feb. 1, 1866. Pg. 2890 (statement of Sen. Howard).

[44]  *Congressional Globe,* Senate, 39th Congress, 1st Session, May 30, 1866. Pg. 2893 (statement of Sen. Trumbull).

[45]  *Id.*

[46]  John P. Foley, The Jeffersonian Cyclopedia: A Comprehensive Collection of the Views of Thomas Jefferson, Funk & Wagnalls, 1900, p. 32, www.archive.org/stream/thejeffersoncycl00jeffuoft#page/32/mode/2up/search/alien.

[47]  *Congressional Globe,* Senate, 39th Congress, 1st Session, May 30, 1866. Pg. 2893 (statement of Sen. Johnson).

[48]  Camarota, *supra* note 5.

[49]  Brief of the United Mexican States as Amicus Curiae in Support of Plaintiffs Pursuant to Court Order, Friendly House, et al. v. Michael B. Whiting, et al., (D. Ariz. 2010) (No. CV-10-1061-PHX-SRB),  http://www.deweyleboeuf.com/en/Firm/MediaCenter/PressReleases/2010/06/~/media/Files/pressreleases/2010/20100622_AmicusCuriae.ashx.

50  Available at: http://www.juanhernandez.org/index-1.html

51  Peter Jennings, *The New Frontier; Juan Hernandez Works on Both Sides of Mexico/American Border to Help Resolve Concerns of Mexicans*, ABC News: Nightline, June 7, 2001.

52  Slaughter-House Cases, 83 U.S. 36, 73 (1873).

53  Elk v. Wilkins, 112 U.S. 94, 103 (1884).

54  *Id.* at 102.

55  *Id.*

56  United States v. Wong Kim Ark, 169 U.S. 649, 705 (1898).

57  Joseph Story, Commentaries on the Conflict of Laws, ch. 3 § 48 (Hilliard, Gray, and Company 1834). *See also* Inglis v. Trustees of Sailor's Snug Harbor, 28 U.S. 99 (1830).

58  *Wong Kim Ark*, at 687.

59  *Id.* at 682.

60  *Id.* at 729-731.

61  Edward J. Erler, The Founders on Citizenship and Immigration: Principles and Challenges in America 57-67 (Rowman & Littlefield, 2007).

62  Schuck, *supra* note 23, at 78.

63  Plyler v. Doe, 457 U.S. 202, 212 n.10 (1982).

64  Lino A. Graglia, *Birthright Citizenship for Children of Illegal Aliens: An Irrational Public Policy*, Tex. Review of Law & Politics, Vol. 14, No. 1 (2009), www.trolp.org/main_pgs/issues/v14n1/Graglia.pdf.

65  Schuck, *supra* note 23, at 117.

66  Jon Feere, *Plenary Power: Should Judges Control U.S. Immigration Policy?*, Center for Immigration Studies, Feb. 2009, www.cis.org/plenarypower.

67  Harisiades v. Shaughnessy, 342 U.S. 580 (1952).

68  Erler, *supra* note 24. *See also Hearing on the Citizenship Reform Act of 1997 (H.R. 7), Before the House Comm. on the Judiciary, Subcomm. on Immigration and Claims* (June 25, 1997) (statement of Edward J. Erler, Professor, California State University), http://judiciary.house.gov/legacy/6042.htm.

69  *Oforji*, at 621.

70  *Id.*

71  We could not confirm the citizenship policy of 19 nations. This report will be updated if the information becomes available.

72  Rainer Bauböck, *Who are the citizens of Europe?*, Eurozine, Dec. 23, 2006, http://www.eurozine.com/articles/2006-12-23-baubock-en.html.

73  Barbados Ministry of Labour & Immigration, *Comprehensive Review of Immigration Policy and Proposals for Legislative Reform*, noting: "It is the Department's view that the legislation should be amended to stipulate that (as in the United Kingdom and the Bahamas) children born in Barbados will not be deemed to be citizens of Barbados, unless at least one parent at the time of the birth, has permanent status in Barbados. In addition persons born in Barbados should not be deemed to be citizens where the parents are residing illegally in Barbados." Available at: www.foreign.gov.bb/Userfiles/File/IMMIGRATION%20POLICIES.pdf.

74  Ms. E. Ann Henry et al., *Report on Review of Matters Pertaining to Immigration, Work Permits, Citizenship and Electoral Reform*, Gov't of Antigua and Barbuda, Feb. 9, 2010, www.ab.gov.ag/gov_v3/pdf/immigration_report.pdf.

75  *Id.*

76  *Id.*

77  *Id.*

78  Phone conversation with Ms. Gracelyn Henry, Embassy of Antigua and Barbuda, Washington, D.C., June 8, 2010. It is likely that the issue of birthright citizenship for children of illegal aliens will have to be addressed by Antigua and Barbuda if the recommendations become law because the country does not have any interest in legalizing illegal alien parents: "The prevailing view was that if we are to pursue Immigration reform in Antigua and Barbuda, it is of importance that the message of zero-tolerance of noncompliance with the Law must be conveyed. Flowing from this was the view that amnesty was not an acceptable way forward and should not be entertained as an option. Indeed, some persons were of the view that persons who were in Antigua and Barbuda illegally should be deported. It is the recommendation of the Committee that there is no compelling argument for implementing a program for the wide spread grant of amnesty." Instead, the country recommends that "persons who are residing in Antigua and Barbuda illegally should be given an opportunity to leave on their own" but if they do not do so within six months, "appropriate action should be taken." Just as in Barbados, the question of separating children from parents would immediately put the propriety of automatic birthright citizenship into the spotlight.

79  Automatic acquisition of citizenship on 10th birthday "A child born in Australia on or after 20 August 1986, who did not acquire Australian citizenship at birth, automatically acquires it on their 10th birthday if they have been ordinarily resident in Australia for 10 years from birth. This provision operates regardless of the parent/s immigration or citizenship status," www.immi.gov.au/media/fact-sheets/17nz.htm.

80  Conversation with Rose Lacey, Citizenship and Migration Officer, Australian High Commission, May 31, 2010.

81  Para. Const. art. 69.

82  Mex. Const. tit. I, ch. III, art. 33, http://info.juridicas.unam.mx/infjur/leg/constmex/pdf/consting.pdf.  See also, J. Michael Waller, *Mexico's Glass House*, Center for Security Policy, Jan. 13, 2009, http://www.centerforsecuritypolicy.org/p17844.xml.

83  Mex. Const. tit. I, ch. I, art. 16.

84  Mex. Const. tit. I, ch. I, art. 27.

85  Mex. Const. tit. I, ch. I, art. 9.

86  Mex. Const. tit. III, ch. III, art. 82.

87  Kalinga Seneviratne, *Islanders welcome Chinese cash, but not Chinese*, Asia Times Online, Sept. 17, 2002, http://www.atimes.com/atimes/China/DI17Ad04.html.

88  Braz. Const. tit. II, ch. III, art. 12, http://www.v-brazil.com/government/laws/titleII.html; Australian Citizenship Act 2007, pt. II, div. 1 (2007), http://www.comlaw.gov.au/ComLaw/Legislation/ActCompilation1.nsf/0/36700F7A6C6BF1DCCA2575DE000D5D6D/$file/AusCitizenship2007.pdf; Dom. Rep. Const. ch. V, § 1, art. 18, http://www.jmarcano.com/mipais/politicos/title1.html.

Center for Immigration Studies



Center for Immigration Studies
1522 K Street, NW, Suite 820
Washington, DC 20005-1202
(202) 466-8185
center@cis.org
www.cis.org

NON-PROFIT
U.S. POSTAGE
PAID
PERMIT # 6117
WASHINGTON, DC

# Backgrounder

## Birthright Citizenship
### A Global Comparison

By Jon Feere

Every year, 300,000 to 400,000 children are born to illegal immigrants in the United States. Despite the foreign citizenship and illegal status of the parent, the executive branch of the U.S. government automatically recognizes these children as U.S. citizens upon birth. The same is true of children born to tourists and other aliens who are present in the United States in a legal but temporary status. Since large-scale tourism and mass illegal immigration are relatively recent phenomena, it is unclear for how long the U.S. government has followed this practice of automatic "birthright citizenship" without regard to the duration or legality of the mother's presence.

Eminent legal scholars and jurists, including Professor Peter Schuck of Yale Law School and U.S. Court of Appeals Judge Richard Posner, have questioned whether the 14th Amendment should be read to mandate such a permissive citizenship policy. Nevertheless, the practice has become the de facto law of the land without any input from Congress or the American public.

Center for Immigration Studies
1522 K Street, NW, Suite 820
Washington, DC 20005-1202
(202) 466-8185 • (202) 466-8076
center@cis.org • www.cis.org

Support the Center through the Combined Federal Campaign by designating **10298** on the campaign pledge card.

EXHIBIT 4

# Backgrounder

August 2008

# Immigration to the United States and World-Wide Greenhouse Gas Emissions

## By Leon Kolankiewicz and Steven A. Camarota

The findings of this study indicate that future levels of immigration will have a significant impact on efforts to reduce global $CO_2$ emissions. Immigration to the United States significantly increases world-wide $CO_2$ emissions because it transfers population from lower-polluting parts of the world to the United States, which is a higher-polluting country. On average immigrants increase their emissions four-fold by coming to America.

Among the findings:

- The estimated $CO_2$ emissions of the average immigrant (legal or illegal) in the United States are 18 percent less than those of the average native-born American.

- However, immigrants in the United States produce an estimated four times more $CO_2$ in the United States as they would have in their countries of origin.

- U.S. immigrants produce an estimated 637 million metric tons of $CO_2$ emissions annually — equal to Great Britain and Sweden combined.

- The estimated 637 tons of $CO_2$ U.S. immigrants produce annually is 482 million tons more than they would have produced had they remained in their home countries.

- If the 482 million ton increase in global $CO_2$ emissions caused by immigration to the United States were a separate country, it would rank 10th in the world in emissions.

- The impact of immigration to the United States on global emissions is equal to approximately 5 percent of the increase in annual world-wide $CO_2$ emissions since 1980.

- Of the $CO_2$ emissions caused by immigrants, 83 percent is estimated to come from legal immigrants and 17 percent from illegal immigrants.

- Legal immigrants have a much larger impact because they have higher incomes and resulting emissions, and they are more numerous than illegal immigrants.

- The above figures do not include the impact of children born to immigrants in the United States. If they were included, the impact would be much higher.

- Assuming no change in U.S. immigration policy, 30 million new legal and illegal immigrants are expected to settle in the United States in the next 20 years.

- In recent years, increases in U.S. $CO_2$ emissions have been driven entirely by population increases as per capita emissions have stabilized.

*Leon Kolankiewicz is an environmental scientist, planner, and consultant whose work has included analyses of the environmental impacts of alternative energy technologies, including their greenhouse gas emissions. Steven A. Camarota is the Director of Research at the Center for Immigration Studies.*

Center for Immigration Studies

# Introduction

The small body of research on immigration's environmental impact in the United States has tended to focus on the effects of the population growth induced by immigrants and their U.S.-born offspring on the U.S. environment alone.[1] In contrast, the present study attempts to quantify the direct contribution of immigrants in the United States to growing U.S. and global carbon dioxide ($CO_2$) emissions. Since American emissions per capita are much higher than almost all of the immigrant-sending countries, immigration to the United States has significant implications for worldwide emissions.

Greenhouse gas (GHG) emissions, the most important of which is $CO_2$, raise the concentration of these gases in the earth's atmosphere. Most scientists think this increase is causing average global temperatures to rise. There is concern that warming in turn may trigger far-reaching, long-term effects on the Earth's climate and biosphere, and consequently, on human civilization.[2] Thus, the impact of U.S. immigration on annual $CO_2$ emissions is an important research question.

# U.S. Population Growth Drives Increasing $CO_2$ Emissions

The large population and comparative prosperity of the United States are underpinned by the consumption of fossil fuels on a prodigious scale. In one year alone (2006), Americans burned 1.1 billion tons of coal, 7.6 billion barrels of petroleum, and 21.6 trillion cubic feet of natural gas.[3]

A fundamental consequence of the combustion of coal, oil, and natural gas to generate electricity, run cars, and heat homes is the release of $CO_2$ into the atmosphere.[4] Total U.S. emissions of $CO_2$ have been the highest in the world for many years — until just recently. It now appears that in 2006 China surpassed the United States in annual $CO_2$ emissions.[5] However, the United States still leads the world's largest economies in per capita emissions. China's annual per capita $CO_2$ emissions in 2005 were just four tons, below the global average and only one-fifth of America's per capita emissions of 20 tons.[6]

In recent years U.S. per capita $CO_2$ emissions have held steady and the rise in overall U.S. emissions is entirely due to population growth. The link between population and $CO_2$ emissions is shown in a 2002 study that found GHG emissions in the United States from fossil fuel combustion grew by almost 13 percent from 1990 to 2000. Over the same time period, the U.S. population grew by an almost identical amount. This is powerful direct evidence that increases in U.S. $CO_2$ emissions are driven by population increases as per capita emissions have stabilized.[7] Adding more people to the United States, at least recently, has meant a proportional increase in emissions.

# Comparing U.S. Emissions to Immigrant-Sending Countries

Research by the Center for Immigration Studies, the Pew Hispanic Center, and the Census Bureau shows that new immigration and births to immigrants are the determinate factors in future U.S. population growth. Immigration is now the driving force behind continued U.S. population growth, accounting directly (immigration itself) and indirectly (through births to immigrants) for at least three-quarters of our annual increase of three million residents. The Center for Immigration Studies has projected that if the current level of (legal and illegal) immigration continues, the U.S. population will grow from 300 million in 2007 to 468 million by 2060. Longer-range projections done by the Census Bureau show a U.S. population by 2100 of between 571 million and 1.18 billion using the Bureau's middle or high range immigration scenario.[8] The U.S. population would grow some even without immigration, but there is no question that immigration is the primary reason the U.S. population continues to increase by about three million each year.

Of course, if immigrants had remained in their home counties they would still have produced some $CO_2$, but as we will see, their output would have been a great deal less because immigration represents a large-scale population transfer from the less consuming, less industrialized, and less $CO_2$ emitting parts of the world to one of the highest consuming, most industrialized, high $CO_2$ emitting parts of the world — the United States. Table 1 compares per capita $CO_2$ emissions in the United States with per capita $CO_2$ emissions in the top-25 immigrant-sending countries.

Table 1 shows extreme variability in per capita $CO_2$ emission rates from country to country. More developed countries of origin — such as Canada, European countries, and Japan — have higher annual per capita $CO_2$ emissions, though with the exception of Canada, even the industrialized countries such as Great Britain, Germany, and Italy all have much lower per capita emissions than the United States. Less-developed countries from Asia and Latin America, which are the primary immigrant-sending counties, have much lower annual per capita $CO_2$ emissions than does the United

2

Center for Immigration Studies

States. The most extreme example, Haiti, has a per capita $CO_2$ emissions rate of barely more than 1/100 that of the United States. In contrast, Canada's per capita $CO_2$ emissions are comparable to America's, which is not surprising considering the similarly large size and advanced level of development of this neighboring North American country.

## Table 1. Carbon Dioxide Emissions per Capita from Fossil Fuel Consumption: Comparison Between U.S. and Top-25 Countries of Origin of Immigrants in the U.S.

| Country | Annual $CO_2$ Emissions per Capita (Metric Tons per Person, 2005)[a] | U.S. $CO_2$ Emissions per Capita/Sending Country $CO_2$ Emissions per Capita (2005) |
| --- | --- | --- |
| United States | 20.14 | 1.0 x |
| Mexico | 3.75 | 5.4 x |
| China[b] | 4.07 | 4.9 x |
| India | 1.07 | 18.8 x |
| Philippines | 0.89 | 22.6 x |
| Vietnam | 0.96 | 21.0 x |
| El Salvador | 0.92 | 21.9 x |
| Cuba | 2.91 | 6.9 x |
| Former USSR[c] | 11.88 | 1.7 x |
| Korea | 10.27 | 2.0 x |
| Dominican Republic | 1.95 | 10.3 x |
| Canada | 19.24 | 1.0 x |
| Guatemala | 0.90 | 22.4 x |
| Colombia | 1.36 | 14.8 x |
| United Kingdom | 9.55 | 2.1 x |
| Jamaica | 4.22 | 4.8 x |
| Germany | 10.24 | 2.0 x |
| Haiti | 0.21 | 96.0 x |
| Honduras | 0.99 | 20.3 x |
| Poland | 7.38 | 2.7 x |
| Italy | 8.35 | 2.4 x |
| Ecuador | 1.79 | 11.3 x |
| Iran | 6.96 | 2.9 x |
| Peru | 1.12 | 18.0 x |
| Brazil | 1.94 | 10.4 x |
| Japan | 9.65 | 2.1 x |

**Notes:** Top-25 countries of origin of immigrant population in the United States, as listed in "Immigrants in the United States, 2007: A Profile of America's Foreign-Born Population."[9] Countries of origin are listed in order of the size of their immigrant population in the United States. Per capita $CO_2$ emissions from U.S. Department of Energy, Energy Information Administration, 2007.[10]
[a] See endnote 10.
[b] Does not include Taiwan or Hong Kong.
[c] Includes Russia, Ukraine, Armenia, Lithuania, and other former Soviet states.

What is most important about the table is that it shows that almost all of the top immigrant-sending countries to the United States have dramatically lower $CO_2$ emissions per capita. By and large, people who migrate to the United States aspire to improve their material standard of living, and as noted above, this generally entails a higher level of energy consumption and, thus, $CO_2$ emissions. If Table 1 indicated that U.S. $CO_2$ emissions per capita were lower or even the same as the primary immigrant-sending countries, it is likely that immigration to the United States would have little or no effect on world-wide GHG emissions, although total U.S. emissions would still rise dramatically. But, in fact, the United States has much higher per capita $CO_2$ emissions — five times higher — than the world average (20 vs. four metric tons annually). As a result, immigration to the United States has significant implications for world-wide $CO_2$ emissions.

## Methodology for Estimating Immigrant $CO_2$ Emissions

One obstacle to estimating annual immigrant and native-born per capita $CO_2$ emission rates is that there are no data that disaggregate rates of these two population cohorts. For that matter, there are also no data that break down per capita $CO_2$ emission rates along other important categories of the United States, such as by urban vs. suburban vs. rural, rich vs. poor, apartment dwellers vs. homeowners, or by ethnic/racial origin. One way around this absence of data is to use annual income as a surrogate for annual $CO_2$ emissions. There is a strong positive correlation between income and $CO_2$ emissions, especially those associated with fossil fuel consumption; that is, an increase in income is associated with an increase, though not necessarily a proportionate increase, in carbon emissions.[11] Higher-income Americans simply

Center for Immigration Studies

tend to consume more fossil energy than lower-income Americans, such as by driving instead of taking the bus, longer commutes to larger homes in distant suburbs (large, detached dwellings that take more energy to heat and cool), consuming more goods and services with substantial energy "embodied" in their manufacture production and delivery, taking more airline flights, etc.

Rather than assuming that all immigrants in the United States have the same annual per capita $CO_2$ emissions as native-born Americans or the average for the United States as a whole, this study postulates a broad correlation between a person's annual income and his or her annual $CO_2$ emissions. This premise is explored and supported by Table 2, which lists the per capita income and per capita $CO_2$ emissions for each of the 25 countries

## Table 2. Comparison of per Capita Incomes and per Capita CO₂ Emissions Between U.S. and Top-25 Countries of Origin of Immigrants in the U.S.

| Country | Purchasing Power Parity: Gross National Income per Capita (Dollars, 2005)[a] | U.S. per Capita Purchasing Power Parity/Sending Country per Capita Purchasing Power Parity | U.S. CO₂ Emissions per Capita/Sending Country CO₂ Emissions per Papita (2005) |
|---|---|---|---|
| **United States** | **$41,950** | 1.0 x | 1.0 x |
| Mexico | $10,030 | 4.2 x | 5.4 x |
| China[b] | $6,600 | 6.4 x | 4.9 x |
| India | $3,460 | 12.1 x | 18.8 x |
| Philippines | $5,300 | 7.9 x | 22.6 x |
| Vietnam | $3,010 | 13.9 x | 21.0 x |
| El Salvador | $5,120 | 18.4 x | 21.9 x |
| Cuba | $5,200 [c] | 8.1 x | 6.9 x |
| Former USSR[d] | $10,640 | 3.9 x | 1.7 x |
| Korea | $21,850 | 1.9 x | 2.0 x |
| Dominican Republic | $7,150 | 5.9 x | 10.3 x |
| Canada | $32,220 | 1.3 x | 1.0 x |
| Guatemala | $4,410 | 9.5 x | 22.4 x |
| Colombia | $7,420 | 5.7 x | 14.8 x |
| United Kingdom | $32,690 | 1.3 x | 2.1 x |
| Jamaica | $4,110 | 10.2 x | 4.8 x |
| Germany | $29,210 | 1.4 x | 2.0 x |
| Haiti | $1,840 | 22.8 x | 96.0 x |
| Honduras | $2,900 | 14.5 x | 20.3 x |
| Poland | $13,490 | 3.1 x | 2.7 x |
| Italy | $28,840 | 1.5 x | 2.4 x |
| Ecuador | $4,070 | 10.3 x | 11.3 x |
| Iran | $8,050 | 5.2 x | 2.9 x |
| Peru | $5,830 | 7.2 x | 18.0 x |
| Brazil | $8,230 | 5.1 x | 10.4 x |
| Japan | $31,410 | 1.3 x | 2.1 x |

**Notes:** [*] Per capita income data from World Bank, 2007.[13]
[a] Purchasing power parity is the true exchange rate of different currencies based on differences in standard of living and overall pricing among different nations.
[b] Does not include Taiwan or Hong Kong.
[c] Exact figure not tabulated or provided by Cuban government. Gross national income per capita estimated by the World Bank (2007) to be global lower middle-income ($876–$3,465). For this analysis, the midpoint of this range was used, and then multiplied by 2.4, which was the average factor of increase between gross national per capita income and purchasing power parity for all Latin American countries in the table with a gross national income per capita below $3,465.
[d] Includes Russia, Ukraine, Armenia, Lithuania, and other former Soviet states.

Center for Immigration Studies

listed in Table 1. This comparison is useful because it depicts the correlation between per capita income and per capita $CO_2$ emissions from fossil fuel consumption in countries from three continents. Figure 1 (p. 6) is a scatter plot, in which for all countries except Haiti (a statistical outlier), per capita income ratios (X or horizontal axis) are plotted against per capita $CO_2$ emissions ratios (Y or vertical axis). In country after country, as per capita

income increases, per capita $CO_2$ emissions increase as well, although not always in lockstep. In this study then, the same relationship is assumed to hold for different populations of immigrants in the United States.

That carbon dioxide emissions are a function of income means that they do not conform to a pattern that environmental economists have observed with other pollutants and "negative externalities." As national

| Table 3. Estimated per Capita Income and $CO_2$ Emissions by Immigrants' Countries of Origin | | | | | |
|---|---|---|---|---|---|
| | Number of Immigrants in U.S. (1,000s) | Average Annual Income in U.S. | Immigrant Income Relative to Average U.S. Income (Not Native Income) | Per Capita $CO_2$ Emissions in Country of Origin (Tons) | Per Capita $CO_2$ Emissions in U.S. (tons) |
| Average U.S. | | $35,038 | 100 % | 20.14 | 20.14 |
| Mexico | 11,671 | $18,636 | 53.2 % | 3.75 | 10.71 |
| China[a] | 2,007 | $37,943 | 108.3 % | 5.90 | 21.81 |
| India | 1,704 | $50,466 | 144.0 % | 1.07 | 29.01 |
| Philippines | 1,665 | $35,389 | 101.0 % | 0.89 | 20.34 |
| Vietnam | 999 | $34,867 | 99.5 % | 0.96 | 20.04 |
| El Salvador | 998 | $20,509 | 58.5 % | 0.92 | 11.79 |
| Cuba | 980 | $27,835 | 79.4 % | 2.91 | 16.00 |
| Former USSR[b] | 973 | $35,007 | 99.9 % | 9.02 | 20.12 |
| Korea | 906 | $35,733 | 102.0 % | 10.27 | 20.54 |
| Dominican Republic | 856 | $18,582 | 53.0 % | 1.95 | 10.68 |
| Canada | 699 | $52,015 | 148.5 % | 19.24 | 29.90 |
| Guatemala | 681 | $18,115 | 51.7 % | 0.90 | 10.41 |
| Colombia | 669 | $27,251 | 77.8 % | 1.36 | 15.66 |
| United Kingdom | 590 | $50,791 | 145.0 % | 9.55 | 29.19 |
| Jamaica | 550 | $32,054 | 91.5 % | 4.22 | 18.43 |
| Germany | 514 | $38,815 | 110.8 % | 10.24 | 22.31 |
| Haiti | 514 | $31,264 | 89.2 % | 0.21 | 17.97 |
| Honduras | 439 | $19,766 | 56.4 % | 0.99 | 11.36 |
| Poland | 427 | $30,073 | 85.8 % | 7.38 | 17.29 |
| Italy | 418 | $30,734 | 87.7 % | 8.35 | 17.67 |
| Ecuador | 411 | $27,348 | 78.1 % | 1.79 | 15.72 |
| Iran | 371 | $48,358 | 138.0 % | 6.96 | 27.80 |
| Peru | 354 | $31,163 | 88.9 % | 1.12 | 17.91 |
| Brazil | 338 | $30,657 | 87.5 % | 1.94 | 17.62 |
| Japan | 286 | $41,448 | 118.3 % | 9.65 | 23.82 |
| All other countries[c] | 7,260 | $36,816 | 105.1 % | 4.19 | 21.16 |
| All Immigrants | 37,280 | $29,692 | 84.7 % | 4.19 | 17.10 |

Notes: [a] Includes immigrants from Taiwan and Hong Kong, apportioned according to their relative frequency in the United States.
[b] Includes immigrants from Russia, Ukraine, Armenia, Lithuania, and all other republics formerly in the Soviet Union, apportioned according to their relative frequency in the United States.
[c] Includes all immigrants from other countries not specifically listed in the top-25 countries, broken down (and apportioned according to their relative frequency) by the following regions: Europe, South Asia, East-Southeast Asia, Middle East, Central America, Caribbean, South America, Sub-Saharan Africa, and Oceana.
Source of "Number of immigrants" and "Average income in U.S." columns: Center for Immigration Studies analysis of March 2007 Current Population Survey (CPS). Income figures reflect total income for persons 18 years of age and older.

## Center for Immigration Studies

economies' incomes and Gross Domestic Product (GDP) increase at first, pollution and environmental blight often increase initially but later decrease as incomes continue to grow. When graphed, this relationship takes the form of an inverted or upside-down "U." Because of its similarity to the pattern of inequality and income first articulated by Nobel Prize-winning economist Simon Kuznets, this pattern of pollution and income has been dubbed the "Environmental Kuznets Curve" (EKC). However, while any number of air and water pollutants and aesthetic/ecological assaults, ranging from rampant deforestation to litter, display this pattern, peak pollution levels occur at different income levels for different pollutants, societies, and time periods.[12]

The EKC explains societies' behavior when applied to toxic contaminants that are a visible nuisance and health threat to large numbers of people, such as lead, particulate matter, and sulfur dioxide polluting the air, or raw sewage and industrial effluent defiling water bodies. It is less applicable in the case of pollutants or damage that are hidden, dispersed, or cumulative, like from carbon dioxide emissions or extravagant energy use.

Table 3 (p. 5) uses the average annual per capita incomes of immigrants in the United States to estimate immigrants' $CO_2$ emissions in 2007. These emissions are compared to per capita emissions in the immigrant's home country. The first column lists each immigrant home country in descending order, from the country with the highest number of immigrants in the United States (Mexico) to the country in 25th place (Japan). After Japan, an entry for "all other countries" is listed, referring to the more than 100 countries that collectively account for about a fifth of immigrants to U.S. shores.[14]

The second column in Table 3 lists the number of immigrants in the United States from the country identified in the first column as of 2007.[15] The figures in this column *do not include* children born to immigrants in the United States. The third column displays the average annual income of immigrants in the United States from each country. The fourth column compares this income to the average U.S. income in 2007; a figure above 100 percent (like Canada) means immigrants from the country in question earn more on average than Americans do; a figure below 100 percent (like Honduras) means they have a lower annual income than Americans on average.

The fifth column is per capita $CO_2$ emissions in the immigrants' countries of origin, while the sixth and final column is the estimated annual per capita $CO_2$ emissions in the United States based on the countries' average annual incomes. Comparing columns five and six shows the estimated increase in $CO_2$ emissions that occurred by the act of immigrating to and living in the United States. There is clearly great variation in the income and $CO_2$ output of immigrants in the United States. For example, Mexican immigrants are estimated to produce only about half as much $CO_2$ as the average person in the United States. However, this is still more than double the output of the average person in Mexico. Canadian immigrants on the other hand produce almost 50 percent more in $CO_2$ emissions as the average person in the United States.

The final row of Table 3 shows that the average per capita $CO_2$ emissions for all immigrants in the United States was 4.19 metric tons in their sending countries. In the United States, those same immigrants had estimated emissions of 17.1 tons, about four times as high as the average per capita emissions in their countries of origin. Thus, the 37.3 million legal and illegal immigrants now living in the United States in 2007 produced about four times as



Figure 1. Income vs. $CO_2$ Emissions

Center for Immigration Studies

much $CO_2$ as they would have had they stayed in their home countries.

Table 4 shows by how many times immigrants in the United States increased their per capita $CO_2$ emissions relative to average annual per capita emissions in their countries of origin. It is a measure of just how much emissions have increased because of immigration to the United States.

It should be noted that native-born Americans have a slightly higher annual per capita income ($36,008) than the overall average in the United States ($35,038) shown in Table 3. This is because the overall American average includes both native-born and foreign-born Americans' incomes and the inclusion of immigrants pulls the national average down somewhat. Thus, while Table 3 shows that immigrants on average produce about 85 percent as much $CO_2$ as the average person (immigrant or native-born) living in the United States,

compared to just native-born Americans they produce 82 percent as much.

Overall, the more than 37 million immigrants (legal and illegal) living in the United States account for an estimated 637 million metric tons of $CO_2$ emissions each year or 10.7 percent of the U.S. total of 5,957 million metric tons. This is somewhat below their total share of the total population because of their lower average income. Based on estimates developed by the Center for Immigration Studies we estimate that of the 637 million tons of $CO_2$ emitted by immigrants, 83 percent is from legal immigrants and 17 percent is from illegal immigrants. Although about 30 percent of the 37.3 million immigrants living in the United States in March 2007 are estimated to be illegal aliens, they have much lower average incomes than legal immigrants.[16] For this reason illegal immigrants produce a smaller share of $CO_2$ emissions than legal immigrants. Illegal immigrants also produce significantly less than native-born Americans.

## Table 4. Factor of Increase in $CO_2$ Emissions

| Country | Estimated per Capita $CO_2$ Emissions of Immigrants in U.S. / per Capita CO2 Emissions of Countries of Origin |
|---|---|
| Mexico | 2.9 x |
| China | 3.7 x |
| India | 27.1 x |
| Philippines | 22.9 x |
| Vietnam | 20.9 x |
| El Salvador | 12. x |
| Cuba | 5.5 x |
| Former USSR | 2.2 x |
| Korea | 2.0 x |
| Dominican Republic | 5.5 x |
| Canada | 1.6 x |
| Guatemala | 11.6 x |
| Colombia | 11.5 x |
| United Kingdom | 3.1 x |
| Jamaica | 4.4 x |
| Germany | 2.2 x |
| Haiti | 85.6 x |
| Honduras | 11.5 x |
| Poland | 2.3 x |
| Italy | 2.1 x |
| Ecuador | 8.8 x |
| Iran | 4.0 x |
| Peru | 16.0 x |
| Brazil | 9.1 x |
| Japan | 2.5 x |
| All other countries | 5.1 x |
| All immigrants | 4.1 x |

# Impact of U.S. Immigration on Global Emissions

It is instructive to put the estimated output of immigrants into context. The estimated 637 million tons of $CO_2$ emissions generated by immigrants is roughly equal to the annual $CO_2$ emissions of Brazil, Argentina, and Venezuela combined (the three largest emitting countries in South America). It is also equal to the $CO_2$ emissions of Great Britain and Sweden together. If immigrants in the United States were a separate country, they would rank seventh in world $CO_2$ emissions, behind China, the United States, Russia, Japan, India, and Germany.

Of course, if immigrants had stayed in their home countries, they also would have produced greenhouse gases. If the current stock of immigrants in the United States had stayed in their countries of origin rather than migrating to the United States, their estimated annual $CO_2$ emissions would have been only 155 metric tons, assuming these immigrants had the average level of $CO_2$ emissions for a person living in their home countries. This is 482 million tons less than the estimated 637 tons they will produce in the United States. This 482 million ton increase represents the impact of immigration on global emissions. It is equal to approximately 5 percent of the increase in annual world-wide $CO_2$ emissions since 1980.[17] If the 482 million ton increase in global $CO_2$ emissions caused by immigration to the United States were a separate country, it would rank 10th in the world. Immigration to the United States thus

has significant implications for global greenhouse gas emissions. And it is the total output that matters to $CO_2$ concentrations in the atmosphere, because $CO_2$ emitted anywhere is dispersed everywhere.

It should be noted that Tables 3 and 4 are based on the assumption that immigrants in the United States would have emitted $CO_2$ at rates like the average person in their country of origin if they had remained there. However, in certain cases, particularly Asian countries, this assumption may understate immigrants' actual emission rates if they had stayed in their home countries because immigrants in the United States from several Asian countries are more educated than is the average person in their home countries. Higher education levels should result in higher incomes and higher $CO_2$ emissions in their home countries. This would mean that the immigrant-induced increase in global emissions would be lower than estimated above. However, there is a strong reason to believe that even if $CO_2$ emissions were higher for immigrants from these countries it would not significantly change the above estimates.

If we assume that immigrants from India would have produced three times the $CO_2$ emissions as the average person in that country and that those from China, the Philippines, and Vietnam would have doubled, it changes the underlying findings only slightly.[18] Even making this assumption of much higher emissions in their home countries would still mean that immigrants overall would produce 3.7 times as much $CO_2$ in the United States as they would have in their home countries. This is very similar to the 4.1-fold increase found in Table 4. It must be remembered that highly educated immigrants from Asia account for a modest share of all immigrants in this country. It also should be remembered that immigrants from the largest sending country, Mexico, have very similar education levels to the average person in that country. Moreover, even if their emissions were much higher in their home countries, their output would still be much less than in the United States.

Assuming no change in U.S. immigration policy, 30 million new legal and illegal immigrants are likely to settle in the United States in the next 20 years.[19] Primarily because of immigration (new immigrants plus their descendents), the U.S. population is projected to grow by more than 20 percent over this time period, or by at least 60 million.[20] Even if per capita $CO_2$ emissions could be reduced by 20 percent in the United States over the next 20 years, total annual U.S. $CO_2$ emissions would remain the same. Total emissions are what matters for the global environment. Efforts to reduce greenhouse gas emissions must include some understanding of how immigration and population growth contribute to greenhouse gas emissions.

## Conclusion

Overall, our findings indicate that the average immigrant (legal or illegal) in the United States produces somewhat less $CO_2$ than the average native-born American. However, immigrants in the United States produce about four times more $CO_2$ in the United States as they would have in their countries of origin. The estimated 637 metric tons of $CO_2$ U.S. immigrants produce is 482 million tons more than they would have produced had they remained in their home countries. This 482 million ton increase represents about 5 percent of the increase in annual world-wide $CO_2$ emissions since 1980. These figures do not include the impact of children born to immigrants in the United States. If they were included, the impact would be even higher.

When it comes to dealing with global warming, environmentalists in the United States have generally chosen to adopt what might be described as piecemeal efforts to oppose new sources of fossil fuel-based energy, such as the construction of new coal-fired power plants. They have also supported energy conservation/efficiency (e.g., compact fluorescent light bulbs) and more use of renewable sources like wind and solar energy. But they have assiduously avoided the underlying issue of growing energy demand driven by immigration-fueled population growth. In response to concerns over immigrant-induced population growth, some American environmentalists have even argued that it does not matter where on the Earth people live because the world's environment is so interconnected. This analysis has shown that when it comes to $CO_2$ emissions it matters a great deal where people live. Per capita $CO_2$ emissions are dramatically higher in the United States than in almost every immigrant-sending country. Large-scale immigration to the United States therefore has enormous implications for world-wide $CO_2$ emissions.

Some may be tempted to see this analysis as "blaming immigrants" for what are really America's failures. It is certainly reasonable to argue that Americans could do much more to reduce per capita emissions. And it is certainly not our intention to imply that immigrants are particularly responsible for global warming. As we report in this study, immigrants produce somewhat less $CO_2$ on average than native-born Americans. But to simply dismiss the large role that continuing high levels of immigration play in increasing U.S. and worldwide $CO_2$ emissions is not only intellectually dishonest, it is also counter-productive. One must acknowledge a

problem before a solution can be found. The effect of immigration is certainly not trivial. If immigrants in the United States were their own country, they would rank seventh in the world in annual $CO_2$ output, ahead of such countries as Canada, France, and Great Britain.

Unless there is a change in immigration policy, 30 million (legal and illegal) immigrants are likely to settle in the United States over the next 20 years. One can still argue for high levels of immigration for any number of reasons. However, one cannot make the argument for high immigration without at least understanding what it means for global efforts to reduce the emission of greenhouse gases.

Some involved in the global warming issue have recognized immigration's importance. Chief U.S. climate negotiator and special representative for the United States, Harlan Watson, has acknowledged high immigration to the United States is thwarting efforts to slow its rising GHG emissions. "It's simple arithmetic," said Watson. "If you look at mid-century, Europe will be at 1990 levels of population while ours will be nearing 60 percent above 1990 levels. So population does matter."[21] This research confirms Watson's observation.

# Endnotes

[1]  R. Beck, L. Kolankiewicz, and S.A. Camarota. 2003. *Outsmarting Smart Growth: Population Growth, Immigration, and the Problem of Sprawl.* Washington, DC: Center for Immigration Studies. Available at http://www.cis.org/articles/2003/sprawl.html.

[2]  Committee on the Science of Climate Change, National Research Council, National Academy of Sciences. 2001. *Climate Change Science: An Analysis of Some Key Questions.* National Academies Press: Washington, DC; Intergovernmental Panel on Climate Change (IPCC). 2007. *Climate Change 2007: The Physical Science Basis — Summary for Policymakers.* Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change. Cambridge University Press: Cambridge, UK.

[3]  Coal: Fred Freme, Energy Information Administration (EIA). 2007. *U.S. Coal Supply and Demand — 2006 Review.* April. Accessed online at: http://www.eia.doe.gov/cneaf/coal/page/special/feature.html;   Petroleum: EIA. 2007. *Petroleum Products Consumption.* Accessed online at: http://www.eia.doe.gov/neic/infosheets/petroleumproductsconsumption.html;   Natural gas: EIA. 2008. *Natural gas total consumption MMcf.* Accessed online at: http://tonto.eia.doe.gov/dnav/ng/hist/n9140us2A.htm.

[4]  Pilot projects to capture and sequester carbon dioxide — thus circumventing its release to the atmosphere — are now underway, but whether "carbon capture and sequestration" on a huge scale will ever prove technically feasible and economically viable is highly uncertain at this juncture.

[5]  Bloomberg News. 2007. "China overtakes U.S. in greenhouse gas emissions." *International Herald Tribune.* June 20. Accessed 3-19-08 online at: http://www.iht.com/articles/2007/06/20/business/emit.php .

[6]  U.S. Department of Energy, Energy Information Administration. 2007. *International Energy Annual 2005.* Table H1cco2: World Per Capita Carbon Dioxide Emissions from the Consumption and Flaring of Fossil Fuels, 1980-2005. Posted October 1, 2007. Accessed 2-5-08 online at: http://www.eia.doe.gov/pub/international/iealf/tableh1cco2.xls

[7]  For more discussion of this issue see L. Kolankiewicz. 2002. *Population Growth — The Neglected Dimension of America's Persistent Energy/Environmental Problems.* October. NumbersUSA Education and Research Foundation. Available online at http://www.numbersusa.com/about/books.html.

[8]  The Center for Immigration Studies projections are in *100 Million More: Projecting the Impact of Immigration On the U.S. Population, 2007 to 2060,* which can be found at: www.cis.org/articles/2007/back707.html. A recent Pew Hispanic Center report estimated that 82 percent of population growth between 2005 and 2050 will be from immigrants and their descendents. The report, *U.S. Population Projections: 2005-2050,* can be found at http://pewhispanic.org/files/reports/85.pdf. The last time the Census Bureau did population projections under different immigration scenarios was in 2000. Table F of the methodology section of that report shows the impact of different immigration scenarios on U.S. population size. See "Methodology and Assumptions for the Population Projections of the United States: 1999 to 2100": U.S. Census Bureau, Population Division Working Paper No. 38. Issued January 13, 2000.

Available at http://www.census.gov/population/www/projections/natproj.html.

9  S.A. Camarota. 2007. "Immigrants in the United States, 2007: A Profile of America's Foreign-Born Population." Washington, DC: Center for Immigration Studies *Backgrounder*. November.

10 Energy Information Administration. 2007. *International Energy Annual 2005*. Table H1cco2: World Per Capita Carbon Dioxide Emissions from the Consumption and Flaring of Fossil Fuels, 1980-2005. Posted October 1, 2007. Accessed 2-5-08 online at: http://www.eia.doe.gov/pub/international/iealf/tableh1cco2.xls.

11  U.S. Department of Energy, Energy Information Administration. 2008. *Emissions of Greenhouse Gases Report*. Report No.: DOE/EIA-0573(2006). http://www.eia.doe.gov/oiaf/1605/ggrpt/carbon.html, released November 28, 2007: "In the longer run, residential [carbon] emissions are affected by population growth and income;" Proceedings of the National Academy of Sciences. 2007. Vol. 104, No. 24. Published online May 22, 2007. http://www.pnas.org/cgi/content/full/104/24/10288: "Nearly constant or slightly increasing trends in the carbon intensity of energy [emissions/energy] have been recently observed in both developed and developing regions;" Panel on Policy Implications of Greenhouse Warming, National Academy of Sciences, National Academy of Engineering, Institute of Medicine, Committee on Science, Engineering, and Public Policy. 1992. *Policy Implications of Greenhouse Warming: Mitigation, Adaptation, and the Science Base*. National Academies Press: Washington, DC. From Appendix N, Population Growth and Greenhouse Gas Emissions: "Annual $CO_2$ emissions are calculated from population and income projections. It is assumed that $CO_2$ emissions increase proportionately with population for all income levels. For low income levels (i.e., multiples below five), it is assumed that $CO_2$ emissions additionally increase proportionately with per capita income growth. For higher incomes, $CO_2$ emissions increase less than proportionately with per capita income growth (i.e., at 0.8 for income multiples between five and 10, 0.7 for multiples between 10 and 30, and 0.6 for higher multiples)."

12  New Palgrave Dictionary of Economics, 2nd edition. Accessed May 1, 2008 at: http://www9.georgetown.edu/faculty/aml6/pdfs&zips/PalgraveEKC.pdf .

13  World Bank. 2007. *World Development Indicators 2007*. Table 1.1: Size of the economy. Accessed 02-04-08 online at http://www.siteresources.worldbank.org/DATASTATISTICS/RESOURCES/table1_1.pdf.

14  Includes all immigrants from other countries not specifically listed in the top-25 countries, broken down (and apportioned according to their relative frequency) by the following regions: Europe, South Asia, East-Southeast Asia, Middle East, Central America, Caribbean, South America, Sub-Saharan Africa, and Oceana.

15  The figures are from the March 2007 Current Population Survey collected by the U.S. Census Bureau. The numbers are for all persons from each country. The income figures are based on the total income of persons 18 and older. Most researchers think about 90 percent of illegal immigrants respond to the Survey. Thus the figures in the table represent the total income of immigrants and natives.

16  Based on the March 2007 Current Population Survey, which is the primary data source used in this study for immigrants, we estimate that the average annual income of illegal immigrants over age 18 was $17,497. We also estimate that the average annual income for legal immigrants 18 and older was $34,473. In effect, illegal immigrants account for 18 percent of the aggregate income earned by all immigrants and legal immigrants account for 82 percent of the aggregate income. For more discussion of the characteristics of the illegal immigrants see "Immigrants in the United States 2007: A Profile of America's Foreign-born Population," available at www.cis.org/articles/2007/back1007.html.

17  The March 2007 Current Population Survey shows that the vast majority of immigrants in the United States arrived in 1980 or later. Global $CO_2$ emissions from fuel consumption and flaring were 18,331 million metric tons in 1980. Global emissions in 2005 were 28,193 million metric tons. Thus, annual world output of $CO_2$ increased by 9,862 million metric tons during this quarter-century, or 54 percent. The estimated increase in immigrants' $CO_2$ emissions in the United States over what they would have been in their countries of origin is 482 million metric tons.

18  Iran is another country whose immigrants in the United States are much more educated than the average person in Iran. We do not adjust their assumed output for the following reason: Iran has relatively high per capita emissions for a developing country mainly

10

Center for Immigration Studies

because of the flaring of natural gas associated with its oil industry. However, much of the oil Iran produces is consumed outside of Iran. Thus the actual per capita output actually attributable to fossil fuel consumption by the people of Iran is less than is implied by their per capita numbers found in Tables 3 and 4. So it makes little sense to adjust their figures upward in the way we do India, China, Vietnam, and the Philippines. Of course, this means that immigration from Iran to the United States represents an even larger impact on worldwide $CO_2$ emissions because emissions caused by the consumption of the people of that country are actually lower than implied by the tables.

[19] In recent years the Current Population Survey and the American Community Survey, both collected by the Census Bureau, have indicated that about 1.5 million new immigrants settle in the country each year. There is some undercount in these surveys of recently arrived immigrants, and therefore it is more likely that 1.6 million new immigrants arrive each year. The Pew Hispanic Center assumes a 5.2 percent undercount in the overall immigrant population. This is based research by Passel, Van Hook, and Bean as part of a Census Bureau contract through Sabre Systems. But even assuming only 1.5 million new arrivals would still place the total number of new arrivals over 20 years at 30 million — 1.5 x 30. It is also worth noting that immigration to the United States, both legal and illegal, has been steadily increasing for 40 years. If that long-standing trend continues, then significantly more than 30 million new immigrants will arrive in the United States, assuming no change in policy.

[20] Projections by the Census Bureau, the Center for Immigration Studies, and the Pew Hispanic Center all show that the U.S. population grows by about 1 percent each year. Thus, over a 20 year period, population growth is very roughly 20 percent. The Center for Immigration Studies projections can be found at, www.cis.org/articles/2007/back707.html. The Pew Hispanic Center estimates can be found at: http://pewhispanic.org/files/reports/85.pdf. The Census projections can be found at: http://www.census.gov/ipc/www/usinterimproj/.

[21] Doyle, Allister. Aug 30, 2007. Reuters News Service. http://africa.reuters.com/wire/news/usnL30472039.html .

# ✖ Backgrounder

## Immigration to the United States and World-Wide Greenhouse Gas Emissions

### By Steven A. Camarota and Leon Kolankiewicz

The findings of this study indicate that future levels of immigration will have a significant impact on efforts to reduce global $CO_2$ emissions. Immigration to the United States significantly increases world-wide $CO_2$ emissions because it transfers population from lower-polluting parts of the world to the United States, which is a higher-polluting country. On average immigrants increase their emissions four-fold by coming to America.

Among the findings:

- The estimated $CO_2$ emissions of the average immigrant (legal or illegal) in the United States are 18 percent less than those of the average native-born American.

- However, immigrants in the United States produce an estimated four times more $CO_2$ in the United States as they would have in their countries of origin.

10-08

Center for Immigration Studies
1522 K Street, NW, Suite 820
Washington, DC 20005-1202
(202) 466-8185 • (202) 466-8076
center@cis.org • www.cis.org

NON-PROFIT
U.S. POSTAGE
PAID
PERMIT # 6117
WASHINGTON, DC

Center for Immigration Studies
1522 K Street, NW, Suite 820
Washington, DC 20005-1202
(202) 466-8185
center@cis.org
www.cis.org